UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

I/P ENGINE, INC.

               Plaintiff,

      v.

AOL, INC., *et al.*,

               Defendants.

Civil Action No. 2:11-cv-512

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF STEPHEN L. BECKER

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .........................................................................................................1

II.     FACTUAL BACKGROUND.......................................................................................6

III.    LEGAL STANDARDS ................................................................................................7

        A.      Admissibility of Expert Testimony...................................................................7

        B.      The Reasonable Royalty Analysis .....................................................................8

IV.     DR. BECKER RELIES ON THE WRONG DATE FOR THE HYPOTHETICAL
        NEGOTIATION ...........................................................................................................8

V.      DR. BECKER'S ANALYSIS IS PREMISED ON A GROSSLY OVERSTATED
        ROYALTY BASE........................................................................................................11

        A.      Dr. Becker Improperly Includes Worldwide Revenue in the Royalty Base ..........11

        B.      Dr. Becker Incorrectly Applies the Entire Market Value Rule to the
                Incremental Revenue for Smart Ads................................................................13

VI.     DR. BECKER ARTIFICIALLY INFLATES THE APPLICABLE ROYALTY
        RATE ...........................................................................................................................17

        A.      Dr. Becker Improperly Relies on Non-Comparable Licenses ..........................17

                1.      The Patented Technologies Are Not Even Close to Being
                        Comparable in Value ...........................................................................18

                2.      ██████████████████████████████████████s ..........19

                3.      The Overture Licensees Were Not Situated Comparably to Google..........21

        B.      Dr. Becker Selectively Ignores Every Real-World Transaction Involving
                the Patents in Suit..............................................................................................21

        C.      Dr. Becker's Application of a Running Royalty Is Wholly Unsupported..............23

VII.    CONCLUSION............................................................................................................27

## I.   INTRODUCTION

In his report, I/P Engine's damages expert, Dr. Stephen Becker, concludes that a reasonable royalty in this case is ▮▮▮▮▮▮▮▮▮▮ In order to arrive at this figure, Dr. Becker grossly inflates the alleged amount of damages by undertaking exactly the kind of analysis that the Court of Appeals for the Federal Circuit has repeatedly rejected as inherently unreliable and inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As the Federal Circuit has emphasized throughout its most recent line of cases on this issue, the reasonable royalty analysis must be based on sound economic principles and tied to the particular facts of the case, which Dr. Becker has altogether failed to do. Thus, Defendants respectfully request that the Court strike Dr. Becker's expert report and preclude him from testifying at trial about his inherently flawed damages theory.

- **Hypothetical Negotiation**

As an initial matter, Dr. Becker's damages opinion is fundamentally flawed because he relies on an incorrect date for the hypothetical negotiation. It is black letter patent law that the date of the hypothetical negotiation is the date that the first infringement began. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, -- F.3d --, 2012 WL 3758093, at *19 (Fed. Cir. Aug. 30, 2012). As the Federal Circuit recently confirmed, the correct determination of the hypothetical negotiation date is "essential for properly assessing damages" because it provides the overall framework for the reasonable royalty analysis. *Id.* at *18 (citation omitted).

Here, Dr. Becker relies on an incorrect hypothetical negotiation date in 2004. After Dr. Becker served his expert report, I/P Engine supplemented its infringement contentions, which support a date of first infringement only as of 2010. This disconnect between I/P Engine's allegations of infringement and the date of the hypothetical negotiation pervades virtually every aspect of Dr. Becker's reasonable royalty analysis, and renders his opinions wholly unreliable.

- **Royalty Base**

Dr. Becker completely overstates the applicable royalty base. He assumes that the royalty base in this case is the incremental increase in worldwide revenue for Google's accused "Smart Ads" system over its earlier advertisement serving systems. He includes in his calculations revenue starting in 2005 and continuing to the present.

But Dr. Becker's analysis includes revenue generated prior to the date of the first alleged infringement. Including revenue generated prior to the 2010 date is incorrect as a matter of law. I/P Engine is not entitled to damages based on revenue from non-accused (and therefore, admittedly non-infringing) activities.

Similarly, Dr. Becker includes revenue generated worldwide. But the remedies for alleged infringement of the asserted U.S. patents in this case must be based on activities occurring in the United States. Any extra-territorial activities are outside the scope of the U.S. patent grant, and as a matter of law, cannot infringe. Accordingly, revenue generated from activities outside the United States cannot be included in the applicable royalty base.

Finally, implicit in Dr. Becker's analysis is the assumption that <u>any</u> incremental increase in revenue from Google's Smart Ads system arises from the technology in the asserted patents. Dr. Becker attempts to apportion Google's advertising revenue by including only the incremental increase that he attributes to the use of Smart Ads and excluding revenue that he attributes to Google's earlier systems. But that is not enough. Dr. Becker assumes, without basis, that the entire market value of the improvements in the Smart Ads system arises from the patented technology. Yet, as Dr. Becker admits, the Smart Ads system includes numerous features and functionality that add economic value to the new system, but are not accused of infringement. Nevertheless, Dr. Becker includes the revenue generated by these nonaccused features in the royalty base. By including revenue generated from both patented and unpatented features, Dr.

Becker's attempt to apportion revenue is unavailing, and his analysis runs afoul of the Entire Market Value Rule.

