**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| I/P ENGINE, INC.,                 ) | |
|                  ) | |
|         Plaintiff,    ) | |
|                  ) | |
|      v.             ) | Civ. Action No. 2:11-cv-512 |
|                  ) | |
| AOL, INC. et al.,          ) | **REDACTED VERSION** |
|                  ) | |
|        Defendants.   ) | |
|                  ) | |

## PLAINTIFF I/P ENGINE, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF STEPHEN L. BECKER

Jeffrey K. Sherwood
(Virginia Bar No. 19222)
Frank C. Cimino, Jr.
Kenneth W. Brothers
Charles J. Monterio, Jr.
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
Telephone:    (202) 420-2200
Facsimile:    (202) 420-2201

Dawn Rudenko Albert
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Telephone:    (212) 277-6500
Facsimile:    (212) 277-6501

Donald C. Schultz (Virginia Bar No. 30531)
W. Ryan Snow (Virginia Bar No. 47423)
CRENSHAW, WARE & MARTIN PLC
150 West Main Street
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile:  (757) 623-5735


Counsel for Plaintiff I/P Engine, Inc.

DOCSNY-517885v6

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................2

I.     INTRODUCTION ...........................................................................................................1

II.    LEGAL STANDARD .....................................................................................................2

III.   ANALYSIS .....................................................................................................................3

      A.........Defendants' Argument that Dr. Becker Improperly Applied the Entire Market Value Rule Is a Red Herring .................................................................4

      B.........I/P Engine Accuses Defendants of Infringing the Patents-in-Suit Since 2004, Not 2010 as Alleged for the First Time in Defendants' *Daubert* Motion ...........................................................................................................9

      C.........The Revenue Numbers of the Royalty Base are Easily Adjusted Based On Any Subsequent Rulings of this Court .........................................................10

      D.........Dr. Becker Relies on the Most Comparable License Agreements Produced In this Case ...............................................................................11

      E.........Dr. Becker Considered All Produced Transactions in his Analysis, Relying Upon Those that were Properly Comparable for the Purposes of His Reasonable Royalty Determination ............................................................15

      F.........Dr. Becker's Application Of A Running Royalty is Supported by the Evidence in this Case ............................................................................16

IV.   CONCLUSION ..............................................................................................................18

DOCSNY-517885v6

## I.    INTRODUCTION

Defendants have failed to meet the *Daubert* threshold for excluding the opinions and testimony of I/P Engine's damages expert, Dr. Stephen Becker.  Defendants do not attack Dr. Becker's qualifications.  They do not attack his methodology.  Instead, they attack the weight that he gives to certain evidence over other evidence, mischaracterize his opinions, and misapply the relevant case law.  Every argument made by Defendants goes to the weight and characterizations of Dr. Becker's expert opinions, not to its reliability under *Daubert*.

Defendants claim that Dr. Becker is using the wrong hypothetical negotiation date. Based upon the infringement analysis of plaintiff's expert, Dr. Frieder, Dr. Becker selected 2004 for the date of the negotiation; Defendants' expert agreed.  In their motion, however, Defendants assert for the first time that the correct hypothetical negotiation date is 2010, contradicting their own expert's report.  Defendants' repudiation of their own expert's opinion is driven by Defendant's untimely disclosure of new source code after the close of discovery which, they assert, precludes infringement claims prior to 2010.[1]  This is an infringement issue, not a *Daubert* issue for a damages expert.

Defendants also argue that Dr. Becker overstates the royalty base by using the wrong revenues and by apportioning the revenue base incorrectly.  This argument is based upon Google's untimely disclosure, in the final days of discovery, of an entirely different set of revenue figures, after Google had provided different data in connection with a Rule 30(b)(6) deponent, in prior interrogatory responses, and a month after Dr. Becker served his expert report. Defendants' untimely disclosure of those new revenue data is the subject of I/P Engine's Second

---

[1] Defendants' disclosure of that evidence violated both the discovery deadlines and this Court's Rule 16(b) scheduling order.  I/P Engine has moved to preclude that evidence in its Third Motion for Sanctions. [Dkt No. 314.]

Motion for Sanctions.  [Dkt. No. 277.]  Google's failure to timely produce relevant discovery cannot serve as a basis to exclude Dr. Becker's analysis of the revenues that Google previously had sworn was accurate.  In any event, this is not a *Daubert* issue, but a matter of mathematics.  If the Court permits Defendants to use the untimely revenue data that Dr. Becker did not have access to when he prepared his report, then (as Dr. Becker testified), he will be able to conduct the math exercise and adjust the royalty base.  [Exh. 1 (Excerpt of Deposition Transcript of Stephen L. Becker, Ph.D., dated September 8, 2012 ("Becker Tr."), at 104:12-105:7).]

