**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| I/P ENGINE, INC. | |
| Plaintiff, | |
| v. | Civil Action No. 2:11-cv-512 |
| AOL, INC., *et al.*, | |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff's Opposition fails to rebut the points raised in Defendants' Motion for Summary Judgment and confirms why summary judgment is appropriate. First, Plaintiff's Opposition confirms that the accused products do not filter the alleged combined information as required by the '664 patent. Plaintiff also fails to substantively rebut that ██████████████████ ████████████████████ Plaintiff also fails to show that the accused products filter based on information from users with similar interests or needs, instead advancing an interpretation of this limitation that renders it meaningless. Plaintiff also continues to fail to identify any genuine issue of material fact as to indirect infringement.

As for anticipation, Defendants' Opening Brief and Plaintiff's Opposition Brief show a consistent pattern – Defendants rely on the text from the prior art references, while Plaintiff relies on Dr. Carbonell's opinions. Yet Plaintiff cannot ward off summary judgment merely by proffering expert testimony that contradicts what the references plainly say. *Advanced Materials v. Praxair*, 228 Fed. Appx. 983, 985 (Fed. Cir. 2007) ("where a prior art reference plainly discloses a claim limitation, the court may recognize and apply that teaching on summary judgment."); *PharmaStem Therapeutics v. ViaCell*, 491 F.3d 1342, 1361 (Fed. Cir. 2007) (ruling JMOL of obviousness should have been granted, despite expert testimony to the contrary, where the expert testimony "cannot be reconciled . . . with the prior art references themselves.")

Finally, Plaintiff fails to rebut that, due to the six-plus year delay in filing suit, a presumption of laches applies. Yet Plaintiff's Opposition provides no valid evidence rebutting either prong of the laches presumption. Therefore, summary judgment of laches is appropriate.

## I.   THE ACCUSED PRODUCTS DO NOT "FILTER" COMBINED INFORMATION AS REQUIRED BY THE '664 PATENT.

Plaintiff acknowledges that both asserted independent claims of the '664 patent, claims 1 and 26, "require that the system 'filter *the combined information* for relevance to at least one of

the query and the first user.'" (Opp., 22 (emph. added).)  Plaintiff suggests that Defendants

argue that Plaintiff failed to identify the "combined information" required by these claims.  (*Id.*)

This is not Defendants' argument.  Plaintiff has identified the "combined information" it alleges

meets this element.  As articulated by Plaintiff's expert, Plaintiff contends the combined

information is ███ (D.N. 240-30, 263:5-8 ("Q. So the combined information is the ███A.

The ███represents the combined information.").)

Defendants' <u>actual</u> argument is that Plaintiff's identified "combined information," ███

is not "filtered" as required by the claims. (D.N. 238, § III.B.)  And this is undisputed.  Plaintiff

does not contend that its identified "combined information," ███is filtered as required by the

claims.  Rather, Plaintiff admits that it is <u>not</u> the supposed "combined information," ███that

is filtered, but rather (in its view) an *ad* that is filtered.  Indeed, Plaintiff explicitly states that the

accused systems ███████████████████████

███████████████ (Opp., 22 (emph. added).)  As there

is no dispute that AdWords does not filter ███ the alleged "combined information," as

required by the claims, summary judgment that Defendants do not infringe the '664 patent

should be granted on this basis alone.

## II. THE ACCUSED PRODUCTS DO NOT USE THE HISTORICAL CTR OF AN AD TO SERVE ADS.

As to historical CTR, Plaintiff again misstates Defendants' argument.  Defendants do not

contend that the asserted claims require tracking and using historical CTR for a specific ad.

(Opp., 14.)  <u>Plaintiff</u> has repeatedly alleged that the accused products meet the "[collaborative]

feedback" limitations in the claims because "CTR is collaborative feedback data." (D.N. 238,

§ I.A.)  There can be no genuine issue of material fact ███████████████

███████████and summary judgment on this issue is appropriate.

2

**A.     Plaintiff Fails to Rebut the Clear Testimony of its Own Infringement Expert** ████████████████████████████████████████

As detailed in Defendants' motion, Dr. Frieder repeatedly testified at his deposition that

the ████████████████████████████████████████████████ (D.N. 238,

§ I.B.) Plaintiff ignores nearly all of these statements. Plaintiff does purport to address one of

them, arguing that Defendants' citation is incomplete because Dr. Frieder states █████████

████████████████████████████████████████████████

███████████████████████ Thus, Plaintiff's cited testimony

fails to undo Dr. Frieder's admissions.

