```
 1              THE UNITED STATES DISTRICT COUR
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Norfolk Division

 3

 4  I/P ENGINE, INC.,              )
                                   )
 5              Plaintiff,         )    CIVIL ACTION
                                   )
 6        V.                       )    2:11CV512
                                   )
 7  AOL INC., GOOGLE INC.,         )
    IAC SEARCH & MEDIA, INC.,      )
 8  GANNETT CO., INC., and         )
    TARGET CORPORATION,            )
 9                                 )
                Defendants.        )
10

11

12

13

14              TRANSCRIPT OF PROCEEDINGS

15                  Norfolk, Virginia

16                 October 31, 2012

17

18              JURY TRIAL - Day 11

19              (Pages 1796-1973)

20

21  Before:   THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
22

23

24

25
```

```
 1  Appearances:

 2
            CRENSHAW, WARE & MARTIN, P.L.C.
 3          By:  W. RYAN SNOW, ESQUIRE
                 DONALD C. SCHULTZ, ESQUIRE
 4                    and
            DICKSTEIN SHAPIRO, LLP
 5          By:  JEFFREY K. SHERWOOD, ESQUIRE
                 FRANK C. CIMINO, JR., ESQUIRE
 6               KENNETH W. BROTHERS, ESQUIRE
                 CHARLES J. MONTERIO, JR., ESQUIRE
 7                    and
                 DAWN RUDENKO, ESQUIRE
 8               Counsel for the Plaintiff

 9
            QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
10          By:  DAVID A. PERLSON, ESQUIRE
                 DAVID L. BILSKER, ESQUIRE
11               DAVID NELSON, ESQUIRE
                 EMILY C. O'BRIEN, ESQUIRE
12               ROBERT A. WILSON, ESQUIRE
                      and
13          KAUFMAN & CANOLES
            By:  STEPHEN E. NOONA, ESQUIRE,
14               Counsel for the Defendants

15

16

17                      *    *    *

18

19

20

21

22

23

24

25
```

1798

```
 1                    EXAMINATION INDEX

 2
   DR. JAIME CARBONELL
 3       DIRECT BY MR. CIMINO  . . . . . . . . 1818
         CROSS BY MR. NELSON . . . . . . . . . 1889
 4

 5

 6                       *    *    *

 7
                      EXHIBIT INDEX
 8
                                        MAR   /   ADM
 9  PLAINTIFF'S

10   434    The TREC-4 Filtering Track Article    1849   1849

11   447    S-1 Statement                         1799   1799

12

13

14

15                       *    *    *
16

17

18

19

20

21

22

23

24

25
```

```
 1            (Court convened at 10:00 a.m.)

 2            MR. BROTHERS:  Your Honor, two brief

 3  housekeeping matters before we bring in the jury.   I

 4  believe we can handle these without objection.

 5            Yesterday your Honor indicated that a limited

 6  version of Plaintiff's Exhibit 447, the S-1 statement

 7  that was referenced, would be admitted.  I have reviewed

 8  this with opposing counsel.  They have indicated there

 9  are no objections, so we move to admit Exhibit 447.

10            THE COURT:  All right.  Hearing no objection, it

11  will be admitted.

12            MR. WILSON:  No objection, your Honor.

13            (Plaintiff's Exhibit No. 447 was admitted.)

14            MR. BROTHERS:  The second matter is with respect

15  to the video depositions.  I understand it is this

16  Court's practice not to have those transcribed in the

17  part of the transcript, and I just wanted to state on the

18  record we have tendered to the Court all of the

19  deposition video, the transcripts that were played, and

20  we understand the Court will be making that a part of the

21  official record.

22            THE COURT:  Thank you.

23            MR. BROTHERS:  Thank you, your Honor.

24            THE COURT:  Yesterday, counsel raised a series

25  of motions under Rule 50 for the Court's consideration,
```

1  and the Court has had an opportunity to consider those

2  motions and the Court will take the following action with

3  respect to those motions.

4         With respect to the plaintiff's motion for a

5  Rule 50 ruling as a matter of law on the question of

6  validity based on anticipation and obviousness, the Court

7  will deny that motion at this juncture.  The motion is

8  denied.

9         With respect to their motion for judgment as a

10  matter of law regarding the invalidity because of alleged

11  inadequacy of written descriptions, that motion is

12  granted and there's no question that the defendants were

13  not going forward on that.

14         With respect to the motion for judgment as a

15  matter of law on laches, the Court has had an opportunity

16  to read the submission of the defendant regarding that

17  and consider plaintiff's response to that motion, and the

18  Court takes this view of that motion:

19         The course of defense of laches, as both parties

20  have well indicated, bars a plaintiff from winning any

21  damages accrued before the filing of a suit, and in this

22  case the Court has looked at the elements of laches.

23  There are basically two elements of laches, one requiring

24  the defendant to show that the plaintiff delayed filing

25  the suit for an unreasonable period of time or an

1  inexcusable delay.

2        The other one is that the delay in some way

3  affected prejudice or operated prejudice to the

4  disadvantage of the defendant.

5        Of course, there arises a presumption of laches

6  where the defendant can show that the plaintiff delayed

7  suing for more than six years after the patentee knew or

8  should have known of the alleged infringement in the

9  case.

10        In this case suit was filed on September 15th,

11  2011, in this case the claim was filed.  The defendants

12  allege that plaintiffs were on constructive notice of the

13  infringement as early as July 2005 when Google put forth

14  a blog that was entitled Google Inside AdWords, Exhibit

15  176 in this case, Plaintiff's Exhibit 176, which in some

16  way described Quality Score, described parts of the

17  accused product in this case.

18        The plaintiffs, of course, contend that a

19  one-sentence blog is inadequate to put them on any type

20  of constructive notice of infringement.  That's their

21  basic response in this case.

22        The Court understands that I/P Engine, of

23  course, acquired these patents.  Lycos in 2005 was

24  certainly the owner of these patents, but the law

25  provides that when a patent transfers ownership, the

1  transferee of the patent must accept the consequences of

2  any dilatory conduct of immediate and remote

3  transferors.  I think this case was quoted as the Eastman

4  Kodak case versus Goodyear Tire & Rubber Company, at 114

5  F.3d 1547, a 1997 Fed Cir. case.

6         In this case the Court has to examine the

7  question of whether the plaintiffs were on notice of the

8  alleged infringement in this case.  Beyond the blog,

9  which plaintiffs object and finds short, the Court also

10  found, in reading the testimony of Mr. Blais and

11  Mr. Kosak and also in looking at the full record of this

12  case, that in 2005, as early as 2003, 2004, Lycos was in

13  a commercial relationship with Google.

14         During the course of that commercial

15  relationship the record reflects that, in fact, Lycos was

16  taking advantage of Google ads.  They had a relationship

17  with Google, and they were using the Google ads product.

18  According to the testimony of Mark Blais, the general

19  counsel for Lycos, in 2004 Lycos was using Google's

20  products.

21         Certainly if Lycos was, in fact, using Google's

22  products, AdWords, they were in a position to consider

23  and scrutinize the product to determine whether their

24  product was in some way infringing on their technology.

25         According to the testimony of Mr. Kosak, one of

1  the inventors of the patents, the asserted patents in

2  this case, he had no reason to analyze the AdSense or

3  look at these products because he was not receiving any

4  revenue stream from the product, so he took no action to

5  determine whether Google was, in fact, infringing on the

6  product.

7          According to Mr. Blais, Lycos in 2005 had no

8  policy regarding patent infringement or enforcement.

9  They did not investigate in 2005 whether Google had

10  infringed any of its products.  In 2005, 2006 they had no

11  policy on patent licensing.  In 2005, 2006 Lycos did not

12  negotiate regarding the licensing of its patents.  In

13  short, they did nothing regarding protecting their

14  patents.

15          But it is also clear under the law that a patent

16  owner is required to engage in some type of diligence or

17  some type of effort to determine whether someone is

18  infringing their technology.

19          I think one of the parties quoted the *Wanlass*

20  *versus General Electric Company* case, at 148 F.3d 1334, a

21  1998 Fed Cir. case, which says that ignorance will not

22  insulate a patentee from constructive knowledge under

23  certain circumstances regarding infringement of its case.

24          That particular case also had this line that is

25  important here:  "A reasonable patentee must investigate

1    potentially infringing, pervasive, open and notorious

2    activity, including sales, marketing, publication or

3    public use of a product similar to or embodying

4    technology similar to the patented invention or published

5    description of the defendant's potential infringing

6    activities."

7         What the Court is saying, in a nutshell, is that

8    the plaintiff in this case, specifically Lycos, had some

9    responsibility to be proactive in determining whether its

10   patent was being infringed.  Surely if the blog was

11   sufficient to be alleged in paragraph 43 of the

12   complaint, that same paragraph, the same blog should have

13   given at least a spark of interest to Lycos to determine

14   whether maybe Google was infringing its patent back in

15   2005.

16        More over, in view of the fact that there was a

17   close relationship between Google an Lycos, Lycos was, in

18   fact, benefiting from Google ads or Google's use of their

19   technology, again, should have placed them on notice

20   that, perhaps, their patent was being infringed.

21        The Court finds, in view of these facts, that

22   there arises a presumption of prejudice here to Google

23   for what the Court finds to be an unreasonable delay or

24   inexcusable time in bringing suit in this case.  And that

25   being the fact that there is a presumption of prejudice,

```
1   a presumption that arises, a presumption of laches, then
2   the burden shifts to the plaintiffs in this case.
3        The Court finds in this case that plaintiff has
4   not produced sufficient evidence to overcome the
5   presumption of laches.  The Court doesn't find anything
6   in the record to adequately explain the delay in bringing
7   this lawsuit.  Nothing has been articulated, the Court
8   finds, adequate to explain the delay.
9        In terms of whether Google has been prejudiced,
10  one of the things that's often cited is memory loss or
11  inability to recall.  The Court would note for the record
12  that Mr. Kosak, or is it Mr. Lang?  One of the inventors
13  had substantial difficulty remembering anything.  The
14  deposition is replete with I don't recall, I don't
15  remember things pertinent to this invention that would be
16  pertinent and relevant to the infringement.
17       So to the extent that the defendants cite that
18  memory loss and the inability to find this, that or the
19  other in the record as an example of prejudice, plaintiff
20  certainly has not responded to it.  So the Court finds in
21  this situation that the defense of laches is appropriate
22  and should apply and so, therefore, the Court grants
23  defendant's motion on the defense of laches.
24       That being said, in this case the plaintiff's
25  damages must flow from the date of filing its complaint,
```

1   which was September 15th, 2011.

2          So I say this:  When we look at the instruction

3   on determining when damages should be calculated, the law

4   talks about the damages flowing from the date of the

5   alleged infringement and notice of the infringement.

6   There was no evidence in this case that the plaintiff

7   Lycos or I/P Engine ever gave Google any notice of any

8   infringement before filing of the complaint, at least the

9   Court didn't hear that.  I think the question was asked,

10  and there was no evidence that happened.

11         In any event, if you did not run into a problem

12  with laches, you probably would have had a problem when

13  you got down to getting an instruction on calculation of

14  damages, in any event.  But the Court finds it's

15  appropriate to grant the motion.

16         So that being the case, the Court recognizes

17  granting its motion may, in fact, change the way you

18  intend to question your next witness and will certainly

19  impact on your closing argument in this case in terms of

20  what goes up before the jury now on the issue of

21  calculation of damages and so you may need some time to

22  make some adjustments, I don't know.  But that's the

23  Court's ruling on that issue.

24         You know, I will note any objections you have

25  and you can take it up at some future point.

```
 1          MR. BROTHERS:  Your Honor, I appreciate the
 2   Court giving plaintiff a moment to respond.
 3          THE COURT:  Oh, I wasn't giving you a moment to
 4   respond.  I was giving you my ruling.
 5          MR. BROTHERS:  No, I understand.  This motion,
 6   however, we have not filed a written response.  This
 7   motion was made yesterday, and we have not provided a
 8   written response.
 9          THE COURT:  Well, let's put it this way:  The
10   Court deemed you to be giving a response yesterday to the
11   motion for laches.  And now you are telling me it's
12   something the Court -- no, not only that, Mr. Brothers.
13   I want you to understand this.  The parties filed a
14   motion for summary judgment in this case on this very
15   same thing.  The Court didn't rule on the motion for
16   summary judgment on laches.  It waited to get a full
17   record, and the Court has a full record.
18          The Court also heard your response yesterday.
19   So now to tell the Court that somehow or another the
20   Court is prematurely ruling because you haven't filed a
21   written response, that's just plain not going to fly
22   here.  But you can certainly -- you are free to file what
23   you wish to file on this motion and at a minimum you may
24   have to take it up with the Federal Circuit, but the
25   Court has ruled.
```

```
 1          MR. BROTHERS:  I understand, your Honor.  In the

 2   evidence that we have submitted to the Court, including

 3   our opposition to the motion for summary judgment, I want

 4   to point out some facts that I didn't hear the Court

 5   referencing.  I understand the Court's ruling, but with

 6   regard to the Doctrine of laches, it is an inequitable

 7   doctrine and the defendants must have unclean hands.

 8          The sole document on which they refer,

 9   Plaintiff's Exhibit 176, defendants have said is not

10   accurate.  So to impute the running of the laches clause

11   on a document that the defendants themselves say wrongly

12   describes their system, because that document is

13   inaccurate --

14          THE COURT:  Now, let me respond to that.  The

15   Court assumed that.  Let's assume that document, Exhibit

16   176, incorrectly described their product.  That still

17   does not mean an incorrect document would not be

18   sufficient to raise the inference about what is going on,

19   the fact that it's inaccurate.  More over, if you assume

20   that document is inaccurate, that's why the Court went

21   into examination about the relationship between Google

22   and Lycos because it's just not a matter of that

23   document, it's a matter of them being in the position to

24   receive information that they could analyze.

25          MR. BROTHERS:  Understood.  The relationship
```

```
 1  between Lycos and Google started when Google was using

 2  the DumbAds system.  It was not a system that was

 3  practicing the patents.  So to impute knowledge to Lycos

 4  when Lycos and Google entered into that relationship and

 5  Google was not infringing, I believe, is error.

 6          THE COURT:  Well, in 2005, you take the position

 7  that Google was not infringing in 2005?

 8          MR. BROTHERS:  No, sir, and I didn't mean to

 9  say.  The Court referred to the relationship starting in

10  2003 running into 2000 --

11          THE COURT:  And the Court went to 2004 and 2005,

12  and the heart of the Court's ruling is based on that

13  relationship in 2005.

14          MR. BROTHERS:  Understood.  But what I'm trying

15  to do is put into context the relationship commenced when

16  Google was using a system that was not infringing.

17          THE COURT:  It doesn't matter where it started.

18  The question is how soon did they learn of the potential

19  that there was infringing going on?

20          MR. BROTHERS:  Yes.  And the testimony that the

21  Court heard from Mr. Alferness was that Google didn't

22  want to reveal the details of the system, the technical

23  information about how the system worked.  It wanted to

24  keep it a very high level the information it put out, so

25  as a result, there was insufficient information to put a
```

```
1   party on notice with regard to the technical operation of
2   the system until in years later all of the additional
3   evidence came out that was cited in the complaint, and we
4   cited a considerable amount of information that Google
5   made public in 2007, 2008, 2009, 2010 and 2011.  That
6   information is what put --
7            THE COURT:  Well, I understand that's your
8   view.  The Court takes the position that Google had
9   sufficient information to put it on constructive notice
10  to do some investigation and some inquiry about whether
11  its patents were being violated.
12           MR. BROTHERS:  I understand the Court's ruling.
13           THE COURT:  You have made your record, and I'm
14  sure this won't be the end of it.
15           MR. BROTHERS:  There's one other point that I
16  would like to address with regard to the Court said that
17  Lycos did nothing with regard to protecting its patent.
18  In fact, we have tendered evidence as part of our
19  opposition to motion for summary judgment that Lycos
20  between 2007 and 2010 was engaged in litigation with
21  other entities regarding this patent family, and the law
22  does not require that Lycos sue everybody at the same
23  time and that that is an excusable delay under Federal
24  Circuit case law that if Lycos is enforcing the patent
25  family against others, that that is appropriate and
```

1  sufficiently an excusable reason, and that is why laches

2  should not apply.

3         THE COURT:  Okay.  Thank you.

4         The Court does recall that, and the Court did

5  not cite that in its ruling a few minutes ago.  The Court

6  did rule that you were doing some other things regarding

7  the patent in 2007 and 2008.  The Court didn't mention

8  that in its ruling just now.  The Court didn't construe

9  that as being something that totally barred you from

10 raising the issue of infringement with Google.

11        And the Court is aware of the fact that you

12 litigating somewhere else is something the Court may

13 consider.  That doesn't mean that the Court is bound to

14 consider that and to consider that as a total defense to

15 the laches.  You are right, you have indicated the Court

16 does have discretion in its equitable defense.  The Court

17 doesn't have discretion in considering the facts in the

18 case in ruling on laches.

19        MR. BROTHERS:  Well, because I think that in

20 addition to -- because I think this might be an issue

21 that would be appropriate on appeal, I would urge the

22 Court that we proceed through verdict and then in a JMOL

23 motion, assuming that there is a verdict for the

24 plaintiff, that then once we have that full verdict, then

25 the Court can so rule and then we can, if need be, go to

1  the Federal Circuit so we don't have to go through and

2  redo this again.

3          THE COURT:  Now, Mr. Brothers, what you said,

4  the Court understands, and that may very well be a

5  wise way to go, to avoid coming back and to reconsider it

6  again, but let's put it this way:  That is the Court's

7  ruling on the issue of laches .  But what the Court will

8  do is the Court will defer this and let it simply go, but

9  I want you to understand that when the verdict comes back

10  in here for the plaintiff, the Court is going to come

11  back to the issue of laches and the question -- I think

12  what you say is wise, to avoid us having to come back

13  here again or to deal with this issue again.  So I just

14  want you to know that's what the Court's ruling is.

15          So the Court, gentlemen, as a matter of caution,

16  the Court will defer and hold it; but if the verdict

17  comes back in here for the plaintiff, the Court is going

18  to --

19          Yes, sir, Mr. Nelson.

20          MR. NELSON:  I would just like to address that

21  issue, your Honor.  I appreciate the Court's ruling and

22  understand what you are talking about, but there's a

23  fundamental problem with doing it that way because most

24  of their case, particularly on the damages side, is based

25  on this use, use, use, use.  They are trying to use that

1 argument to prejudice the jury with a big number.

2          Now, if the jury really is not to be considering

3 that big number because they don't have any right to

4 claim it, they shouldn't be allowed to use that evidence

5 to try to prejudice the verdict and to achieve some kind

6 of compromise because the jury thinks, oh, there was a

7 lot of use on the one side and, therefore, they should be

8 able to get something out of it.

9          THE COURT:  Let's put it this way, Mr. Nelson.

10 If the jury finds infringement, okay, they are simply

11 trying to calculate the damages.  If they come in and

12 they calculate damages to come in with some large number,

13 the Court is simply saying it's very easy for the Court

14 to grant its motion for laches and cut down the size of

15 that verdict.

16          Now, I guess one problem may very well be --

17          MR. NELSON:  Because, see, the problem we have,

18 your Honor, with that --

19          Okay.  You are thinking.  Let me know when I can

20 talk.

21          THE COURT:  Go on.  I'm thinking about what you

22 said.

23          MR. NELSON:  Okay.  So the problem we have with

24 that is, remember, the only evidence that Dr. Becker put

25 in goes back to 2005, right, mid-2005?  So the jury has

```
 1  the one number.  He hasn't offered anything else about
 2  what would be the case as of a different date.  So they
 3  are going to be arguing to the jury that they are
 4  entitled because of this use by Google, as they keep
 5  saying, that they are entitled to $493 million in
 6  damages.
 7          Now we know from your Honor's ruling that's not
 8  correct.  So what happens if the jury comes back with a
 9  verdict of $50 million?  What are we to take from that,
10  because they haven't been given the proper evidence in
11  terms of what the damages claims are to consider, and
12  then we don't know how to deal with that.
13          THE COURT:  Okay.  We are going backward and
14  forwards.
15          Mr. Brothers, Mr. Nelson's point is simply this,
16  and it reminds the Court that the Court has an
17  instruction in here -- the Court understands what you
18  want to do and the Court doesn't want to be in a position
19  it has to come back here again to try this case,
20  depending upon what happens, but that may be a reality
21  because there is an instruction in here that the Court
22  has to deal with to tell the jury from what date they are
23  to commence calculating damages in this case, and the
24  Court has to give them an appropriate date to commence
25  calculating damages.
```

1        In view of the Court's position on the laches

2    issue, I think it may be inappropriate then for the Court

3    to go back and tell them in that instruction to start

4    calculating damages in some other way.  As a matter of

5    fact, we haven't even resolved that issue.  The Court's

6    ruling certainly resolves that issue about when you start

7    calculating damages.  You know, it's very clear to the

8    Court that one way or the other, based on the way you

9    counsel, both sides have tried this case, this is a case

10   the Court may be living with for the next five years, six

11   years.  So, that's just the reality.

12        MR. BROTHERS:  If I can propose, with the

13   Court's indulgence, I believe that there is a solution,

14   okay?  First of all, Dr. Becker has provided evidence on

15   a quarter-by-quarter basis.

16        With respect to the total, both revenue based,

17   the rate, and remember that blue bar chart that went up,

18   that was on a quarter-by-quarter basis.  So that evidence

19   has been referenced by the witness.  Now, we haven't done

20   the specific math.  That would be the quarter -- so we

21   would start fourth quarter of 2011 on that chart, and you

22   would be missing 15 days of September.

23        What I would propose is that the jury be given

24   two periods.  So, In other words, for the award -- and

25   this is to preserve the record.  So there's the total

1   award and then damages as of September 15, 2011.

2           So we have that question being presented to the

3   jury, we have the full record, and we have the answers to

4   the questions, so we don't need to retry the case.   And I

5   believe that can be explained in instructions to the jury

6   where the jury can then say this is the total amount that

7   is sought; however, there is an issue or a question,

8   however the Court wants to phrase it, with regard to

9   damages prior to the filing of the lawsuit.   The Court

10  instructs you that you are also to determine the

11  appropriate measure of damages as of the date of the

12  filing of the lawsuit.

13          So we have those two pieces of information and

14  we can tailor the summation accordingly.   That, I

15  believe, will have all of the evidence in the record.

16          THE COURT:   All right.   Mr. Nelson, the Court is

17  going to have to decide this.   The Court is trying to

18  accommodate you and understand what you are saying, but

19  --what else do you have to say?

20          MR. NELSON:   So, your Honor, that's exactly the

21  purpose of a Rule 50(a) motion.   It's something that

22  shouldn't go to the jury, and your Honor has ruled as a

23  matter of law.   So the fact of the matter is in the jury

24  instructions we cannot go back to the jury and say,

25  please calculate damages from some period of time when

1  your Honor has already ruled that they are not entitled

2  to damages because, I mean, set aside the confusion issue

3  that we have already talked about, that's an advisory

4  verdict, your Honor.  I mean, that's an Article 3 problem

5  right there.

6          I mean, I understand what it is they are trying

7  to do, but that is exactly the purpose of Rule 50(a).

8  It's something that shouldn't go to the jury.

9          THE COURT:  Okay.  Gentlemen, here's where we

10  stand.  The Court is going to stick with its ruling.

11          Mr. Brothers, the Court understands what your

12  concern is and the Court has some concern, but the Court

13  has accepted the inevitability that with respect to this

14  case that is heavily litigated, it's heavily financed, so

15  you have all the time in the world and all the lawyers in

16  the world, that this case will go on, even after we are

17  gone.  So the Court has granted the motion and the Court

18  will proceed to just let it take effect.

19          Gentlemen, you have an opportunity to again

20  renew your motions, depending upon the verdicts:  Motions

21  for a new trial, motions for appeal.  You have all kinds

22  of options out there, and I'm sure I will be hearing

23  about it.

24          Okay.  That's it.  Bring in the jury.

25          (Jury in.)

Dr. J. Carbonell - Direct

1          THE COURT:  You may have a seat.

2          Let the record reflect all jurors are present in

3    the courtroom.  Does counsel agree?

4          MR. CIMINO:  Agreed.

5          MR. NELSON:  Agreed.

6          THE COURT:  Ladies and gentlemen, now the

7    plaintiffs have the opportunity to call a rebuttal

8    witness.

9          You may call your witness.

10          MR. CIMINO:  Your Honor, the plaintiff calls

11    Dr. Carbonell, an expert, who will provide an opinion on

12    the validity of the '420 and '664 patents.