In order for the Entire Market Value Rule to apply, the patentee must demonstrate that "the patent-related feature is the 'basis for customer demand.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301,1336 (Fed. Cir. 2009) (citations omitted). On the other hand, if multiple features of the accused system drive customer demand (as is the case here), the accused revenue must be apportioned between patented and unpatented features. *Uniloc*, 632 F.3d at 1318. Only that portion of the accused revenue that is attributable to demand for the patented technology may be used as the applicable royalty base. *Id.* Otherwise, the reasonable royalty analysis is premised on an artificially inflated base that does not reflect the economic contribution of the asserted patents to the accused system. *Id.* at 1320-21.

Dr. Becker does not even attempt to make the required showing necessary to apply the Entire Market Value Rule to the incremental increase in revenue for Smart Ads. Instead, he simply declares that the incremental increase in revenue is a "reasonable" royalty base without any factual basis to do so. Dr. Becker's conclusion is flatly inconsistent with his plain admissions during his deposition that the Smart Ads system includes a wide variety of features that have nothing to do with the patented technology. Accordingly, Dr. Becker's analysis is flawed from the outset because he cannot show that the revenue he sweeps into his supposedly "apportioned" royalty base is related in any way to demand for the technology in the asserted patents, as opposed to the numerous unaccused features of the Smart Ads system.

The royalty base determination is a threshold issue that renders Dr. Becker's entire analysis unreliable. The overinflated royalty base may not be cured after-the-fact by adjusting

the royalty rate down. *Uniloc*, 632 F.3d at 1319-20. It is not an issue that can be cured at trial through cross-examination. *Id.* at 1320. Instead, the incorrect royalty base infects the entire analysis and "cannot help but skew the damages horizon for the jury" by exposing them to calculations based on inflated revenue figures that are plainly disproportionate to the value of the patented technology. *Id.* For this reason, Dr. Becker should be precluded from testifying about his damages opinions at trial.

- **Royalty Rate**

Dr. Becker's analysis of the applicable royalty rate is a textbook example of what the Federal Circuit has said not to do in at least three of its most recent decisions. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010); *Lucent*, 580 F.3d at 1327-32; *LaserDynamics*, 2012 WL 3758093 at \*23. Dr. Becker relies on ██████ licenses that do not have any bearing on what a reasonable royalty would be for the asserted patents in this case. The licenses that Dr. Becker cites involve a completely unrelated patent – U.S. Patent No. 6,269,361 ("the '361 patent"). This patent is not at issue here. Indeed, it is not even owned by I/P Engine or its predecessor in interest, Lycos Inc. And none of the '361 patent licenses that Dr. Becker relies on involved Google or any of the other Defendants. Nevertheless, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ of Google's incremental revenue for the Smart Ads system.

At the same time, Dr. Becker excludes from his analysis actual transactions involving the asserted patents. ████████████████████████████████

████████████████████████████. Similarly, I/P Engine purchased eight U.S. patents (including the patents in suit) from Lycos in 2011 ████████████████

4

████. Yet, now, in the context of this litigation, Dr. Becker concludes that a mere license to the patents in suit would have been a running royalty costing Google ████████████ ████████████████████████████████████ and I/P Engine for rights to the asserted patents (in addition to six other patents), respectively.

This type of cherry picking of unrelated licenses in order to artificially inflate the royalty rate is exactly what the Federal Circuit has criticized as inherently unreliable because it is completely detached from the facts of the case. *ResQNet*, 594 F.3d at 870-72; *Lucent*, 580 F.3d at 1327-28. Indeed, in *ResQNet* (a case involving facts remarkably similar to this one), the Federal Circuit harshly criticized the patentee's damages expert for selectively relying on unrelated agreements in order to "drive the royalty rate up to unjustified double digit levels." *ResQNet*, 594 F.3d at 870. At the same time, the *ResQNet* expert excluded from his analysis two other agreements directed to the asserted patents, both of which involved much lower payments and revealed the inherent unreasonableness of the patentee's damages demand. *Id.* The Federal Circuit rejected the expert's testimony, explaining that the district court "must consider licenses that are commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id.* at 872.

But that is exactly what Dr. Becker has attempted to do here. By picking and choosing license agreements to unrelated patents that happen to have a high running royalty rate, Dr. Becker has detached his reasonable royalty analysis from any measure of economic value attributable to the patented technology. Thus, Dr. Becker's analysis of the applicable royalty rate is inherently unreliable, and he should be precluded from testifying at trial.

5

## II.   FACTUAL BACKGROUND

I/P Engine alleges that Google infringes two patents:  U.S. Patent No. 6,314,420, titled "Collaborative/Adaptive Search Engine" ("the '420 patent") and U.S. Patent No. 6,775,664, titled "Information Filter System and Method for Integrated Content-Based and Collaborative/ Adaptive Feedback Queries" ("the '664 patent").  According to I/P Engine, "the patented technology generally relates to using a combination of content-based data and collaborative feedback data in filtering items for relevance to a query from a user."  (*See* Declaration of Emily C. O'Brien in Support of Defendants' Motion to Exclude ("O'Brien Dec."), Ex. 1 (7/25/12 Expert Report of Stephen L. Becker, Ph.D.  ("Becker Rep.")), ¶ 43.)