Defendants finally argue that Dr. Becker inflates the royalty rate by ignoring certain evidence, including license terms, other transactions, and other evidence that support Google's preference for a lump sum payment structure.  The admissibility of that evidence is the subject of two different motions *in limine*.  [Dkt. Nos. 314 and 333.]  These issues relate to factual disputes, differing analyses by experts, and the appropriate weight the jury should give to such evidence.  It is not a *Daubert* issue.  Defendants provide no legitimate basis to exclude or limit Dr. Becker's testimony or evidence.

Defendants do not contend that Dr. Becker is unqualified to provide expert testimony, nor do they contend that the reasonable royalty method and analysis that he uses is flawed or unreliable.  Because Defendants have failed to show why Dr. Becker's methodology is outside the scope of Fed. R. Evid. 702, Defendants' *Daubert* motion should be denied in its entirety.

## II.    LEGAL STANDARD

The courts are obligated to serve as gatekeepers where expert opinion evidence is offered to determine whether an expert witness is qualified and his or her opinion is grounded in objective underlying scientific methodology, as opposed to mere speculation or conjecture.  *VS Techs., LLC. v. Twitter, Inc.*, No. 2:11-cv-43, 2011 WL 4744572, *2 (E.D. Va. Oct. 5, 2011) (citing *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993)).

2

Expert testimony is admissible under Fed. R. Evid. 702 if it "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  "The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987) (internal citations omitted); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009) (Rader, J., sitting by designation) ("Reliance on hypothetical sales or estimated revenues is entirely permissible in connection with a reasonable royalty analysis."). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S.Ct. 2238 (2011); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, __F.3d__, 2012 WL 3636908, at *17 (Fed. Cir. Aug. 24, 2012) ("disputes about the degree of relevance or accuracy . . . go to the testimony's weight, but not its admissibility").  "A court need not determine whether the expert's testimony is correct, but should leave such conclusions to the jury after "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *VS Techs.*, 2011 WL 4744572 at *3; *see also East West, LLC v. Rahman*, No. 1:11-cv-1380, 2012 WL 4105128, at *5 (E.D. Va. Sept. 17, 2012) ("[t]he court need not determine that the expert testimony . . . is irrefutable or certainly correct").

## III.   ANALYSIS

Google does not dispute that Dr. Becker's reliance on a hypothetical negotiation and the *Georgia Pacific* factors comports with sound methodological standards, nor could it.  *See, e.g., Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (the Federal Circuit has "endorsed the conceptual framework of a hypothetical negotiation between

patentee and infringer as a means for determining a reasonable royalty"); *i4i*, 598 F.3d at 854

("We have consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific*

factors for estimating a reasonable royalty.").  Rather, Defendants' arguments go solely to the

weight of the evidence that Dr. Becker relied upon, and Defendants' disagreement with the fact

that he gave little or no weight to evidence that they think is more important.

Significantly, Defendants fail to even assert (much less explain) that they would not be

capable of challenging Dr. Becker's analysis or evidence at trial.  *See East West, LLC*, 2012 WL

4105128, at *5.  Neither do they assert that the jury would not be capable of appropriately

determining the weight that should be given to the experts' opinions and to the evidence that they

rely upon in support of their opinions.  *Id.*  The proper way to address Defendants' disagreements

with Dr. Becker's damages analysis is at trial through "[v]igorous cross-examination" and

"presentation of contrary evidence," which are the "traditional and appropriate means" of

attacking an expert's opinions.  *Daubert*, 509 U.S. at 596.

### A.    Defendants' Argument that Dr. Becker Improperly Applied the Entire Market Value Rule Is a Red Herring

Defendants appear to argue that Dr. Becker's analysis is improper because he did not

sub-apportion the revenue to the functionalities of a component of the Accused Products.

Defendants argue (at 2) that "Dr. Becker does not even attempt to make the required showing

that the Entire Market Value Rule applies to the *incremental* revenue figures here."  This is a red

herring.  The entire market value rule requires the patentee "give evidence tending to separate or

apportion the defendant's profits and the patentee's damages between the patented feature and

the unpatented features."  *LaserDynamics, Inc. v. Quanta Comp., Inc.*, ___ F. 3d ___, 2012 U.S.