Further, Plaintiff's citation is incomplete. Dr. Frieder made clear on further questioning

(in a portion of his testimony cited by Defendants but ignored by Plaintiff), █████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

Dr. Frieder also testified explicitly that he is no longer asserting that historical CTR is the

collaborative feedback data. (*Id.*, 222:12-16 ("Q. But for purposes of AdWords, you're not

saying that the – the CTR is collaborative data? A. No. I'm not saying the CTR. I'm saying the

████████████ are indeed."); 221:4-222:18.)  Plaintiff ignores this too.

Instead, Plaintiff cites back to the statements in Dr. Frieder's expert report that he

disavowed at his deposition. But unlike his deposition testimony, Dr. Frieder's report was not

signed under penalty of perjury. *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) ("The

substance of this report was not sworn to by the alleged expert" and so "the purported expert's

report is not competent to be considered on a motion for summary judgment."). Even had Dr.

3

Frieder submitted a declaration, a party may not create an issue of fact through a sham declaration that contradicts sworn testimony. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."); *Modern Fence Techs., Inc. v. Qualipac Home Imp. Corp.*, 726 F. Supp. 2d 975, 984 (E.D. Wis. 2010) (striking declarations which were "sham affidavits" that contradicted prior deposition testimony and were submitted to defeat summary judgment).

**B.**   **Plaintiff Continues to Fail to Identify Any Evidence from the Source Code to Support its Accusation that the Accused Products Track Historical CTR**

Although not addressed in its Argument, Plaintiff earlier points to ██████████████ ████████████████████████████████████████████████████ ████████████████████████████ (Opp., 6.) Initially, Plaintiff has never pointed to this ████████ before, whether in Dr. Frieder's "Updated" report or otherwise.  Plaintiff cannot rely on it now. Fed. R. Civ. P. 26(a)(2), 37(c)(1); *O2 Micro Int'l v. Monolithic Power Sys.*, 467 F.3d 1355, 1368-69 (Fed. Cir. 2006) (affirming refusal to consider new infringement theory absent from plaintiff's infringement contentions and raised for the first time in plaintiff's summary judgment papers).  Dr. Frieder even testified at his deposition he was not aware of any ██████████████████████████ (Sohn Dec., Ex. 34, 23:15-20 ("Q. Sitting here today, are you aware of ██████████████████ ████████████ A. Sitting here today, I'm not aware of any."); 21:24-23:20.)

In all events, ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ For example, a search for "New Zealand

Vacation" returns many ads that share the first line

"New Zealand Vacation." (highlighting added.)

Because Plaintiff has failed to offer any

evidence from an authoritative source, whether it

be Google's source code or the engineers who

designed the system, Plaintiff has not met its

burden of showing that the accused product uses

CTR to serve ads.

### C.   Plaintiff Fails to Rebut Its Improper Reliance on Marketing Documents

Rather than focus on the source code, the testimony of engineers working on the accused

products, or the testimony of its own expert, Plaintiff argues that its support for its position is

"overwhelming" based on non-technical marketing or other high level documents. Unlike the

source code, however, the marketing documents do not actually control how the accused

products function.[1]  A finding of infringement cannot be based on a "high level feel" of how the

accused products work or "how things roughly work." *Phillips Petroleum Co. v. Huntsman

Polymers Corp.*, 157 F.3d 866, 877 (Fed. Cir. 1998) (affirming summary judgment that accused

products did not meet the claimed "block copolymer" limitation when Plaintiff merely pointed to

some "product literature" that used this term to describe the products); *Whirlpool Corp. v. LG

Elecs., Inc.*, 2006 WL 2035215, at *8 (W.D. Mich. July 18, 2006) (granting summary judgment

---

[1]  Plaintiff also cites to the testimony of Chris Bakewell from the *Bright Response* case as purported support for its CTR theory. (Opp., 18, 19.) Plaintiff omits, however, that Dr. Bakewell was Google's <u>damages</u> expert, not its technical expert, in that case.

noting "[i]t is the [product], not the marketing materials, that are the subject of the infringement accusation. The marketing materials cannot override the actual operation of the [product].")