13          THE COURT:  All right.

14          DR. JAIME CARBONELL, called as a rebuttal

15    witness, having been first duly sworn, was examined and

16    testified as follows:

17                         DIRECT EXAMINATION

18    BY MR. CIMINO:

19    Q.   Good morning.

20    A.   Good morning.

21    Q.   Could you please introduce yourself to the jury?

22    A.   I am Jaime Carbonell.

23    Q.   Where do you live, Dr. Carbonell?

24    A.   I live in Pittsburgh, Pennsylvania.

25    Q.   And why are you here today?

Dr. J. Carbonell - Direct

1  A.   I'm here to testify on behalf of the plaintiff on

2  the validity of the asserted patents.

3  Q.   Okay.  So what's your current occupation?

4  A.   I am a professor at Carnegie Mellon University, a

5  chaired professor, and I'm also the director of the

6  Language Technologies Institute, which is part of the

7  university.

8  Q.   You mentioned chaired professor.  Can you explain to

9  the jury what a chaired professor is?

10  A.   Yes.  I believe that we heard earlier three ranks of

11  professor, assistant, associate and full, and chaired

12  professor is one level above that in the university.

13  Q.   What percentage of professors in the university

14  achieve the rank of chaired professor?

15  A.   It's approximately five percent.

16  Q.   Are there any ranks above chaired professor?

17  A.   Not on the academic track.  On the administrative

18  track you have the Provost or president.

19  Q.   And how long have you been a chaired professor,

20  Dr. Carbonell?

21  A.   At least 15 years.

22  Q.   And as a chaired professor, have you focused on

23  search and information retrieval and related

24  technologies?

25  A.   Yes, I have.

Dr. J. Carbonell - Direct

1   Q.   Do you currently teach?

2   A.   Yes, I do.

3   Q.   What type of courses?

4   A.   They are primarily graduate courses and graduate

5   studies.

6   Q.   In what type of areas?

7   A.   I teach in search, text mining, artificial

8   intelligent, machine learning.

9   Q.   Now, you also mentioned that you are the director of

10   the Language Technologies Institute?

11   A.   Yes.

12   Q.   What's the Language Technologies Institute?

13   A.   It's a research institute that conducts research in

14   all aspects of computer processing of language, spoken

15   language, speech recognition, textual language, machine

16   translation, search engines, information retrieval, text

17   mining, and so on.

18   Q.   And you said that you are the director?

19   A.   I am.

20   Q.   What is the director position?

21   A.   I have responsibility for the research agenda, the

22   educational programs and the administration of the

23   institute.

24   Q.   And how long have you been the director?

25   A.   Since it started in 1996.

1    Q.   Did you have any involvement with starting the

2    institute?

3    A.   Yes.  I essentially founded the institute.

4    Q.   How many people make up the Language Technologies

5    institute?

6    A.   It's over 200 in total of which, I believe, 32 are

7    faculty members, a number of staff members for

8    post-doctoral fellows, Ph.D. and Master's students.

9    Q.   Does the institute conduct research?

10   A.   It certainly does.

11   Q.   Can you give the jury a couple of examples of the

12   types of research that the institute does relating to

13   search and information retrieval?

14   A.   Yes.  The institute does research in the areas I

15   mentioned earlier.  A couple of specific examples would

16   include working with IBM on the Watson system.  This is

17   the Jeopardy Championship System.  Two of the components

18   were developed in the institute.

19        Another example is search engines.  The

20   institute has been responsible for two of the three most

21   popular open source search engines.  One is called

22   Leamer, the other one is called Indri.

23   Q.   Do you have any project teams you are responsible

24   for that conduct research?

25   A.   Me personally, you mean?

Dr. J. Carbonell - Direct

1   Q.   Yes.

2   A.   Yes, I do.

3   Q.   Can you describe what types of research that project

4   does?

5   A.   I'm responsible for a project that conducts research

6   with the U.S. Government, primarily DARPA.  That is part

7   of the Department of Defense.  That research is in areas

8   like text mining and machine learning for text mining,

9   an especially large scale.  Another group focuses on

10  machine translation and text mining.

11  Q.   Is in your view Carnegie Mellon University known for

12  computer science?

13  A.   Yes, it is.  I would say it's among the top three

14  with MIT and Stanford.

15  Q.   How big is the College of Computer Science?

16  A.   It's fairly large.  There are over 200 faculty

17  members in total.  Those include the ones I mentioned,

18  and over 800 students.

19  Q.   And how long have you been there, Dr. Carbonell?

20  A.   I have been there since 1979.

21  Q.   Can you describe how your career progressed at CMU?

22  A.   Yes.  I was hired as an assistant professor for the

23  first five or six years there, then as an associate

24  professor, then I was awarded tenure, then as a full

25  professor, and most recently as a chaired university

Dr. J. Carbonell - Direct

1  professor in the Language Technologies Institute.

2  Q.   Can you describe a description of your educational

3  background for the jury?

4  A.   My undergraduate education was at MIT, The

5  Massachusetts Institute of Technology where I have

6  degrees in mathematics and in physics.  Then I went to

7  Yale University where I received a Master's degree and a

8  Ph.D, both in computer science.

9  Q.   And when did you receive your Ph.D?

10 A.   In 1979.

11 Q.   Did you do a dissertation?

12 A.   Yes, I did.

13 Q.   What was your dissertation about for your Ph.D?

14 A.   The dissertation was in the area of artificial

15 intelligence and text mining, and it received the

16 highest honor.

17 Q.   Have you done any design of search and retrieval

18 systems?  You mentioned the open source.  Any others?

19 A.   Yes, I have.  I am the founder -- the founder of

20 Lycos was my Ph.D. student, Michael Mouldin.  I provided

21 formal advice there.  I was also the designer of another

22 search engine system called Condor, a search engine used

23 in Asia and, particularly, in Korea.

24 Q.   Have you heard of a system called advise as a

25 memorandum?

Dr. J. Carbonell - Direct

1    A.   Yes.  Vivisimo is a company, a spin-off of Carnegie

2    Mellon University, which works in the area of search, in

3    particular enterprise search.  I was a scientific

4    advisor to Vivisimo.  Vivisimo was recently acquired by

5    IBM and their search engine now becomes IBM's search

6    engine.

7    Q.   You mentioned Lycos and the founder Michael Mauldin,

8    that you were an advisor.  Were you a paid advisor?

9    A.   I was paid my salary at the university.  I received

10   nothing beyond that.

11   Q.   When did advising Lycos and Michael Mauldin end?

12   A.   Well, advising Michael Mauldin as a student ended in

13   the early 90's when he graduated, then I was an informal

14   advisor to Lycos, the company, and that ended, I

15   believe, in 1994 when it had its initial public

16   offering.

17   Q.   Did you know Ken Lang?

18   A.   I knew of Ken Lang.  He was a student at Carnegie

19   Mellon.  Not in the institute where I direct, but

20   elsewhere.

21   Q.   Did you do any advising for WiseWire?

22   A.   No, I did not.

23   Q.   Is it uncommon for your students to pursue careers

24   in search engine technology?

25   A.   No.  On the contrary, it's quite common.  Many of

Dr. J. Carbonell - Direct

1  them go and work in search engine technologies in

2  various companies or in academia.  We have more of our

3  Ph.D. students now working in Google than anywhere else,

4  including the five or six that I had advised myself are

5  Google employees.  Others have gone to Microsoft and

6  other search engine companies.

7  Q.  Other than the students that you advised going to

8  Google, does your language institute have any other

9  connection to Google?

10  A.  Well, there's an informal connection in the sense

11  that I was a colleague of Andrew Moore, who is the

12  director of Google Pittsburgh.  We taught courses

13  together and so forth.  Also, two of the faculty at the

14  Language Technologies Institute have received grants

15  from Google.  I personally have not.

16  Q.  How about awards or honors, have you received any

17  awards or honors through your academic career?

18  A.  I have received several such as the Simon Teaching

19  award.  Maybe the most relevant one is a Best Paper

20  award for translating multilingual search engines.  That

21  was in 1997 awarded by the International Jones

22  Conference on Artificial Intelligence.

23  Q.  Dr. Carbonell, have you started any companies that

24  are involved in search or information retrieval?

25  A.  Yes, I have.

Dr. J. Carbonell - Direct

1  Q.  Do you know what the Carnegie Group is?

2  A.  The Carnegie group was started in the 1980s.  It was

3  a company in artificial intelligence and text mining

4  and, essentially, the precursor of modern search

5  engines.  That company had an IPO and was later

6  acquired.

7  Q.  And you had involvement with that company?

8  A.  I was the founder of that company.

9  Q.  How about Carnegie Speech, have you heard of

10  Carnegie speech?

11  A.  Yes, Carnegie Speech was founded about 12, 13 years

12  ago.  It's in the area of computer assistance to teach

13  languages, to teach humans how to speak or write other

14  languages.  I'm a co-founder of that one as well.

15  Q.  How about Dynamix Corp., do you know what that

16  company is?

17  A.  Sure.  I was also a co-founder of Dynamix.  Dynamix

18  is somewhat different.  It does research and development

19  for the U.S. Government for various agencies in

20  different projects.  It involves text mining, it

21  involves large scale systems, it involves search, and it

22  involves machine learning.

23  Q.  And what's your connection to the company now?

24  A.  My connection to the company now, I am the chief

25  scientific advisor to the company.

Dr. J. Carbonell - Direct

1  Q.  How about books, have you had any books published?

2  A.  I've had five books published, three of which

3  essentially belongs to the current era of machine

4  learning.  These were together with two of my

5  colleagues, Tom Mitchell and Ryszard Michalski, the late

6  Ryszard Michalski.

7  Q.  What do you mean by launched the era of machine

8  learning?

9  A.  Machine learning is a vibrant field now, but in the

10  early 80s' it was just beginning and we, the three of us

11  that I mentioned before, started the first conference,

12  the first journal, and the first three books in the

13  area.  That was considered the genesis of that field.

14  Q.  So are you aware of any books on machine learning

15  prior to yours?

16  A.  Not in machine learning, per se, no.  There were

17  other books that pertained to it in a more indirect way.

18  Q.  How about publications, do you have any publications

19  directed to search or information retrieval?

20  A.  Yes.  I have 300 scientific articles in total, some

21  of which are pertaining to information retrieval and

22  search engines.

23  Q.  How about patents, are you the named inventor on any

24  patents?

25  A.  On four patents, on the four issued patents I'm the

Dr. J. Carbonell - Direct

1  named inventor in areas of text analysis, machine

2  translation.

3  Q.  Do you have any other inventions?

4  A.  There's one which I believe is particularly

5  relevant.

6  Q.  Could you please describe it to the jury?

7  A.  Yes.  It's called maximum marginal relevance.

8  That's a big name to just simply say diversity in search

9  engines.  Search engines today, if you get diverse

10  results, it will give you copies of the same web page

11  for others that are almost identical because they

12  include both a relevance and a diversity criteria.

13  That's what maximum marginal relevance does.  I did not

14  patent that.  I published it as a paper.  It has over

15  1,000 scientific citations.

16  Q.  What does it mean to have over a thousand scientific

17  citations?

18  A.  It means that a thousand others have based their

19  work on the maximum marginal relevance result or method

20  that I described in that paper.

21  Q.  Dr. Carbonell, all in all, how long have you been

22  involved in the field of search and information

23  retrieval?

24  A.  For a long time, roughly 28, 30 years.

25       MR. CIMINO:  Your Honor, we offer the testimony

Dr. J. Carbonell - Direct

 1  of Dr. Jaime Carbonell as an expert in this case in the

 2  field of search and information retrieval.

 3          THE COURT:  Do you wish to voir dire him on his

 4  credentials?

 5          MR. NELSON:  No, sir, your Honor.

 6          THE COURT:  All right.  Ladies and gentlemen,

 7  you may accept Professor Carbonell as an expert in the

 8  field of search and information retrieval.

 9  BY MR. CIMINO:

10  Q.  Dr. Carbonell, let's turn to your opinions in this

11  case.

12          And, your Honor, Dr. Carbonell has a

13  presentation that he would like to go through.  The

14  majority of it are demonstratives or exhibits that are

15  already in evidence.  There is one new exhibit that he

16  has a little bit later in his presentation, and I will

17  stop and have him look at the binder before that slide

18  goes up.

19          THE COURT:  Okay.

20  BY MR. CIMINO:

21  Q.  Dr. Carbonell, were you in the courtroom when

22  Dr. Ungar testified about validity?

23  A.  Yes, I was.

24  Q.  Do you agree with his conclusions that the '420 and

25  '664 asserted claims are invalid?

Dr. J. Carbonell - Direct

1    A.   I certainly do not disagree.

2    Q.   Why not?

3    A.   Because the asserted prior art fails to teach or

4    disclose some of the essential claim elements of the

5    asserted claims of claim 10 and 25 of the '420, and

6    claim 1 and 26 of the '664.  Those are the independent

7    claims.

8    Q.   So before we get into your detailed analysis there,

9    Dr. Carbonell, I was wondering if you could walk the

10   jury through a high-level explanation of why you believe

11   the '420 and '664 asserted claims are valid.

12          Now, what is the prior art date for the '420 and

13   '664 patents?

14   A.   For both of them it is December 3rd of 1998.

15   Q.   And what does that date mean?

16   A.   That date means that in order to be qualifying prior

17   art, it would have to have been published prior to that

18   date.

19   Q.   And what types of systems existed before that date?

20   A.   Well, basically, there were two camps, two different

21   sets of systems.  One was a search-based system, which

22   processed a query and retrieved the results.  The other

23   camp was a profile or collaborative camp that had

24   long-term user needs or long-term user preferences, and

25   these systems filtered new incoming data for relevance

Dr. J. Carbonell - Direct

1  to the filter and offered it to the person when it was

2  available.  So one served an immediate information need

3  very quickly, that's a search, and the other one, a

4  long-term need, slowly.

5  Q.  Can you pull up Dr. Carbonell's demonstrative.

6       Dr. Carbonell, I understand you have a simple

7  animation you wanted to walk the jury through to explain

8  the search systems?

9  A.  Yes.  I'm sure the jury is familiar with having used

10  search systems.  Here we animate, essentially, how they

11  work, which is that information is collected from

12  external sources such as the web or it's already

13  available in internal sources such as libraries, files,

14  data bases.  That information is aggregated in a

15  database and then an index is built.  That index is

16  crucial to be able to search quickly.

17       That index is then made available to a query

18  server, as you can see on your bottom right-hand part of

19  the demonstrative, and then when the user issues a query

20  or a set of queries, a rank set or rank list of results

21  is offered back to the user, and that is based on the

22  index.

23  Q.  Dr. Carbonell, what criteria is used to pull

24  information back to the user in a search system?

25  A.  It's usually a query versus item match.  Items are

Dr. J. Carbonell - Direct

1   the things that are indexed.  Terms are the words in the

2   query.  And it's usually serving the immediate need of

3   the user as expressed in the query.

4   Q.   And what do you mean by immediate need?

5   A.   I mean the need that the user expressed at that

6   moment by virtue of formulating the query.

7   Q.   Okay.  And I understand that you have a similar

8   animation for profile systems?

9   A.   Yes, I do.

10  Q.   Before we get there, can you explain what you mean

11  by profile?

12  A.   A profile is a long-term, long-standing need of one

13  user or of multiple users and uses shared profiles, or

14  shared parts of profiles can be used in the profiling

15  system to determine what to show to the first user.

16        So if another user with very similar interests

17  or needs has liked some books or some articles or some

18  items to purchase, then these are offered as potentially

19  relevant to the first user who is similar because of the

20  profile similarity.

21  Q.   In a profile system, would I fill out a profile?

22  How would it be created?

23  A.   It can be created in different ways.  You can fill

24  it out over time.  It could be based on things that you

25  have liked that the system has automatically extracted

Dr. J. Carbonell - Direct

1  those features and put it into a profile, it can be

2  based on what other people have liked.  If you liked the

3  same things that they have liked, you would essentially

4  borrow parts of their profile.

5  Q.  Okay.  Let's take a look at what you put together.

6  A.  So the profile system in this demonstrative, instead

7  of searching the library for a book that this lady might

8  like, we match her to a collaborative profile, in other

9  words, find other people who have similar likes.  That

10 goes to a persistent interest matching engine.  That

11 means long-term interests are similar to others, and you

12 look at which other books the others have liked or which

13 other books are similar to books that she has liked in

14 the past.  So she can be part of that group that you see

15 to your right, and that results in a recommendation.  It

16 could be a single recommendation or it could be multiple

17 recommendations over time.

18 Q.  What do you mean by over time?

19 A.  I mean that a profile system does not represent an

20 immediate need.  It represents a long-term standing

21 need, and the system, as new books come in or new

22 articles become available, it would be filtered through

23 the profile and then offered to the user.

24 Q.  Would the user here, Dr. Carbonell, ask for the

25 books as new ones became available?

Dr. J. Carbonell - Direct

1  A.  No.  That's not the way profile systems work.  They

2  would establish a profile and they get recommendations

3  over time.  It could be that these recommendations

4  accumulate, for example, the e-mail and the user chooses

5  to read the e-mail at a particular time or chooses to

6  read the recommendations once she is ready.

7  Q.  Okay.  So how would the prior art process result

8  from both systems?

9  A.  Well, the prior art was divided into one or another

10  of these camps.  It would either search their systems

11  that processed the query and provided immediate results

12  based on the immediate needs of a user, or they were

13  profile systems.  At best, some prior art suggested that

14  the output of one could serve as the input to the

15  other.  So, if you animate this slide, please.

16  Q.  Sure.  Would you walk the jury through this.

17  A.  This shows the user using a query.  The query server

18  producing a set of ranked results which are then,

19  metaphorically speaking, tossed over the wall to a

20  profile system, which then checks whether these results

21  are of interest to the long-term needs or long-term

22  likes of that user, producing some final results.

23       So in this case we see the output of the search

24  system or the query-based system serving as the input to

25  the profile system.  Notice that in this case the query

Dr. J. Carbonell - Direct

1  or the search criteria are not available to the profile

2  system in reading results.

3  Q.   So is the query also passed over the wall to the

4  profile system?

5  A.   No.  The query is not passed over the wall and even

6  if it somehow were, the profile systems are not set up

7  to process a query.  That is a search functionality.

8  Q.   So what criteria would the profile system use on the

9  right-hand side of this demonstrative to select the

10 final results?

11 A.   It would use the long-time profile, in other words,

12 the long-term information desires or preferences of that

13 user or those of other users which have very similar

14 profiles.  So it is not a question answering or a query

15 serving process at all.  It works very differently.

16 Q.   Now, Dr. Carbonell, why is Mr. Lang and Mr. Kosak's

17 invention different from the prior art methods you

18 describe here?

19 A.   Yes.  Mr. Lang and Mr. Kosak worked in WiseWire,

20 which is a profile-based system or was at that time.

21 They were acquired by Lycos.  Lycos was a search system,

22 and so now they had the combination of both approaches

23 available to them inside the same roof in Lycos.

24       What they did was find a way to tightly couple,

25 tightly integrate the two, collaborative analysis,

Dr. J. Carbonell - Direct

1  content-based analysis with respect to a query, In other

2  words, to use the immediate information need, not just a

3  long-term standing need, of the users, and then filter

4  also with respect to the query, filter with respect to

5  the immediate need, not just simply filter with respect

6  to what they generally liked.

7  Q.   Dr. Carbonell, in your review of the prior art, have

8  you seen any profile systems that would return results

9  with respect to relevance of the query?

10  A.   No, I have not.  This is unique.

11  Q.   And, Dr. Carbonell, have you seen in prior art in

12  search systems that used the combination that you showed

13  here in yellow, collaborative and content data, to

14  provide results with respect to relevance to the query?

15  A.   No, I have not seen that either.  In particular,

16  search engines of the day were more primitive, if that

17  is an appropriate word, than the current ones and they

18  were struggling just to do a good job finding items that

19  were relevant to the query in the early days.

20  Q.   In your opinion, Dr. Carbonell, would Mr. Lang and

21  Mr. Kosak's invention in the '420 and '664 patents

22  provide better results than the prior art systems you

23  studied?

24  A.   Oh, they absolutely would, for more than one reason.

25  Q.   Can you please explain those reasons?

Dr. J. Carbonell - Direct

1   A.   One is that you are now able to use multiple

2   criteria for selecting the information.  You are able to

3   use criteria about the immediate need, as well as

4   criteria about what they generally like, as well as

5   criteria about what other people with similar likes or

6   even similar immediate needs, even similar queries would

7   have liked.  That combination uses much more information

8   in making the selection, in making the ranking, in

9   making the filtering.  That is the primary reason.

10          Another reason is that if you, quote, throw

11  something over the wall, the search results, you throw

12  them only by the criteria of search, not by the

13  relevance to the query, not by the criteria of other

14  things such as what they typically like, what their

15  friends typically like, and so forth.  So you miss some

16  things.  So after you filter them on a second pass, they

17  are only filtering those things that are actually

18  provided, not the ones that you missed that may have

19  proved better by the combination of all the criteria.

20  That's the results, surprising, in the sense they are

21  better.

22  Q.   I believe Dr. Ungar testified that it would have

23  been easy to come up with what Ken Lang and Mr. Kosak

24  came up with.  Did you hear that testimony?

25  A.   I heard the testimony, yes.

Dr. J. Carbonell - Direct

1    Q.   Do you agree with that?

2    A.   No, I definitely fundamentally disagree with that

3    testimony.

4    Q.   Can you explain why?

5    A.   Well, first of all, the two camps were indeed

6    separate.  The camp that did the profile had no deep

7    knowledge of how a search method worked, and the same

8    was true the other way around.  You needed somebody that

9    was well steeped in both camps to be able to see how to

10   do this tight integration and perform the profile and

11   content analysis with respect to the query and the

12   filtering also with respect to the query.

13          To attest to the difficulty, I was working in

14   the area at the time, the thought occurred to me that it

15   would be a good idea to do this and I failed to come up

16   with an effective method.

17   Q.   Given the prior art you have reviewed in this case

18   and the prior art presented by Dr. Ungar, do you think

19   anyone else was successful prior to the December 3rd,

20   1998 coming up with the Lang and Kosak invention?

21   A.   There's no evidence that anyone else was successful

22   or even close at the time.

23   Q.   Okay.  Dr. Carbonell, can you please provide the

24   jury with a summary of your opinions?

25   A.   Yes.  My opinions, in summary, are that all the

Dr. J. Carbonell - Direct

1  asserted claims of the '420 patent are valid.  This

2  would be claim 10 and 25 independent claims, and also

3  the dependent claims based upon them.  All the asserted

4  claims of the '664 patent are valid.  That would be

5  claim 1 and 26.  Those would be the independent claims,

6  and all the dependent claims based on them.

7      In particular, no claim is anticipated by Bowman

8  or Culliss.  Those are the two references cited by

9  Dr. Ungar as anticipating, and no claim is rendered

10  obvious in any of the patents by Balabanovic Lashkari,

11  Rose, Bowman and/or Culliss, or any combination thereof.

12  Q.  I'm going to refer to the Balabanovic as Fab, okay?

13  A.  Okay.

14  Q.  Let's turn to your detailed analysis and start

15  talking a little bit about the technology.  Before we

16  get there, though, can you please provide your

17  understanding of what anticipation is?

18  A.  Yes.  Anticipation means that a single prior art

19  must anticipate, in other words, must disclose and teach

20  every single element in a patent claim in the manner

21  described in that claim.  So to turn that around, no

22  anticipation means that a claim is not anticipated if

23  even a single element of the claim is missing.  In our

24  case, if it's missing from Bowman or Culliss.

25  Q.  So what does it mean if a patent claim is

Dr. J. Carbonell - Direct

1   anticipated?

2   A.   Well, it means that every single one of the

3   elements, each and every one, must be contained in that

4   single prior art reference and, moreover, be used in a

5   combined in the manner described in the claim.

6   Q.   And you heard Dr. Ungar testify that he believes two

7   references, Bowman and Culliss, anticipate and,

8   therefore, invalidate the '664 and '420 patent claims?

9   A.   Yes, I have heard him testify.

10  Q.   So for anticipation we only need to look at two

11  pieces of prior art?

12  A.   Only the ones that he claimed anticipated.

13  Q.   Okay.  Let's look at the first one.  Let's start

14  with Bowman.  To keep it simple, let's focus our

15  analysis on claim 10 of the '420 patent.  Is that okay?

16  A.   That's okay.  That's one of the independent claims.

17  Q.   Okay.  And then we will come back and talk about

18  some of the other asserted claims, okay?

19           In your opinion does Bowman anticipate claim 10

20  of the '420 patent?

21  A.   Bowman certainly does not anticipate claim 10.

22  Q.   Can you explain to the jury which claim elements you

23  believe are not shown in Bowman or disclosed by Bowman?