I/P Engine alleges that certain aspects of Google's search advertising platforms, known as AdWords, AdSense for Search, and AdSense for Mobile Search (collectively "the accused products"), infringe the patents in suit.  The AdWords system provides advertisements that may appear alongside search results on Google.com.  AdSense for Search provides advertisements that may appear alongside search results for third-party websites, such as those operated by the other Defendants in this case.  AdSense for Mobile Search is similar to AdSense for Search, but for use on mobile website search results pages.

In 2004, Google released an upgrade to the AdWords system, known as the "Smart Ads Selection System" ("SmartASS" or "Smart Ads"). (O'Brien Dec., Ex. 1, ¶ 11(d).)  Smart Ads is used as part of the process of returning advertisements. █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



I/P Engine does not allege that every feature of the accused products infringes the patents in suit. Instead, I/P Engine only alleges that specific functionalities infringe relating to the use of

(D.N. 240-4 (Expert Report of Ophir Frieder on Infringement of U.S. Patent Nos. 6,314,420 and 6,775,664 ("Frieder Rep.")), ¶¶ 55-60.) It is undisputed, however, that several aspects of the Smart Ads system are not accused, and therefore, do not infringe the asserted patents. (*See, e.g.,* O'Brien Dec., Ex. 3 (Report of Defendants' Expert Lyle H. Ungar, Ph.D. Concerning Non-Infringement ("Ungar Non-Infringement Rep."), ¶¶ 79-83.)

(*See, e.g., id.,* Ex. 2, 15:7-14, 16:1-3, 29:23-30:11, 173:8-24, 176:1-4.)

## III.   LEGAL STANDARDS

### A.   Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702, *see also Daubert,* 509 U.S. at 589-92.

**B.      The Reasonable Royalty Analysis**

35 U.S.C. § 284 provides that, upon a finding of patent infringement, the patentee is entitled to damages "in no event less than a reasonable royalty." "The burden of proving damages falls on the patentee." *Lucent*, 580 F.3d at 1324.

One way to calculate a reasonable royalty is to consider a "hypothetical negotiation." The hypothetical negotiation attempts "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent*, 580 F.3d at 1324. "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.* at 1325. In other words, the hypothetical negotiation attempts to determine "[t]he amount that a licensor (such as the patentee) and a licensee (such as the accused infringer) would have agreed upon (at the time the alleged infringement began) if both had been reasonably and voluntarily trying to reach an agreement." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). For purposes of the hypothetical negotiation, the asserted patents are assumed to be valid and infringed. *Lucent*, 580 F.3d at 1325.

**IV.    DR. BECKER RELIES ON THE WRONG DATE FOR THE HYPOTHETICAL NEGOTIATION**

A reasonable royalty determination "must relate to the time infringement occurred, and not be an after-the-fact assessment." *LaserDynamics*, 2012 WL 3758093 at *19 (citation omitted). Because the hypothetical negotiation date provides a framework for all aspects of the reasonable royalty analysis, reliance on an incorrect date is reversible error. *Id.* at *18-20.

At his deposition, Dr. Becker testified that his opinion is based on the assumption that Google has been infringing I/P Engine's patents since the first quarter of 2004 – the date that Google first implemented the Smart Ads system. (O'Brien Dec., Ex. 1, ¶ 11(b), (d); Ex. 2,

8

132:21-133:8, 224:24-225:10.)  Based on that assumption, Dr. Becker's analysis is directed to a hypothetical negotiation between Lycos (the predecessor in interest to the asserted patents) and Google in 2004.  (*Id.*)  At his deposition, Dr. Becker testified that the 2004 date of the hypothetical negotiation was a "significant premise of [his] analysis."  (*Id.*, Ex. 2, 224:24-225:10.)  As Dr. Becker explained in his report, "[t]he timing of the hypothetical negotiation is important, as it defines the market conditions and circumstances of the parties as well as the facts and circumstances that inform the bargaining positions of the two sides."  (*Id.*, Ex. 1, ¶ 182.)

Dr. Becker's reliance on the 2004 alleged date of first infringement is wrong.  After Dr. Becker served his expert report on damages, I/P Engine changed its infringement contentions.  In an "Updated" infringement report, I/P Engine's technical expert, Dr. Frieder, contended that his infringement theory is based on Google's use of ███████████████████████ (O'Brien Dec., Ex. 4, Frieder Ex. 1, 7; Ex. 5, 303:14-305:12.)  ████████████████████

████████████████████████████████████████████

████████████████████████

Under I/P Engine's updated infringement contentions, the 2004 date that Dr. Becker relies on for the hypothetical negotiation is incorrect.  As a result, Dr. Becker's royalty base is dramatically overstated because it includes revenue from 2005-2010 that was generated by a version of the Smart Ads system that is not currently accused of infringement.  At a minimum, Dr. Becker should not be permitted to testify about his damages calculation that includes revenue generated prior to the first alleged infringement.

More than that, Dr. Becker's use of the incorrect date renders his reasonable royalty analysis based on the hypothetical negotiation completely unreliable.  One of the fundamental premises of his entire analysis is wrong.  In addition to the correct royalty base, the hypothetical

negotiation date also underlies Dr. Becker's consideration of the fifteen "*Georgia-Pacific* factors" that comprise the vast majority of the analysis underlying his reasonable royalty opinion. (*See* O'Brien Dec., Ex. 1, ¶¶ 68-191.) For example, approximately a year after the correct date of the hypothetical negotiation, Lycos sold eight U.S. Patents, including the patents in suit, to I/P Engine ▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*, ¶ 75.) In his analysis of *Georgia-Pacific* Factor 1, Dr. Becker attempts to distinguish this transaction by emphasizing the seven year period of time that would have elapsed between the incorrect hypothetical negotiation in 2004 and the 2011 date of this transaction. (*Id.*, ¶ 76.) But Dr. Becker's argument regarding the passage of time does not hold up in light of the correct hypothetical negotiation date in 2010.