App. LEXIS 18441, at *33 (Fed. Cir. Aug. 30, 2012).  That is exactly what Dr. Becker did.

Relying on Google's own documents, Dr. Becker has apportioned the incremental revenues that

4

Google received by using the infringing systems. Dr. Becker properly apportioned the overall revenue of the accused products (AdWords, AdSense For Search, and AdSense For Mobile Search) by apportioning only that incremental revenue attributable to the accused functionality in the accused products (SmartAds, Disabling and Promotion functionalities). [Exh. 3 (Excerpt of July 25, 2012 Expert Report of Stephen L. Becker, Ph.D ("Becker Rpt.") at ¶¶ 174-77, Exh. SLB-18).]

Defendants' real objections with Dr. Becker's apportionment opinion relate to the scope of infringement (massive), the impact and benefits of the patented inventions on the accused products (huge), and the accuracy of Dr. Becker's apportionment base. Defendants' argument that Dr. Becker's apportionment overstates the royalty base because it includes some unidentified impact on revenue of unpatented features (an argument I/P Engine rejects) raises a factual dispute, not a question of Dr. Becker's methodology. Thus, even accepting Defendants' argument at face value, this is a matter of the weight to be decided by the jury, not one of admissibility. *PACT XPP Techs. v. Xilinx, Inc.*, No. 2:07-cv-563, 2012 U.S. Dist. LEXIS 66436, at *8 (E.D. Tex. May 10, 2012) (holding that defendants' criticisms that expert's apportionment, which relied on defendants' customer surveys and internal reports, go more toward weight of evidence than admissibility). Notably, Defendants fail to cite even a single case to support their novel theory that the entire market value rule is violated by failing to sub-apportion revenue attributable to a feature of a system, as opposed to failing to apportion altogether.

Defendants provide two reasons why they believe that Dr. Becker's apportionment is inaccurate. Both go to the weight of the evidence, not its admissibility. Defendants first argue that Dr. Becker's apportionment is overstated because although I/P Engine alleges that the disabling and promotion functionalities used in the infringing SmartAds system are infringing,

5

DOCSNY-517885v6

the data that Dr. Becker relies upon to apportion revenue also includes revenue attributable to non-infringing functionality (i.e., "ranking" and "pricing"). [Dkt. No. 320 at 7, 16.] Unsurprisingly, I/P Engine disagrees with Defendants' position, particularly that the functionalities of SmartAds (a component of the Accused Products) may be separated out and apportioned as Defendants assert (something Defendants' damages expert has not attempted to do).[2]

But as Dr. Becker explained, he has not included 100% (or even 50%) of the profits from SmartAds in his revenue base. Dr. Becker's analysis establishes a reasonable royalty of 3.5% on the *apportioned incremental revenue* of the new, improved, and infringing SmartAds system. [Exh. 3 (Becker Rpt. at ¶ 190).] Dr. Becker relied upon substantial evidence from *Google's own documents* to establish and support his apportionment. [*Id*. (Becker Rpt. at ¶¶ 174-176, n. 235-239).] One such document is an internal Google document that includes a chart showing the

███████████████████████████████████████████████████████

████████████████████████████████████████ [*Id*. (Becker Rpt. at ¶¶ 174-175).] █████████████████████████████████████

████████████████████████████████ *Id*.[4]

---

[2] The evidence shows that █████████████████████████████ ███████████████████████ [Exh. 4 (Except of Expert Report of Ophir Frieder, dated July 25, 2012 ("Frieder Rpt.") at ¶¶ 46-47).] This accused functionality is a primary reason that SmartAds was created and how it is used. [Exh. 3 (Becker Rpt. at ¶ 131).]

[3] The title of the chart uses the acronym RPM, which refers to revenue per thousand queries. Defendants acknowledge tha███████████████████████████ ██████████████████████ [Dkt. No. 320 at 14.]

[4] Defendants' complaints that Dr. Becker's apportionment was unreliable is belied by the fact that they do not take a position on what the correct number would be, or point to any documents that show more reliable figures. Defendants' damages expert, Keith Ugone, admitted that in his report, he did not provide████████████████████████████ ██████████ [Exh. 5, Ugone Tr. at 218:3-19.] Any dispute about the accuracy (or

6

Defendants appear to demand precision in Dr. Becker's analysis. But apportionment is not an exact science, a determination of a damage "[i]s not an exact science, and the amount need not be proven with unerring precision." *Del Mar Avionics*, 836 F.2d at 1327. "Reliance on hypothetical sales or estimated revenues is entirely permissible in connection with a reasonable royalty analysis." *Cornell*, 609 F. Supp. 2d at 288. For this reason, "the Federal Circuit permits estimates in the damages context." *Id.* at 289-90 ("Similarly unavailing is Cornell's contention that it could not properly have relied on processor sales as a royalty base because the hypothetical processor royalty base was an estimate, rather than a firm calculation.").