Plaintiff points to testimony that supposedly shows it is appropriate to rely on these marketing documents, including citations to the testimony of Google's Rule 30(b)(6) designee Jonathan Alferness. (Opp., 7 n.3, 17-18.) But as Mr. Alferness testified, in the marketing documents "what's being described here is not a true mathematical formula as it would relate to how the ad system operates" and "not a technically accurate description of how Quality Score is computed." (D.N. 329-8, 102:7-12.) Rather, as even the quotations Plaintiff chose to cite show, they are meant to give a high level feel to non-technical customers. (*See* Opp., 17.) This is precisely the type of non-technical material that courts find inappropriate to support an infringement theory. Thus, summary judgment that the accused products do not track historical CTR of an ad – a requisite part of Plaintiff's theory for each asserted claim – should be granted.[2]

## III.   THE ACCUSED PRODUCTS DO NOT GROUP USERS WITH SIMILAR INTERESTS OR NEEDS

### A.   Plaintiff Seeks to Make "Collaborative Feedback" Meaningless.

As the Court found, "collaborative feedback data," must be "data from users with similar interests or needs." (D.N. 212, 4.) Plaintiff's theory that the "collaborative feedback data" element can be met by looking at whether people have clicked on an ad in response to the same query should be rejected because it renders the requirement of "collaborative feedback" meaningless. For example, claims 10(c) and 10(d) of the '420 patent recite:

---

[2] Plaintiff attempts to backtrack from its CTR theory, arguing that Dr. Frieder also asserted other theories. (Opp., 15-16.) But as detailed in Defendants' Opening Brief, having consistently asserted that historical CTR of an ad is the [collaborative] feedback required by the claims, Plaintiff should not be able to introduce new theories to avoid summary judgment, either on the issue of whether Smart Ads uses historical CTR of an ad or otherwise.

(c) a feedback system for receiving <u>collaborative feedback</u> data from system users relative to informons considered by such users;

(d) the filter system combining <u>pertaining feedback data from the feedback system</u> with the content profile data in filtering each informon for <u>relevance to the query</u>"

Thus, the claim takes the "collaborative feedback data" and then filters that data for relevance to the query. Under Plaintiff's theory, however, the collaborative feedback data already comes from users who have clicked on ads in response to that same query; a determination that the alleged "informon," the ad, was relevant to the query would thus <u>already</u> have been made as part of the feedback step. This is made clear by Plaintiff's "Buy Washington Nationals baseball jersey" example. (Opp., 20. ) If the similar interests or needs could be met merely by looking at users who clicked on an ad in response to a "Buy Washington Nationals baseball jersey query," there would already have been a determination that the clicked on ad was relevant to that query, making later filtering for "relevance to the query" as the claim requires superfluous.[3] *Nikken USA, Inc. v. Robinsons-May, Inc.*, 51 Fed. Appx. 874, 883-884 (Fed. Cir. 2002) (rejecting claim construction which was so broad that it would render another claim limitation meaningless). Therefore, Plaintiff's position that the "similar interests or needs" requirement can be met simply by considering actions from users who entered the same query is incorrect and should be rejected.[4] (*Id.*)

---

[3]   Plaintiff does not directly rebut Defendants' "jaguars" example (D.N. 238, 15), other than to conclude it is "faulty." (Opp., 20 n.7.)

[4]   That Plaintiff's interpretation makes no sense is further shown by the specification which discloses breaking users into distributed groups called "mind pools" where users have similar interests and further breaking users down into sub-mind pools, sub-sub-mind pools, etc. (D.N. 240-1, 20:1-23.) If a system just used data from users who ran a same or similar query, there would be no need for any subsets of the original mind pool  For example, the specification states that "the set of users who find the same articles about 'gardening' by author A to be interesting but nevertheless found other articles by author A on 'gardening' to be uninteresting

**B.     Plaintiff Fails to Raise a Genuine Issue of Material Fact, Even as to Its Improper Interpretation of Similar Interests or Needs.**

Even if Plaintiff were correct that filtering based on users who ran the same or similar query was filtering based on collaborative feedback, Plaintiff has failed to offer any evidence to support its assertion that Google separates data based on users who ran the same or similar query. (D.N. 238, 15.) The only evidence quoted by Plaintiff points, instead, to the opposite. For example, Plaintiff states that "[b]y allowing users to vote with their clicks, we have millions of people that are helping us to decide which ads are best for each search query." (Opp., 19.) But this does not show that Smart Ads tracks users who run the same or similar query. In fact, as Defendants pointed out in their motion but Plaintiff again ignores, Dr. Frieder admitted that the accused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (D.N. 240-30, 93:7-94:1; D.N. 239, ¶ 9.) Thus, even if it were true that all users who enter the same query have "similar interests or needs" (which, as Defendants demonstrated above and in its opening brief, it is not), Plaintiff has not and cannot show that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

**C.     Plaintiff Again Admits that the '664 Patent Requires Collaborative Feedback**

For the '664 patent, Plaintiff concedes, yet again, that it requires collaborative feedback data. In its Opposition, Plaintiff explains "I/P Engine occasionally has stated that both patents relate to filtering using collaborative feedback data among other things. This is because the '664 claim language ('information found to be relevant to the query by other users') refers to a type of