24  A.   I will do so first with a reminder of the color

25  scheme that we are using, which is the same color scheme

Dr. J. Carbonell - Direct

1    that was provided by Dr. Frieder and then also a color

2    code by Dr. Ungar.  Yellow refers to search or query,

3    blue refers to content of items, green refers to

4    collaborative, and purple refers to filtering or

5    filtering combining relevance to the query.

6            So now to answer your question, it would be the

7    second and fourth claim, otherwise known as claim (b)

8    and claim (d) that were circled in red here, are not

9    anticipated.

10   Q.   The ones settled in red you believe are missing from

11   the disclosure of Bowman; is that right?

12   A.   That's exactly correct.

13   Q.   Okay.  So let's start with your description of what

14   Bowman actually teaches.  How does the Bowman reference

15   work?

16   A.   Okay.  If you would bear with me a minute, I am

17   showing in this demonstrative a figure from Bowman.

18   It's Fig. 4.  It shows what he calls the item rating

19   table or just the rating table.

20           The rating table contains number of clicks each

21   time a word and item appear.  In other words, when the

22   user issued a query that contained the word "dynamics"

23   and different items were shown to the user -- these

24   items are by those long numbers here -- the column on

25   the right is a number of times a user clicked on it.

Dr. J. Carbonell - Direct

1   So, if you would animate.

2   Q.   Sure.   What is shown here?

3   A.   This is simply to illustrate that if a user typed

4   the word "dynamics" as a query, the document that begins

5   with 1883 was clicked on 23 times by other users.   So it

6   would have the highest score according to that query

7   term in this example that he shows.

8   Q.   Okay.   Dr. Ungar believes that Bowman discloses the

9   content analysis in the manner called for by the

10  asserted claims; is that right?

11  A.   He has stated as much.   I disagree with him.

12  Q.   Why do you disagree with him?

13  A.   Well, as you saw on that item rating table, what

14  Bowman is doing is he's matching a query term against an

15  entry in the table.   A query term against entry in the

16  table, not against the content of the items.   It does

17  not look at the content of the items.   He does not match

18  against the content of the items.   In fact --

19  Q.   Dr. Carbonell, up on the screen is a part of Bowman

20  DX-59, if you will read the passage in column 4:38 to

21  48.   Can you explain whether that supports your opinion?

22  A.   Yes.   In fact, that very strongly supports my

23  opinion.   This passage comes from two different parts of

24  Bowman, column 2 and column 4.   It's clearly central to

25  the way his facility operates, and he says that the

1  query results are produced in accordance with a

2  collective and individual user behavior.  Collective and

3  individual user behavior.  That is collaborative.  That

4  is what other users have done in the past.

5      And then it goes on to say, "rather than in

6  accordance with the attributes of the items."

7  Attributes are the content of the items.  He's saying

8  rather than.  He's disallowing looking at the content.

9  He's teaching explicitly the behavioral part and

10 teaching away from the content part.

11 Q.   So Dr. Carbonell, in your view what would this

12 sentence here circled in red say to a person in the

13 field in 1998 reading Bowman?

14 A.   If a person of ordinary skill in the field was

15 reading Bowman, he would, she would, interpret it to

16 mean perform the search based on collaborative criteria

17 and collaborative criteria only.

18 Q.   Now, Dr. Ungar in his analysis mentioned something

19 about matching in Bowman.  Do you agree that discussion

20 in Bowman about matching provides a content analysis?

21 A.   No, I disagree with that.  Bowman does use the word

22 "matching," but he means matching to the rating table.

23 Q.   Let's take a look here at DX-59, the Bowman patent

24 Fig. 9.  Does Fig. 9 of the Bowman patent support your

25 view about what matching means?

1    A.   Yes.  Not just Fig. 9, but Fig. 9 is a good

2    illustration.  If we look at the second processing item,

3    901 that is called out in this figure, Bowman talks

4    about identifying entries matching the term having the 3

5    highest rating scores.  So by matching, he's matching

6    the term, that is the word in the query, with the entry

7    which is in the rating table.  So nothing about

8    content.  He's looking at the rating scores.  The rating

9    scores are user ratings, number of clicks, purely

10   collaborative, and Bowman is very clear on this.

11   Q.   Okay.  Dr. Carbonell, I believe you have up here a

12   demonstrative that was used by Dr. Ungar, DDX-3.59.  Can

13   you explain how your view is different from Dr. Ungar's?

14   A.   Yes.  This demonstrative is one of Ungar's slides

15   where he characterizes or mischaracterizes my position

16   from a report that I provided earlier.  He says -- he

17   cites to claim 29 of Bowman that uses the word

18   "matching," adjusting the ranking value for use in each

19   item in the query results to reflect the number of terms

20   specified by the query are matched.  So he's just simply

21   pointing to the use of the word "matching."  And as we

22   saw, the word "matching" is used to match the term in a

23   rating table in order to look at the number of clicks,

24   the number of times that people have liked -- the

25   popularity of the item, as it were.  So matching means

Dr. J. Carbonell - Direct

1   looking up the popularity.  It does not mean looking at

2   the content or doing anything else with the content.

3   Q.   Now, the color coding here is blue.  What does blue

4   stand for?

5   A.   Blue stands for content, and I believe that he is

6   wrong in that.  So if we were to modify that coloring

7   scheme to make it green, collaborative, then I would

8   agree with his statement of what that frame is actually

9   disclosing.

10        By the way, the word "matching" must be used in

11  a consistent way throughout the patent description and

12  the patent claims.

13  Q.   Yes.  And Dr. Ungar has part of the patent

14  specification on the same page below the claim 29 we

15  just looked at.  What does that passage say to a person

16  of ordinary skill in the art?

17  A.   This, I believe, is the same passage that I have

18  shown earlier that Dr. Ungar highlighted.  It says that

19  the individual user behavior rather than in accordance

20  with attributes of the items.

21        This basically supports my opinion, rather

22  than.  The word could not be more clear that it says not

23  to do it with respect to the attributes of the item.  So

24  it definitely does not look at content.

25  Q.   Does this passage help you to understand what was

Dr. J. Carbonell - Direct

1   meant by the word "matching" in Bowman?

2   A.   This passage and the figure that we just saw and the

3   rest of the mentions of matching within Bowman.  So your

4   answer is yes.

5   Q.   In his direct testimony did Dr. Ungar take this

6   passage into account in his interpretation of the word

7   "matching"?

8   A.   Insofar as I can see, Dr. Ungar conveniently ignored

9   this passage and many others that did not support his

10  opinion.

11  Q.   Okay.  Thank you, Dr. Carbonell.

12       Let's talk about filtering.  Dr. Ungar testified

13  that Bowman discloses filtering in the manner recited by

14  the asserted claims.  Do you agree with that opinion?

15  A.   No, I disagree with that opinion.

16  Q.   Why?

17  A.   Well, because filtering is different from ranking

18  and Bowman discloses ranking and does not disclose

19  filtering.

20  Q.   Okay.  I believe that you have prepared a

21  demonstrative to explain the difference between

22  filtering and ranking.  Can you provide your view of how

23  the industry would understand filtering and ranking in

24  1998?

25  A.   Yes, I would.  First let me apologize for my lack of

Dr. J. Carbonell - Direct

1   artistic ability.  Filtering operates by taking a set of

2   items, as you see on that group of cloud to the left,

3   and looks at one item at a time one by one and looks at

4   the one or more attributes of that item and then decides

5   whether to accept it or reject it, whether to keep it or

6   to throw it away.  So filtering is done with a fixed

7   criterion, a criterion that does not depend on the other

8   items, and it does the processing one at a time without

9   comparing one item to another.

10  Q.   And ranking?

11  A.   And ranking in contrast takes the same input, a set

12  of items, but then compares them with each other.  It

13  uses a ranking function or a ranking score, for example,

14  popularity, as Bowman does, and then outputs a rank

15  list, also known as a sorting list.  Ranking and sorting

16  are very similar concepts.  So the outputs are very

17  different.  Instead of a region set and subset, it

18  operates a rank list.

19        I also should mention that a filtering system

20  could accept everything or could reject everything.  It

21  doesn't have to have members of both of those sets.

22  Q.   So why would a person of ordinary skill in the art

23  in 1998 use filtering versus ranking?

24  A.   They would use filtering if all they wanted to do

25  was to select some items that were, for example, of very

Dr. J. Carbonell - Direct

1  high quality and they have none, in which case the

2  accepts would have been empty, or it could have been

3  many, in which case that set would dominate the rejects

4  set.

5        To rank them would be putting them in order.

6  Even the one at the top of the order could be low

7  quality or the top of the order in many more could be of

8  high quality.  Ranking is just a different kind of

9  operation.  Search engines typically rank because you

10 have to have some output.  So, the best you can, whether

11 it's good or not.

12 Q.  Now, Dr. Carbonell, I believe you have a witness

13 binder in front of you?

14 A.  Yes, I do.

15 Q.  Hopefully it's pretty thin.  Can you take a look at

16 PX-434?

17 A.  Yes, I have it here.

18 Q.  Can you identify this document?

19 A.  Yes.  This document is an article written by David

20 Lewis of AT&T Research.  It pertains to the so-called

21 TREC evaluations.  TREC is an evaluation conducted by

22 the U.S. Department of Commerce through the National

23 Institute of Standards and Technology.  They are

24 evaluations of different kinds of information retrieval

25 and information processing systems.

Dr. J. Carbonell - Direct

1          MR. CIMINO:  Your Honor, we would seek to admit

2    PX-434 into evidence.

3          THE COURT:  Any objection?

4          MR. NELSON:  Well, your Honor, it wasn't

5    discussed in his report, but it's in the materials

6    considered.  So we can move it along, I am fine with

7    that.

8          THE COURT:  All right.  It will be admitted.

9          (Plaintiff's Exhibit 434 was admitted.)

10         MR. CIMINO:  I have to add an objection.  I do

11   disagree that it was not discussed in his report, but we

12   can move on.

13         So, your Honor, the next demonstrative pulls up

14   a passage from that.  I would like to be able to have

15   that published for the jury.

16         THE COURT:  All right.

17         MR. CIMINO:  I believe the rest of the

18   presentation is all based on either demonstratives or

19   admitted exhibits, your Honor.

20   BY MR. CIMINO:

21   Q.  Dr. Carbonell, is your understanding of filtering

22   consistent with how those in the field refer to the

23   method?

24   A.  It is completely consistent, yes.

25   Q.  Can you explain how the TREC article you just

1  mentioned, PX-434, supports your opinion?

2  A.   Yes.   The U.S. Department of Commerce through the

3  National Institute of Science and Technology -- I will

4  abbreviate that as NIST -- wanted a way to evaluate the

5  science or evaluate the technology, primarily the

6  technology.   It had a retrieval conference called TREC

7  which had more than one TREC, more than one part of that

8  conference.

9       One part of that conference focused on

10 filtering, a different part focused on ad hoc retrieval,

11 and so on.   The abstract of this paper describing the

12 TREC-4 conference -- this would be the fourth time the

13 evaluations were done -- stated that the TREC-4

14 filtering track was an experiment in the evaluation of

15 binary text classification systems, accept or reject --

16 that's binary -- in contrast with ranking systems.

17      So the field was using classification or, in

18 this case, filtering.   Binary classification and

19 filtering are the same thing.   We were contrasting it

20 with ranking systems with a separate evaluation for

21 ranking systems for what they call the ad hoc retrieval

22 track.   That's the only point I really wish to make

23 here.   The paper goes on in scientific detail as to how

24 each evaluation was conducted.

25 Q.   Do you know whether Dr. Ungar agrees that filtering

Dr. J. Carbonell - Direct

1  and ranking are different?

2  A.   Well, originally Dr. Ungar disagreed, but he changed

3  his opinion and by the time he testified, he stated that

4  they are indeed different.  So the witness for the

5  defense and I have the same opinion.

6  Q.   Now, in Bowman, does Bowman discuss presenting its

7  results through filtering or ranking?

8  A.   Through ranking.

9  Q.   Dr. Ungar in attempting to show that Bowman

10  discloses filtering mentioned a term called subsetting.

11  Do you remember that?

12  A.   Yes.

13  Q.   Is there a difference between subsetting and

14  filtering?

15  A.   Yes, there is.  If I may have the next slide.

16  Q.   Can you please explain the difference?

17  A.   Okay.  The part on the left is filtering.  I am not

18  going to walk you through it a second time.  The part on

19  the right is a one additional step performed after

20  ranking.  So subsetting means that you first rank the

21  items according to a score.  That's the one at the top,

22  for example, and so on down the list.  And then you take

23  that sorted list and you snip it, you say I'm going to

24  keep the top 3 or the top 10.  Search engines typically

25  return the top 10 best results.  That is a subset.

Dr. J. Carbonell - Direct

1    You could also subset with respect to a ranking

2   value.  For example, the median value and keep the top

3   half of that list.  Notice that subsetting is with

4   respect to the rank list.  It's not an item-by-item

5   selection.  It is not based on the specific properties

6   of the item.  Hence, it is quite different from

7   filtering.

8   Q.   Dr. Carbonell, does ranking occur first when you do

9   a subsetting technique?

10  A.   Ranking is a requisite step to do subsetting.

11  Q.   Okay.  Well, let's take a look at Bowman.  Does

12  Bowman's discussion of subsetting meet the filtering

13  requirement of the asserted claims?

14  A.   It does not.  Bowman describes the subsetting

15  process that I have just described quite clearly.  First

16  he talks about ranking, generating ranking values for

17  the items, and then he talks about ordering the items,

18  that is, putting them in a rank list, and then he talks

19  about subsetting the items, that is, keeping part of

20  that rank list.  He's very clear on his description.

21  Q.   Do you recall what Bowman describes as the criteria

22  for subsetting?

23  A.   Bowman describes two possible criteria for

24  subsetting.  One of them is keeping a fixed number of

25  items, the top 3 or top 10 or top 20.  And the other one

Dr. J. Carbonell - Direct

1  is based on a ranking value, a particular value that was

2  generated while the ranking was being done and he

3  decided to keep all the ones above that value.

4  Q.   Okay.  So up on the screen I believe you have

5  another demonstrative that Dr. Ungar used, DDX-3.57.

6  A.   That's correct.

7  Q.   What is your take on Dr. Ungar's position that

8  Bowman discloses filtering?

9  A.   Well, Dr. Ungar merely states it discloses

10  filtering.  He does not argue why it discloses

11  filtering, and he is wrong with respect to Bowman

12  disclosing filtering.  You see on the top left that's a

13  recitation of claim element (b) of claim 10 of the '420

14  which requires content-based filtering.  Of course, it

15  is not content based, as we discussed before.  It is

16  also not filtering.

17          Ungar cites to Bowman in a different part than

18  the one that I cited, which says pretty much the same

19  thing.  In "Step 808 preferably involves sorting the

20  items in a query result --" sorting, that's the same

21  thing as ranking, "-- in decreasing order of their

22  ranking values --" he's using ranking values in the

23  exact same way I described before, "-- and/or subsetting

24  the items in the query to include only those items above

25  a threshold ranking value."  So he has to generate the

1 ranking values and pick one for the median or one that's
2 close to the top so you can only return the top results
3 and use that as the subsetting guide after he has the
4 rank list.  So this is clearly subsetting as I described
5 it and not filtering.
6 Q.   Okay.  Dr. Carbonell, I believe here you have
7 DDX-3.68.  This was Dr. Ungar's summary of all the
8 disclosures in Bowman that met the claim elements.  Do
9 you agree with this?
10 A.   No, I disagree with this.
11 Q.   Where do you disagree?
12 A.   I disagree with respect at least with respect to
13 claim element (b) and claim element (d).  Bowman does
14 not disclose content-based anything and does not
15 disclose a filtering system, and those two claim
16 elements are not disclosed or taught by Bowman and,
17 hence, Bowman does not anticipate claim 10.
18 Q.   And in your opinion is claim 10 of the '420 patent
19 valid over Bowman then?
20 A.   Since it is not anticipated by Bowman, it is valid
21 over Bowman, yes.
22 Q.   Okay.  Thank you.
23        Let's move to the second prior art reference.
24 What is the second prior art reference that Dr. Ungar
25 asserts is anticipated?

Dr. J. Carbonell - Direct

1  A.   Yes.   That is a patent by Gary Culliss.

2  Q.   And, Dr. Carbonell, like you did on Bowman, let's

3  focus just on claim 10 of the '420 patent for now to try

4  to keep this as simple as possible.

5       Do you believe that claim 10 of the '420 patent

6  is anticipated and, therefore, invalid over Culliss?

7  A.   No, I do not believe that claim 10 is anticipated

8  and so, therefore, claim 10 is valid over Culliss.

9  Q.   Which claim elements do you believe are missing in

10  Culliss?

11  A.   It is the same ones that were missing under Bowman.

12  That would be claim element (b) and claim element (d),

13  the two that are circled in red.

14  Q.   The two circled in red?

15  A.   Yes.

16  Q.   Okay.   So like with Bowman, let's first start by

17  having you describe to the jury how Culliss would

18  actually work.

19  A.   Yes, actually Culliss works in a way that is very

20  similar to Bowman so maybe I can make my description a

21  little more rapid.   Bowman discloses something he calls

22  a rating index.   That rating index is very similar to --

23  excuse me, Culliss.   I misspoke.   Culliss describes a

24  rating index that is very similar to Bowman's rating

25  table.   Culliss states that his invention monitors

Dr. J. Carbonell - Direct

1   searching activity, that is, selections and clicks by

2   different users to organize articles in accordance with

3   the searching activity of one or more users.  Purely a

4   collaborative process.

5   Q.   How would it monitor searching activity?

6   A.   It will take into account what queries were issued,

7   what were the terms in those queries, and then what was

8   clicked by the user of the different squares or

9   summaries generated in the results page, whether they

10  clicked on No. 1 or they clicked on No. 3, or clicked on

11  both and not the others.

12  Q.   Okay.  I believe you just read from column 2:62-64.

13  You also show here a part of the specification at column

14  4:57-64, an index at the bottom of this demonstrative.

15  Can you explain for the jury what that index is and how

16  it would work?

17  A.   Yes.  That index is what he calls his rating index.

18  Alpha and Beta are meant to stand for query terms like

19  "human" or "dynamics" that we saw earlier.  And then A1,

20  A2 and A3, that represents articles -- that's why he

21  calls them A -- or items.  And the numbers represent the

22  clicks.  So, for example, if you look under Gamma, A2 --

23  excuse me, A3 has two clicks under that index.  So,

24  again, this rating table is purely collaborative in the

25  instruction.

Dr. J. Carbonell - Direct

1   Q.   And how would Culliss then serve results in

2   accordance with this index?

3   A.   Culliss will look up in the index, it would match

4   the query terms against the index entries and it would

5   output the ones that have the highest number of clicks,

6   the most popular ones, the ones that were most liked by

7   other users or by the same user.

8   Q.   Now, Dr. Carbonell, Dr. Ungar testified that Culliss

9   discloses content analysis in the manner called for by

10  the asserted claims.  Do you remember hearing that

11  testimony?

12  A.   I remember hearing it.

13  Q.   And do you agree with that?

14  A.   No, I certainly disagree with that.

15  Q.   Okay.  Pull up part of DX-58, the Culliss patent.

16  Here's the abstract.

17        Can you explain to the jury why you don't

18  believe Culliss teaches the content elements as required

19  by the asserted claims?

20  A.   Because Culliss specifically teaches or discloses

21  the collaborative or popularity-based aspect.

22        We see here as users enter search queries and

23  select articles, the scores are altered.  These are the

24  scores in that rating index that I just mentioned.  The

25  scores have been used in subsequent searches to organize

Dr. J. Carbonell - Direct

1  the articles that match a search query.  So he used the

2  scores, the number of clicks that users have done.  If

3  they liked article 3 and not liked article 1, article 3

4  will come up the next time.  Culliss thinks that this is

5  a good way for searching, a collaborative way.

6  Q.   And that would not take into account the content of

7  the article?

8  A.   That process does not take into account the content

9  of the article at all.  It takes into account the search

10 terms and it takes into account the popularity of the

11 articles.

12 Q.   Well, Dr. Ungar testified that Culliss's index,

13 which we just saw, could be initialized with a content

14 analysis.  Do you recall that?

15 A.   I recall that.

16 Q.   So, first, what does it mean that the index could be

17 initialized?

18 A.   Okay.  Let me explain initialization a little bit.

19 Initialization means before you start, before the system

20 starts to function you can have some initial values.

21 They could all be blank, zero.  They could all be set by

22 a human.  In fact, Culliss discloses both of those

23 possibilities.  Culliss also says that the initial value

24 could be set by whether a term is contained in an

25 article or the number of times that term is contained in

1   an article.  That would be the initialization step.

2   Q.   Well, what role does initialization play in the

3   index in serving results?

4   A.   It plays virtually no role whatsoever.  As you will

5   see later in another example, Culliss itself ignores the

6   initialization.

7        If we look at the highlighted region of the

8   abstract, Culliss is talking about millions of people

9   using the Internet typing in millions of queries.  That

10  was back in 1998.  Today we are talking about billions

11  of queries being served.  So you would have billions of

12  click-throughs having initialization value of 1,

13  regardless of how that was arrived at, becomes totally

14  immaterial.  Or even in this subsetting value of 3, the

15  word would occur 3 times.

16       So the initialization is immediately swamped by

17  the use of the system in the Internet over time.  So it

18  doesn't matter how the initialization was done.  The

19  initial operation of the system is purely collaborative,

20  pure profile, pure popularity-based system, and that's

21  what governs.

22  Q.   Okay.  How many figures are there in the Culliss

23  patent?

24  A.   There's only one figure in Culliss's patent and that

25  is the one that you see before you here.

Dr. J. Carbonell - Direct

1  Q.   Does this figure describe the operation of the

2  Culliss system?

3  A.   Yes, it does.   That's why Culliss put the figure in

4  there in the first place.

5  Q.   Does this figure describe content analysis?

6  A.   The figure does not describe content analysis.

7  Q.   What does the figure describe about the operation of

8  the Culliss patent?

9  A.   It describes the normal operation of the Culliss

10  system.   If we look at the top -- I'm sorry that my

11  glasses are not great -- the first step he's talking

12  about receiving a search query from the first user.   The

13  next step, Step 20 is presenting articles.   The third

14  step is allowing the first user to select one or more

15  articles.   That means to click on one or more articles.

16  And then you alter the index according to the

17  selections.   In other words, you add one if the person

18  liked it and don't do anything if the person did not

19  click on it.

20       Then when you get a search query from another

21  user, the user's popularity rating table.   So he's

22  describing the operation of it.   He doesn't even bother

23  to mention the initialization step in his figure because

24  it is irrelevant for the normal running of the system.

25       The last step, by the way, when he presents the

Dr. J. Carbonell - Direct

1  article, he presents it in ranked order, so he's

2  disclosing ranking and not filtering, in addition to not

3  doing any content analysis.

4  Q.   Okay.  Thank you.

5        So just on the content analysis, do any of the

6  boxes, 10, 20, 30, 40, 50 or 60 that describe the

7  operation of Culliss, provide any information about a

8  content analysis for selecting the results?

9  A.   No, they do not.  They all refer to the

10 collaborative process.  Not a single step refers to

11 content.

12 Q.   All right.  Let's move on to the other issue of

13 filtering.  Dr. Ungar testified that Culliss discloses

14 filtering is embodied in the asserted claims.  Do you

15 agree?

16 A.   No, I disagree.

17 Q.   And why is that?

18 A.   Well, first of all, Culliss -- there's more than one

19 part to Culliss's patent.  The main part is the main

20 facility, the one that we just described now, discloses

21 only ranking.  I don't know whether the next slide

22 demonstrates that as well or not.

23 Q.   Well, first of all, you mentioned facility.  Can you

24 explain to the jury what you mean when you say the

25 Culliss facility?

Dr. J. Carbonell - Direct

1  A.   Facility is the Culliss system.  I'm using the word

2  that Bowman used to describe his system.  He called it a

3  facility.  So I'm using the same word both in Culliss

4  and Bowman.

5  Q.   Okay.  Dr. Ungar, I believe, when he talked about

6  Culliss teaching filtering referred to the rating index

7  here in DX-50 in the Culliss patent at column 2, line 63

8  to column 3, line 2.  Do you believe that the ratings

9  index discloses filtering?

10 A.   I believe that the -- first of all, let me explain.

11 The main part of the Culliss patent is exactly what we

12 described before.  It's an add-on part where he's

13 disclosing a rating system.  You see that figure here in

14 front of you from the Culliss patent describing the

15 other part, and that other part purports to disclose

16 filtering.  First of all, it is not content-based

17 filtering and, second, it's not even a workable

18 filtering.