Likewise, Dr. Becker's analysis of the other *Georgia-Pacific* factors is necessarily framed in terms of the date of the hypothetical negotiation. These factors include at least Factor 5 (the commercial relationship between the parties at the time of the hypothetical negotiation) (*id.*, ¶¶ 92-96); Factor 7 (the duration of the patent and the term of the license) (*id.*, ¶¶ 100-102); Factor 8 (the established profitability of the product made under the patent) (*id.*, ¶¶ 103-112); Factor 11 (the extent to which the infringer has made use of the invention) (*id.*, ¶¶ 113-138); and Factor 13 (the portion of the realizable profit that should be credited to the invention) (*id.*, ¶¶ 171-178). Indeed, Factor 15 incorporates the concept of the hypothetical negotiation explicitly, including the requirement that the negotiation occurs at the time the alleged infringement began. (*Id.*, ¶¶ 180-191.) Because Dr. Becker's entire reasonable royalty analysis is premised on a false assumption, he should be precluded from testifying at trial.[1]

---

[1] I/P Engine may argue that Google should not be permitted to make this argument regarding the hypothetical negotiation date because, according to Plaintiff, Google supposedly did not produce certain source code early enough. (*See* Dkt. Nos. 282-283.) Any such argument is without merit as the 2010 hypothetical negotiation date did not become an issue until Dr.

## V.    DR. BECKER'S ANALYSIS IS PREMISED ON A GROSSLY OVERSTATED ROYALTY BASE

Where a patentee seeks to measure its damages in the form of a running royalty, the patentee must demonstrate the appropriate "royalty base" against which the royalty rate is applied. The royalty base "represents the revenue generated by the infringement." *Whitserve v. Computer Packages, Inc.*, -- F.3d --, 2012 WL 3573845, at *11 (Fed. Cir. Aug. 7, 2012). As the Federal Circuit has repeatedly held, a damages opinion that relies on an unduly broad royalty base is unreliable and provides grounds for a new trial. *Uniloc*, 632 F.3d at 1315-23; *Lucent*, 580 F.3d at 1336-40.

### A.    Dr. Becker Improperly Includes Worldwide Revenue in the Royalty Base

A United States patent does not apply extra-territorially to prohibit use of the claimed invention abroad. *See* 35 U.S.C. § 271(a); *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1313 (Fed. Cir. 2005). Even Dr. Becker admits that the royalty base can be no larger than Google's United States revenue derived from the allegedly infringing products. (O'Brien Dec., Ex. 1, ¶ 57; Ex. 2, 104:2-5.) Thus, it is undisputed that I/P Engine's patents are limited territorially to the United States and cannot reach non-U.S. revenue. Dr. Becker has, however, included within the royalty base for each of these products Google's worldwide revenues. By doing so, Dr. Becker has grossly inflated the royalty base and I/P Engine's claimed damages.

Dr. Becker states that he derived his revenue figures from documents produced by Google and identified in interrogatory responses. (*Id.*, Ex. 1, 16 n.85.) The revenue figures that

---

Frieder's September 4, 2012 "Updated" Report. But regardless of the outcome of any pending discovery dispute, Dr. Becker's reliance on a hypothetical negotiation date in 2004 is legally incorrect in light of I/P Engine's earliest alleged date of first infringement in 2010 under its currently expressed theory. *LaserDynamics*, 2012 WL 3758093 at *18. Dr. Becker's opinion based on a wrong hypothetical negotiation date is therefore inadmissible under Fed. R. Evid. 702 and *Daubert*, and should be precluded.

Dr. Becker extracts from these documents, however, pertain in many instances to Google's worldwide revenue, not its U.S. revenue. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ (*Id.*, Ex. 1, SLB-6.) ██

████████████████████████████████████████

████████████████████████████████████████

███████████ *Id.*, Ex. 6, 24:19-23, 54:22-55:18, Deposition Ex. 2.)[2]

On August 29, 2012, following service of Dr. Becker's report, Google produced supplemental information on its U.S.-only revenue for these products during these time periods. These figures demonstrate that Dr. Becker's error inflates I/P Engine's claimed damages by approximately ████████ (O'Brien Dec., Ex. 7, ¶ 163, Ex. 9.) Thus, Dr. Becker should not be allowed to testify at trial regarding his inflated royalty base that includes worldwide revenue.

---

[2]  For AdWords, *compare* Becker Ex. SLB-6 *with* G-IPE-0867399-400; G-IPE-0218440; G-IPE-0218437-38. (*See, e.g.*, O'Brien Dec., Exs. 1, 8-10.) For AdSense for Search, *compare* Becker Ex. SLB-8 *with* G-IPE-0218437-38; G-IPE-0867397; G-IPE-0867398. (*Id.*, Exs. 1, 10-12.) I/P Engine may argue that Google did not produce certain U.S.-based revenue figures until after Dr. Becker's expert report was due. (*See* Dkt. Nos. 277-278.) But regardless of any objection to the timing of discovery, Dr. Becker's use of Google's worldwide revenues as the royalty base is legally incorrect and therefore inadmissible. More than that, Dr. Becker could have apportioned Google's worldwide revenues, but chose not to do so. For example, Dr. Becker could have apportioned by using the U.S. versus worldwide revenue information from ████ ███ as a guideline for U.S. revenues generated by AdWords, AdSense for Search, and AdSense for Mobile Search from ████████. Alternatively, Dr. Becker could have apportioned worldwide revenues based on information in Google's 10-Ks. Dr. Becker, however, did not make any attempt to apportion, but instead, merely assumed that all worldwide revenues were "U.S.-based revenues" for purposes of his analysis, despite clear evidence to the contrary.