The second reason that Google attacks Dr. Becker's reasoning is an unsupported assertion (at 16) that the Disabling and Promotion features identified in the Product Impact on RPM Chart that Dr. Becker relied upon for apportionment actually refers to unpatented, "non-Smart Ads related changes to Google's system." This argument is unsupported by any citations. There was no evidence that was produced during discovery to support this assertion. This argument was not made by Defendants' damages expert; in fact, Dr. Ugone admitted that he did not provide ██████████████████████████████████████████ ████████ [Exh. 5, (Excerpt of Sept. 14, 2012 Deposition of Keith R. Ugone, Ph.D. ("Ugone Tr.") at 218:3-19.] The only support for this brand-new assertion is a declaration from Google employee Nicholas Fox.[5] Mr. Fox states that the document referenced by Dr. Becker "is an example of one of the presentations that was created by the Revenue Force Group." [Exh. 6 (Declaration of Nicholas Fox in Support of Defendants' Motion to Exclude the Testimony of Stephen Becker (Sealed Version) ("Fox Dec.") at ¶ 4).] He purports to characterize what he

appropriateness) of Dr. Becker's apportionment based on this evidence goes to weight, not admissibility. *ActiveVideo Networks, Inc.,* 2012 WL 3636908, at *17.

[5] Because this declaration, and the evidence it purports to contain, was never disclosed during discovery, it should be stricken.

7

believes the chart covers, but other than saying "it is my understanding," he provides no basis to support his conclusions. [*Id.* at ¶ 5.] Significantly, in his deposition just one week ago, Google's damages expert, Dr. Ugone, testified that he asked Google about this document and was told by Google's counsel that "[t]here's no knowledge of the underlying data or the genesis of that data" and "I don't think anyone knows who the author is." [Exh. 5 (Ugone Tr. at 218-20).][6]

Continuing its pattern of violating the discovery schedule and Rule 16, only when it suits Google, after the close of discovery, Google suddenly not only knows the genesis of the document, but also what it relates to, which contradicts with what Google told its own expert, Dr. Ugone. This new information also is contrary to Dr. Ugone's position regarding this document as he disclosed it in his expert report. [Exh. 7 (Excerpt of Aug. 29, 2012 Rebuttal Expert Report of Keith R. Ugone, Ph.D ("Ugone Rpt.") ¶ 170) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮.]

Even if this was an appropriate argument, and was supported by admissible evidence, however, it goes to the weight of the evidence, not to its admissibility. In doing his analysis, Dr. Becker properly followed the law of the Federal Circuit apportioning the total revenue of the accused products to include only the incremental revenue from the accused components of those products. Defendants' argument relates to infringement and the interpretation of the claims, which are questions of fact for the jury. *See VS Techs*, 2011 WL 4744572, at *3 ("a court need not determine whether the expert's testimony is correct, but should leave such conclusions to the jury after vigorous cross-examination, presentation of contrary evidence, and a careful instruction on the burden of proof").

---

[6] His understanding was based on a series of questions to Google including "does anyone know who the author is, where the data came from." [Exh. 5 (Ugone Tr. at 219).]

8

**B.**    **I/P Engine Accuses Defendants of Infringing the Patents-in-Suit Since 2004, Not 2010 as Alleged for the First Time in Defendants' *Daubert* Motion**

Defendants claim that Dr. Becker used the wrong hypothetical negotiation date in his damages analysis. They say (for the first time) that the proper date should be in 2010, not 2004. The 2010 infringement date is based upon a brand-new, never previously disclosed non-infringement theory that Defendants argue for the first time in their *Daubert* Motion. The theory apparently is based upon previously concealed source code that, according to Google, shows that there could be no infringement prior to 2010.[7] I/P Engine continues to maintain that Google commenced its infringement in 2004, a date that Defendants' damages expert agreed was appropriate. This remains true even after Google untimely produced its new source code.[8]