_____

may be joined in one subset." (D.N. 240-1, 20:19-23.) The patent separates out users by their interests, *i.e.*, whether the user liked all of author A's books, not whether the user had previously run a search for author A. Thus, data from "users with similar interests or needs" cannot just be data from "users who have enter[ed] the same or similar query."

collaborative feedback." (Opp., 21 fn. 8)  If the '664 patent refers to the use of a type of

collaborative feedback, it necessarily requires collaborative feedback.  Thus, by Plaintiff's own

admission, to show infringement of the '664 patent, Plaintiff must at minimum show that the

accused products receive collaborative feedback data.  As detailed above and in Defendants'

Opening Brief, Plaintiff cannot do so.  Accordingly, summary judgment that the accused

products do not infringe the '664 patent is appropriate.

IV.   **PLAINTIFF HAS FAILED TO RAISE A GENUINE ISSUE OF MATERIAL
      FACT AS TO INDIRECT INFRINGEMENT**

      Plaintiff fails to raise a genuine issue of material fact regarding indirect infringement in

its Opposition  Initially, Plaintiff has still failed to point to any separate incidence of inducement

or contributory infringement.[5]  (D.N. 238, 18.)  Rather, the purported indirect infringement that

Plaintiff points at is the same as Plaintiff's claims for direct infringement.

      Plaintiff also continues to ignore the case law regarding the requisite knowledge for

indirect infringement, which Defendants explained in the Opening Brief.  (D.N. 238, 19.)  In

*Global-Tech Appliances, Inc. v. SEB S.A.*, the Supreme Court explained that for contributory

infringement, the Plaintiff needs to prove that the Defendants "know that the combination for

which his component was especially designed was both patented and infringing."  131 S. Ct.

2060, 2067 (2011).  Similarly, inducement "requires knowledge that the induced acts constitute

patent infringement."[6]  *Id.* at 2068.  Nevertheless, Plaintiff has failed to provide any evidence, as

opposed to its unsupported conclusory statements, that Defendants knew their actions would

---

[5]  While Plaintiff claims that Defendants "wholly ignored" Dr. Frieder's statement
regarding indirect infringement (Opp., 23), Defendants quoted this same language in their brief,
noting that it was merely conclusory and provided no actual evidence.  (D.N. 238, 19.)

[6]  *Lucent*, cited by Plaintiff, applies a now outdated, pre-*Global-Tech*, standard that did
not explicitly require that Defendants know that the act they were inducing constituted patent
infringement.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009).

infringe the Asserted Patents.  Plaintiff, instead, only chooses to try and provide evidence that

two of the Defendants knew of the *existence* of the Asserted Patents, which is insufficient as a

matter of law.  Summary judgment of no indirect infringement is therefore appropriate.

## V.     BOWMAN ANTICIPATES ALL ASSERTED CLAIMS

The Court must resolve only three issues to decide whether Bowman anticipates all

asserted claims.  These issues are whether Bowman (1) uses content analysis; (2) "filters"

information; and (3) "searches" for information.  Plaintiff's arguments on each point fail.

### A.     Bowman Employs Content Analysis[7]

As detailed in Defendants' Motion, the content analysis in Bowman is taught by claim

29, which recites "adjusting the ranking value produced for each item identified in the query

result to reflect the number of terms specified by the query that are matched by the item."  This

"matching" process analyzes how many query terms are contained in the item's content.  The

more terms match, the higher the item score.  Indeed, Bowman uses the word "matched" to

explicitly refer to content analysis – *e.g.*, seeing how many query terms are "matched" or

contained within the title of a book.  (D.N. 240-2, 1:32-38.)

Nonetheless, Plaintiff argues that summary judgment should be denied because Dr.

Carbonell's Report asserts that "matching" does not compare a query term to the item's content,

but instead determines whether the item is associated with the query term in Bowman's rating

table – meaning that the item was selected at least once in response to a prior query containing

that term.  (Opp., 27.)  If Dr. Carbonell's interpretation of claim 29's "matching" technique were

---

[7]  Plaintiff makes identical arguments for both Asserted Patents as to why Bowman and
Culliss do not filter or use content analysis.  Thus, Defendants' responses address the Asserted
Patents together.

plausible, then this might be enough to defeat summary judgment. But Dr. Carbonell's interpretation is not plausible, and cannot be correct, as it would render claim 29 meaningless.