19 Q.   What do you mean by it's not a workable filter?

20 A.   So, you bear with me a bit, I will explain what

21 Culliss has described.

22 Q.   Yes, please do.

23 A.   Okay.  So Culliss described a method that he claims

24 is useful for ratings.  In this case he's talking about

25 G-rated and X-rated for material.  G-rated being

Dr. J. Carbonell - Direct

1  appropriate for everybody and X-rated being appropriate

2  for only adults.

3       He gives an example of a table in which he has

4  initialized, this is the early step, initialized A1 and

5  A3 to be G-rated and A1, A2 and A3 to be X-rated.

6       First of all, that is initialization strikes me

7  as somewhat absurd because A1 and A3 are rated as both

8  G-rated and X-rated, but nonetheless, Culliss quickly

9  dismisses the initialization step anyway, so it actually

10 doesn't matter.  This initialization, whether

11 content-based or otherwise, plays no role.

12      This table shows after the system has been in

13 use for a while or the facility has been in use for a

14 while that G-rated people liked both A1 and A3 because

15 they clicked on A3, 21 times after it was shown to them

16 22 times, and they clicked on A1 all 4 times it was

17 shown to them.  And the adults liked A3 a lot.  They

18 clicked on it 45 times out of 45, but they did not like

19 A1 and A2 as much.  They only clicked on it twice, even

20 though it was shown more often.

21      From that Culliss concludes that A3 must be

22 X-rated.  I'm not sure how he concludes that.  Both the

23 G-rated and the X-rated people liked it.  Maybe just

24 because the adults liked it, he concludes that it must

25 be X-rated.

Dr. J. Carbonell - Direct

1     Of course, adults can like all kinds of things
2  that are not X-rated.  Even if it was adult males, they
3  could like football, they could like popcorn while they
4  watched the football.  They could like a number of
5  things that are completely appropriate for G-rated.  You
6  would not want to deny the children their popcorn also
7  because their fathers also liked the popcorn.
8     Moreover, even if it worked in the manner
9  Culliss describes, it would require the G-rated crowd to
10  view X-rated material, if A3 is indeed X-rated material,
11  22 times prior to it being finally labeled X-rated.
12     So my conclusion is this so-called rating system
13  is absurd.  It does not work.  It does not provide what
14  Culliss wishes.  Culliss is trying to come up with a way
15  of rating based on collaborative feedback data.  The way
16  that he describes it, by his own example, just doesn't
17  work.
18  Q.   Okay.  Thank you, Dr. Carbonell.
19     Up is one of Dr. Ungar's slides about claim
20  element 10(d), DDX-3.107.  What is your take on
21  Dr. Ungar's conclusion here?
22  A.   Well, Dr. Ungar has two conclusions, both of which
23  are wrong.  The first conclusion is he claims that
24  Culliss teaches a content profile, because of that
25  initialization step that we have already discussed and

Dr. J. Carbonell - Direct

1   dismissed as irrelevant, that's the blue one at the top.

2        Second, he claims that it discloses a filter

3   system combining data because Culliss is talking about

4   altering items in the index.  For the life of me, I

5   can't see how altering refers to combining or

6   filtering.  All it's doing is adding one to the

7   collaborative score.  He's clearly in a collaborative

8   area.  Even Dr. Ungar colors that part green, but

9   altering a score means you add one to the score.  The

10  person clicked on it, he liked it, so, therefore, the

11  score is now bigger.  That is not combining; that is not

12  filtering.  So, therefore, I disagree with both parts of

13  his slide here.

14  Q.   I believe you have colored some more of 10(d) here

15  to make your point?

16  A.   Yes, I colored some more because Dr. Ungar failed to

17  color the filtering part that is also required by this

18  claim element, so I extended the color.

19  Q.   Okay.  Again, now, we have the summary of the

20  anticipation slide that Dr. Ungar used for Culliss.  Do

21  you agree that there should be a check in each of these

22  boxes?

23  A.   No, I disagree.

24  Q.   Why?

25  A.   Because Culliss does not teach claim element (b) and

Dr. J. Carbonell - Direct

1  he does not teach claim element (d).  Therefore,

2  Culliss's contention is incorrect, and the claim is not

3  anticipated by Culliss.

4  Q.   Thank you, Dr. Carbonell.

5       So we just went through claim 10 of the '420

6  patent for both Bowman and for Culliss.  Let's talk about

7  the other asserted claims.

8  A.   Okay.

9       THE COURT:  Before you start, let's just take a

10 15-minute break before you start on the other asserted

11 claims.

12      MR. CIMINO:  Yes, your Honor.

13      THE COURT:  All rise.

14      (Jury out.)

15      THE COURT:  You may step down.

16      (A recess was taken at 11:40 a.m., after which

17 court reconvened at 12:08 p.m.)

18      MR. BROTHERS:  Your Honor, before you bring the

19 jury back in, I would like to raise one issue with the

20 Court.

21      With respect to the ruling this morning, I want

22 to alert the Court that we believe its procedurally

23 improper because once the Court found that the burden had

24 shifted after they presented their evidence in their

25 case, in our rebuttal case we are permitted to respond to

1  their evidence of laches because they have the initial

2  burden of going forward.  So for the Court to have ruled

3  prior to the receipt of our evidence, we believe is

4  procedurally improper, that he should have had an

5  opportunity to present evidence and we would propose

6  calling Mr. Blais as a rebuttal witness -- it was

7  disclosed in the pretrial order -- to explain with regard

8  to what was going on at Lycos because he joined Lycos in

9  2005.  But to do that, we need to get him down here

10 immediately.

11        And we would also make proffers with regard to

12 other evidence, but we can take that up later as long as

13 your Honor is willing to receive this evidence.

14        THE COURT:  Thank you.

15        Mr. Brothers, you can have a seat.

16        MR. BROTHERS:  Thank you.

17        THE COURT:  There's two things the Court didn't

18 do that it usually does a few minutes ago.  Indicate to

19 counsel the Court reserves the right, and frequently

20 does, in a written memorandum order to explain its

21 ruling.

22        Second, you indicated, and the record will

23 reflect, that you had one rebuttal witness that you were

24 calling, and that was Dr. Carbonell on the question of

25 validity.  So the Court did not rule foreclosing you an

Dr. J. Carbonell - Direct

1  opportunity to put on rebuttal evidence on the issue of

2  laches because you told the Court -- the Court was aware

3  of it -- that you were calling one witness, and the Court

4  ruled based upon what was then a complete record on this

5  issue.

6           Secondly, in terms of you providing written

7  submissions, the Court indicated it was ruling

8  yesterday.  You never indicated that, Judge, after you

9  made your oral presentation, we want an opportunity to

10  file a written response, though it might be short, and

11  you didn't say it this morning when the Court commenced

12  to rule on laches.  You only said it after the Court made

13  an adverse ruling, just as you are now bringing up the

14  question about you have not had an opportunity to rebut

15  after you told the Court that you only had one witness

16  left, and this was the witness that's on the stand.

17          So at this juncture, the Court hears you.  The

18  Court is not granting that opportunity.  The Court will

19  keep in mind what you said, but I'm telling you, you had

20  a full opportunity and you told the Court you were only

21  bringing Dr. Carbonell.  You expressed no interest in

22  bringing anybody in here on the question of laches.

23          Bring in the jury.

24          (Jury in.)

25          THE COURT:  You may be seated.

Dr. J. Carbonell - Direct

1        Let the record reflect all jurors are present in

2   the courtroom.   Does counsel agree?

3           MR. NELSON:  Yes, your Honor.

4           MR. CIMINO:  Agreed.

5           THE COURT:  Okay.  You may continue.

6           MR. CIMINO:  Thank you, your Honor.

7   BY MR. CIMINO:

8   Q.   Dr. Carbonell, before we broke, you were going to

9   talk about the other asserted claims in your opinions

10  about validity.  Do you remember that?

11  A.   Yes.

12  Q.   We have already done claim 10 of the '420 patent and

13  you provided your opinions on Bowman and Culliss with

14  respect to that claim, right?

15  A.   Correct.  I provided the opinion that Bowman and

16  Culliss did not anticipate that claim.

17  Q.   Okay.  So let's look at the other claims.  First,

18  does Bowman anticipate claim 25 of the other independent

19  claim of the '420 patent?

20  A.   No.  Bowman does not anticipate claim 25 of the

21  '420.  It's a method claim otherwise equivalent to claim

22  10.

23  Q.   And why doesn't it anticipate?

24  A.   For exactly the same reasons that claim 10 is not

25  anticipated.

Dr. J. Carbonell - Direct

1  Q.   Okay.  Up on the screen, on the right side of the

2  screen is Dr. Ungar's chart for claim 1 of the '664

3  patent.  Does Bowman anticipate claim 1 of the '664

4  patent?

5  A.   No, Bowman does not anticipate claim 1 of the '664

6  patent.

7  Q.   Can you explain why not?

8  A.   Because it does not meet claim element (c) which

9  requires content-based filtering with respect to the

10  query.

11  Q.   Is your analysis in any way different from your

12  analysis for the '420 patent?

13  A.   No, it's the same analysis.

14  Q.   Okay.  How about claim 26, the other independent

15  claim of the '664 patent, what does that claim require

16  and do you believe that it's anticipated by Bowman?

17  A.   Claim 26 of the '664 patent is a method claim

18  corresponding to claim 1 and it is also not anticipated,

19  and it's not anticipated for the same reasons that claim

20  1 of the '664 is not anticipated.

21  Q.   Okay.  Let's talk about Culliss.  Again, you have

22  provided an opinion about claim 10 of the '420 patent,

23  correct?

24  A.   That's correct.

25  Q.   How about claim 25 of the '420 patent, do you

Dr. J. Carbonell - Direct

1  believe that claim 25 of the '420 is anticipated by

2  Culliss?

3  A.   Claim 25 of the '420 patent, as I mentioned before,

4  is a method version of claim 10 of the '420 and it is

5  not anticipated by Culliss because he fails to disclose

6  claim element (b) or (d) of the that claim and, hence,

7  is not anticipated for the same reasons that claim 10 is

8  not anticipated.

9  Q.   How about claim 1 of the '664 patent, does Culliss

10  anticipate claim 1 of the '664 patent?

11  A.   Culliss does not anticipate claim 1 of the '664

12  patent.  It does not disclose the third claim element,

13  element (d).

14  Q.   You show that down here in the bottom right-hand

15  corner?

16  A.   Yes.

17  Q.   And how about claim 26 of the '664 patent, in your

18  opinion does Culliss anticipate claim 26?

19  A.   No.  Once again, claim 26 is a method claim

20  corresponding to claim 1 of the '664 and Culliss does

21  not anticipate that claim for the same reasons that

22  Culliss does not anticipate the claim 1 for the '664.

23  Q.   Okay.  And there are some dependent claims that are

24  asserted in this case.  Are any of the dependent claims

25  asserted by Bowman or Culliss?

Dr. J. Carbonell - Direct

1  A.   Without going into each one of these dependent

2  claims, they are all dependent upon one of these four

3  independent claims and they are not anticipated, at

4  least because the independent claims on which they

5  depend are themselves not anticipated.

6  Q.   So, Dr. Carbonell, in your opinion is there any

7  asserted claim anticipated by Bowman or Culliss?

8  A.   No, none of the asserted claims are anticipated by

9  either Bowman or Culliss.

10  Q.   Does that complete your anticipation analysis?

11  A.   Yes, it does.

12  Q.   Okay.  Let's move on to obviousness.  Can you

13  provide a brief overview of your obviousness

14  conclusions?

15  A.   Yes.  My conclusions are that the asserted claims of

16  the '420 and '664 are not rendered obvious by the cited

17  prior art, namely the Lashkari, Fab and Rose by

18  themselves or in combination with Culliss are not.

19  Q.   Lashkari, Fab and Rose, are those the three pieces

20  of prior art that Dr. Ungar identified for the purposes

21  of obviousness?

22  A.   Those are exactly the three that he identified, yes.

23  Q.   Now, did you hear Dr. Ungar testify that all

24  elements of the asserted claims are shown in the prior

25  art?

Dr. J. Carbonell - Direct

1  A.   He has indeed testified to that.

2  Q.   Do you agree with that?

3  A.   No, I disagree.  I believe that there are claims

4  that are entirely missing -- claim elements, excuse me,

5  that are entirely missing from the cited prior art.

6  Q.   Can you explain that opinion to the jury, please?

7  A.   Yes.  It is not possible to render obvious by

8  combining claim elements if some of the claim elements

9  are not disclosed or taught by any of the cited prior

10  art.  In particular, four claim elements are missing

11  from all of the cited prior art.

12       As we can see in this demonstrative here, claim

13  (d) of the '420 -- excuse me, element (d), claim 10 of

14  the '420, element (d) of claim 25 of the '420, element

15  (c) of claim 1 of the '664 and element (c) and (d) of

16  claim 26 of the '664.

17  Q.   And what is the consequence of obviousness if there

18  are elements missing from all cited prior art?

19  A.   It means that it is not possible for the cited prior

20  art to render the asserted claims obvious.  You cannot

21  combine that what you don't have.

22  Q.   Now, earlier you talked about having two camps of

23  prior art.  Do Rose, Lashkari and Fab fall into either

24  of those two camps?

25  A.   Yes, they do.  As you can see, this is the

Dr. J. Carbonell - Direct

1  non-animated version of my earlier demonstrative.  All

2  three, Lashkari, Fab and Rose, fall into the profile

3  system side, in other words the right side of this wall.

4  Q.   So they should be shown on the right side?

5  A.   That's right.

6  Q.   Do Rose, Lashkari or Fab, the filtering aspect in

7  ranking, do either of them have access or use of the

8  query?

9  A.   Yes.  First, Rose does not teach filtering.  It

10 mentions it, but does not teach us how to do it, and

11 none of the three describe how to perform any of their

12 operations with respect to the query.  In fact, none of

13 them use the query, none of them access the query, none

14 of them process the query, none of them filter with

15 respect to the query, none of them perform the content

16 or collaborative analysis with respect to the query.

17 Q.   So, Dr. Carbonell, over here on the right side where

18 it says profile system, you have Rose, Lashkari and Fab,

19 what criteria do they use to select the final results

20 for the user?

21 A.   Well, they do not use the query.  Instead they use

22 the longstanding profile, the set of things that each

23 person or each user is interested in, and the set of

24 things which other users have a longstanding interest in

25 if their first user's interests match theirs.

Dr. J. Carbonell - Direct

1   Q.   Now, you heard the testimony of Dr. Ungar in court?

2   A.   Yes, I have.

3   Q.   Does he agree that profile systems and search

4   systems are different?

5   A.   He agrees that they are indeed different, as you can

6   see from his quote here.  He says that they are

7   different, they being the profile systems are different

8   from the demand search systems.  So the answer is yes.

9   Q.   Okay.  Dr. Carbonell, so what is the difference

10   between the profile systems of Rose, Lashkari and Fab

11   and the Lang and Kosak invention?

12   A.   Well, Lang and Kosak disclose a tight integration

13   among all of the different parts.  As you can see here

14   from element (d) of claim 10 of the '420 and element (c)

15   of claim 1 of the '664, they require all of the

16   components, the filtering, the combining, the pertaining

17   feedback data, the content profile and the relevance to

18   the query to be tightly or closely integrated.  In fact,

19   they perform all of those operations, the filtering, the

20   combining with the feedback with respect to the query.

21   That is something that all of the cited prior art fails

22   to do.

23   Q.   In your opinion is it better to do it this way than

24   the Lang and Kosak tightly integrated way, rather than

25   the over-the-wall method that you explained earlier

Dr. J. Carbonell - Direct

1  about how the prior art would take the output of one

2  system and use it as an input of another system?

3  A.   It is indeed better to do the Lashkari integration.

4  I think I have alluded to this before.  If you perform a

5  multi-factor analysis, you combine the content, you

6  combine the profile, you combine the collaborative and,

7  most importantly, you combine the immediate information

8  need as represented in the query in order to find the

9  best possible items that satisfy a combination of all of

10  these ingredients.  That yields better results.  That's

11  why this reflects the current practice.

12  Q.   Okay.  Dr. Carbonell, let's take a closer look at

13  the three pieces of prior art Dr. Ungar identified for

14  obviousness, and let's start with Rose.

15        So, can you tell the jury which elements you

16  believe are missing from the Rose patent?  And, again,

17  let's start with claim 10 of the '420 patent so we have

18  got a consistent base by which to have you explain your

19  opinions.

20  A.   Okay.  Let's do that.  It's claim element (a), (b)

21  and (d).  Those are the three circled in red are missing

22  from Rose.  Rose does not scan a network and find items

23  relative to a query.  Content-based analysis is not

24  relevance to the query, and Rose does not teach

25  filtering or combining with relevance to the query.

Dr. J. Carbonell - Direct

1  Q.   Let's scroll down a little bit.  Does Rose teach

2  filtering in the manner required by the asserted claims?

3  A.   Actually, Rose does not teach filtering in that

4  manner.  Rose teaches ranking.  It mentions ranking

5  throughout, as you can see from this passage which I

6  will save time by not reading.

7       Rose does mention filtering, but doesn't mention

8  out how to do the filtering or how to combine it.

9  Instead, it mentions and teaches that one should rank.

10  Q.   Okay.  Dr. Carbonell, does Rose teach relevance to

11  the query in a manner required by the asserted claims?

12  A.   No, Rose does not teach relevance to the query.  In

13  fact, Rose doesn't have a query, doesn't have access to

14  a query.  Instead, Rose has a basic profile system

15  focusing on long-term likes, long-term needs, long-term

16  interests of users.

17       This is an example of Fig. 7 from Rose in which

18  it is updating and making recommendations about movies

19  to a particular user.  You can see on the right that it

20  says movie recommendations and it's an had ordered list,

21  a rank list.  It's ranking, that is disclosing, and

22  ranking with respect to filtering.  Excuse me, I said it

23  wrong.  Ranking with respect to the items that it is

24  recommending in this case with respect to profile is

25  what I meant to say.

Dr. J. Carbonell - Direct

1  Q.   Would the recommendations here be developed over a

2  long-term need or an immediate need?

3  A.   It will be developed over a long-term need.  The

4  movie recommendations are based on what movies they

5  liked and it would be updated if they liked other

6  movies, and it would be updated with other people with

7  similar tastes who have seen other movies, and so on.

8  It's a long-term profile, long-term needs.

9  Q.   So in your opinion, Dr. Carbonell, does Rose make

10  claim 10 of the '420 patent obvious?

11  A.   No, it does not, for the reasons cited, lack of

12  teaching filtering and, particularly, lack of teaching

13  filtering with respect to the query.  It fails to meet

14  three of the claim elements.

15  Q.   What about the other asserted claims?

16  A.   It doesn't render obvious claim 25 of the '420, for

17  example, for the same reasons, that is it's a method

18  version of claim 10.

19        It also does not render obvious the '664 claims,

20  claim 1 and claim 26, because it does not perform any of

21  the operations with respect to the query.

22  Q.   Okay.  Thank you.

23        Let's move on to Lashkari.  Let's put up claim

24  10 of the '420 patent.

25        Do you believe there are elements missing in

Dr. J. Carbonell - Direct

1  Lashkari that are in claim 10 of the '420 patent?

2  A.   Yes, I do.   The missing elements are, once again,

3  (a), (b) and (d), the same missing elements as for Rose,

4  because Lashkari does not teach to do anything with

5  respect to the query.   It does not process the user's

6  immediate information need.

7  Q.   Okay.   Let's take a look at that.

8       Does Lashkari teach relevance to the query in

9  the manner required by the asserted claims?

10  A.   Lashkari does not.   As evidence of that, we take

11  Lashkari's own summary of his method, the ACF

12  algorithms.   Those are the ones Lashkari disclosed.

13  Take the following steps.   He then elaborates on the

14  steps, but you can see here in summary, he constructs a

15  profile of a user, a profile, not a query, long-term

16  need, long-term interest.

17       It compares the profile to the profile of other

18  users, collaborative.   Profile again.

19       It constructs a set of nearest neighbors for

20  this user.   That just simply means other users with

21  similar preferences.

22       And then it uses that set to make

23  recommendations.   So it doesn't provide answers or

24  results in the query sense.   It makes recommendations

25  over time.   Nowhere does he mention search, nowhere does

1   he mention query, nowhere does he mention information

2   need.

3   Q.   So, Dr. Carbonell, Dr. Ungar cited section 7.2,

4   Filtering Search Engine Query Results, as evidence it

5   disclosed search and query.  What's your opinion about

6   this section 7.2?

7   A.   So, first of all, to put it in context, section 7.2

8   is part of Chapter 7 of Lashkari, which is conclusions

9   and future work.  Lashkari discloses that one possible

10  future work is to perform one of these over-the-wall

11  operations where a search engine such as Lycos produces

12  results.  These results are then thrown over the wall to

13  the Lashkari system who then uses them as input to do

14  its profile systems.  So what Lashkari is disclosing is

15  that it could be one of these over-the-wall systems.

16         The query itself is not even accessed by

17  Lashkari's method.  It is certainly not processed or

18  integrated.

19  Q.   Does the Lashkari filter, then -- let me ask it

20  differently, Dr. Carbonell.

21         What criteria does the Lashkari filter use,

22  then, to select the final results for presentation to the

23  user?

24  A.   It uses the user's profile and the similarity of

25  that profile to the items or the similarity of that

Dr. J. Carbonell - Direct

1  profile to other profiles of other users to see what

2  they had liked.  It is the typical profile-based system.

3  Q.   So in your opinion, Dr. Carbonell, does Lashkari

4  render claim 10 of the '420 patent obvious?

5  A.   Lashkari does not by itself or in combination and it

6  also does not render the other claims, claim 25,

7  obvious, which is the same or equivalent to claim 10, or

8  the '664, claim 1 or claim 26, does not render them

9  obvious either for the same reasons.

10  Q.   Okay.  Let's move on to the final reference,

11  Dr. Ungar asserted which we are calling the Fab

12  reference.  Does Fab render the asserted claims obvious?

13  A.   Fab does not render the asserted claims obvious

14  either.

15  Q.   Let's take a look at part of Fab PX-50 at

16  G-IPE-0217927.

17         Can you explain the Fab system with respect to

18  this drawing?

19  A.   Yes.  First of all, the cited references at the

20  position paper, it describes more of a desire of what.

21  It does not describe a method or a how, other than by

22  presenting this figure.  So this figure comes closest to

23  describing a method, which is why I have selected it

24  here.

25         This is an overview of the Fab architecture.

1  It's, essentially, a recommendation system.  It is

2  recommending pages to a user.  The user is clicking --

3  you see his finger there -- as to whether he likes

4  him -- it looks more like a he, I suppose.  Whether he

5  likes them or he doesn't like them.  Nowhere here do you

6  see search, nowhere here do you see query, nowhere do

7  you see relevance to the query.  So it is also a profile

8  system very similar to the ones we have just finished

9  discussing.

10 Q.   Can you summarize for the jury which elements of the

11 asserted claims, then, are not disclosed by the Fab

12 reference?

13 A.   Yes.  To save time we don't have to look at it

14 again.  It's, again, claim elements (a), (b) and (d) of

15 the claim 10 of the '420 and the corresponding claim

16 elements for claim 25 of the '420, and it's, in fact,

17 all of the elements from claim 1 and claim 26 of the

18 '664 patent.  None of those are disclosed; therefore, it

19 does not render obvious.

20 Q.   Okay.  Dr. Carbonell, I'm switching gears a little

21 bit.  What is your view of the person of ordinary skill

22 in the art in 1998?

23 A.   A person of ordinary skill in the art would have a

24 bachelors degree in computer science or a related field,

25 computer engineering, for example, and would have two or

1  three years of experience in an area roughly called

2  information systems.  That would include databases,

3  programming, algorithms, and so on.

4       This is very similar to what Dr. Ungar

5  described, the exception being is that he said it had to

6  be experienced in information retrieval and search

7  engines.  In 1998, these were just becoming popular.

8  There were precious few people with experience in that

9  area, so I think a somewhat broader experience, rather

10 than narrowing this area, would be appropriate for

11 somebody of ordinary skill in the art.

12 Q.   Dr. Carbonell, you testified earlier that you

13 believed there are some claim elements in the '420 and

14 '664 asserted claims that are not present in the prior

15 art at all; is that right?

16 A.   That is correct.  So some claim elements, claim

17 element (d), claim 10 of the '420 and claim 25, claim

18 element (c) of claim 1 of the '664, and claim elements

19 (c) and (d) of claim 26 of the '664 are missing from all

20 of the cited prior art.