12

**B.     Dr. Becker Incorrectly Applies the Entire Market Value Rule to the Incremental Revenue for Smart Ads**

The Entire Market Value Rule "allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc*, 632 F.3d at 1318 (quoting *Lucent*, 580 F.3d at 1336) (emphasis added). This rule is derived from Supreme Court precedent requiring that the patentee in every case must "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Uniloc*, 632 F.3d at 1318 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

"At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *ResQNet*, 594 F.3d at 869. "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet*, 594 F.3d at 869. Thus, to be admissible, expert testimony on a reasonable royalty must "carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet*, 594 F.3d at 869; *Uniloc*, 632 F.3d at 1317.

*Uniloc* explains "the danger of admitting consideration of the entire market value of the accused [product] where the patented component does not create the basis for customer demand." 632 F.3d at 1320. Once the patentee's damages expert is permitted to testify about an inflated revenue base not attributable to the patented technology, it is impossible for the defendant or the court to "put [the cat] back into the bag" after inflated revenue figures are presented to the jury, regardless of cross-examination or cautionary instructions from the court. *Id.* "The disclosure [of defendant's total revenues] cannot help but skew the damages horizon for

13

the jury, regardless of the contribution of the patented component to this revenue." *Id.* Dr. Becker's opinions regarding the applicable royalty base pose the same dangers as *Uniloc.*

Dr. Becker agrees that Google's advertising revenue is generated as a result of hundreds, if not thousands, of technologies that are not encompassed by the asserted patents and that the patented technology is not the basis for customer demand for the entirety of the accused systems. (O'Brien Dec., Ex. 1, ¶¶ 65-66, 171-178.) As such, Dr. Becker concedes that the Entire Market Value Rule does not apply in this case, and he agrees that the revenues for the accused systems must be "apportioned." *Id.* at ¶ 46 (citing *Uniloc,* 632 F.3d 1292). But Dr. Becker's supposed attempt to apportion revenues to obtain an appropriate royalty base is nevertheless flawed because he continues to include certain incremental revenue for admittedly unpatented features. Thus, despite his attempt to apportion, Dr. Becker's analysis runs squarely into the Entire Market Value Rule and violates the legal standards for reliability under *Uniloc.*

In his attempt to apportion revenues, Dr. Becker relies on a Google document from 2006 titled "Revenue Force June 26, 2006" and labeled as a "DRAFT" (the "Draft Revenue Force Presentation").

14



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████

Despite these plain admissions, Dr. Becker did not make any attempt to apportion the revenue base to exclude revenue related to the use of these non-infringing functionalities. (*See, e.g., id.,* 30:12-16; 175:19-176:13.) Instead, he included the entire amount of incremental revenue for Smart Ads in the royalty base. (*Id.*) Dr. Becker, therefore, agrees that the patented technology is not the sole driver of the value of Smart Ads, and I/P Engine is not entitled to recover damages based on the entire market value of that system. Yet, inexplicably, Dr. Becker has used all incremental revenue generated by the use of Smart Ads as his revenue base. That is incorrect as a matter of law. *Uniloc,* 632 F.3d at 1318-20.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Dr. Becker has therefore improperly included in his calculations these additional categories of revenue for features that are not related to the patents in suit and

are not accused of infringement. Thus, Dr. Becker's damages theory is premised on a legally flawed analysis of the royalty base and should be precluded.

## VI.    DR. BECKER ARTIFICIALLY INFLATES THE APPLICABLE ROYALTY RATE

The Federal Circuit "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet*, 594 F.3d at 869 (emphasis in original). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 2012 WL 3758093, at *23. A patentee attempting to rely on unrelated license agreements to support a reasonable royalty has "the burden to prove that the licenses were sufficiently comparable" to the agreement that would result from a hypothetical negotiation. *Lucent*, 580 F.3d at 1329, 1332.

As *ResQNet* explains, a damages expert may not use "licenses with no relationship to the claimed invention to drive the royalty rate up." *ResQNet*, 594 F.3d at 870. Instead, the licenses must be "commensurate with what the defendant has appropriated." *Id.* at 872. "If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id.*

### A.    Dr. Becker Improperly Relies on Non-Comparable Licenses

Dr. Becker's royalty rate opinion is largely dictated by his reliance on three licenses that do not involve the patents in suit and do not involve any of the parties in this case. (O'Brien Dec., Ex. 1, ¶¶ 142-155, 166-170, 184-185.) Those three agreements were all entered into by Overture Services, Inc. ("Overture"), who is not a party, to license a portfolio of patents that is not at issue here. Based on those agreements, Dr. Becker opines that, in the hypothetical negotiation, "███████████████████████████████████████████████

17

███████████████████████████████ (*Id.*, ¶¶ 184-185.) But Dr. Becker's

reliance on the Overture licenses is merely an attempt to artificially drive the royalty rate up.