Any dispute between the parties about when infringement began (which is what this issue really is) is not the proper subject matter of a motion to exclude testimony of a damages expert. The hypothetical negotiation requires a damages expert to accept as true a patentee's allegations that the asserted patent is valid and infringed. *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2010). Both parties' damages experts did this. Google's damages expert, Dr. Ugone, like Dr. Becker, identified 2004 as the proper hypothetical negotiation date—the date asserted by I/P Engine. [Exh. 7 (Ugone Rpt. at ¶¶ 63-64).] And like Dr. Becker, Dr. Ugone analyzed the *Georgia Pacific* factors using the 2004 date. This fact makes it even more evident that this argument is nothing but a distraction, particularly, after both experts have proceeded on

---

[7] This source code was produced by Google on September 14, 2012, after the close of fact and expert discovery, and in violation of the Rule 16 Scheduling Order. This untimely production is the focus of I/P Engine's Third Motion for Sanctions filed on September 21, 2012. [Dkt. No. 282.]

[8] I/P Engine does not agree with Google's characterization that the untimely source code precludes any infringement claim prior to 2010. The new source code relates to only one aspect of I/P Engine's infringement theory; I/P Engine has additional evidence of infringement that remains unaffected by the newly produced source code.

9

this basis and discovery has closed. Google cannot make an untimely disclosure, insist upon a brand-new analysis that is inconsistent with both sides' experts, then use the untimely evidence as proper grounds for a *Daubert* motion.

### C. The Revenue Numbers of the Royalty Base are Easily Adjusted Based On Any Subsequent Rulings of this Court

Defendants argue (at 11) that Dr. Becker relies on "[a] grossly overstated royalty base." Specifically, Defendants argue that Dr. Becker's royalty base includes worldwide revenues. Defendants' position is ironic given that **Dr. Becker's royalty base is calculated from the very documents that Google identified by interrogatory response as setting forth its U.S. revenue.** [Exh. 9 (Excerpt of Google Inc.'s Objections and Responses To I/P Engine Inc.'s Fourth Set of Interrogatories ("Original Interrogatory Response"), No. 15).]

In its July 19, 2012 interrogatory response, Google identified seven business records setting forth revenue for the accused systems. [*Id.*] Google's Rule 30(b)(6) designee previously had referenced those documents during his deposition, but had expressed some uncertainty about all of the revenues. [Exh. 2 (Excerpt from June 12, 2012 Deposition Transcript of Sanjay Datta at 86-101).] I/P Engine thus served an interrogatory seeking a definitive statement of Google's U.S. revenues. In response, Google identified the same documents referenced by its Rule 30(b)(6) designee. [Ex. 9 (Original Interrogatory Response at No. 15).] Dr. Becker properly relied on the veracity of this response to Interrogatory No. 15 in calculating his royalty base.[9] Not until August 29, 2012, over a month after I/P Engine served Dr. Becker's July 25, 2012 expert report on damages, three business days before the close of fact discovery, and the same

---

[9] In its brief (at 12), Google notes that its deponent testified that one particular business record was directed to worldwide revenue. It was in response to this testimony, as well as Google's document production the evening before Google's June 12, 2012, Rule 30(b)(6) deposition, that prompted I/P Engine to serve Interrogatory No. 15 on Google asking for its U.S. revenue.

10

day that Google served its rebuttal damages expert report, did Google disclose for the first time new revenue figures that it now claims show the correct U.S. revenue for the accused products. [Exh. 8 (Excerpt of Google's First Supplemental Response To I/P Engine's Fourth Set of Interrogatories, dated Aug. 29, 2012, No. 15).]  Dr. Ugone had the temerity to criticize Dr. Becker for not using this previously undisclosed revenue data in his calculations.  [Exh. 7 (Ugone Rpt. at ¶¶ 159-162).]  Defendants' untimely production of this data is the subject of I/P Engine's pending Second Motion for Sanctions filed on September 21, 2012.  [Dkt No. 277.]

If the Court rules in Defendants' favor to allow them to introduce the untimely revenue data that Google now claims is the "real" U.S. revenue, then as Dr. Becker testified, he will be able to adjust the royalty base. [Exh. 1 (Becker Tr. at 104:12-105:7).]  Dr. Becker could easily adjust his royalty base at no prejudice to Defendants.  At that point, this becomes an issue of mathematics.

### D. Dr. Becker Relies on the Most Comparable License Agreements Produced In this Case

In support of his *Georgia-Pacific* analysis, Dr. Becker cites three patent licenses in which different licensees, ███████████████████████████████████., were granted a patent license from Overture Services, Inc. to U.S. Patent No. 6,269,361 ("the '361 patent") (collectively, "the Overture Licenses").  [Exh. 3 (Becker Rpt. at ¶¶ 144-155).]  Dr. Becker concluded that these licenses concern related technology, were negotiated under similar circumstances as the hypothetical negotiation in this case, in non-litigation environments, around the relevant time period.  [*Id*. at ¶¶ 166-169.]