Claim 29 depends from claim 28, and the score that a query result item receives in claim 28 is based on how often the item was selected in response to prior queries containing "each" of the terms in the current query. (D.N. 240-2, claim 28[c]). As Dr. Carbonell admitted at his deposition, if an item is returned in response to the query "lightweight running shoes," the item's "claim 28 score" would be generated by seeing how often the item had been selected in response to prior queries containing "lightweight," "running," and "shoes." (Sohn Dec., Ex. 35, 138:10-139:15.) Claim 29 then requires adjusting this score to reflect the number of query terms that are "matched" by the item. Dr. Carbonell's interpretation of "matched," which merely asks if an item is associated with a query term in the rating table, would render claim 29 meaningless. This is because every item with a "claim 28 score" is already associated with every query term in Bowman's rating table; it cannot have a "claim 28 score" without having been selected at least once by a prior query containing each of the terms in the current query.

To use the "lightweight running shoes" example from Dr. Carbonell's deposition, every item with a claim 28 score must be associated with "lightweight," "running," and "shoes" in the rating table because its claim 28 score is based on how often it was selected by prior queries containing all three of those terms. (138:10-139:15.) So if Dr. Carbonell's interpretation of "matching" were correct, it would be impossible to adjust an item's score based on how many of the query terms it "matches" (as required by claim 29) because every item necessarily would be matched with every query term. As Dr. Carbonell's interpretation would render claim 29 meaningless and inoperable, Dr. Carbonell's interpretation cannot be correct.

11

The <u>only</u> alleged support for Dr. Carbonell's interpretation are two identical passages from Bowman that refer to scoring items "in accordance with collective and individual user behavior, rather than in accordance with attributes of the items." (Opp., 26-27 (quoting D.N. 240-2, 2:64-66; 4:42-45).)  Plaintiff argues that these passages "teach away" from content analysis, and therefore claim 29's "matching" concept must not require content analysis. (*Id.*) This argument is legally flawed, since the question of whether a reference "teaches away" is relevant only for obviousness and has no relevance for anticipation. *Celeritas Tech., Ltd. v. Rockwell Intern. Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) ("the question of whether a reference 'teaches away' from the invention is inapplicable to an anticipation analysis.")

In any event, neither passage cited by Plaintiff describes claim 29's "matching" concept or mentions "matching" at all.  Given that fifty-one of Bowman's fifty-three claims rely solely on user feedback without applying the "matching" technique of claim 29,[8] it is unsurprising that much of the Bowman specification (including the passages cited by Plaintiff) describes the feedback-only embodiments.  But Bowman's specification explicitly uses the word "matching" to refer to content analysis (1:32-38, 1:43-45), and Dr. Carbonell's "content-free" interpretation of claim 29's matching technique is inconsistent with the way "matching" is used and would render claim 29 meaningless.  Accordingly, the only plausible conclusion is that the claim 29 "matching" technique <u>does</u> use content analysis.

**B.     Bowman "Filters" Information**

There is no dispute that Bowman teaches "subsetting the items in the query result <u>to</u> <u>include only those items above a threshold ranking value</u>." (D.N. 240-2, 9:60-62 (emph. added).)  In other words, Bowman excludes items that fall below a threshold and retains items

---

[8]   The only exceptions are claim 29 itself and claim 23.

12

that exceed the threshold.  No reasonable fact finder could hold that excluding items which fall below a threshold is not "filtering" those items, and Plaintiff's arguments cannot demonstrate otherwise.

Plaintiff first argues that "a filter process [] would evaluate each item independent of the others to determine if it would pass through the filter." (Opp., 28.)  Yet Bowman discloses precisely this concept.  By setting a numerical threshold and excluding items that don't meet the threshold, Bowman determines whether each item, independently of the others, has scored highly enough to be retained or must be excluded.  Bowman also states that the threshold can be "predetermined" (D.N. 240-2, claim 15), and thus can be set independently of whatever scores the items happen to receive.

Plaintiff next argues that "retaining a subset of a ranked list," as taught by Bowman, cannot be "filtering." (Opp., 28.)  But Dr. Carbonell himself refuted this position at his deposition, stating that "filtering" is a process where a set of items "is divided into two sets, one of which is the filtered or accepted set, one of which is the rejected or filtered out set." (Sohn Dec., Ex. 35, 84:10-17.)  Thus, when Bowman excludes a subset of results that fall below a threshold, this is "filtering" under Dr. Carbonell's own formulation.

C.     **Bowman "Searches" for Information**

The disclosure of "searching" in Bowman is readily apparent.  Claim 28 of Bowman discloses "rank[ing] items in a search result" by receiving a query and generating a list of items satisfying the query.  Moreover, Dr. Carbonell himself called Bowman an "ad-hoc search" reference and "a popularity based search engine." (D.N. 240-19, ¶¶ 156, 167.)  Thus, no reasonable fact-finder could find that Bowman does not disclose "searching for information."