21 Q.   In your view would it have been obvious for a person

22 of ordinary skill in the art, as you have defined or as

23 Dr. Ungar has defined, to supply those missing elements

24 to the prior art to arrive at the claimed invention?

25 A.   I think it would have been very far from obvious and

Dr. J. Carbonell - Direct

1   would not have been obvious for somebody of ordinary

2   skill in the art, even under Dr. Ungar's narrower

3   definition or narrower assertion, to have created those

4   missing claim elements.  That would have required deep

5   skill in both camps, in the search camp and in the

6   profile camp.  That did not happen until some event such

7   as the acquisition of WiseWire by Lycos.

8   Q.   Similarly, would you believe that a person of

9   ordinary skill in the art in 1998, as you defined or

10  Dr. Ungar has defined, would have appreciated the

11  advantage provided in the '420 patents and '664 patents?

12  A.   No, I do not believe that they would have

13  appreciated those advantages, the advantages of tight

14  integration, the advantages of this multi-pictorial

15  taking all of the different factors into account,

16  especially the immediate information needed relevance to

17  the query.

18       As evidence of that is the cited prior art.  It

19  does not suggest any kind of tight integration, it does

20  not suggest serving the immediate information need, it

21  does not suggest performing the collaborative or the

22  content-based analysis or the filtering with respect to

23  the query.  Not only does it not teach how, it doesn't

24  even suggest doing so.

25  Q.   Would the results obtained by the '420 and '664

Dr. J. Carbonell - Direct

1  patents have been predictable to the person of ordinary

2  skill in the art as you have defined here or as

3  Dr. Ungar has defined in 1998?

4  A.   No, it definitely would not have been predictable.

5  They did not know how to do it and they did not know

6  what the outcome of doing it would have been, the higher

7  quality search results from modern search engines that

8  can be achieved by this kind of tight integration.

9  Q.   Do you believe it would have been difficult for

10  those of skill in the art under your definition or

11  Dr. Ungar's definition to have achieved the invention of

12  the '420 and '664 patent in 1998?

13  A.   It would have been extremely difficult.

14  Q.   And why do you say so?

15  A.   It required a skill that was not present by somebody

16  of ordinary skill in the art.  They may have had present

17  a skill of some of the components at best.  They

18  certainly did not have the skill in all of the different

19  art that would have been required to perform that

20  combination and to have invented the missing elements in

21  the claims.  So, therefore, it would not be rendered

22  obvious in the sense that somebody of ordinary skill in

23  the art would not have been able to perform the

24  requisite combination and the requisite invention of the

25  patents.

1  Q.   Thank you.

2       Let's talk about secondary considerations of

3  non-obviousness.  Can you first explain to the jury what

4  secondary considerations of non-obviousness are?

5  A.   Yes.  These are additional considerations that would

6  provide further evidence as to whether an invention is

7  obvious or is not obvious by combining elements from

8  prior art.

9  Q.   And have you formed an opinion as to whether there

10  are any secondary considerations of non-obviousness that

11  are relevant to your analysis of the '420 and '664

12  patent claims?

13  A.   Yes.  I formed that opinion with regard to three

14  secondary considerations.

15  Q.   Okay.  Let's start with the first one.  Can you

16  describe for the jury the first bullet point Commercial

17  Success, how it might impact your analysis of

18  obviousness?

19  A.   Yes.  Commercial success means that if something

20  succeeded commercially, there would have been a reason

21  to do it, there would have been people trying very hard

22  to do it.  And if they tried hard to do it and it was

23  still not done, that would provide strong evidence that

24  it was not obvious.  And, in fact, the commercial

25  success of modern search engines, Google included, that

Dr. J. Carbonell - Direct

1  use the teachings of these patent claims is strong

2  evidence that the commercial success criterion is met

3  and yet nobody else had come up with that invention at

4  that time.

5  Q.   How about the second one, Long-Felt but Unmet

6  Needs.   How does that affect your opinion of

7  non-obviousness?

8  A.   That, again, if there were long-felt needs but

9  nobody figured out how to meet those needs, it means

10 that it must not have been obvious to replicate or

11 create the equivalent of the claims taught by the

12 patent.   In fact, the long-felt needs were recognized

13 even in the cited prior art.   They talked about possible

14 combining, but they came up with the over-the-wall

15 method, the output of one becomes the input of the

16 other.   So, therefore, those needs were there, but they

17 were not met.

18 Q.   If the patent claims here were obvious, do you

19 believe that would have been disclosed, the tight

20 integration that you talk about would have been

21 disclosed in Rose, Lashkari and Fab?

22 A.   It certainly would have been disclosed in those

23 three and elsewhere because then this would have enabled

24 them to gain the upper ground or the upper hand to come

25 up with the invention that is effective.

Dr. J. Carbonell - Direct

1   Q.   And the final one is Failure of others.  Can you

2   explain what you mean here by failure of others?

3   A.   Yes.  If others have tried to achieve the same

4   invention or the same effect, what it means is this

5   would have shown it could be done.  The failure, having

6   tried and failed, indicates that it's not obvious.  Had

7   it been obvious, they would have succeeded.  So others

8   have tried, the prior art has tried, as I mentioned in

9   passing, I myself tried and did not succeed in arriving

10  at this kind of tight integration in performing all

11  these operations with respect to the query, with respect

12  to the immediate information need and the tight

13  integration.

14  Q.   Okay.  Dr. Carbonell, can you provide the

15  conclusions of your validity study to the jury, please.

16  A.   Yes.  These are my overall conclusions.  The first

17  conclusion I said, No asserted claim is anticipated by

18  the cited prior art, that is, by Bowman and Culliss; no

19  asserted claim is rendered obvious by the cited prior

20  art or by any combination of the cited prior art for the

21  reasons stated, including the secondary considerations;

22  that Dr. Ungar's anticipation and obviousness theories

23  are in incorrect and unfounded; and that all asserted

24  claims are, therefore, valid.

25       MR. CIMINO:  Thank you, Dr. Carbonell.

Dr. J. Carbonell - Cross

1     Your Honor, I pass the witness.

2     THE COURT:  Cross-examination?

3     MR. NELSON:  Yes, your Honor.  May I proceed?

4     THE COURT:  You may.

5                    CROSS-EXAMINATION

6  BY MR. NELSON:

7  Q.   Good afternoon, Dr. Carbonell?

8  A.   Good afternoon.

9  Q.   Nice to see you again.  I'm Dave Nelson, in case you

10  don't remember me.

11  A.   Yes, I remember you.

12  Q.   I have a few questions for you.  Well, maybe more

13  than a few.

14     Something you said there at the end when you

15  were talking about commercial success.  You referenced

16  the commercial success of search engines generally like

17  Google, do you remember?

18  A.   Yes.

19  Q.   You understand that search engine is not accused in

20  this case, right?

21  A.   I understand that the ads functionality is what's

22  being accused.  I do not know the details because I'm

23  not part of the infringement.

24  Q.   Oh, so you didn't ever get to see Dr. Carbonell's --

25  excuse me, you are Dr. Carbonell -- Dr. Frieder's

Dr. J. Carbonell - Cross

1   reports or anything like that?

2   A.   No, I did not.

3   Q.   And you didn't see his testimony here on the

4   infringement case?

5   A.   No, I did not.

6   Q.   So you are not aware of what he's saying infringes

7   these patents?

8   A.   Only with respect to very generally what counsel has

9   reported.

10  Q.   Okay.  Let me talk about the Lashkari patent, first

11  of all.  So, I think what I heard you say is that --

12  A.   That's incorrect.  Lashkari is not a patent.

13  Q.   Can we call it a WebHound.  That's easier for me to

14  remember.

15  A.   Whatever is easiest.

16  Q.   That's the WebHound reference; is that okay?

17  A.   Yes.

18  Q.   I think I heard you say you didn't think that the

19  WebHound reference disclosed filtering with relevance to

20  the query, right?

21  A.   That's correct.

22  Q.   Okay.  But you agree that it discloses a combination

23  of content-based and collaborative filtering, right?

24  A.   Yes.

25  Q.   Okay.  And you agree that at least in the page 78,

Dr. J. Carbonell - Cross

1  which I think you cited, it talks about combining that

2  filtering, the content and collaborative, with search

3  engine functionality, right?

4  A.    That's not what I said.  I said that it can use as

5  input the output of a search engine.

6  Q.    Okay.  So I think I heard you say that you didn't

7  believe that modern -- excuse me, not modern, going back

8  to 1998 and before, search engines did any filtering; is

9  that right?

10  A.    No, I did not say that either.  I said that search

11  engines typically performed ranking.

12  Q.    But you are aware that search engines out there did

13  filtering for relevance to the query themselves prior to

14  1998, aren't you?

15  A.    I did not offer an opinion on that.

16  Q.    Well, I understand.  I'm asking you whether you are

17  aware of that?

18  A.    The cited prior art performed ranking instead of

19  performing filtering?  I would have to go back and

20  analyze at that time period to see whether they

21  performed filtering in order to be able to answer your

22  question with confidence.

23  Q.    Okay.  So you have reviewed the '420 patent, haven't

24  you?

25  A.    Yes, I have.

1  Q.   And that includes the background section of the

2  patent; is that right?

3  A.   Yes, it does.

4  Q.   Before I go further, did I give you the binders,

5  your Honor?

6        THE COURT:  Yes.

7  BY MR. NELSON:

8  Q.   So, can we look at DDX-6.7?

9        THE COURT:  6 what?

10       MR. NELSON:  It's one of the demonstratives,

11 your Honor.

12       THE COURT:  What number was it?

13       MR. NELSON:  It's slide 7, 6.7.

14       THE WITNESS:  Can you point to me where I'm

15 supposed to look?

16 BY MR. NELSON:

17 Q.   Yeah.  Well, you can look on the screen, or this is

18 the '420 patent.

19 A.   Okay.  I will look on the screen.

20 Q.   So here on the '420 patent you are aware that in

21 column 1 and 2 it talks about the background of the

22 invention, right?

23 A.   Yes.

24 Q.   Okay.  And your understanding of the discussion of

25 the background of the invention, those are the things

Dr. J. Carbonell - Cross

1   that are in the prior art?

2   A.   That's generally what it is, yes.

3   Q.   Okay.  Well, what I want to draw your attention here

4   to, this is an excerpt we have from column 2.  This is

5   lines 4 through 20.  You see picking up at about --

6   well, it's probably about line 10 there's a sentence

7   that says, "Thus, the integrated information filter

8   system performs continued long-term searching, i.e., it

9   compares -- you don't need to worry about that.  Let me

10  start over again.

11       Picking up at about line 12, you see it says,

12  "Thus, the integrated information filter system performs

13  continued long-term searching, i.e., it compares network

14  informons to multiple users' queries to find matching

15  informons for various users' wires over the course of

16  time."  So let me stop there.  Is that what you are

17  describing as these various profile systems?

18  A.   So this is incomplete for me to be sure, but with

19  respect to long-term searching comparing informons to

20  multiple users' queries over time and use of wires,

21  wires represented profiles under the Lang work in

22  general.  So the answer appears to be yes.

23  Q.   Okay.  So then let me pick up the second part of

24  that.  See where it says, "Whereas, conventional search

25  engines initiate a search in response to an individual

Dr. J. Carbonell - Cross

1  user's query and use content-based filtering to compare

2  the query to accessed network informons typically to

3  find matching informons during a limited, short-term

4  search time period."  Do you see that?

5  A.   Yes.

6  Q.   Okay.  So your understanding is that this is a

7  description of prior art search engines, correct?

8  A.   Yes.

9  Q.   So, in fact, according to the patent, prior art

10 search engines did, in fact, compare content-based

11 filtering for relevance to the query, correct?

12 A.   According to this description, that's what it says.

13 I'm not sure.  I would have to read more context to know

14 whether they were using the word "filtering" precisely

15 or loosely, but, yes.

16 Q.   So at least, then, with respect to certain search

17 engines out there, there was content-based filtering for

18 relevance to the query, right?

19 A.   That is according to the background section of the

20 patent description, yes.

21 Q.   So now let's go back to DDX-6.6.

22       So this is the excerpt from the WebHound

23 reference at page 78 that you looked at, correct?

24 A.   That is correct.

25 Q.   So here what you said is a description of -- I think

1  you called it an over-the-wall technique?

2  A.    Yes.

3  Q.    Providing the search results to the filtering

4  engine; is that right?

5  A.    That's correct.

6  Q.    Okay.  Now, with respect to the WebHound reference,

7  you said that there's no disclosure whatsoever about

8  filtering for relevance to the query, correct?

9  A.    That's right.

10  Q.    In fact, that's the only thing that you said was

11  absent from the WebHound reference, correct?

12  A.    No.  I said that it did not meet claim elements (a),

13  (b) and (d), so it does not search and it does not do

14  the combination with respect to the query and it does

15  not do the filtering with respect to the query.

16  Q.    Okay.  So the last two are with respect -- those are

17  both based upon your notion that it doesn't disclose

18  filtering with respect to relevance to the query, right?

19  A.    It doesn't combination and filtering with respect to

20  the query.

21  Q.    Now you say it doesn't disclose search?

22  A.    It doesn't perform search.

23  Q.    Well, doesn't it say right here to combine it with a

24  search engine query such as Lycos, WebCrawler and Yahoo?

25  A.    Well, it says right here that the two are

Dr. J. Carbonell - Cross

1  complimentary.  In other words, what Lashkari did or

2  WebHound did is different from what search engines did,

3  and it's talking about putting one in front of the other

4  for WebHound to then do its filtering on the output of a

5  search engine.  It does not say anywhere that that

6  filtering is done with respect to the query or that any

7  type of combination that WebHound does internally,

8  WebHound combines content and filtering not with respect

9  to a query.

10 Q.  But you agree that WebHound discloses combining

11 content-based and collaborative filtering, right?

12 A.  Yes.  Not with respect to the query, but it does

13 disclose as you just stated.

14 Q.  Okay.  Now, let's look at this.  This is on page 78

15 of DX-49.  That's the exhibit number.

16     Right below the highlighted part it says, "as a

17 concrete example, let's say a user is looking for

18 documents on Indian Cooking.  He types the keywords

19 Indian Cooking into the Lycos search form.  The number

20 of documents matching both keywords numbers in the

21 hundreds," and continues on.  Do you see that?

22 A.  I see that.

23 Q.  So that's not a disclosure of search?

24 A.  That is a disclosure that the user can use a search

25 engine.  That is not a disclosure that search is

Dr. J. Carbonell - Cross

1   integrated with the -- I don't know whether to call it

2   system or facility that is taught by Lashkari.  In other

3   words, WebHound does not use a query.  WebHound uses the

4   results of a search engine as its input.

5   Q.  Right, but we've established that there are search

6   engines out there in the prior art that did filter with

7   respect to relevance to the query, right?

8        MR. CIMINO:  Objection, misleading.  That wasn't

9   his testimony.

10       THE COURT:  Well, I'm going to overrule it and

11  permit the doctor to correct it if that's the case.

12       THE WITNESS:  What I said was that filtering

13  with respect to the query is -- filtering and combining

14  with respect to the query are not disclosed by WebHound

15  or by any of the other prior art.

16  BY MR. NELSON:

17  Q.  So let's talk a little bit about the inventors here.

18       Now, at least as of the time of your expert

19  report, wasn't it your understanding that neither

20  Mr. Kosak nor Mr. Lang worked on search technologies

21  until they joined Lycos?

22  A.  I was not aware that they had worked on it.

23  Q.  Right.  So you are not aware of any information to

24  indicate that Mr. Lang or Mr. Kosak ever had experience

25  with search technology before joining Lycos, right?

Dr. J. Carbonell - Cross

1  A.  I do not know one way or the other.

2      Okay.  Well, let me see if I can refresh your

3  recollection on that.  This is from paragraph 140 of your

4  expert report.  We have it on a slide DDX-6.11.  So you

5  prepared an expert report in this case, right?

6  A.  Yes, I prepared an expert report.

7  Q.  And you disclosed in that all of your opinions and

8  the bases for your opinions, right?

9  A.  That's correct.

10  Q.  So here from paragraph 140 of your report you say,

11  "For example, as I understand it, Mr. Kosak and Mr. Lang

12  themselves worked on filtering techniques and did not

13  become involved with search technologies until they

14  joined Lycos."  Do you see that?

15  A.  That's correct.

16  Q.  So does that refresh your recollection that your

17  understanding is they did not have any experience with

18  search technologies before joining Lycos?

19  A.  It means that I do not know if they had any such

20  experience.  I believe they did not, but I cannot say

21  for sure.  After they joined Lycos, of course, that

22  changes.

23  Q.  Now let's talk about the timing of that.  So the

24  patent, you said, was filed December 3rd, 1998, right?

25  A.  Yes.

Dr. J. Carbonell - Cross

1   Q.   Okay.  And the purchase of Lycos or Lycos's purchase

2   of WiseWire -- WiseWire, you understand, was Mr. Lang's

3   and Kosak's prior company?

4   A.   Yes.

5   Q.   That occurred sometime in mid-1998; is that right?

6   A.   I do not recall the date.  I recall that there was a

7   extensive period of negotiation and discussion prior to

8   the actual finalization of the purchase.

9   Q.   Right.  You were at Lycos still, or as a consultant,

10  you said, up through 1998, right?

11  A.   No.  I was actually -- through the IPO I was by that

12  time no longer affiliated with Lycos.

13  Q.   So then do you know how long it was that Mr. Kosak

14  and Mr. Lang were at Lycos before they filed this patent

15  on December 3rd, 1998?

16          MR. CIMINO:  Objection, beyond scope.

17          THE COURT:  Objection sustained.

18          MR. NELSON:  Well, your Honor --

19          THE COURT:  The objection is sustained.

20          MR. NELSON:  All right.

21  BY MR. NELSON:

22  Q.   Now, you have never discussed with Mr. Lang or

23  Mr. Kosak their patents; is that correct?

24  A.   That's correct.

25  Q.   Okay.  So you don't know whether they encountered

Dr. J. Carbonell - Cross

1   any technical hurdles when they combined their filter

2   technology with the search technology at Lycos?

3   A.   That's right, because at that time I no longer was

4   affiliated with Lycos so I did not have privy or I don't

5   have an inside track.

6   Q.   So we are going to talk about some other things here

7   in your report.  You have talked a lot about tight

8   integration, would you agree?

9   A.   Yes.

10  Q.   Now, the words "tight integration" don't appear

11  anywhere in the claims of this patent, right?

12  A.   Those exact words do not.  The concept does.

13  Q.   Right.  And the words "tight integration" don't

14  appear in the patent itself, right?

15  A.   If you say so.  I would have to check.

16  Q.   I'm just asking whether you know?

17  A.   Okay.  The concept of tight integration appears, not

18  the words, insofar as I know.

19  Q.   Okay.  So now I want to look here, if we can look at

20  DDX-6.9, and this begins on page 44 of your report and

21  continues on to page 45.  The highlighted sentence that

22  says," The combination of query, content and

23  collaborative feedback to filter in a single engine can

24  yield results superior to applying less than all of them

25  or applying them in sequence."  Do you see that?

Dr. J. Carbonell - Cross

1    A.    Can you pull it up some more?

2    Q.    Sure, absolutely.

3    A.    Okay.  Now I can read it.  Thank you.

4    Q.    Do you see that?  So is it your understanding that

5    the '420 and the '664 patent require all of the elements

6    of the claim to be in a single search engine?

7    A.    What my understanding is that they are all required

8    to be inside the same system.  Whether the system is --

9    whether you use search engine expansively to refer to

10   the combination or not is less important.

11   Q.    So is that where your understanding of tight

12   integration comes from?

13   A.    My understanding of tight integration comes from my

14   experience over 30 years.  I know what tight integration

15   means.  As it applies to this work, it is the fact that

16   all of the elements -- excuse me, all of those

17   ingredients are combined in the same claim elements, and

18   it's also consistent with the patent description and

19   with the figures that we did not analyze here that shows

20   how all of the items -- teaches how all of the items are

21   tightly integrated.

22   Q.    Okay.  Well, let's put up claim 10, for example, of

23   the '420 patent.

24           THE COURT:  Mr. Nelson, the Court hates to

25   interrupt, but I don't know how much longer you have for

Dr. J. Carbonell - Cross

1  this witness, but we are simply going to go on and take a

2  lunch break and come back in and continue with the

3  cross-examination after lunch.

4          MR. NELSON:  Okay.

5          THE COURT:  Ladies and gentlemen, please rise.

6  I want the jury to come back prepared to go forward at

7  2:30, please.

8          (Jury out.)

9          THE COURT:  You may step down, Doctor.

10          For planning purposes, do you know approximately

11  how long your cross of this witness will take?

12          MR. NELSON:  I think maybe another 30 or 45

13  minutes, your Honor.

14          THE COURT:  All right.  The Court will be in

15  recess until 2:30.

16          (A luncheon recess was taken at 12:58 p.m.,

17  after which court reconvened at 2:34 p.m.)

18                    **AFTERNOON SESSION**

19          THE COURT:  Bring the jury in.

20          (Jury in.)

21          THE COURT:  You may be seated.

22          Let the record reflect all jurors are present.

23  Does counsel agree?

24          MR. CIMINO:  Yes, your Honor.

25          MR. NELSON:  Agreed, your Honor.

Dr. J. Carbonell - Cross

1        THE COURT:  All right.  You may resume your

2   cross-examination.

3        MR. NELSON:  Thank you, your Honor.

4   BY MR. NELSON:

5   Q.   Good afternoon.

6   A.   Good afternoon.

7   Q.   So let's put DDX-6.9 back on the screen.  This is

8   the demonstrative we were looking at before lunch.

9        So I want to explore a little bit more of this

10  statement you have in your report about the combination

11  of query and content and collaborative feedback to filter

12  in a single engine, okay?

13  A.   Okay.

14  Q.   So let's put up claim 10 of the '420 patent.

15       Now, you see the first element of claim 10 says

16  a system for scanning a network.  Do you see that?

17  A.   Yes.

18  Q.   And then the next one says a content-based filter

19  system.  Do you see that?

20  A.   Yes.

21  Q.   And the third says a feedback system.  Do you see

22  that?

23  A.   Yes.

24  Q.   So do you believe that all three of those systems

25  have to be in a single search engine system?

Dr. J. Carbonell - Cross

1    A.   I believe that all three have to be integrated, all

2    the elements in those three have to be combined.  One

3    way to do it is a search engine system, but that's not

4    the only way.

5    Q.   Okay.  So the claim, you agree, talks about separate

6    systems, right, the elements of the claim?

7    A.   No.  They are separate elements of the claim.

8    Q.   Right, but the first one says a system for scanning

9    a network, right?

10   A.   Correct.

11   Q.   And then, I don't need to go through it again, but

12   they are all each introduced as a system, correct?

13   A.   They are all introduced as a system.

14   Q.   Right.  So they are separate systems?

15   A.   No, sir.  They are combined, as it says so on the

16   third element in which the feedback system for receiving

17   collaborative feedback data from systems used relevant

18   to informons considered by other users, and then it goes

19   on the filtering system combining and so forth.  The

20   combining is an integral part of the claim, in my review

21   of it.

22   Q.   Okay.  Let's go back to DDX-6.9.

23        So what does that have to do with being a single

24   search engine?

25   A.   It has to be an integrated system.  As I said a

Dr. J. Carbonell - Cross

1  moment ago, a search engine is one way to integrate it.

2  It's not the only way.  It can be combined without it

3  being a single search engine.  It could be integrated.

4  Q.  So, in other words, you could take, as you say,

5  separate systems and they can still be integrated,

6  correct?

7  A.  I did not say separate systems.  Those are your

8  word, not mine, sir.

9       THE COURT:  I think this has been asked and

10 answered.  He said they are elements.

11      MR. NELSON:  Right.

12 BY MR. NELSON:

13 Q.  So you are not saying the elements all need to be

14 combined in one system, correct?

15 A.  I'm saying the elements only need to be tightly

16 integrated.

17 Q.  Okay.  Now, let's talk a little bit about Rose.  Did

18 I understand you to say that you don't believe that Rose

19 disclosed a search?

20 A.  Rose does not -- the Rose facility is not a search

21 facility.  Rose mentions search externally to the Rose

22 facility and it can be connected in terms of Rose

23 operating on the output of a search system as input to

24 Rose, in the same manner as Lashkari.

25 Q.  Okay.  So let's talk about that a little bit.  Let's

Dr. J. Carbonell - Cross

1   put up DDX-6.2, this is an excerpt from the Rose

2   patent.  And, by the way, you have that in your binder

3   if you wish to look at the binder.

4   A.   I have got several binders.  I'm not sure which is

5   which.