The Overture licenses are in no way comparable to the agreement that would result from a

hypothetical negotiation in this case. As a matter of law, Dr. Becker's reasonable royalty

analysis based on non-comparable licenses is inherently unreliable and should be precluded.

### 1. The Patented Technologies Are Not Even Close to Being Comparable in Value

Dr. Becker fails to provide any justification for his assumption that the value of the '361

patent is comparable to the technology claimed in the asserted patents. Even patents directed to

similar technologies may enjoy vastly different licensing rates depending on numerous factors,

including the breadth of the claims and the ease with which the patent can be designed around.

Dr. Becker cites no evidence or authority whatsoever that the economic value conferred

by use of the '361 patent is comparable to that of the patents in suit. Indeed, the '361 patent is

widely considered a foundational patent in the field of pay-per-click search advertising.[3] News

reports have referred to it as a "crown jewel" and the "heart" of Yahoo's "revenue engine."[4] The

'361 patent covers the "basic paid-search bid-for-placement advertising model." *Id.* As such, the

---

[3] *See, e.g., Microsoft's Yahoo! Interest: Patently Paid Search*, WebPro News (July 9, 2008), *available at* http://www.webpronews.com/microsofts-yahoo-interest-patently-paid-search-2008-07 ("The paid search/bidding for placement technology patent known as '361, developed by the company that became Overture (later acquired by Yahoo), loomed out of the past. . . . Microsoft's proposed acquisition of Yahoo gives it control of that valuable patent.").

[4] Mohammad Talha, *Why Microsoft Really Wants Yahoo's Search*, *available at* http://cyberssystem.blogspot.com/2008/12/why-microsoft-really-wants-yahoos.html (describing the '361 patent as a "crown jewel"); Usman Latif, *What Microsoft Wants From Yahoo*, TechUser.net, *available at* http://techuser.net/microsoft-yahoo.html ("Also known as the '361 patent, it covered the basic paid-search bid-for-placement advertising model. The '361 patent effectively granted Overture the right to monopolize the lucrative US paid-search market and subsequently dictated the evolution of the global paid-search market. . . . Yahoo now effectively dictated what Microsoft could and could not do in the paid-search market. . . . Both companies' business models depended on having access to '361 patent . . . .").

18

'361 patent was considered a "key competitive barrier" to entry into the paid-search advertising market.[5]

Dr. Becker conceded at his deposition that "the '361 patent was sort of widely written about and a well-known patent . . . that people in the industry who were going to implement that type of system were going to need to deal with Overture." (O'Brien Dec., Ex. 2, 96:19-23.) When asked whether the patents in suit, by comparison, enjoyed "any industry recognition," Dr. Becker replied "No." (*Id.*, 97:7-10.) Even assuming, therefore, that the patents involve similar areas of technology, this does not establish that the license agreements are comparable. Indeed, the overwhelming evidence (and Dr. Becker's own admissions) confirm that the value of the patented technology in this case is far different.[6] Dr. Becker's reliance on the Overture licenses as allegedly "comparable," despite all evidence to the contrary, is merely an attempt to drive the royalty rate up in exactly the same way that the Federal Circuit has held is impermissible.

█ ███████████████████████████████████████

To support a reasonable royalty award, a license agreement must convey rights of comparable scope to the license that would result from the hypothetical negotiation. *See Trell v.*

---

[5]  Credit Suisse Equity Research, Overture Services, *The Leading Pay for Performance Search Provider* 17 (Apr. 8, 2002).

[6]  In support of his opinion regarding the comparability of the Overture patents, Dr. Becker relies exclusively on discussions with I/P Engine's technical expert, Dr. Frieder. (O'Brien Dec., Ex. 1, ¶ 142.) In his expert report, Dr. Frieder characterizes the technology of the asserted patents as relating to filtering for relevance. ██████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ (D.N. 240-4, ¶ 71 (emphasis added).) But Dr. Frieder in his deposition admitted that the '361 patent only related to bids, and did not "deal with filtering for relevance." (O'Brien Dec., Ex. 5, 285:8-16.) Thus, the sole basis for Dr. Becker's conclusion regarding the comparability of the Overture technology is completely undermined by Dr. Frieder's subsequent admissions at his deposition regarding the fundamental distinctions between the Overture patents and the I/P Engine patents in suit.

19

*Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990).  Where a license conveys the right to multiple patents, a damages expert must apportion the royalty rate in that agreement between the patents to be comparable to the license that would result from a hypothetical negotiation.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 694-95 (S.D.N.Y. 2011).

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.

(*See, e.g.*, O'Brien Dec., Ex. 14.)  The '361 patent, by itself, resulted in at least nineteen continuation patent applications and at least eight continuation patents, ████████████████████ ████████████████████.[7]  (*See, e.g., id.*, Ex. 15.) ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

Dr. Becker's report fails to make any allowance for the fact that the result of the hypothetical negotiation would be a license for the two U.S. patents that Google is accused of infringing, ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████.

---

[7] ████████████████████████████████████████████
███████████████████ (*See* O'Brien Dec., Ex. 1, 147, 150, 153.)