Defendants argue that these licenses should be precluded because they are not comparable.  Specifically, Defendants argue that these licenses (1) are not comparable in value; (2) cover an international portfolio of patents; and (3) the licensees were not comparably situated

11

to Google.  This is not a *Daubert* issue.  Even if true (which they are not), each of these issues

goes to the weight given the evidence, not to its admissibility.  But as set forth below, the

Overture Licenses are the most comparable licenses produced and considered in this case.

**(1) The Overture Licenses are Comparable in Technology, Economies, and Terms.**

The Overture Licenses are comparable for purposes of determining damages in a patent

infringement case.  To constitute a comparable license under these factors, a license must:

(1) Relate to similar technology.  *Lucent,* 580 F.3d at 1329.  If there is no association to

the technology at issue (here, internet search advertising), then the licenses are irrelevant and

must be excluded.  *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 870 (Fed. Cir. 2010)

("Notably, none of these licenses even mentioned the patents in suit or showed any other

discernible link to the claimed technology.").

(2) Be of similar relative value as the patented technology. *Lucent,* 580 F.3d at 1330.

"[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the

market place."  *ResQNet*, 594 F.3d at 869.

(3) Have been negotiated under comparable circumstances to the license being

negotiated in the hypothetical negotiation. *ResQNet*, 594 F.3d at 870.

**a.  The '361 patent relates to search advertising technology**

Unlike any other allegedly "comparable" license in this case, the '361 patent that was

licensed in the Overture License undisputedly relates to search advertising technology.  [Dkt. No.

320 at 18.]  As Defendants acknowledge, its use in the search advertising industry was well

documented.  [*Id*.]  In fact, ▮▮▮▮▮▮▮▮▮▮ both took a license to the '361 patent.  [Exh. 3

(Becker Rpt. at Exh. SLB-14-15).]  Further, I/P Engine's infringement expert, Dr. Frieder,

provided an opinion that the '361 patent concerned related technology to that of the patents in

12

suit.  [Exh. 4 (Frieder Rpt at ¶ 80).]  Dr. Becker relied upon Dr. Frieder's opinion.  [Exh. 3 (Becker Rpt. at ¶ 168).][10]

Also contrary to Defendants assertions, Dr. Becker does not measure the value of the patents in suit through the use of the Overture Licenses (as alleged by Defendants).  The value of the patented technology in Dr. Becker's approach comes from Google's use of it, and the testing and valuation of the improvements to its ad serving system when it implemented the patented technology.  *Lucent Techs.*, 580 F.3d at 1325 (citing to *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 32 F.3d 1541 (Fed. Cir. 1994), for the proposition that in determining a reasonable royalty, parties must consider the patented technologies "usefulness and commercial value as shown by its advantages over other things and by the extent of its use").  The Overture Licenses (being comparable in technology, economies and terms) are appropriately used by Dr. Becker to set the rate that Google should pay against the incremental value and benefit derived from using the infringing systems.

### b.  The Overture Licenses have Similar Economies and Terms

The Overture Licenses also have significant economic similarities to the hypothetical negotiation.  As presumed in the hypothetical negotiation, the Overture Licenses were arms-length negotiations in non-litigation environments.  [Exh. 3 (Becker Rpt. at ¶ 169).]  Each license was negotiated between Overture Services and an interested party for use of the patented '361 technology.  [*Id*. at ¶¶ 144, 148, 151.]  There was no pending litigation between the parties, and the licenses were not a result of settlement.  [*Id*. at ¶¶ 169.]

---

[10] Defendants' claim (at 17-19) that Dr. Becker cherry-picked licenses to support a higher, inflated rate, is untrue.  Dr. Becker has relied on the most technologically and economically comparable patent licenses of record in this case.  In fact, there were additional licenses to the '361 patent that Dr. Becker chose not to rely on which supported a rate as high as 5%.  [Exh. 3 (Becker Rpt. at Exh. SLB-15).]