Nevertheless, Plaintiff argues that "Bowman cannot disclose searching for information relevant to a query," (Opp., 30), pointing to Dr. Carbonell's Report as its only support.   But Dr. Carbonell clarified at deposition that he only disputes whether Bowman meets the "searching for information" element "to the extent that it requires content-based analysis." (*See* Sohn Dec., Ex. 35, 153:3-14.) And the "searching for information" element (the first element of '664 claims 1 and 26) by its plain terms does <u>not</u> require the "search" to be conducted through content analysis or any other particular means.   Rather, the "content-based filter" element of these claims only appears in <u>later</u> claim steps.   (D.N. 240-24, claims 1[c], 26[c].)   Accordingly, there can be no genuine dispute that Bowman meets the "searching" element.

## VI.   <u>CULLISS ANTICIPATES ALL ASSERTED CLAIMS</u>

Plaintiff raises the same three supposed issues with Culliss as it does with Bowman. Here too, Plaintiff's arguments fail to rebut the plain language of the reference.

### A.   **Culliss Employs Content Analysis**

As explained in Defendants' Opening Brief, Culliss sets articles' initial key term scores based on <u>content</u> analysis and then adjusts these scores based on user feedback, so that the scores ultimately reflect a combination of content and feedback.   (D.N. 238, 31-32.) <u>Plaintiff's Opposition Brief does not dispute this fact.</u>   Instead, Plaintiff just states that the content analysis in Culliss sets the initial scores and the subsequent adjustments to these scores are based on feedback.   (Opp., 33.)   This is a red herring, which does not rebut the fact that Culliss' content analysis is one factor that determines an article's ultimate key term score.   Indeed, Dr. Carbonell confirmed at deposition what Defendants argued in their Opening Brief – namely, that Culliss's key term scores are based on a combination of content and feedback data even in the stylized example of Culliss's system set forth in Dr. Carbonell's Report.   (Sohn Dec., Ex. 35, 51:16-

52:12.)

**B.     Culliss Discloses Filtering**

Defendants explained that Culliss filters articles by giving them ranking scores and displaying them in ranked order. (D.N. 238, 32-33.) In response, Plaintiff argues that presenting articles in ranked order is not "filtering" because "filtering" must be an exclusionary process of determining which items are eligible to be displayed at all. (Opp., 31-32.)

Even if one accepted Plaintiff's position for purposes of this Motion, Culliss also discloses the type of "exclusionary" filtering that Plaintiff now contends is required. Specifically, Culliss discloses that its articles' key terms can include "rating" key terms like X-rated, G-rated, etc. (*See* D.N. 240-3, 11:8-12:41.) Like the other key term scores, the rating key term scores can be initially set by content analysis (14:23-25) and then altered based on user feedback. (11:47-51.) And these rating key term scores can be used to filter the articles – for example, articles with an X-rated key term score above a certain threshold will be filtered out and not displayed to G-rated searchers. (11:66-12:5.)

Thus, in this "rating" embodiment, Culliss discloses filtering even under the theory from Plaintiff's Opposition Brief. Culliss also states that the rating embodiment can be integrated with the more traditional Culliss embodiments, so that Culliss's articles would receive a variety of key terms, one of which is the rating key term used for filtering. (D.N. 240-3, 11:39-41 ("The invention, operating separately or in addition to the manner described above, would permit or require the user to enter a rating key term in the search query.") (emph. added).) Dr. Carbonell agreed that the rating embodiment can be integrated with the other Culliss teachings in the workings of Culliss's system. (Sohn Dec., Ex. 35, 88:12-89:1, 91:3-9.) Thus, when one

15

considers the teachings of Culliss' rating embodiment, Culliss "filters" even under the narrower

new view of "filtering" espoused in Plaintiff's Opposition Brief.

### C.   Culliss "Searches" for Information

Culliss discloses accepting a search query from a user and returning articles that are

associated with the matched key terms from the query. (D.N. 240-3, 4:10-19.)  Indeed, Dr.

Carbonell himself calls Culliss an "ad hoc search" reference. (D.N. 240-19, ¶ 156.)

Plaintiff's cursory argument that Culliss "does not disclose searching for information,"

which again merely points to Dr. Carbonell's report, fails. (Opp., 34.)  As he did with Bowman,

Dr. Carbonell clarified at deposition that he only disputes whether Culliss meets the "searching

for information" element "to the extent that that is interpreted to mean that that is a content-based

search." (Sohn Dec., Ex. 35, 118:21-119:9.)  As explained above, the "searching for

information" element is not limited to content-only searching.  But even if it was, Culliss's

searching can be conducted "in any conceivable manner." (D.N. 240-3, 4:13-15 ("The search

engine then identifies in any conceivable manner the articles which are associated with the

matched key terms.") (emph. added).)  Thus, Culliss clearly embraces content-based searching.