6   Q.   It would be the white one.

7          MR. CIMINO:  He has three white ones.

8   BY MR. NELSON:

9   Q.   Oh, you have three white ones?

10  A.   Okay.  I found it.

11  Q.   Okay.  So what I'm showing here is an excerpt from

12  the Rose patent.  This comes at column 1, lines 33 to

13  40.  Do you see that?

14  A.   I see that.

15  Q.   So I have something highlighted here from the Rose

16  patent.  It says, "Using a text searching tool,

17  individual users can locate documents matching a

18  specific topical query."  Do you see that?

19  A.   Yes.

20  Q.   So now let's take a look at another part of the Rose

21  patent at column 2, line 51-57, which would be in

22  DDX-6.13.

23          You see it says, "The relevance predicting

24  technique of the present invention is applicable to all

25  different types of information access systems.  For

Dr. J. Carbonell - Cross

1  example, it can be employed to filter messages provided

2  to a user in an electronic mail system and search results

3  obtained through an on-line text retrieval service."  Do

4  you see that?

5  A.   Yes.

6  Q.   So you agree that Rose says that the relevance

7  predicting technique in the present invention can be

8  used with an on-line text retrieval service, right?

9  A.   It says there explicitly that it can be applied to

10 the output, in other words, the results is Rose's words,

11 obtained from an on-line text retrieval system or an

12 electronic mail system.

13 Q.   And that could include a query-based search system,

14 right?

15 A.   It could apply to the output of -- yes, it could be

16 applied to the output of different kinds of information

17 retrieval systems, presumably a search system as well.

18 Q.   A query-based search system, right?

19 A.   Yes.

20 Q.   Now, here in this same passage that I have up now --

21 we don't need to go to a new one -- you see where it

22 says, "For example, it can be employed to filter

23 messages provided to a user in an electronic mail

24 system."  You see that?

25 A.   Yes.

Dr. J. Carbonell - Cross

1  Q.   Okay.  So the Rose patent actually says it does

2  filtering, right?

3  A.   The Rose patent in the summary mentions filtering,

4  that is correct.  It does not teach how to do

5  filtering.  The internal description describes ranking.

6  Q.   Okay.  So then what you are saying is that in order

7  to figure out whether something meets the claims of

8  these patents, you need to look at how it actually

9  operates and not just some high-level words, right?

10  A.   I'm saying exactly what I said, that it mentions

11  that filtering can be employed, and it actually

12  describes how to do it with a ranking system.

13  Q.   Now, let's move on and talk about your opinions with

14  respect to the Bowman patent a little bit.

15       The Bowman patent is Tab 7 in your binder.  It's

16  DX-59, for the record.

17       So I heard you say two things about Bowman, why

18  you thought it didn't anticipate.  The first one, you

19  didn't think that it shows filtering, right?

20  A.   Correct.

21  Q.   And the second thing is you didn't think it showed a

22  content-based analysis; is that right?

23  A.   That's also correct.

24  Q.   Okay.  So let's take that first one.  Let's focus on

25  the filtering.  So, can we show DDX-6.15.  And let's

Dr. J. Carbonell - Cross

1   blow up that bottom part.  This is from column 9 and

2   this excerpt is from lines 53-65 of the patent, if you

3   want to take a look at that, and I will give you a

4   moment.  When you are there, let me know.

5   A.   I'm there.

6   Q.   Okay.  So it says, "Step 808 preferably involves

7   sorting the items in the query result in decreasing

8   order of their ranking values, and/or subsetting the

9   items in the query result to include only those items

10  above a threshold ranking value, or only a predetermined

11  number of items having the highest ranking values."  Do

12  you see that?

13  A.   Yes.

14  Q.   Do you believe that this is an accurate description

15  of the Bowman system?

16  A.   I wouldn't see any reason to dispute that.

17  Q.   Okay.  So let me focus in on this a little bit.  You

18  see where it says and/or?

19  A.   And/or subsetting, yes.

20  Q.   Right.  So, in other words, you understand that to

21  mean that the subsetting, or that part of the sentence

22  that comes after the and/or can be used by itself

23  without the ranking referred to in the first part of the

24  sentence, right?

25  A.   No, that's not right.  The system will rank and may

Dr. J. Carbonell - Cross

1  or may not also do the subsetting, the step that

2  follows.

3  Q.   Well, let's talk about that.  So you see it says,

4  "Step 808 preferably involves," preferably, right?  You

5  see that word?

6  A.   I see that word.

7  Q.   So that means it doesn't necessarily involve sorting

8  the items, correct?

9  A.   Yes.  The rest of the sentence is in the context of

10  that same preferably involving sorting the items.

11  Q.   Okay.  So let's just pick it up, Step 808 preferably

12  involves sorting the items in the query result in

13  decreasing order of their ranking values, and/or

14  subsetting the items in the query result to include only

15  those items above a threshold ranking value."

16        Let's stop there.  So you agree that one of the

17  things the Bowman patent teaches is that you could subset

18  the items in the query result to include only those items

19  above a threshold ranking value, correct?

20  A.   Yes, that is correct.  In order to do the

21  subsetting, it must do the ranking to be able to

22  subset.

23  Q.   Well, that's not what the sentence structure says,

24  though, is it?

25  A.   The sentence says, "involves sorting the items in

Dr. J. Carbonell - Cross

1  order of the ranking values," and then it may or may not

2  do the subsetting.

3  Q.   Well, let's go a little bit farther up in this same

4  column 9 and let's just see what it talks about.

5          So if we can go to DDX-6.16, and we will have to

6  blow these up individually, but this is from column 9.

7  This goes from about line 28 to line 65 of the patent, if

8  you have it in front of you.

9          So you see first it says, "The facility uses

10 rating tables that it has generated to generate ranking

11 values for items in new query results."  Do you see that?

12 A.   Yes, I see that.  It was right on my ranking table

13 on direct.

14 Q.   Right, understood.  And an example of that you gave

15 was in Fig. 4, right?

16 A.   Correct.

17 Q.   But there's also an example in Fig. 6 of the Bowman

18 patent; isn't there?

19          So let's show Fig. 6 of the Bowman patent.

20 A.   Yes, that's also an example.

21 Q.   Okay.  So you agree that this is an example of a

22 ranking table or what you called a rating table, I

23 guess, right?

24 A.   I'm using Bowman's words.  He calls it a rating

25 table, so I'm calling it the same thing.

1912
Dr. J. Carbonell - Cross

1  Q.   Okay.  So let's go back to DDX-6.16, and let's blow

2  up the middle highlighting there.

3        You see here it says, "In Step 806, the facility

4  combines the scores for the current item to generate a

5  ranking value for the item."  Do you agree that's an

6  accurate description of what's going on?

7  A.   Yes.

8  Q.   "As an example, with reference to Fig. 6 --"

9        Is there any way we can get Fig. 6 up at the

10 same time maybe?

11       Okay.  Then let's pull up that middle part

12 again.

13       Okay.  Can you see that?  Let me begin again.

14 "As an example, with reference to Fig. 6, in processing

15 datum having item identifier '1883823064' --" That would

16 be in the middle column.  That would be the identifier,

17 right?

18 A.   Correct.  This is the same I illustrated in Fig. 4.

19 Q.   Okay.  So I think he's highlighted there the item

20 that corresponds to the term, the key term "dynamics,"

21 right?

22 A.   Yes, sir.

23 Q.   Then if we look below, there's another reference to

24 item 1883823064; is that correct?

25 A.   That is correct.

Dr. J. Carbonell - Cross

1   Q.   And that's with respect to a key term "human"; is

2   that correct?

3   A.   That is also correct.

4   Q.   So picking up at the description of this says, "the

5   facility combines the score '116' extracted from the

6   entry 602 for this item and the term "dynamics" and the

7   score '211' extracted from the entry 605 for this item

8   and the term "human"."  Do you see that?

9   A.   Yes, I do.

10  Q.   So then what's taught there is you would take the

11  116 corresponding to the term "dynamics" which is the

12  rating score for that, correct?

13  A.   Yes, it is a rating score in the middle of this.

14  Q.   Right.  And then you would take 211, which is the

15  score for the term "human" with respect to that item,

16  correct?

17  A.   That's correct.  That would be the number of times

18  that item was clicked when the term "human" was in the

19  query.

20  Q.   So you add them together and you get 317, right?

21  A.   No, you get 327.

22  Q.   327.  Actually, I got that right at the deposition

23  and got it wrong today, didn't I?

24  A.   Right.  I was impressed.

25  Q.   Yes.  So, 327?

Dr. J. Carbonell - Cross

```
 1   A.   Yes.
 2   Q.   So what we just walked through, 327 would be the
 3   ranking value for item 1883823064 in this example,
 4   right?
 5   A.   If the query was human dynamics, that is correct.
 6   Q.   So then if we go further down to what we were
 7   looking at before on the previous slide -- let's go back
 8   to 6.15.
 9        So I just want to take that last piece or after
10   the or.  "Subsetting the items in the query result to
11   include only those items above a threshold ranking
12   value."  Do you see that?
13   A.   I see that.
14   Q.   Okay.  So in this example, the ranking value for the
15   item we just walked through would be 327, correct?
16   A.   Yes.
17   Q.   And what this section that I just read says that you
18   can subset based upon whether that ranking value is
19   above a certain threshold value, correct?
20   A.   That is correct.  That threshold value would
21   typically be derived from the rank, as you illustrated.
22   Q.   So, for example, if the threshold value was 300,
23   then with respect to the item we just walked through, it
24   would be displayed in Bowman, correct?
25   A.   That is correct.
```

Dr. J. Carbonell - Cross

1  Q.   And if the threshold value is 350, it would not be

2  displayed, correct?

3  A.   That is also correct.

4  Q.   So you don't think that determining whether a score

5  is above or below a threshold level is filtering for the

6  purposes of this patent?

7  A.   No, I did not say that.  In this case the ranking

8  value is derived -- would normally be derived from the

9  rank list.  So, for example, as more and more items are

10  ranked, if the number is poor, you get fewer items

11  ranked.  If you had a ranking of 300, everything would

12  be excluded.  Over time more clicks happen, hundreds,

13  thousands, maybe millions of clicks happen, the ranking

14  value has to be adjusted to be selected from the actual

15  set of values that are generated in the rank list.

16  Typically you would select -- I'm sorry.

17  Q.   But that would still be a threshold value.

18       THE COURT:  Excuse me, Doctor, if you would

19  please raise your voice.  There's some problem hearing

20  you.

21       THE WITNESS:  Should I repeat the answer?

22       THE COURT:  Repeat the answer.

23       THE WITNESS:  Okay.  My answer was that the

24  threshold value is a ranking value and would be derived

25  from the other ranking values in the rank list.  So, for

Dr. J. Carbonell - Cross

1   example, 300 is a potentially reasonable one in Fig. 6.

2   It would be unreasonable in Fig. 4 because that would

3   exclude everything and the search engine would return

4   nothing.  That's not a good search engine.  Or after a

5   while there would be thousands, maybe millions of user

6   clicks, and at that time a rank of 300 would allow

7   everything to come through.  So the normal operation

8   would be setting the ranking value -- selecting a ranking

9   value as a threshold based upon the other ranking values

10  on the rank list.

11  BY MR. NELSON:

12  Q.   So what you are saying is the threshold value could

13  change over time, right?

14  A.   It can change over time and over query.

15  Q.   Right, but it's, nonetheless, a threshold value,

16  correct?

17  A.   It is a threshold value derived from the ranking.

18  Q.   So let's talk about the second part where you say

19  Bowman doesn't engage in content analysis.

20  A.   Okay.

21  Q.   Okay?  So let's take a look at -- and you have it as

22  Tab 7 still, if you are still on the Bowman patent.

23  A.   Yes, I am.

24  Q.   Look at column 1, lines 29 to 45.

25  A.   Could you repeat the line numbers, please?

Dr. J. Carbonell - Cross

1   Q.   Excuse me?

2   A.   Could you please repeat the line numbers?

3   Q.   Sure, absolutely.  Column 1, lines 29 to 45.  They

4   have it on a slide.  We can put it up, 6.17.

5           So I'm not going to read all of this, but some

6   of the relevant parts.  It starts, "In order to perform a

7   search, a user submits a query containing one or more

8   query terms."  Do you see that?

9   A.   Yes.

10  Q.   Do you agree that's an accurate description of

11  Bowman?

12  A.   No, that's an accurate description of the prior art

13  as disclosed by Bowman.

14  Q.   Okay.  You agree that in Bowman there is a search

15  performed where user submits query terms as well,

16  correct?

17  A.   Bowman discloses that that's what the prior art

18  does, yes, that is correct.

19  Q.   All right.  So let's talk about this.  Now, we have,

20  "A query server program processes the query to identify

21  within the domain items matching the terms of the

22  query."  Do you see that?

23  A.   I see that.

24  Q.   Now we go on and skip a sentence, it says, "In the

25  example, a query result is a list of books whose titles

Dr. J. Carbonell - Cross

1  contain some or all of the query terms."  Do you see

2  that?

3  A.   Yes.

4  Q.   Okay.  So what Bowman is saying there with respect

5  to the prior art is matching the terms in the query to

6  the list of books involves looking at what words appear

7  in a title, correct?

8  A.   Yes.  Bowman is describing how a search engine prior

9  to Bowman's invention or Bowman's patent functioned.

10  Q.   Okay.  And then finally if we look at the last

11  sentence I have highlighted it says, "As another

12  example, the list may be ordered based on the extent to

13  which each identified item matches the terms of the

14  query."  Do you see that?

15  A.   Yes.

16  Q.   Okay.  So with respect to the prior art you would

17  agree that when Bowman is a talking about matching here,

18  it's referring to comparing terms of the query to words

19  that are in the article or, in this case, the book,

20  right?

21  A.   In this case a title, not the list, yes.

22  Q.   Right.  So that's a content-based analysis, right?

23  A.   Bowman is disclosing that the prior art is based on

24  content-based analysis, correct.

25  Q.   Right.  So now if we go to what we looked at

Dr. J. Carbonell - Cross

1    earlier, and I believe we looked at this in your

2    direct -- if we could go to 6.16.  It's in column 9 of

3    the Bowman patent again, very close to what we were

4    looking at before, about line 43.

5        So here it says, ""in particular, scores may be

6    adjusted to more directly reflect the number of query

7    terms that are matched by the item, so that items that

8    match more query terms than others are favorable in the

9    ranking."  Do you see that?

10   A.   I see that.

11   Q.   So it's the same terminology that we looked at with

12   respect to the prior art, correct?

13   A.   It's the same terminology with respect to the prior

14   art but different than Bowman himself had disclosed

15   prior to this passage.  He had defined matching in a

16   different way to be the number of clicks.

17   Q.   Okay.  So then your opinion that Bowman doesn't

18   disclose content analysis -- well, first of all, you

19   agree it discloses content analysis in the prior art,

20   correct?

21   A.   Yes.

22   Q.   Your opinion that Bowman doesn't disclose content

23   analysis is based on the fact the term "matching" is

24   used differently in column 9 than it is in column 1,

25   correct?

Dr. J. Carbonell - Cross

1   A.   Correct.  It's not just in column 9, but throughout

2   the description of his facility.

3   Q.   Right.  So let's pull up claim 28 and 29 of the

4   Bowman patent.

5        So you talked about these on direct, right?

6   A.   Yes, I did.

7   Q.   So focusing on claim 29 for a moment, claim 29 says,

8   "The computer-readable medium of claim 28."  First of

9   all, that means 29 depends from 28, correct?

10  A.   Right.

11  Q.   So you agree whatever is covered by claim 29 has to

12  be included in claim 28, right?

13  A.   Yes.  That's the definition of a dependent claim.

14  Q.   Right.  So here it says, "Wherein the contents of

15  the computer-readable medium further cause the computer

16  system to perform the step of adjusting the ranking

17  value produced for each item identified in the query

18  result to reflect the number of terms specified by the

19  query that are matched by the item."  You see that?

20  A.   I see that.

21  Q.   So your opinion that claim 29 is going to talk about

22  content analysis is, again, based on the fact that the

23  term "matched" as used in claim 29 means something

24  different than when it's used in column 1, correct?

25  A.   The word "matched" is used when Bowman describes the

Dr. J. Carbonell - Cross

1  last piece of his facility, which is in the vast

2  majority of the patent specification, and so the word

3  "matched" must be interpreted in a manner consistent

4  with what Bowman disclosed as to how his facility

5  worked.

6  Q.   Okay.  So let's go back to 6.16.  And let's blow up

7  that middle step.

8           So we walked through this example with respect

9  to Fig. 6 and we established that the ranking value, the

10 score in Bowman is going to result from determining which

11 key terms are matched by the item, correct?

12 A.   Yes, that's correct.

13 Q.   So in this example it would be 327, correct?

14 A.   If the combination function is an addition, which

15 typically would be, yes, I agree.

16 Q.   Right.  So, in other words, in order to get that

17 ranking value that we walked through with respect to

18 Fig. 6, we already took the query terms and matched them

19 to items that were in the table, correct?

20 A.   That's right.

21 Q.   So now just below that it says, "In particular,

22 scores may be adjusted to more directly reflect the

23 number of query terms that are matched by the item, so

24 that items that match more query terms than others are

25 favored in the ranking."  Do you see that?

Dr. J. Carbonell - Cross

1    A.   I see that.

2    Q.   Okay.  So just above that, in order to get the

3    ranking value we have already determined which query

4    terms are matched by the items, correct?

5    A.   Which query terms are matched by the ranking table.

6    Q.   Exactly.

7    A.   Which references the items, yes.

8    Q.   Okay.  And immediately below that it says we are

9    going to adjust the score based upon the number of query

10   terms that are matched by the item, correct?

11   A.   That is correct.

12   Q.   Okay.  So if we already got the score by determining

13   which query terms are present in the ranking table, you

14   still think that we would be adjusting that score by

15   determining which query terms matched terms in the

16   ranking table?

17   A.   Yes, sir, because you could have -- first of all,

18   you can match an item in the ranking table even if that

19   term is not contained in the item.  All we need is

20   somebody to have clicked on that particular item.  So if

21   I say my query is automobile insurance and the item

22   mentions vehicle policies and people click on it, then

23   that one will rank high, will start to rank high as more

24   people click on it, even though it contains neither of

25   my query terms, according to the Bowman facility.

Dr. J. Carbonell - Cross

1    To address your specific question here, if a
2    query has, let's say, four terms and one item has a
3    score for all four of the terms and another item only
4    has scores for two of the terms, then this is saying
5    that you will get a bonus -- it doesn't say how to do a
6    bonus, but it's saying you will get a bonus if it has
7    scores for all four terms because it matches,
8    essentially, all four terms.  So Bowman is favoring one
9    that has some user clicks or user relevance to as many
10   terms, or in this case, all of the terms in the query.
11   It's a sensible thing to do.
12   Q.   I'm sorry, I didn't know you weren't finished.
13   A.   I'm done.
14   Q.   Okay.  But you agree that -- it's okay?
15        THE COURT:  Go on.
16        MR. NELSON:  All right.  Just checking.
17   BY MR. NELSON:
18   Q.   The original ranking value is going to come from how
19   many terms in the table match words in the query, right?
20   A.   Not how many, the sum of the scores as in your
21   example.
22   Q.   Right.
23   A.   So you could have five of them with low scores
24   versus two terms that are matched with high scores.  The
25   two terms with high scores with high clicks would

Dr. J. Carbonell - Cross

1  dominate the five.  This one is sort of curing that to

2  some extent by giving a bonus score if all of the terms

3  in the query are contained in the rating table, or have

4  scores in the rating table.

5  Q.   Okay.  So let's talk about your opinions concerning

6  the Culliss reference now.

7  A.   Okay.  This is going to be at Tab 8 in your binder.

8  It's DX-58.

9        Now, on your direct examination I think you said

10  that you thought Culliss didn't disclose filtering and

11  didn't disclose content-based analysis; is that right?

12  A.   That's right.

13  Q.   So you agree that Culliss includes the collaborative

14  feedback elements of the asserted claims, correct?

15        MR. CIMINO:  Objection, beyond the scope.  He

16  talked about two things that were missing and he didn't

17  talk about anything else in the reference.

18        THE COURT:  No, the objection overruled.

19        THE WITNESS:  I did not offer an opinion as to

20  whether it disclosed the collaborative part.  By

21  Dr. Ungar's definition of collaborative filtering, it

22  will actually not be disclosed; however, my understanding

23  of collaborative filtering is different from that of

24  Dr. Ungar's.

25  BY MR. NELSON:

Dr. J. Carbonell - Cross

1  Q.   Okay.  How about if you use Dr. Frieder's

2  definition?

3  A.   I was not here for Dr. Frieder's testimony.

4  Q.   So you don't know what Dr. Frieder's definition of

5  collaborative filtering is?

6  A.   I know what Dr. Ungar's is.  I know what mine is.

7  Q.   All right.  So let's talk about this content-based

8  first, and we are going to need to walk through the

9  patent a little bit.  So let's put up DDX-6.18.  This

10  comes from column 3 at about line 42.

11        You see at the bottom it says "This data may

12  comprise articles, databases, data collections, web

13  sites, web pages, graphics, encryption, audio, video or

14  any other type of information collectively referred to as

15  articles and designated herein by the generic labels A1,

16  A2, A3, etc."

17  A.   Yes, I believe these are references of performance.

18  Q.   Okay.  So when we see A1, A2, and A3 in the Culliss

19  reference, it would include, among other things,

20  articles, correct?

21  A.   Yes.

22  Q.   So let's just stick with articles because we don't

23  want to recite this litany each time we talk about it,

24  okay?  Does that work?

25  A.   It works for me.

Dr. J. Carbonell - Cross

1   Q.   All right.   Now, if we look a little bit further

2   down, and this is in DDX-6.19.   It begins at about line

3   62.   It says, "The articles are each associated with one

4   or more of these key terms by any conceivable method of

5   association, such as through indexing all words or

6   through meta-tag headers containing keywords selected by

7   the author or editor."   Do you see that?

8   A.   That's correct, yes.

9   Q.   So you agree that Culliss teaches that the key terms

10  can be selected by indexing actual words that are in the

11  articles, correct?

12  A.   Yes.   This is the initialization step.   One of the

13  ways of doing it is by presence in the article.   Another

14  is through a human editor assigning it to a meta-tag and

15  so on.

16  Q.   Okay.   So let's stick to the example in Culliss

17  where the key terms come from indexing actual words,

18  content that appears in the article, okay?

19  A.   Okay.

20  Q.   So now let's put go to 6.20, and this is from

21  shortly after we just read.   It's from column 4,

22  beginning at line 1 and 9.   I think you actually showed

23  this table in your direct, didn't you?

24  A.   I believe I showed the table at the bottom of that

25  column.

Dr. J. Carbonell - Cross

1  Q.   Okay.  So this table, then, you agree that this

2  table is representative of an initialization of the

3  index settings in the Culliss reference, right?

4  A.   That would be correct.  That would be before Culliss

5  begins to operate.

6  Q.   Okay.  So let's just talk about this a little bit,

7  and let's take, first, article A1.  Do you see article

8  A1 there?

9  A.   Yes.

10  Q.   So what this table is telling us that article A1

11  contains the word alpha, for example, right?

12  A.   And Beta and Gamma.

13  Q.   Yeah, I was going to go through them one at a time.

14  A.   I'm trying to save you some time, sir.

15  Q.   Okay.  Thank you.  Fair enough.  So you do agree,

16  then, this table shows that article A1 contains the

17  words Alpha, Beta, Gamma and Epsilon, right?

18  A.   Right.  Under that particular embodiment, yes.

19  Q.   And, similarly, you would agree that this table

20  shows that article A2 contains the words alpha and

21  Delta, correct?

22  A.   Yeah.  Actually, article A1 does not contain the

23  word Delta.

24  Q.   I skipped Delta.

25  A.   Oh, I did not hear it.  You are correct.

Dr. J. Carbonell - Cross

1   Q.   And then you would, similarly, agree this table

2   shows that article A3 would contain the words Alpha,

3   Gamma, delta and Epsilon, correct?

4   A.   Yes.

5   Q.   So you agree that's what's shown here in this table

6   would be a content-based initialization, right?

7   A.   If the ones come from whether or not the article

8   contains it, yes, and that is one of the possibilities.

9   Q.   So that's a content-based association, right?

10  A.   Yes.

11  Q.   So now let's go to DDX-6.21.  This is in column 4 of

12  the patent, and it says, "The invention will accept a

13  search query from a user and a search engine will

14  identify key terms which match the search query."  Do

15  you see that?

16  A.   Yes.

17  Q.   And you agree that's an accurate description of

18  Culliss?

19  A.   That's an incomplete description, yeah.

20  Q.   Right, but just focus on this sentence.  You don't

21  quibble with that?