[8]  The '361 patent and its subsequent continuation applications had numerous foreign counterparts, including patents in South Africa (2001/09564), New Zealand (NZ515534), Mexico (MX PA01012340), Japan (2003-501729), Europe (EP1208500), Germany (DE20023291), China (CN102136121 & CN1378674), Canada (CA2375132), Brazil (BR0011035), and Australia (AU5171400 & AU769955).  (O'Brien Dec., Ex. 16.)

### 3.    The Overture Licensees Were Not Situated Comparably to Google

Dr. Becker has conceded that the licensees in the agreements he relied on – Marchex, Inc., ██████████████ , and Interchange Corp. – were all in radically different negotiating positions against Overture than Google would have been in a hypothetical negotiation with Lycos.  Yet, Dr. Becker did not account for these differences when he relied on the Overture agreements.  For example, Dr. Becker concedes ███████ , Interchange, and Marchex were "much smaller compan[ies]" than Google. (O'Brien Dec., Ex. 2, 85:5-21.)  Dr. Becker testified that Google's size would have made it "a more attractive licensee to Lycos than Marchex represented to Overture" and that this "would have given it an edge in the negotiation." (*Id.*, 94:2-6; *see also id.*, 94:14-17 (Google would also have been a more attractive licensee than ██████ .)  Dr. Becker further agreed that ██████ , Interchange, and Marchex were enjoying much slower growth than Google.  (*Id.*, 95:3-11.)  Indeed, Google was a global technology leader in the search business, unlike ██████ , Interchange, or Marchex.  (*Id.*, 118:15-119:1.)  Becker's failure to account for these differences in negotiating position further renders his opinion unreliable.

### B.    Dr. Becker Selectively Ignores Every Real-World Transaction Involving the Patents in Suit

Rights in the asserted patents have been traded in arms length transactions several times.  These historic, real-world transactions provide compelling evidence of the value that Google and Lycos would have placed on a license to the patents in suit.  *See Georgia-Pacific*, 318 F. Supp. at 1120.  Indeed, the Federal Circuit has found it "particularly troubling" when a plaintiff's damages expert eschews actual licenses to the patents in suit and instead relies on "extremely high rates" in unrelated licenses.  *ResQNet*, 594 F.3d at 870.  Here, there are ██████████ agreements that provide objective indications that Dr. Becker's ██████████ opinion vastly overstates the value of I/P Engine's patents. ████████████████████████████████████████████████

21



He is unable, however, to cite any authority that there must be evidence that a licensee practices the patent in suit for a license to be relevant to a reasonable royalty determination. Indeed, Dr. Becker admits that there is no evidence that any licensee to the Overture agreements actually practiced the '361 patent. (*See* O'Brien Dec., Ex. 2, 86:23-92:13.) Thus, Dr. Becker's own rationale for what licenses he relied on and which ones he rejected is completely inconsistent.

Further, the Federal Circuit has held that reliance on a real world license involving the asserted patents to settle litigation is appropriate where it is the most reliable evidence in the record. *ResQNet*, 594 F.3d at 872. Reliance on licenses to settle litigation may involve additional considerations that may affect the negotiated amount.

*See id.*

Second, Dr. Becker ignores the fact that Lycos sold the patents in suit, along with six other patents, to I/P Engine in 2011 ▮▮▮▮. (O'Brien Dec., Ex. 1, ¶¶ 75-76.) In 2011,

22

Lycos would have been well aware of Google's Smart Ads system, which was a matter of public knowledge, and any potential patent infringement claims it had based on the patents in suit.[9] Thus, Dr. Becker contends that Lycos sold a ████████ lawsuit against Google, along with six other patents, to I/P Engine for ███████████████. Yet, he inexplicably deems that data point irrelevant to his damages analysis.

Third, Dr. Becker ignores the fact that in 2004, Daum Communications bought Lycos, which owned the patents in suit at the time, for $95 million. (*Id.*, ¶ 25; Ex. 17, 117:13-15.) Thus, in the same year as the hypothetical negotiation, when Lycos held the rights to this alleged ███████████ lawsuit, all of Lycos, including the patents in suit and the right to sue Google, was █████████████████████ what Dr. Becker now contends is a reasonable royalty for a mere license to two of Lycos' patents. Dr. Becker's opinion is therefore wildly disproportionate to any real-world transactions for rights to the patents in suit.

## C.   Dr. Becker's Application of a Running Royalty Is Wholly Unsupported

Dr. Becker acknowledges that there are "two primary approaches to specifying a patent royalty: the lump-sum approach and the running royalty approach." (O'Brien Dec., Ex. 1, ¶ 54; *see also Lucent*, 580 F.3d at 1326.) In a running-royalty approach, "a licensee makes continuing, periodic payments based on the extent of use of the licensed patents." (O'Brien Dec., Ex. 1, ¶ 54.) In a lump-sum approach, the licensee makes a single payment "for a paid-up license to use the asserted patents." (*Id.* ¶ 55.) In paragraph fifty-six of his report, Dr. Becker states, "As discussed later in this report, it is my opinion that a running royalty is the appropriate structure to

---

[9]  *See, e.g.*, Cade Metz, *Google Behavioral Ad Targeter Is a Smart Ass*, The Register (Feb. 2, 2010) available atwww.theregister.co.uk/2010/0202/google_smartass_server/ (describing SmartAds); R. Minerva & T. Demaria, *There is a Broker in the Net . . . It's Name Is Google*, Int'l Conference on Intelligence in Service Delivery Networks (2007) (describing AdWords use of pCTR), *available at* http://www.icin.biz/files/programmes/Session1A-1.pdf.

be used in the determination of damages in this case." (*Id.* ¶ 56.) Nowhere in the remainder of his report, however, does Dr. Becker ever explain or justify his opinion that a running-royalty, and not a lump sum, is the appropriate form of payment. And Dr. Becker's conclusion cannot be reconciled with the actual licensing evidence.