13

The timing of the Overture Licenses also makes them highly relevant.  As Dr. Becker discusses in his report, the Overture Licenses were all executed in 2005, close to the 2004 hypothetical negotiation in this case.  [Exh. 3 (Becker Rpt. at ¶ 166 (chart)).][11]

That the '361 patent was a seminal patent does not automatically exclude licenses involving that patent as incomparable.  There is no dispute that the '361 patent was a pioneering event in the paid-search advertising market.  Defendants' argument neglects the fact that accepting I/P Engine's infringement allegations as true, as the damages experts in this case must, the patents in suit are *more valuable* than the '361 patent.  Here, the evidence indicates that between ▮▮▮▮▮▮ of Google's revenue is attributable to its use of the patented technology. [Exh. 3 (Becker Rpt. at ¶¶ 174-176).]

Dr. Becker relies on the Overture Licenses to set the royalty range as between ▮▮▮ ▮▮ .  Applying each of the *Georgia Pacific* factors to this range he adjusted the range based on the evidence and his experience to arrive at 3.5%.  Whether his adjustments and ultimate royalty rate is right or wrong is a question for the jury, not a *Daubert* motion.

### c.  The Overture Licenses Are Of Comparable Scope

Dr. Becker concluded that The Overture Licenses are of comparable scope to the license that would result from the hypothetical negotiations between Lycos and Google.  The running royalty is applied to the revenue base, it does not dictate the royalty rate.  That is a function of the perceived value and benefits to be derived from using the licensed technology.  Dr. Becker followed this analysis, developing a running royalty and applying it against the appropriately allocated royalty base.  [Exh. 3 (Becker Rpt. at ¶¶ 189-191).]

---

[11] *See* Section III(F), *infra*, for a discussion of the licenses offered by Defendants as supposedly "comparable."

14

DOCSNY-517885v6

In arguing that they are not, Defendants misconstrue how Dr. Becker used the Overture Licenses. The Overture Licenses say that the worldwide revenues are used solely for convenience. [*See, e.g.*, Exh. 10 at 4.2 ████████████████████████████ ████.] The grant in these licenses was for the U.S. patents and any foreign counterparts. [*See, e.g.*, *id.* at Article I, "Licensed Patents."] This is a general and very common provision in patent agreements. Dr. Becker took this into account in his analysis. [Exh. 3 (Becker Rpt. at ¶ 169).]

I/P Engine does not dispute that there are differences in size, success and negotiating power between Google and the Overture licensees. Google was much larger, more successful and a leader in internet search; ██████████████████████ were not. Dr. Becker accounted for these facts by making a downward adjustment in his analysis of *Georgia Pacific* Factor 5. [Exh. 3 (Becker Rpt at ¶ 187).] This adjustment accounts for Google's superior bargaining position and then-current success. But any dispute between the parties as to whether Dr. Becker sufficiently adjusted the rate, or gave appropriate weight to the Overture Licenses as opposed to other licenses, goes to the weight to be given to his opinions, not its admissibility.

**E.**     **Dr. Becker Considered All Produced Transactions in his Analysis, Relying Upon Those that were Properly Comparable for the Purposes of His Reasonable Royalty Determination**

Contrary to Defendants assertion, Dr. Becker considered each of the so-called "real-world transactions" cited in Defendants' motion. He gave them what he determined to be the appropriate weight in his analysis. [Exh. 3 (Becker Rpt. at ¶¶ 25, 71-76).] For the reasons cited in Dr. Becker's report, the transactions warranted very little weight in his damages determination. [*Id.* at ¶¶ 72, 76.] If Defendants believe otherwise, they can subject Dr. Becker to the "vigorous cross-examination" envisioned by the *Daubert* Court.

The transactions that Defendants rely on in their motion are the subject of two pending motions *in limine* filed by I/P Engine on September 21, 2012. [*See* Dkt. Nos. 315 and 331. If I/P

15

DOCSNY-517885v6

Engine's motions are denied, and the evidence of those other transactions is admitted, then Defendants can examine Dr. Becker on why he elected to give little weight to those other transactions in his reasonable royalty analysis.

**F.      Dr. Becker's Application Of A Running Royalty is Supported by the Evidence in this Case**

Contrary to Defendants' assertion, Dr. Becker's structuring of the hypothetical agreement as a running royalty is supported by the evidence in this case.  For example, he relies on the Overture Licenses, which as discussed above are the most comparable agreements produced in this matter.  *See supra* at Section III(D).  As another example, Dr. Becker also relies on the testimony of Mark Blais, who testified that Lycos had a preference for a running royalty as constant revenue source.  [Exh. 11 (Excerpt of the July 31, 2012 Deposition of Mark Blais ("Blais Tr.") at 57:2-16).]  The fact that Google believes that other evidence exists to rebut or weaken Dr. Becker's reliance on such evidence regarding this issue, goes to the weight that the jury may give this evidence, not to its admissibility.