### VII.   SUMMARY JUDGMENT OF LACHES IS APPROPRIATE.

### A.   Defendants Are Entitled to a Presumption of Laches

As detailed in Defendants' Motion, Plaintiff and its predecessors-in-interest had

constructive knowledge of Google's alleged infringement no later than July 2005, when Google

published a blog post about Quality Score that matches almost word for word the infringement

allegations in Plaintiff's Complaint. *Compare* D.N. 240-10 ("The Quality Score is simply a new

name for the predicted CTR, which is determined based on the CTR of your keyword, the

relevance of your ad text, the historical keyword performance, and other relevancy factors") *with*

Complaint, ¶ 43 ("Google's search advertising systems filter advertisements by using 'Quality

Score' which is a combination of an advertisement's content relevance to a search query . . . and click-through-rates from prior users relative to that advertisement").

Plaintiff argues that this blog post did not provide constructive notice of Google's alleged infringement because it did not show whether "Google was practicing every element of every asserted claim of both of the patents in suit." (Opp., 36.) But Plaintiff cites no cases holding that a publication must disclose every element of every asserted claim in order to give a plaintiff constructive notice of the alleged infringement. To the contrary, "publication . . . of a product similar to or embodying technology similar to the patented invention" is sufficient for constructive notice. *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) (emph. added). Here, Plaintiff's Complaint alleged infringement based on the same supposed facts contained in the blog post – namely, Google's use of a "Quality Score" that allegedly includes both click-through rate and ad text relevance. Thus, based on Plaintiff's own statements in its Complaint, the disclosures in the blog post are at least "similar to" the claimed invention under Plaintiff's reading of the claims. And because the blog post mirrors the infringement allegations from Plaintiff's Complaint, Plaintiff's Complaint could have been filed as early as July 2005.

Plaintiff next argues that "Defendants never showed that Lycos knew how the Google system operated." (*Id.*) Yet Lycos' actual knowledge is irrelevant. And while Lycos's status as a Google partner might not have given Lycos insider knowledge of how Google's system operates, it at least underscores how Lycos should have considered whether Google's public disclosures of this system implicated the Asserted Patents. After all, Plaintiff was able to rely on these public disclosures to allege infringement in 2011. If that was sufficient for Plaintiff in 2011, there is no reason why it would not have been sufficient for Lycos in 2005.

Plaintiff next argues that Defendants should be equitably estopped from relying on this

17

public blog post to show constructive notice because Google has stated that publicly-facing statements are not a technically accurate description of how Google's system actually operates. (*Id.*, 37.) Defendants are not saying that Plaintiff should have known how Google's system actually works from these public statements. Defendants are merely pointing out that, if the public statements Plaintiff pointed to were a sufficient basis for Plaintiff to file suit in 2011, the nearly identical public statements from July 2005 would have provided the same alleged basis.

**B.   Plaintiff Has Not Rebutted the Laches Presumption**

   1.   Plaintiff Has Not Rebutted the "Unreasonable Delay" Prong of Laches

Plaintiff argues that Lycos' 6-plus year delay was not "unreasonable" because Lycos was suing other parties over related patents during the delay period and could not "sell" the Asserted Patents while this litigation was ongoing. (Opp., 38-39.) Whether Lycos could have sold the Asserted Patents during the period of delay is irrelevant. The relevant question is whether there was any impediment to Lycos asserting these Patents against Defendants during the delay period. *A.C. Auckerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032-33 (Fed. Cir. 1992) (en banc). Clearly there was no impediment to Lycos asserting its patents, as shown by the very fact that Lycos asserted related patents against other parties during the delay period.

Contrary to Plaintiff's argument, Lycos's other litigation provides no excuse for its delay in suing Defendants over the Asserted Patents. While other litigation over the patent-in-suit can sometimes excuse a plaintiff's delay for purposes of laches, other litigation over different patents cannot do so, even if the patents are related. *Humanscale Corp. v. CompX Intern. Inc.*, 2010 WL 3222411, *11 (E.D. Va. Aug, 16, 2010) (rejecting argument that delay in asserting the patent-in-suit was excused by ongoing litigation over different patents in the same technological field).