22  A.   No.

23  Q.   So then what this is saying is that the query will

24  be content-based in the sense of matching the index key

25  terms in a query, correct?

Dr. J. Carbonell - Cross

1    A.   No, it doesn't say one way or the other here.  It

2    will accept a search query from the user and will

3    identify the key terms which match the search query.

4    The key terms are those entries in the table.

5    Q.   Right, and those key terms come from words in the

6    article in our example, right?

7    A.   In the initialization step only.

8    Q.   Okay.  So let's talk about that a little bit.  So

9    you agree in the initialization step that Culliss

10   discloses a content-based analysis, correct?

11   A.   A content-based initialization.

12   Q.   Right.  So the key terms are associated with content

13   in the article, correct?

14   A.   Yeah.  We have been over this before.  Yes.  There

15   are other ways of doing it as well.  This is one of the

16   ways.

17   Q.   Okay.  Understood, this is one of the ways, so let's

18   just stick with this example.

19        So but what you are saying is that what Culliss

20   describes is the feedback, in other words, how many times

21   users actually clicked on the various articles will

22   increase the initialization score, correct?

23   A.   Yes, that's correct.

24   Q.   Okay.  So for that reason you don't believe that

25   Culliss shows a content-based analysis, correct?

Dr. J. Carbonell - Cross

1  A.   The short answer is yes.   To elaborate a little,

2  over time, and usually over very little time, the users

3  will click and click and click some more.   There are

4  millions of queries or billions of queries everyday, and

5  the number of clicks will totally overwhelm the

6  initialization, whether it be one, as in this example,

7  or whether it be some other small number from another

8  example.   So during the operational phase it will be

9  purely collaborative.   During the initialization step,

10  which is not the operational step, it will be

11  content-based, as you described.

12  Q.   Okay.   So you don't think, then, that doing an

13  operation where I match the query terms to key terms and

14  use that to access a feedback score meets the

15  content-based filter limitation of this patent?

16  A.   That's right.

17  Q.   Okay.   So let's talk a little bit more about this

18  content-based initialization and what Culliss teaches.

19  So if we go to 6.23, and this comes from column 14.   If

20  you have that in front of you, you can turn to that and

21  let me know when you are there.

22  A.   I got here already.

23  Q.   So here it says, "Initially, the key terms, category

24  key terms and rating key terms may be associated with

25  words or other information in the article, or may be

Dr. J. Carbonell - Cross

1  arbitrarily associated with the article in any manner."

2  Do you see that?

3  A.  Yes.

4  Q.  So this is another description of initializing the

5  key terms to content in the articles, correct?

6  A.  Only one of the alternatives is with context in the

7  article to the article.  Associated with words or other

8  information in the article, that is content for

9  initialization, sir, but it also says may be arbitrarily

10 associated with the article in any manner.  So there's

11 more than one possible way.

12 Q.  And if we look to 6.24, it's a little bit farther

13 down in column 14, it says "Although the scores in the

14 index are initially shown at 1, they can be initially

15 set to any desired score.  For example, the scores can

16 be initially set to correspond with the frequency of the

17 term occurrence in the article."  Do you see that?

18 A.  That's correct.

19 Q.  So you could provide a content score of anything

20 other than 1, right?

21 A.  If the word occurred 3 times, you could initial lies

22 it at 3, for example.

23 Q.  Right.  Or you could initialize it at 3,000 if you

24 wanted to, correct?

25 A.  It would be arbitrary.  I guess it's permitted, yes.

Dr. J. Carbonell - Cross

 1   Q.   Okay.  So you agree, then, that the initialization

 2   to the frequency of the words in the article is the

 3   content-based initialization, correct?

 4          MR. CIMINO:  Objection, asked and answered.

 5          THE COURT:  Sustained.  This is about the third

 6   time, I think, Mr. Nelson.

 7          MR. NELSON:  Well, this is just going to the

 8   frequency, your Honor, but that's fine.  I will go

 9   quickly through this.

10   BY MR. NELSON:

11   Q.   So you agree that that content-based initialization

12   never goes away, correct?

13   A.   No.  Content-based initialization is completely

14   swamped.  It doesn't matter whether it's there or not.

15   If you have a million clicks does it matter the real

16   score should have been a million and one?  The facility

17   will work in the same way whether or not the

18   initialization is there or initialization is not there.

19   So from an engineering perspective, the content goes

20   away.

21   Q.   So what you are saying is if the content piece is a

22   very small part of the score, then that's not

23   content-based filtering, correct?

24   A.   I'm saying that it doesn't have any effect.  So for

25   all practical purposes, it is not content-based

Dr. J. Carbonell - Cross

1  filtering.

2  Q.   Now, you have been in, I think you said, in the

3  search industry for a long time, right?

4  A.   That's correct.

5  Q.   And we heard about your background.  You have been

6  in it for 30 years, probably?

7  A.   Yes.

8  Q.   Okay.  So you are not aware, at least as of the time

9  of your report, of any praise of this claimed invention

10  by anybody in the industry, correct?

11  A.   This claimed invention refers to --

12  Q.   In the '420 and '664 patent.

13  A.   Okay.  You aren't talking about Culliss?

14  Q.   Correct.  I'm sorry.

15  A.   I was wondering if you were asking about praise for

16  Culliss.  No, I do not know of any praise that those

17  inventions received.  I don't know of any for Culliss

18  either.

19  Q.   Okay.  Just so we are clear, as to the '420 and '664

20  patents, you are not aware of any praise those

21  inventions ever received?

22  A.   No, I have not.

23       MR. NELSON:  That's all the questions I have,

24  your Honor.  I pass the witness.

25       THE COURT:  Any redirect?

```
 1            MR. CIMINO:  No redirect.

 2            THE COURT:  Okay, Doctor.  You may step down.

 3            May the witness be permanently excused?

 4            MR. CIMINO:  Yes, your Honor.

 5            THE COURT:  All right.  You may be excused,

 6   Doctor.

 7            (Witness excused.)

 8            THE COURT:  Your next witness?

 9            MR. BROTHERS:  Your Honor, we have some matters

10   we need to take up with the Court that I think are best

11   outside the presence of the jury.

12            THE COURT:  Okay.  Are there any more witnesses?

13            MR. BROTHERS:  No witnesses for the jury's

14   consideration, your Honor.

15            THE COURT:  All right.  Ladies and gentlemen, if

16   you would step into the jury room for a few minutes and

17   let me get a handle on this.

18            (Jury out.)

19            THE COURT:  You may be seated.

20            Yes, sir.

21            MR. BROTHERS:  Your Honor, this relates to the

22   discussion that we initiated this morning with respect to

23   our proposed rebuttal on the issue of laches.

24            As your Honor will recall, yesterday plaintiff

25   moved for JMOL under Rule 50 for laches.  The defendants
```

1  did not move.  The defendants were responding to our

2  motion when they tendered the proffer, and it's clear.  I

3  just went back and reread the transcript at pages 1771.

4  It was my motion that I made saying that the defendants

5  had not satisfied their burden with regard to laches and

6  made the argument to the Court.  And in response to

7  plaintiff's motion, defense counsel explained that they

8  believed that they had, but the defendants did not have a

9  pending motion with regard to laches.

10       THE COURT:  So now your argument is that the

11  Court ruled on a laches motion without their being a

12  motion for laches?

13       MR. BROTHERS:  It granted -- it precluded

14  through the Court's ruling this morning damages prior to

15  the day of suit without their having been a pending

16  motion, that's correct.

17       And we had no -- plaintiff had no opportunity,

18  no notice to be heard, as required under Rule 50(b) on

19  that motion and because that motion was not made, and we

20  had no opportunity to present rebuttal evidence.

21       The Federal Circuit has ruled in the Wanlass

22  case that once the presumption of laches is applied,

23  which is what your Honor implied this morning, a prima

24  facie defense of laches is made with the presumption the

25  facts of unreasonable and inexcusable delay has produced

1  or inferred absent rebuttal evidence.  Once the

2  presumption is established, the patentee may introduce

3  evidence sufficient to support a finding of the

4  nonexistence of presumed facts.

5          That is what plaintiff proposes to do, and I can

6  tender a copy of this court decision to your Honor.

7          THE COURT:  The Court is familiar with the

8  decision.  The Court quoted from that case this morning

9  when the Court ruled.

10          MR. BROTHERS:  Yes, and I wanted to point out

11  the specific language of the Federal Circuit stating that

12  once the presumption was found, again, without a motion

13  having been made, we, plaintiff, has the opportunity to

14  respond by providing in rebuttal that evidence.

15          We also understood pursuant to the discussion at

16  the pretrial conference that laches was going to be

17  heard, for the most part, outside the jury.

18          Your Honor indicated if there was specific

19  witnesses, maybe we could ask a few questions.

20          THE COURT:  I wanted to let you go on, but,

21  Mr. Brothers, I think you are redefining some things

22  here.  You had an opportunity to present evidence on

23  laches if you wanted to do it.  Now you are Johnny come

24  lately with this argument because you found that the

25  Court has held against you, but you had no intentions and

1 | expressed no intentions of calling any witness in here on

2 | laches.

3 |       Now, no matter what the Court does, that's what

4 | the record reflects.  Now, you can reinvent history, but

5 | you did not intend to call a single witness in here after

6 | this witness, and you told the Court that more than one

7 | time.  And to tell the Court now that somehow or another

8 | you haven't been given a chance to do what you were not

9 | going to do, the Court finds that disingenuous.  You can

10 | go on and tell anything else you want to say about what

11 | you are in the process of presenting to the Court.

12 |       MR. BROTHERS:  To clarify, your Honor, we never

13 | believed we needed to call witnesses for the jury with

14 | regard to laches.  We had understood from the conference,

15 | from the pretrial conference, that the Court would take

16 | up laches after the close of evidence to the jury.

17 |       THE COURT:  Mr. Brothers, you never indicated to

18 | this Court anything about calling any more witnesses on

19 | this issue.  Now, when they presented that transcript

20 | yesterday, the Court indicated yesterday that it would

21 | consider that transcript and rule on that issue this

22 | morning, you never said a word, and you have got enough

23 | lawyers over there if you forgot it, for somebody to say

24 | something about it.  You never said a word.

25 |       MR. BROTHERS:  I'm sorry, your Honor.  I won't

1   interrupt.

2          THE COURT:  You know something, the Court finds

3   it troubling that you would now come in here and raise an

4   issue you never had a chance to really raise, to put

5   forth evidence.

6          Let me hear from your opponent just in case the

7   Court missed something here on this issue.

8          Have a seat.

9          Yes, sir.

10         MR. NELSON:  We did move on laches.  I mean,

11  actually we've talked about it in chambers many times.

12  We submitted the evidence and we filed a written JMOL on

13  this issue.

14         Yesterday after the argument on the issue, which

15  was an argument on the laches issue consistent with the

16  summary judgment briefing, as your Honor referenced

17  earlier this morning that we had filed previously,

18  Mr. Brothers actually said, your Honor, it's okay if we

19  don't file anything?  He didn't want to file anything

20  else.  They went through -- he specifically said we have

21  no more witnesses to call.  This is the only witness that

22  we have.  They never intended to offer any additional

23  evidence, never did they ask the Court, never did they

24  apprise us that they wanted to offer any additional

25  evidence on laches.

1    We made the submission.  They specifically asked
2  if they could not file anything with your Honor.
3  Therefore, they could have done the same thing.  If they
4  believed that they had some evidence and wanted to make a
5  proffer, as we did to your Honor, then they could have
6  done that, but they chose not to do that.  And now what
7  they are doing is exactly what your Honor has said.  Now
8  they got an adverse ruling.  What we have here is a
9  situation where they just didn't take the defense
10 seriously.  They didn't think they needed to put on
11 evidence.  They didn't think that they needed to do
12 anything.  It was a serious defense.  It's been a serious
13 defense from the beginning, and with all due respect to
14 them, they have been on notice of this since the
15 beginning of the case.  If they chose not to come in and
16 offer your Honor any more evidence on that, well, that's
17 too bad.  That would be just like I rested my case
18 yesterday.  Now I'm supposed to come back and say, oh,
19 your Honor, I thought of one more thing and I didn't have
20 an opportunity to be heard.  That's not the way trials
21 work.
22    THE COURT:  Well, I just want to be clear the
23 Court wasn't imagining that's what the Court heard
24 yesterday afternoon --
25    I'm not ready to hear from you again,

 1  Mr. Brothers.

 2          Before the Court indicated that it would rule on

 3  this matter and read those transcripts last night, the

 4  Court's reasonable expectation would have been that you

 5  would have said then, once he tendered those transcripts

 6  for the Court to read, that, Judge, there's something

 7  else I want you to consider on this motion before you

 8  make any determination on this issue based on reading

 9  those transcripts.  That's what the Court would have

10  expected to be done.  It never happened.

11          You also indicated to the Court that there were

12  not going to be any more witnesses because the Court's

13  concern in not addressing the motion for summary judgment

14  in the first place was that the Court wanted to make sure

15  it knew what was in the record on this issue before it

16  did anything.

17          The Court clearly recalls, I think you,

18  Mr. Brothers, responding to one of the Court's questions

19  about what were you doing?  And the response was, Judge,

20  this goes to laches.

21          So you knew you had to put on some evidence.

22  You made reference to putting on evidence in the case, in

23  your case in chief when the Court questioned you.  So you

24  have had more than ample opportunity to address this

25  issue, and so the Court absolutely rejects any suggestion

 1  that you have been foreclosed with going forward with any

 2  evidence in this case on the issue of laches.  I think

 3  this is a procedural issue and the Court is not prepared

 4  to go back and run a trial this way.  It's just not the

 5  Court's experience as soon as the Court rules against a

 6  party, then we start all over again with a new record.

 7          The record on appeal is based on what the Court

 8  considered before it ruled, not what you introduce after

 9  the Court rules.  If you wanted me to know something

10  more, you should have introduced it before the Court

11  ruled.  And you knew I was going to rule because I gave

12  you overnight to do it.  And if you didn't think about it

13  yesterday, you had an opportunity to think about it this

14  morning when the Court sat down and started to rule.  You

15  still had an opportunity to stand up and say something

16  about it.  You did not.  You waited, and that's not the

17  way we are going to operate in here.  A trial will never

18  end if a party can come in wanting to present new

19  evidence after you get an adverse ruling.  And so, no,

20  the Court has ruled on that matter.

21          So, now what is it that you now intend to offer

22  so I will know exactly what the Court is rejecting?

23          MR. BROTHERS:  I would simply point out to your

24  Honor that last night with regard to the transcript I

25  noted that the defendants had renewed their Rule 50

```
1  motion last week which the Court had denied, and I said
2  this morning, in reading from the transcript, "This
3  morning we --" I'm sorry.  This is at page 1792, "This
4  morning they filed essentially the same thing.  Do you
5  require a written response?"
6          And the Court said, "I don't require written
7  response.  I think we recall where you went."
8          And on that issue we understood that the Court
9  was not going to accept a further written response.
10         THE COURT:  No.  You asked me did the Court
11 require an additional response?  The Court indicated no.
12 That's not the same as you saying, Judge, I want to
13 supplement the record with what I have presented.  That's
14 a different question.  You didn't say, Judge, I want, as
15 a party, to supplement the record with what I have
16 presented.  That's what you are called upon to do as a
17 lawyer.  So, now, let's not misinterpret what happened
18 here.
19         MR. BROTHERS:  Well, I understand the Court's
20 comments.  The context as I understood, our having made
21 the JMOL, we were the moving party, and very clearly in
22 the record after I made that motion, a response was made
23 to our JMOL on laches.
24         THE COURT:  And then they made a motion, a JMOL
25 on laches, and you stood up and you responded to it
```

1  yesterday afternoon.

2        MR. BROTHERS:  Your Honor, the record indicates

3  that Mr. Sohn in his response was responding to our

4  motion on laches.  This is at page 1785 and 1786 of the

5  transcript.  I can proffer it to your Honor, but to be

6  clear, this was a response to plaintiff's motion.

7        THE COURT:  Well, let me ask you something.

8  What do you call yourself doing yesterday when he stood

9  up and argued on laches and then you responded?  What was

10  that?

11        MR. BROTHERS:  I'm sorry, that was his response

12  to plaintiff's motion, and the Court said it would take

13  and it would review the materials that had been proffered

14  with regard to whether the Court was going to grant or

15  deny the plaintiff's motion.

16        THE COURT:  The Court also addressed the matter

17  of the JMOL, so now you are standing here and telling the

18  Court that you didn't understand the Court was going out

19  and coming back and ruling on laches.  Is that your

20  argument?

21        MR. BROTHERS:  No, your Honor.  I'm sorry if I'm

22  being unclear.  It was plaintiff's motion on Rule 50 that

23  the defendants had not met their burden of proof on

24  laches.  That was the pending motion.  And we understood

25  that the Court was going to consider the materials

1  proffered by the defendants to determine whether it was

2  going to grant or deny the plaintiff's motion for JMOL on

3  laches.

4          THE COURT:  So, in other words, you are saying

5  to the Court you didn't expect the Court in any way to

6  address whether the defendant's motion for laches should

7  be granted?

8          MR. BROTHERS:  That's entirely correct, because

9  no motion was made.  It's not here in the transcript and

10  we had understood, quite frankly, from the pretrial

11  conference and the Court's comments that laches would be

12  determined by the Court outside the presence of the jury.

13          THE COURT:  And it did.

14          MR. BROTHERS:  I'm sorry?

15          THE COURT:  And it did.  I tell you what, if the

16  Court has made an error, I'm sure the Federal Circuit

17  will correct me.

18          MR. BROTHERS:  Will the Court permit us to make

19  our written proffer with regard to our proposed rebuttal

20  evidence regarding laches?  Can we make that written

21  submission?

22          THE COURT:  Well, the Court has ruled, number

23  one, you presented your evidence and you told the Court

24  that you had no further evidence to present.  Now you are

25  coming back through the door suggesting you have

1 something.

2        Well, I can tell you what, just as a matter of

3 policy, the Court will permit you to give it to me, but

4 it's rejected, just for the record, but I'm not confident

5 that any Court of Appeals will let you attempt to game

6 the trial court this way, Mr. Brothers.

7        MR. BROTHERS:  Your Honor, I respectfully

8 disagree that that's what we were trying to do.

9        THE COURT:  That's not what you were trying to

10 do, that's what you are trying to do now.

11        Call the witness.  Call him.  Who are you going

12 to call, Mr. Blais?

13        MR. BROTHERS:  We are prepared to proffer a

14 declaration from Mr. Blais, but you have already told us

15 you wouldn't hear that testimony.

16        THE COURT:  Well, you can give a declaration of

17 Mr. Blais.  I will let you proffer it for the record,

18 purely for the purposes of appeal.

19        MR. BROTHERS:  And we expect to make a written

20 submission, your Honor, with regard to the other evidence

21 that we think that the Court disregarded in its

22 determination.

23        THE COURT:  Well, I can tell you, you can appeal

24 it.  You can file whatever motions you want.  The Court

25 also -- you may want to wait until the Court issues a

1  memorandum order on its ruling, which the Court has the
2  authority to do.  I mean, since you are now saying you
3  are going to issue -- you wait until the record is ripe
4  if you want to do any such a thing.  Otherwise, that
5  will, likewise, be out of order and upside down as you
6  are on this motion here.
7          Okay.  This declaration of Mark Blais, when did
8  you prepare this?
9          MR. BROTHERS:  When we received your Honor's --
10         THE COURT:  Ruling?
11         MR. BROTHERS:  -- ruling.  This is a proffer of
12 declaration.  I'm sorry, let me hand it to opposing
13 counsel also.  So I left the courtroom and I had a
14 conference call with Mr. Blais today, and so we tender
15 this information to the Court.
16         THE COURT:  The Court will note, just even
17 glancing at it, this seems to be add odds with part of
18 his deposition testimony.  But anyway, mark it as an
19 exhibit.  The Court, basically, refuses the declaration.
20 It's submitted after the fact and with the benefit of the
21 Court's ruling, made after the Court had articulated its
22 ruling on the issue.
23         All right.  Anything else?
24         MR. BROTHERS:  We need to discuss, your Honor,
25 how we are going forward now in light of the Court's

1    ruling with regard to the evidence.

2            THE COURT:  Okay.  Let's do this.  Let's bring

3    the jury back in and let them go home.

4            MR. BROTHERS:  Thank you, your Honor.

5            THE COURT:  Hold on, Mr. Taylor.

6            Let's be clear.  Are there any more witnesses?

7            MR. BROTHERS:  There are no more witnesses for

8    the jury's consideration, your Honor.  The only witnesses

9    that we would proffer, which we understand the Court will

10   not hear, relates to the equitable defense of laches

11   based on the Court's ruling.

12           THE COURT:  What witnesses?  You told me you had

13   a declaration from Mr. Blais.

14           MR. BROTHERS:  Well, we proffered Mr. Blais this

15   morning and asked if we could call him.  You said no,

16   don't bring him down.

17           In addition, we would proffer for the Court --

18   again, this is not for the jury.  This is for the Court

19   because it goes solely to laches -- Mr. Kosak on the

20   issue of laches.

21           THE COURT:  You have had Mr. Kosak in here as a

22   witness in this case.  You had him in here as a witness

23   in the case.  You are now asking the Court to put it in

24   the record after the fact.  I mean, you had an

25   opportunity to do that, Mr. Brothers, so, no, the Court

1  is not going to call Mr. Kosak as a witness.  If you want

2  to make an oral proffer of what he would say, you are

3  welcome to do that, but the Court is not going to put him

4  back on the stand.

5         MR. BROTHERS:  We will submit a written proffer

6  or I can make an oral proffer, but I believe we can let

7  the jury go home before we do that.

8         THE COURT:  Well, you know, I'm prepared for you

9  to make your proffer right now.  How long are you going

10 to be?  You know what he's going to say.  You are

11 pressing me to call him, so you obviously know what he's

12 going to say.  You can make the proffer now.

13        MR. BROTHERS:  Okay.

14        MR. NELSON:  Judge --

15        THE COURT:  Just a minute, Mr. Nelson.

16        MR. NELSON:  May I say something, your Honor?

17        Just so you know and so the record is clear on

18 this, Mr. Kosak is not only sitting in here again

19 listening to all the testimony, he's been sitting here

20 listening to all the arguments.  Your Honor ruled on this

21 issue yesterday on the 615 and now they want to call him

22 back up again after they chose not to heed your Honor's

23 ruling.

24        THE COURT:  I tell you what, Mr. Brothers.  You

25 can make a written proffer and you can put that in the

1  record along with Mr. Kosak, but the record will reflect

2  that the Court has already excluded him once before and

3  dealt with this issue.  So you can, likewise, give me a

4  written proffer tomorrow morning and we will put it in

5  there as refused purely for appellate purposes.

6            MR. BROTHERS:  We will do that, your Honor.

7  Thank you.

8            THE COURT:  Bring the jury in.

9            (Jury in.)

10            THE COURT:  You may be seated.

11            Let the record reflect all jurors are present in

12  the courtroom.  Does counsel agree?

13            MR. CIMINO:  Yes, your Honor.

14            MR. NELSON:  Agreed, your Honor.

15            THE COURT:  All right.  Ladies and gentlemen,

16  all of the evidence is in in this case and the parties

17  have concluded, but what the Court has to do now is meet

18  with counsel to review the final instructions that you

19  will be given, and that's a lengthy process.  So what the

20  Court is going to do is the Court is going to excuse you

21  to come back tomorrow morning at 9:30 a.m.  We will start

22  with the -- no, no, hold on.  10:30, 10:30 a.m. so that

23  we can start with the closing arguments, and you should

24  get this case tomorrow for your deliberation.

25            Although the evidence is all in, the precautions

1  that the Court gave you in the beginning of this case

2  certainly apply.  It's not time to conduct any research,

3  or to make up your mind, or do anything.  Just wait until

4  tomorrow afternoon when you have an opportunity to get in

5  and deliberate.

6          Thank you for your attention.  The Court will

7  see you in the morning at 10:30.

8          All rise.

9          (Jury out.)

10          THE COURT:  You may be seated.

11          Yes, sir.

12          MR. NELSON:  So at this point, your Honor, we

13  have a Rule 50(a) motion with respect to invalidity.  We

14  also renew our prior Rule 50(a) motions.

15          I don't know how much argument you want on this,

16  your Honor, but with respect to the invalidity case, I

17  think on the anticipation first, with respect to the

18  Bowman reference you have just heard not only the

19  testimony of Dr. Ungar establishing that all the elements

20  are, in fact, present, but in addition you heard the

21  admissions of Dr. Carbonell here today that indicate

22  that, in fact, he says it doesn't disclose content-based

23  analysis.  He says it doesn't disclose filtering, but as

24  to the filtering he admitted that there is a threshold

25  value and that things above the threshold will be

1   maintained, things below the threshold will be tossed

2   out, which is exactly what Dr. Frieder has accused of

3   infringement in the case.