The Federal Circuit's decision in *LaserDynamics* is instructive. In that case, the Federal Circuit held that it was error to admit the testimony of plaintiff's expert that a 6% running royalty was appropriate in part because "the licenses to the patents-in-suit were all for lump sum amounts not exceeding $1 million" and because a "6% running royalty theory cannot be reconciled with the actual licensing evidence, which is highly probative of . . . the form that a hypothetical agreement would likely have taken." *LaserDynamics*, 2012 WL 3758093 at *24. By ignoring the undisputed evidence that the hypothetical agreement in this case would be a lump sum, Dr. Becker makes the same error as the patentee's expert in *LaserDynamics*.

When asked at his deposition what evidence he had that Google and Lycos would have agreed on a running royalty, the only basis that Dr. Becker could identify was that, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (O'Brien Dec., Ex. 2, 121:20-122:7.) The fact that the parties might consider a running royalty during the hypothetical negotiation, however, does not even come close to justifying a conclusion that the actual result of the negotiation would be a running royalty. Indeed, all of the evidence is to the contrary.

Dr. Becker acknowledges that ▮▮▮▮▮

▮▮▮▮▮. (O'Brien Dec., Ex. 1, ¶ 70.) ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (*Id.*, ¶ 71.) Lycos also sold the patents-in-suit, along with six

others, to I/P Engine ████████████████████. (*Id.*, ¶ 75.)  And Lycos' General Counsel, Mr. Blais, confirmed at his deposition that Lycos never had a strong preference for a running royalty to license its patents.  (O'Brien Dec., Ex. 17, 57:17-22.)  Thus, Lycos would have been willing to license the asserted patents for a lump sum to Google, and Dr. Becker is ██████

████████████████████████████████████████

  ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████

Dr. Becker does not dispute any of this. ██████████████████████

████████████████████████████████████████

██████████████████████████████████

███████ (O'Brien Dec., Ex. 1, ¶ 185 n.244.) He then concedes that a lump-sum royalty "can provide some advantages, in particular for a licensee such as Google, such as ease of administration and protection of confidential business information that otherwise might need to be revealed to the licensor in periodic royalty reporting." (*Id.*)

Dr. Becker's explanation for disregarding the overwhelming evidence that Lycos and Google would have entered into a lump-sum royalty agreement, not a running royalty makes no sense. Dr. Becker states that despite all this evidence, he will assume that the hypothetical negotiation would have resulted in a running royalty merely because "the structure of the license . . . does not alter the economic value of the patented technology." (*Id.*) But it does not follow that the form of the license is immaterial to the amount of royalties that a licensee would pay to use that technology. *See Lucent Techs.*, 580 F.3d at 1326 ("Significant differences exist between a running royalty license and a lump-sum license."). The choice between a lump-sum royalty and a running royalty dramatically shifts the risks associated with deviations from the expected revenue that the licensee derives from use of the invention. *See id.* (explaining differences between lump-sum and running royalties). Should, for example, the licensee's use or revenue exceed the parties' expectations, the royalty payment from a running royalty agreement may be greater, sometimes much greater, than the lump-sum the parties would have otherwise agreed upon. Simply assuming that the hypothetical negotiation would have resulted in a running royalty, therefore, has the potential to dramatically increase damages.

An expert is not at liberty to simply assume, without basis, that the hypothetical negotiation would have resulted in a running royalty and not a lump-sum payment. *See LaserDynamics*, 2012 WL 3758093 at *14 ("LaserDynamics overlooks that a per-unit running royalty is not the only form of a reasonable royalty that the parties might have agreed to in a

26

hypothetical negotiation."). Dr. Becker's report fails to provide any basis to support his opinion that a running royalty is appropriate here, ████████████████████████████████. Under these facts, Dr. Becker's opinion regarding a running royalty is error as a matter of law. *See id.* at *24.

## VII. CONCLUSION

For the foregoing reasons, Dr. Becker's expert report should be stricken, and he should be precluded from testifying at trial regarding (1) any analysis that relies on an incorrect date for the hypothetical negotiation in 2004, (2) a royalty base that includes revenue prior to the first alleged infringement in 2010, (3) a royalty base that includes worldwide revenue, (4) a royalty base that is derived from the entire market value of the incremental revenue attributed to the accused Smart Ads system, (5) a royalty rate that is derived from non-comparable licenses to unrelated technology between parties that are not involved in this case, and (6) a running royalty framework for the hypothetical license that has no basis in the facts of this case or otherwise.

DATED: September 21, 2012

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624.3000
Facsimile: (757) 624.3169
senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation, IAC Search & Media, Inc., and Gannett Co., Inc.*

By: */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile:  (757) 624-3169

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile:  (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile:  (415) 653-6444

*Counsel for Defendant AOL Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC   20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA  23510
Telephone:  (757) 623-3000
Facsimile:  (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

  */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone:  (757) 624.3000
Facsimile:  (757) 624.3169
senoona@kaufcan.com

29