Defendants argue that Google's alleged preference for a lump sum should rule the day (or the structure).  According to Google, because it produced several lump sum agreements, under *LaserDynamics*, those agreements must dictate the payment structure.[12]  But *LaserDynamics* requires the licenses that the parties are relying upon to be comparable.  *See LaserDynamics*, 2012 U.S. App. LEXIS 18441, at *24.  In *LaserDynamics*, the plaintiff ignored the many license agreements relating to the asserted patents, relying on a number of non-comparable licenses that the Court reasoned had "no purpose other than to 'increase the reasonable royalty rate above

---

[12] These admittedly non-comparable licenses are the subject of a Motion *in Limine* filed by I/P Engine on September 21, 2012.  [*See* Dkt. No. 334 (Public Version).]

16

rates more clearly linked to the economic demand for the claimed technology.'" *Id.* Defendants are attempting to do exactly the reverse.

Dr. Ugone relies on nine license agreements, eight of which he ███████████ ████████ agreements under *Georgia Pacific* and *LaserDynamics*. [Exh. 5 (Ugone Tr. at 49:20-50:7; 178:8/11; 181:1-6).] All were executed after the date of the hypothetical negotiation. [Exh. 7 (Ugone Rpt. at ¶ 124).] Neither Dr. Ugone nor Defendants attempt to show how any of these licenses or purchase agreements are linked in any way to the economic demand for the claimed technology. Yet, they rely on them (and fault Dr. Becker for not relying on them) as evidence that the parties would have taken a minimal lump sum during the hypothetical negotiation relating to the patents in suit.

Equally unavailing is Defendants argument that Lycos would have been willing to accept a lump sum structure in 2004. The ████ settlement and the Lycos purchase agreements are each "directed to a vastly different situation than the hypothetical licensing scenario of the present case." *Lucent,* 580 F.3d at 1328. Defendants have selected these agreements to "'~~increase~~ [decrease] the reasonable royalty rate ~~above~~ [below] rates more clearly linked to the economic demand for the claimed technology.'" *LaserDynamics*, 2012 U.S. App. LEXIS 18441, at *24. Perversely, Defendants' present motion stands *LaserDynamics* on its head. Just as those agreements were excluded in *LaserDynamics,* so should Defendants be precluded from relying on them here.

That Dr. Becker did not agree to Google's characterization that "the undisputed evidence that the hypothetical negation in this case would be a lump sum" does not make his analysis unreliable. [Dkt. No. 320 at 24.] But again, this is not a *Daubert* issue. Defendants can cross-

17

examine Dr. Becker on why he elected to give little weight to those non-comparable lump sum agreements in his reasonable royalty analysis.

## IV.    CONCLUSION

For the foregoing reasons, Dr. Becker's expert report and expected testimony in this case satisfies the requirements of Federal Rule of Evidence 702 as well as the Supreme Court's directive in *Daubert*.  Accordingly, Defendants' motion to exclude the testimony of Dr. Becker should be denied in its entirety.

Dated: September 27, 2012

By:  /s/  Jeffrey K. Sherwood
Donald C. Schultz (Virginia Bar No. 30531)
W. Ryan Snow (Virginia Bar No. 47423)
CRENSHAW, WARE & MARTIN PLC
150 West Main Street
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile:  (757) 623-5735

Jeffrey K. Sherwood (Virginia Bar No. 19222)
Frank C. Cimino, Jr.
Kenneth W. Brothers
Charles J. Monterio, Jr.
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
Telephone:    (202) 420-2200
Facsimile:    (202) 420-2201

Dawn Rudenko Albert
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Telephone:    (212) 277-6500
Facsimile:    (212) 277-6501

Counsel for Plaintiff I/P Engine, Inc.

18

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2012, the foregoing

**PLAINTIFF I/P ENGINE, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS'**

**MOTION TO EXCLUDE THE TESTIMONY OF STEPHEN L. BECKER,** was served via

the Court's CM/ECF system, on the following:

Stephen Edward Noona
Kaufman & Canoles, P.C.
150 W Main St
Suite 2100
Norfolk, VA 23510
senoona@kaufcan.com

David Bilsker
David Perlson
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

Robert L. Burns
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
robert.burns@finnegan.com

Cortney S. Alexander
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
cortney.alexander@finnegan.com

/s/ Jeffrey K. Sherwood

19

DOCSNY-517885v6