Moreover, "in order to excuse delay based on other litigation, the patentee must give notice to the alleged infringer of the existence of the other litigation and of an intent to enforce its rights

against the infringer at the conclusion of the other litigation." *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1553 (Fed. Cir. 1988).  While *Aukerman* indicated this requirement should not be rigidly applied in every case, it endorsed this notice requirement whenever there is prior contact between the patentee and the accused infringer.  *See Auckerman*, 960 F.2d at 1039 ("Where there is prior contact, the overall equities may require appropriate notice, as in *Jamesbury*.")  Likewise, in the post-*Aukerman* case of *Hall v. Aqua Queen*, the Federal Circuit held that the plaintiff could not use "other litigation" to excuse his delay because he did not give the defendants *Jamesbury*-style notice despite having significant contact with them at trade shows during the pre-suit period.  *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553-54 (Fed. Cir. 1996).

Here, Lycos had significant contact with Google in the pre-suit period, both by being a Google partner and using the Accused Products.  Yet Lycos never notified Google that it intended to assert the patents against Google following the conclusion of its other litigation, as required by *Jamesbury* and the post-*Jamesbury* case law.  Accordingly, Plaintiff cannot use Lycos's "other litigation" to excuse the six-plus year delay in filing this lawsuit.

## 2.  Plaintiff Has Not Rebutted the "Prejudice" Prong of Laches

As the nation's premier patent treatise notes, there are "few cases indeed in which a lengthy period of delay escaped a laches finding because of proof of want of injury."  CHISUM ON PATENTS § 19.05[2][c][iii].  This case is no exception, as Plaintiff has put forth no evidence rebutting the injury or "prejudice" prong of laches.[9]  Economic or evidentiary prejudice is sufficient to meet the prejudice prong, and Plaintiff has made no showing that Defendants lacked

---

[9]  Citing *Aukerman*, Plaintiff argues that Defendants do not have a laches defense unless they suffered "incremental" prejudice between July 2011 (when the delay reached six years) and September 2011 (when suit was filed).  (Opp., 36.)  This position is unsupportable.  Neither *Aukerman* nor any other case holds that a defendant must suffer additional prejudice after the six-year mark in order to support a laches defense.

evidentiary prejudice. Plaintiff simply states that Defendants conducted depositions and identified no lost records that hindered their defense. (Opp., 40.) Yet asking Defendants to identify lost records puts the burden on Defendants to come forward with evidence of prejudice, while it is Plaintiff's burden to come forward with evidence negating prejudice once the six-year presumption has attached. *Aukerman*, 960 F.2d at 1038. Similarly, that Defendants took depositions (which would be true in any lawsuit) cannot negate the prejudice prong of laches.

Finally, even if it were Defendants' burden to come forward with evidence of prejudice (and it is not), the very depositions cited by Plaintiff show how Defendants suffered prejudice from Plaintiff's delay. Specifically, the faded memories of Ken Lang and Donald Kosak (the named inventors of the Asserted Patents) have prejudiced Defendants' ability to conduct a full factual investigation in this case. For example, Mr. Lang could not remember whether his company provided search services to Lycos (Sohn Dec., Ex. 37, 61:7-16) – an important fact in determining whether Lycos may have practiced the patents for purposes of an on-sale bar. Mr. Lang also could not remember whether he conducted a prior art search before filing the patents (152:22-153:7), thus frustrating Defendants' ability to ascertain whether he may have located invalidating prior art and/or prior art that would leave him open to an inequitable conduct charge. For his part, Mr. Kosak could not remember whether his work at Lycos involved collaborative filtering of search results, nor could he remember how the patented invention even operated. (*Id.*, Ex. 38, 214:11-215:13; 255:9-256:7.)

For the foregoing reasons, the laches presumption applies, Plaintiff has not rebutted either prong of the presumption, and Plaintiff's pre-suit damages are thus barred by laches.

DATED: October 1, 2012

          */s/ Stephen E. Noona*
          Stephen E. Noona
          Virginia State Bar No. 25367
          KAUFMAN & CANOLES, P.C.

150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624.3000
Facsimile: (757) 624.3169
senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation,
IAC Search & Media, Inc., and
Gannett Co., Inc.*

By: */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile:  (757) 624-3169

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile:  (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE

21

Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile: (415) 653-6444

*Counsel for Defendant AOL, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2012, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC  20006
Telephone: (202) 420-2200
Facsimile:  (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA  23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

                                    */s/ Stephen E. Noona*
                                    Stephen E. Noona
                                    Virginia State Bar No. 25367
                                    KAUFMAN & CANOLES, P.C.
                                    150 West Main Street, Suite 2100
                                    Norfolk, VA 23510
                                    Telephone: (757) 624.3000
                                    Facsimile: (757) 624.3169

senoona@kaufcan.com