4           Furthermore, with respect to the content-based

5   analysis in the Bowman reference, what Dr. Carbonell's

6   opinion is based solely upon the notion that words have

7   different meanings throughout the patent.  He

8   acknowledges that the term "matching" in the first

9   instance in the patent refers to a content-based analysis

10  and content matching, but then contends when exactly the

11  same terminology appears later in the patent, that that

12  does not refer to a content-based matching.

13          With respect to the Culliss reference, your

14  Honor, he has indicated -- or there are two elements that

15  are challenged by the plaintiff's counsel.  With respect

16  to the content-based analysis, similar to what we just

17  saw with Bowman, Dr. Carbonell just admitted that, in

18  fact, there is content-based analysis.  He says that that

19  is overwhelmed eventually, but the initialization is

20  content-based and the claims themselves don't require a

21  particular amount.  Therefore, based upon his own

22  admissions, that element is, in fact, present.

23          Additionally, he's just admitted on the stand

24  that -- well, actually that's a noninfringement argument,

25  your Honor.  Never mind.

1     He has admitted that his opinion is completely
2  inconsistent with Dr. Frieder's infringement opinion, but
3  with respect now to the filtering, we've shown that the
4  filtering is, in fact, disclosed in the patent, that is
5  the rating term.  He agrees that that is disclosed in the
6  patent.  His argument is that he doesn't think it works,
7  which is, of course, an enablement argument, which was
8  never testified to nor raised.
9     As to the obviousness arguments, your Honor, he
10 based his arguments on a faulty application of the law.
11 He said that if he can find one of the elements that are
12 absent from the prior art, then there can be no
13 invalidity as a matter of law, which, of course, is not
14 the case.
15    He did not address the Graham factors.  He did
16 not address the KSR standards, and furthermore, as to the
17 only element that he said was missing from the prior art,
18 this showing of searching for filtering for relevance to
19 the query, he, in fact, admitted that that is shown in
20 the prior art and, in fact, is disclosed in the
21 background section of the patent.
22    And then in addition to that, of course, we have
23 Dr. Ungar's testimony addressing the Graham versus John
24 Deer factors, addressing the KSR and establishing that it
25 would be obvious to one of ordinary skill in the art

1  given the disclosure in the prior art.

2         So that's the invalidity JMOL, your Honor.  And,

3  of course, the obviousness goes to all the references

4  that we had submitted, the Fab article, the WebHound, the

5  Rose patent, as well as Bowman and Culliss, which

6  Dr. Ungar testified to the various combinations.

7         In addition, on the 50(a) I don't know if you

8  want any more argument on the previous 50(a) motions,

9  whether there are any more of those your Honor would be

10 interested in hearing further about.  If there are, I'm

11 happy to address those, but I would leave that to your

12 Honor.

13        Now, as to damages, based upon your Honor's

14 ruling here, we have an additional issue because we have

15 a complete failure of evidence to support any damages

16 claim post-September 15th, 2011.

17        What Dr. Becker testified to, the only

18 evidence -- remember, his theory is royalty base times

19 the royalty rate equals a royalty.  The only evidence

20 that he chose to put in the record was a cumulative

21 apportionment of royalties for the entire period, which

22 he put in at a big number.  I'm not going to mention the

23 number here, your Honor.  But he did not write that down

24 by quarters.  There's no evidence of what the revenues

25 are by quarter, whether it be post-September 15th, 2011

1   or pre-September 15th, 2011.

2           That was plaintiff's choice.  They wanted to

3   have Dr. Becker state a big number to the jury and they

4   chose not to break his apportionment down by quarters, so

5   they have a complete failure of proof.

6           Now, in response to some of the discussion and

7   your Honor's ruling this morning, there were several

8   references made to a chart that Dr. Becker had shown to

9   the jury that showed bars by quarter.  That's a

10  demonstrative, first of all, so that's not evidence.  He

11  never provided any testimony as to what the individual

12  amounts of the royalties would be on a per quarter

13  basis.  There's no testimony in the record whatsoever to

14  support whether it be a royalty base to apply his royalty

15  to or a final royalty amount post-September 15th, 2011.

16          Now, this is plaintiff's choice.  They knew --

17          THE COURT:  Suppose the jury decides that, you

18  know, they find infringement?  Suppose they find

19  infringement and the patent is still being used and they

20  assume that Dr. Becker's calculation of a 3.5 percent

21  royalty rate is appropriate?  What's stopping the jury

22  from using the 3.5 percent running royalty figure from

23  the date -- whatever date the Court gives them?

24          MR. NELSON:  Well, the problem is, your Honor,

25  they don't have anything to apply it to.  There's no

1  evidence in the record to apply that to a revenue base.

2  They chose not to break that down on a post-September

3  15th, 2011 base despite the fact that they knew this

4  motion was out there and despite the fact that there were

5  other issues concerning infringement regarding their

6  source code, when certain templates were identified.  So

7  this is something that plaintiff has been on notice of

8  and this was a trial strategy decision by them to try to

9  offer only a lump revenue in order to make that number

10 bigger.  So, there is nothing for the jury to apply the

11 3.5 percent to, even if they would choose that the 3.5

12 percent is the appropriate amount.

13         THE COURT:  Suppose they decided a lump sum

14 would be appropriate?

15         MR. NELSON:  Well, then, your Honor, the only

16 evidence in the record is what Dr. Ugone testified to,

17 which would be the $3 to $5 million figure.

18         THE COURT:  That's something.

19         MR. NELSON:  No, I understand that that's

20 something.

21         THE COURT:  Your argument was there was nothing

22 in the record.

23         MR. NELSON:  Well, with respect to the running

24 royalty.

25         THE COURT:  Okay.

MR. NELSON: So, I mean, if they want to argue that Dr. Ugone's number is correct, they can do that, but they can't argue as to the running royalty because they have no evidence in the record to support a damages award based on such an analysis.

THE COURT: All right. Fine. Let me hear from --

Okay. Now, with respect to your motion, you made a Rule 50 motion based on invalidity.

MR. NELSON: Correct, your Honor, as well as the previous ones on noninfringement and damages, your Honor.

THE COURT: Okay.

MR. NELSON: And then, of course, the JMOL on the laches, but that's already been granted, your Honor.

THE COURT: All right.

MR. CIMINO: Your Honor, I can address the invalidity?

If it please the Court. I prefer to do it in writing, if that's okay, but I could summarize the testimony that was just given, if the Court would like.

THE COURT: Let's put it this way: You could address it in writing. The simple truth is by the schedule we are operating on, we would end up ruling on it in the morning, and the Court intends to take up the jury instructions with counsel. So you can give me your

1  oral statements now, but that's the Court's view.  I

2  think that you, hopefully, should be able to address it

3  now.

4          MR. CIMINO:  Sure.  So, Mr. Nelson didn't

5  mention the burden of proof.  The burden of proof for

6  invalidity is high.  It's clear and convincing evidence.

7  That's what we are allowed by the patent office.  So

8  everything is in the context of clear and convincing

9  evidence, and they have not met their burden of clear and

10  convincing evidence of invalidity.

11          On Bowman, the first point he mentioned was

12  filtering.  There was clear testimony by Dr. Carbonell,

13  an established and well-respected expert in the field,

14  that it is not filtering according to the '420, '664

15  patent.  It is a relative analysis by taking a ranking

16  threshold, not a clear threshold, or not an absolute

17  threshold in doing a one-by-one analysis.

18          In the Google product they filter first, then

19  rank.  In the Bowman patent there was testimony by

20  Dr. Carbonell that what happens first is they rank all of

21  them and then they use a ranking, relative ranking

22  threshold to remove some.  That is the difference between

23  the two products.

24          He also addressed the content analysis that

25  Dr. Carbonell says is missing.  He says Dr. Carbonell is

1  reading words in the patent two different ways.  Words in

2  the patent should be interpreted in accordance with the

3  contextual use in the patent.  Dr. Carbonell was very

4  clear every time counsel pointed him to the word

5  "matched," whether it was in the background or whether it

6  was in the actual description of the Bowman facility.

7          In the background Bowman says that prior art

8  ways of doing it would match content of the article.

9  Then if you remember, your Honor, there was a statement

10 in Bowman that says, What I'm going to do is to look at

11 collaborative information rather than the attributes of

12 the item.  I'm going to look solely at collaborative

13 rather than content.  And then when he describes his

14 facility, he uses the word "matched" with different

15 prepositions.  And when he uses the word "matched" later,

16 Dr. Carbonell has testified he's talking about the

17 keyword.  So Dr. Carbonell did not take an inconsistent

18 position.  The patent has to be put in context.  He was

19 talking about the prior art, how it did it.

20         The part that Mr. Nelson left out of his

21 cross-examination was the transition.  I don't want to do

22 it that way anymore.  I'm going to do it the new way just

23 based on collaborative information and when he used

24 matched throughout the patent later, it was always with

25 respect to collaborative information.  So matching,

1  Dr. Carbonell interpreted in context the way a person of

2  ordinary skill in the art would do in 1998 in view of the

3  entire reference.

4         He mentioned Culliss.  Dr. Carbonell was very

5  clear that initialization is different, in his view, from

6  what happens when the Culliss facility is actually

7  processing articles.  There is nothing in Culliss similar

8  to the Fig. 6 to the patent where you take content and

9  collaborative and combine them for a score.  You set up

10 an initial index.  It can be done in many different

11 ways.  One of them could be content, but then as the

12 facility is running, it's purely collaborative.

13        Mr. Nelson mentioned filtering.  Filtering was

14 not connected to the embodiment that was discussed about

15 how Culliss works.  There is a separate embodiment that

16 talks about these ratings for X-rated and G-rated

17 content.  The X-rated and G-rated labels are selected by

18 human judgment or by default.  It's not content-based.

19 And Dr. Carbonell clearly indicated that that was a

20 separate rating from the actual discussion of how Culliss

21 is going to work and also indicated the problems in the

22 patent about how the filtering would be accomplished,

23 even if it was filtering.

24        He mentioned obviousness.  Dr. Carbonell went

25 through the three references, said that Dr. Carbonell

1   didn't discuss the Graham factors.  He didn't use the

2   term "Graham factors", but he went through the scope of

3   the prior art in detail.  He showed profile systems, how

4   they worked; he showed search systems, how they worked

5   both in 1998; he showed the over-the-wall system, how

6   they worked; and then went into a detailed discussion of

7   how the claims are different, that the claims require

8   analysis of content data, collaborative data combined

9   together and then filtered with respect to relevance to

10  the query.  While the query was on one side, it wasn't on

11  the other, and here's where the filtering was being done.

12        He also said that Dr. Carbonell did not do a KSR

13  analysis.  That's untrue.  He didn't use the case name,

14  but the issue in KSR is whether combination is

15  predictable.  I clearly asked him whether he thought they

16  would be predictable to a person of ordinary skill in the

17  art to take the prior art methods and come up with the

18  claimed invention, and Dr. Carbonell went through several

19  different reasons, both academic and based on his

20  personal experience as to why that wouldn't be done.

21        Dr. Ungar had never taken the prior art and

22  stated how it would be combined to meet all of the

23  elements.  He just said all of the elements were there.

24  So since it is defendant's burden to prove invalidity,

25  Dr. Carbonell did not have to build a strong combination

1   to then say that it didn't meet all of the elements.   So

2   he didn't do that.   But what he did say is there are four

3   elements, an element in every claim, that's totally

4   absent in the prior art, and I specifically asked him

5   whether a person of ordinary skill in the art in 1998

6   would be able to find that missing element and then

7   combine it to come up with the claimed invention.   So the

8   testimony from Dr. Carbonell on both the two anticipation

9   and on all the prior art refutes JMOL of invalidity.

10          THE COURT:   Thank you.

11          All right.   The Court heard the defendant's

12   motion for judgment as a matter of law on the question of

13   invalidity.   That motion is denied on all grounds.

14          The Court also denies your Rule 50 motion for

15   judgment as a matter of law on the issue of

16   noninfringement.

17          With respect to the issue of invalidity based on

18   obviousness, I think the simple fact is the question of

19   obviousness is a legal determination for the Court, not

20   for the jury.   But the jury is responsible for making

21   certain underlying factual determinations, so the Court

22   in the verdict will submit certain interrogatories to the

23   jury on the issue of obviousness, and the Court will make

24   the ultimate determination on the issue of obviousness

25   based on using those factual findings in an advisory

1  capacity.  That's what the case law provides and that's

2  what the Court will do.

3          With respect to some guidance on the issue of --

4  Let's see.  What else did I miss here?  Damages.

5          MR. BROTHERS:  Your Honor, we have not yet

6  responded on the issue of damages.

7          THE COURT:  Oh, yes.  I think that's something

8  that you need to do.

9          MR. BROTHERS:  Okay.  On the issue of damages,

10 your Honor, the plaintiff concedes that Dr. Becker did

11 not provide a number for the amount of damages from

12 September 15, 2011 forward.  What the jury did see was

13 this graphic with regard to the reasonable royalties by

14 quarter, and so starting effective the fourth quarter of

15 2011 this information was presented to the jury and so

16 that information is at least sufficient for, we believe,

17 the jury to have accepted and make a determination if the

18 Court instructs that damages need to be calculated solely

19 from September 15th forward.

20         THE COURT:  Was that document introduced?  What

21 exhibit number is this?

22         MR. BROTHERS:  This is PDX-083.  This was a

23 demonstrative exhibit.

24         THE COURT:  So it was never even introduced?

25         MR. BROTHERS:  As a demonstrative exhibit.  It

1  was never marked and admitted into evidence.

2          THE COURT:  They received the information.  They

3  got the date of it and never got the physical exhibit

4  regarding the --

5          MR. BROTHERS:  Well, this is not an exhibit they

6  will take back to the jury room, but the information on

7  this the jury was shown.

8          THE COURT:  All right.

9          MR. BROTHERS:  But you are correct, your Honor,

10 in that this exhibit itself was not marked as an admitted

11 exhibit.

12         So I think with regard to where we are left -- I

13 think the premise that there is an absence of proof to

14 support the plaintiff's case with regard to Dr. Becker's

15 testimony, I believe the evidence is in the record,

16 although I concede the specific number as of September

17 15, 2011 is not in there, and I believe we will require

18 guidance from the Court on how we present that to the

19 jury in our summations.

20         THE COURT:  Well, you certainly cannot go back

21 to the jury and present information on a running royalty

22 as Dr. Becker calculated.  The question for the Court was

23 whether there was sufficient information in the record

24 from which the jury could reasonably fashion a lump sum

25 royalty or a lump sum figure if they found infringement

1  based on infringement from the 11th of September forward

2  and the Court's view, based on what it's heard here,

3  there is sufficient information there for the jury to do

4  so.

5         Now, I know defendants would like to suggest

6  that, well, there's nothing there, so we are caught

7  between a choice of, I was going to say, a devil in a

8  dark blue suit, but I don't think so.  I think there's

9  sufficient evidence in the record for the jury to make a

10  reasonable estimate damages, notwithstanding the fact

11  that Dr. Becker didn't give them a specific figure for

12  the period September 11th through the current date and

13  time.  That's just the Court's view.

14         Now, where you find it in the record is

15  something counsel, I think, would probably be more adept

16  than the Court, but the Court believes it's there.

17         Mr. Nelson.

18         MR. NELSON:  Your Honor, might I show you on the

19  Elmo, if I can, there were two questions and answers

20  regarding PDX-83, which is what he just showed you.

21         There we go.

22         So here we go.  This is right after the question

23  you can see up at line 6 where he talks about this

24  overall number.

25         He goes down to PDX-83.  "This is PDX 83?

1    "Answer:  It is.

2    "Can you explain this to the jury, please?

3    "This takes the total royalties that we just

4 talked about, the 493 million that is the result of

5 adding everything up through the third quarter of 2012,

6 and this shows the amounts by quarter that you would have

7 under a running royalty structure."

8    Okay.  No testimony about amounts, revenues, any

9 of those kinds of things.

10    Next question.  "So at the time of the high

11 hypothetical negotiations, according to PDX-83, what

12 would Google have paid, approximately?

13    "Answer:  Well, in the hypothetical negotiation

14 time period, sort of off to the left on this chart

15 because it's in 2004, but you can clearly see the trend.

16 It would be amounts less than what you are seeing in the

17 quarterly payment, for example, in the fourth quarter of

18 2005, which are somewhere between 5 and 10 million, so it

19 would be a quarterly payment less than that."

20    So there's nothing for the jury to base it on

21 other than pure speculation.  I mean, one, they are not

22 going to have the demonstrative; and, two, the only

23 thing, based upon this testimony they could even do, I

24 guess, is take out a ruler and measure the heights of

25 those bars.

1    THE COURT:  This says that the quarterly

2  payments are somewhere between 5 million and 10 million.

3  That was in 2005.  So now you are in 2012 trying to

4  estimate what would the approximate amount be.  They do

5  know that.

6    MR. NELSON:  But they don't have any information

7  to that, your Honor.  It's just pure speculation.  If

8  they want to argue for the lump sum that Dr. Ugone

9  submitted, that's their prerogative.  That's evidence in

10  the record.  But to argue for running royalty based upon

11  no evidence of what the revenues are or what the royalty

12  amount is would just lead the jury to pure speculation at

13  this point, your Honor, and that's their failure.  They

14  had to opportunity to offer the proof and they didn't do

15  it.

16    THE COURT:  Thank you.

17    MR. BROTHERS:  Your Honor, I would note, first

18  of all, PX-64, which is the Google bar chart, has revenue

19  information which is a reference point for the jury.

20    I would also note that with regard to total

21  revenues, as the Court recalls, there was considerable

22  discussion during the course of trial whether the total

23  revenues would be admitted, and your Honor, I believe

24  where we eventually ended up was the total revenues of 67

25  billion would not be presented to the jury, rather what

```
 1   got to the 14 billion, which was the allocated number,

 2   that was something Dr. Becker would be permitted to speak

 3   to but that the defendants were not going to be

 4   separately attacking the revenue numbers for that, and

 5   that was our understanding on which the evidence was

 6   proffered.

 7          Now we have a change of position in which the

 8   defendants are saying there's an absence of proof with

 9   regard to the revenue numbers because of your Honor's

10   concern with regard to the total amount of revenues and

11   limiting how the allocative revenues were going to be

12   provided to the jury.  So based on the Court's prior

13   rulings, we had proceeded one way and now the defendants

14   are saying that there's a failure of proof because of the

15   evidence as it came in.

16          THE COURT:  I don't think the Court's prior

17   ruling with respect to the $67 billion or having

18   Dr. Becker focus on the 14 million in any way restrained

19   the capacity of the plaintiff to put in evidence about

20   what the revenue figures were.

21          You had the bar chart.  He could have just

22   easily put in dollar figures as measuring -- by using a

23   ruler to measure it.  That didn't restrain you from

24   putting in the actual dollar figures.  The Court didn't

25   do that.
```

1   I'm not so confident still, just based on
2 listening to what you are arguing, that there's still not
3 a reasonable way for the jury to find a lump sum that the
4 plaintiff is due if they find that there has been an
5 infringement of this patent.  You spent a considerable
6 amount of time talking about the worth of this patent and
7 etc., so I'm not convinced of that.  So you are probably
8 going to have to think about it and you probably will
9 have to take it up again in the morning if you don't have
10 an answer to it.  But I don't believe that there's just
11 nothing in the record so here we are if we get a verdict,
12 we can't figure out the damages.  The Court rejects that.
13   MR. NELSON:  No, no, I understand your Honor.
14 Just for clarification, they are not allowed to argue for
15 a running royalty, right?  I mean, there is no evidence
16 in the record to support a damage award based on that.
17 If they want to argue a lump sum, then from what I
18 understand your Honor is saying --
19   THE COURT:  They certainly can't argue a running
20 royalty from 2004 to September 2011, but if they find the
21 patent is still being infringed and it's being infringed
22 from September 2011 to the current date, they certainly
23 can suggest that a royalty is due for that period of
24 time.  You just can't do it for the period that the Court
25 has excluded.

1    MR. NELSON:  I understand, your Honor, but what
2  would the jury base the number on?  That's my question
3  with respect to it.  What would they apply the royalty
4  to?
5    THE COURT:  What would they apply it to?
6    MR. NELSON:  Correct.
7    THE COURT:  As I recall, for each of the
8  quarters Dr. Becker came to and he calculated a certain
9  percentage for each one of these quarters starting back
10  in 2004-2005.  When he was doing that, he was looking at
11  the amount of increase that Google had experienced -- had
12  derived from the accused product and he was using that to
13  calculate a percentage increase.  So I'm suggesting that
14  everything is not tainted in this case.  Only the
15  revenues and the calculation for that period in 2004 up
16  to September 11th, as far as the Court is concerned, is
17  at stake here.  Now, you might want to throw out the baby
18  and the wash water, too, but the Court just doesn't
19  believe that.
20    MR. NELSON:  No, no, I understand that.  I was
21  just trying to get an idea what they would be allowed to
22  argue since there is actually no evidence of the revenues
23  for that --
24    THE COURT:  Let's put it this way.  Counsel know
25  their case better than the Court does, and I will wait

1  for a suggestion from counsel on exactly where they want

2  to go, understanding what the restrictions are.

3           MR. NELSON:  Okay.

4           THE COURT:  You cannot argue for a running

5  royalty from 2004 to 2011.  In fact, it's going to come

6  up on the jury instructions.  I was trying to remember

7  who proposed asking the jury if they found infringement,

8  whether they were going to base any award on the running

9  royalty or a lump sum, and the Court when it initially

10 drafted these jury instructions had, in fact, included

11 that.  That was before the Court ruled on the laches

12 motion.

13          But the Court has to evaluate and counsel need

14 to evaluate whether it's appropriate under those

15 circumstances to pose that question to the jury.

16          MR. BROTHERS:  Your Honor, I believe that

17 putting an interrogatory to the jury with regard to if

18 the jury believes that a running royalty is appropriate,

19 the running royalty rate is appropriate.  There is

20 considerable evidence --

21          THE COURT:  Yes, if you put the question up

22 there on the running royalty, the second question the

23 Court certainly would include would be what do you

24 believe the running royalty rate should be?

25          MR. BROTHERS:  Yes, and there's considerable

1   evidence with regard to the rate.

2         THE COURT:  Okay.  What we want to be sure of is

3   the whole question of whether you should pose the

4   question of a running royalty rate, and the Court has

5   suggested it might be a short running, but it's possible

6   based on the evidence.

7         The Court has to fashion a charge that takes

8   reasonable account of the testimony and the evidence in

9   the case.  Now, the Court doesn't believe at this

10  juncture, unless someone wants to persuade the Court,

11  that all potential evidence for running royalty has been

12  excluded from the case.  It's short, but that's the

13  Court's view on that.

14        It was the Court's original intent to try to

15  meet with counsel to go over this charge this afternoon,

16  but it's clear that the Court has to go back and rework

17  the verdict sheet.  The verdict sheet needs to be

18  substantially reworked to include some interrogatories on

19  the Graham factors, and neither party proposed any

20  interrogatories on the question of obviousness.  The

21  Court didn't see it.  I looked at your verdict sheets and

22  it's not on your verdict sheets.  I have been living with

23  those verdict sheets and it's not on the verdict sheets,

24  the list of questions.  So the Court has to go back and

25  rework that.

1    So what the Court is going to do is direct

2 counsel to meet with the Court tomorrow morning at 9 so

3 that we can take a look at this charge, get a chance to

4 go through it and try to rework parts of it that needs to

5 be reworked.

6    For the most part, the parties, I'm sure you saw

7 each other's charge.  You proposed the same thing with

8 the exception of some matters that defendants raised that

9 the Court traditionally does not give in patent cases and

10 I don't think I'm going to give them in this case, so we

11 will deal with that when we get to the charge

12 conference.  I don't think that it's necessary.

13    The Court has great respect for the law, but

14 sometimes we can misstate case law in giving jury

15 instructions and so the Court has a tendency to stay away

16 from that.  So I'm just putting you on notice.

17    All right.  I will see you tomorrow morning at

18 9:00.  Meanwhile, you think about how you want to

19 approach the damages.  I think that's something that

20 counsel has to deal with here.

21    (Court adjourned for the evening recess at

22 4:14 p.m.)

23                        *    *    *

24                      CERTIFICATION

25    I certify that the foregoing is a correct

1  transcript from the record of proceedings in the

2  above-entitled matter.

3
                        X_____/s/ Sharon B. Borden_____X
4
                         Sharon B. Borden, RMR, FCRR
5
                           X October 31, 2012 X
6
                               Date
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25