1974

```
 1              THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4  I/P ENGINE, INC.,                )
                                     )
 5              Plaintiff,           )     CIVIL ACTION
                                     )
 6        V.                         )     2:11CV512
                                     )
 7  AOL INC., GOOGLE INC.,           )
    IAC SEARCH & MEDIA, INC.,        )
 8  GANNETT CO., INC., and           )
    TARGET CORPORATION,              )
 9                                   )
                Defendants.          )
10

11

12

13

14              TRANSCRIPT OF PROCEEDINGS

15                  Norfolk, Virginia

16                 November 1, 2012

17

18              JURY TRIAL - Day 12

19              (Pages 1974-2125)

20

21  Before:   THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
22

23

24

25
```

```
 1  Appearances:

 2

              CRENSHAW, WARE & MARTIN, P.L.C.
 3            By:  W. RYAN SNOW, ESQUIRE
                   DONALD C. SCHULTZ, ESQUIRE
 4                      and
              DICKSTEIN SHAPIRO, LLP
 5            By:  JEFFREY K. SHERWOOD, ESQUIRE
                   FRANK C. CIMINO, JR., ESQUIRE
 6                 KENNETH W. BROTHERS, ESQUIRE
                   CHARLES J. MONTERIO, JR., ESQUIRE
 7                      and
                   DAWN RUDENKO, ESQUIRE
 8                 Counsel for the Plaintiff

 9

              QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
10            By:  DAVID A. PERLSON, ESQUIRE
                   DAVID L. BILSKER, ESQUIRE
11                 DAVID NELSON, ESQUIRE
                   EMILY C. O'BRIEN, ESQUIRE
12                 ROBERT A. WILSON, ESQUIRE
                        and
13            KAUFMAN & CANOLES
              By:  STEPHEN E. NOONA, ESQUIRE,
14                 Counsel for the Defendants

15

16

17                         *     *     *

18

19

20

21

22

23

24

25
```

1    (Court convened at 10:50 a.m.)

2    THE COURT:  Good morning, ladies and gentlemen.

3    The Court just concluded a charge conference with the

4    parties.  The Court provided the parties with the

5    proposed charge in this case.  I am prepared to hear any

6    objections to the charge.  For the record, if you would

7    note your objection to the charge on behalf of the

8    plaintiff, Mr. Brothers.

9    MR. BROTHERS:  Thank you, your Honor.  The

10   plaintiff objects to Jury Instruction No. 32 with regard

11   to the date of commencement of damages and, specifically,

12   with the limitation of damages for defendant Google to

13   September 15th, 2011, based on the Court's ruling of

14   laches as was discussed several times yesterday.  I/P

15   Engine disagrees with that ruling for the reasons stated

16   on the record yesterday and reiterates and incorporates

17   those objections to the instruction.  I/P Engine believes

18   that damages could be calculated for all defendants as of

19   December 15, 2005.

20   Plaintiff has no other objections to the

21   instructions that were provided to us.

22   THE COURT:  All right.  I thank you.  Your

23   objection is noted.

24   Mr. Wilson, on behalf of defendants.

25   MR. WILSON:  Yes, your Honor.  Thank you.  We

1   have three objections to your Honor's charge.  First,

2   with respect to Jury Instruction No. 22 on the Doctrine

3   of Equivalents.  As stated on the record in connection

4   with our judgment as a matter of law, we do not believe

5   there is adequate evidence of Doctrine of Equivalents to

6   go to the jury and this instruction will, therefore, be

7   confusing and really beyond the scope of what the jury

8   has to decide in the case.

9          With respect to proposed instruction or

10  Instruction No. 23 from the Court on active inducement,

11  our objection is similar, your Honor, based on judgment

12  as a matter of law motion.  Again, we do not believe that

13  this issue should go to the jury and that the instruction

14  on it will be confusing.

15         Finally, with respect to Instruction 32 from

16  your Honor, defendants object to the second portion of

17  your proposed instruction in which you will instruct the

18  jury with respect to the other defendants and the

19  starting point for damages with respect to each of the

20  other defendants besides Google.

21         Then with respect to defendants' proposed

22  instructions, your Honor has indicated that you are not

23  going to instruct the jury according to three of

24  defendants' proposed instructions, and so I would look

25  like to state our objection to those on the record.

1    The three proposed instructions that defendants

2  submitted were 4.6 regarding the entire market value

3  rule, and defendants understand that your Honor is not

4  going to instruct the jury specifically with respect to

5  the entire market value rule, and defendants believe that

6  an instruction is appropriate in order to make sure that

7  the damages instructions are up-to-date with respect to

8  the current Federal Circuit standards of the law and that

9  it's necessary to be the complete instruction.

10    Similarly, defendants' proposed Instruction 4.7

11  relates to comparable licenses, and again, defendants

12  propose that instruction to be consistent and up-to-date

13  with current Federal Circuit law and we understand your

14  Honor is not going to charge the jury with respect to

15  that particular instruction.

16    And then, finally, with respect to proposed

17  Instruction 4.8 on apportionment, the objection is the

18  same.  Defendants believe that this is necessary in order

19  to fully charge the jury as to damages with respect to

20  current Federal Circuit law and we understand your Honor

21  is not going to instruct the jury in accordance with that

22  proposed instruction.

23    THE COURT:  Would you please tender to the court

24  those three instructions?  I know you gave the Court an

25  instruction packet, but I want you to tender to the Court

 1  those three instructions that the Court has refused
 2  here.  Would you pull them out there?
 3          MR. WILSON:  Yes, your Honor.  I have them here
 4  and I can tender them to the clerk.  Let me pull them out
 5  of my packet.
 6          THE COURT:  While you are doing that, let the
 7  Court indicate that the Court had reviewed those
 8  instructions and the Court believes under the
 9  circumstances the way this case has evolved, those
10  instructions are not appropriate and not necessary.  A
11  number of those instructions regarding the
12  confidentiality of the patents and the licensing
13  agreement pertain to matters within the scope of the
14  Court's responsibility to guide the parties during the
15  trial, so there's really no need to give the jury
16  instructions on those issues.
17          Now, regarding your objections to the
18  instructions the Court is giving, the Court believes the
19  Doctrine of Equivalents is reasonably raised by the
20  testimony of Dr. Frieder in the case and also believes
21  the other instructions are appropriate as having been
22  reasonably raised by evidence in the case.  So that's the
23  Court's position on the matter of instructions.
24          May I see those?
25          You also tendered a laches instruction, 4.9.

 1           MR. WILSON:  I believe that's on the back of the

 2  packet.  I intended to tender to the Court 4.6, 4.7 and

 3  4.8, that's all.

 4           THE COURT:  I didn't think you wanted me to go

 5  back on that again.

 6           MR. WILSON:  No, your Honor.  It's just a

 7  double-sided copy.

 8           THE COURT:  Fine.

 9           Okay.  Gentlemen, here's where we stand.  The

10  Court understands that each party has an hour to argue.

11  I think what the Court is going to do is take something

12  like a ten-minute break in between these arguments so we

13  won't go two hours.  A ten-minute break, and then we are

14  going to do the second argument.  Then what we are going

15  to do, if the jury is able to tolerate it, we are going

16  to do the charge, which means the lunch break will be

17  later than usual.  But we are not going to take the hour

18  and-a-half lunch break and then come back and do the

19  charge.  That's the Court's plan this time.

20           MR. SHERWOOD:  Your Honor, may I ask one

21  question?  I think when we talked before, the Court

22  indicated the plaintiff could reserve a certain amount of

23  time for rebuttal.

24           THE COURT:  That's true.  The amount of time you

25  wish to reserve of the time you have been allocated.

```
 1              MR. SHERWOOD:  I think about ten minutes, your
 2   Honor.
 3              THE COURT:  All right.  That's fine, however you
 4   want to reserve it.
 5              MR. SHERWOOD:  Thank you, your Honor.
 6              THE COURT:  Okay.  Are we going to need that
 7   easel in the middle of your arguments?
 8              MR. SHERWOOD:  I don't intend to use it, your
 9   Honor.
10              THE COURT:  Okay.  Then, fine.  Bring the jury
11   in.
12              (Jury in.)
13              THE COURT:  You may be seated.
14              Good morning, ladies and gentlemen.
15              THE JURY:  Good morning.
16              THE COURT:  Let the record reflect that all
17   jurors are present.  Does counsel agree?
18              MR. SHERWOOD:  Yes, your Honor.
19              MR. NELSON:  Agreed, your Honor.
20              THE COURT:  Ladies and gentlemen, we have been
21   at it since 9:00 this morning, and we are now at the
22   point where we are prepared to go forward with the
23   closing arguments.
24              You will remember that I told you the closing
25   arguments of counsel do not represent evidence in the
```

```
 1   case.  It's simply their outline of what they believe
 2   they have shown through the witnesses and documents they
 3   have produced.
 4        We will first have a closing statement by
 5   counsel for plaintiff, then counsel for the defendants,
 6   and then a short rebuttal or closing argument by the
 7   plaintiff.
 8        All right.
 9        MR. SHERWOOD:  May I proceed, your Honor?
10        THE COURT:  You may.
11        MR. SHERWOOD:  Good morning, ladies and
12   gentlemen.  I want to thank you for your service.  This
13   has been a long trial and you have had to listen to a lot
14   of technical testimony, and we are very appreciative for
15   all the effort and attentiveness that you have put into
16   this task.
17        You are going to get a verdict form from the
18   Court that is going to explain -- that you are going to
19   use to complete to explain your verdict.  When I come
20   back up here on rebuttal, I will talk about that for a
21   few minutes.
22        One of the things you are also going to get from
23   the Court are instructions, instructions on the law that
24   you will use to apply to the facts that you find to make
25   your decision.  Your decision is something that will be
```

```
 1  reflected in the verdict form.  And the instructions will
 2  explain who has the burden of proof on which issues.
 3          IPE, as the plaintiff, has the burden of proof
 4  with respect to infringement and damages, and that burden
 5  is more probable than not; whereas, Google and the other
 6  defendants have the burden with respect to invalidity,
 7  and the standard for that, as the Court will instruct
 8  you, is clear and convincing evidence.
 9          Now, before we get into a more detailed
10  discussion about the evidence, I want to suggest to you a
11  couple of ways to think about what you have heard over
12  the last few weeks.  First, I want to suggest to you that
13  you can trust the documents that were written without
14  regard to this lawsuit.  That means that every document
15  written by Google before this lawsuit was filed in 2011
16  will probably be the most reliable, trustworthy evidence
17  of the issues that are before you, and I suggest to you
18  that you can trust them.
19          Witnesses may disagree, and you did hear some
20  disagreement between the witnesses, but the documents are
21  what they are, no matter when they are used during the
22  course of their existence.
23          When you are in the jury room you will have all
24  of the exhibits that were admitted into evidence, all the
25  documents and other things that were admitted into the
```

1984

```
 1  case.  I suggest that you review them.  See if they are
 2  consistent, see what they tell you about the evidence and
 3  the issues in this case.
 4          I'm going to try to remember, as I go through my
 5  presentation this morning, to call out the exhibit
 6  numbers, so you may want to write them down.
 7          And, by the way, PX, I don't know if we ever
 8  explained this to you, refers to plaintiff's exhibit that
 9  was admitted into evidence and DX refers to defendant's
10  exhibit that was admitted into evidence, and you will
11  have a binder, I believe, that will show the PX and DX
12  documents.
13          So when you look at the documents you will see
14  that IPE introduced into evidence about 22 Google
15  documents that showed how the Google system worked.
16  Don't take my word for it in the jury room.  Look at the
17  exhibits, look at the binder, and come to your own
18  conclusion with respect to that.
19          In contrast, you will see that Google only
20  introduced one document to explain how its system worked,
21  and that document, it was a prelitigation document,
22  Mr. Alferness said what incorrect, you may recall when he
23  came here and testified before you.  So that's one thing
24  I want you to think about.
25          Think also about the promises that were made
```

1   about the evidence in the openings.  We promised to

2   provide you evidence from multiple sources to show

3   infringement of each and every element in all the claims

4   that have been asserted.  In other words, we showed you

5   all the legs of the chair, not just one leg of the

6   chair.

7           So you heard testimony from Google witnesses

8   about the presence of infringing elements.  That's why we

9   played all that video testimony earlier on in the trial.

10          You heard evidence about Google documents, the

11  very same documents that I encourage you to review in the

12  jury room.

13          You heard testimony from Dr. Frieder about the

14  source code, which he testified is consistent with those

15  documents, and he said, by the way, that the relevant

16  parts to that code appear repeatedly, not just a few

17  times, as Google suggested.

18          You had the benefit of highly qualified expert

19  testimony from IPE.

20          I told you in opening that a Google witness

21  would testify that the alleged inaccuracies in these

22  documents are confidential.  You heard that from Mr. Fox,

23  who testified by videotape.

24          I told you there was no dispute between the

25  parties that the patents taught how to practice the

```
 1   inventions that they disclosed, the Ken and Don
 2   inventions.  There was no dispute about that.
 3          And I told you there would be evidence that when
 4   Google introduced its infringing products, there was a 20
 5   percent increase in Smart Ads revenue, at least.  And you
 6   saw evidence about that, evidence that will be with you
 7   in the jury room, including by video and audio.
 8          Third, I want you to think as another way to
 9   think about the evidence about what promises Google made
10   at the beginning of its case when it made its opening.
11   They said you would hear about the development of Smart
12   Ads, but they didn't bring anyone to court to tell you
13   that story.  They didn't bring any Google employee who
14   could testify about the effects of Smart Ads on Google's
15   revenue, but you did hear by video testimony that IPE
16   offered that there was, in fact, an impact on revenue, a
17   significant impact on revenue, and none of that was
18   rebutted by any Google witness.
19          If Google had other evidence to offer you with
20   respect to that, then it was incumbent upon Google to
21   bring that evidence to court for you to consider.  I
22   suggest to you that when they didn't provide that
23   evidence on these points to you, it meant they had
24   nothing else to say, that there was no Google development
25   story, that there were no patents on the Smart Ads that
```

1  are relevant, and, in fact, there was that increase in

2  revenue when Smart Ads came online.

3          Now, what did Google bring here?  Well, when you

4  get right down to it, they offered you the one document

5  that was technically inaccurate, what they say, and two

6  experts:  Dr. Ungar, who is a former Google employee, and

7  Dr. Ugone, who expresses his opinion about the structure

8  of the royalty agreement depending on who he's working

9  for.  You heard him testify that when he works for a

10  plaintiff, it's always running royalty rate.  He admitted

11  it right there on the witness stand.

12          Google also brought lots of arguments.  They

13  said they don't do anything that's described in the

14  patents.  They don't do content filtering, they don't do

15  collaborative filtering, even though they watch and

16  report everything that everybody does online.  They argue

17  that there are all kinds of documents that invalidate

18  these patents.  They say that four different patent

19  examiners made a mistake when they allowed these patents.

20          They have argued they could have put a different

21  system in place easily and at no cost, but they didn't do

22  that.  They argued every reason you could imagine as to

23  why they don't think they have any responsibility.

24          Their idea seems to be if you can come up with

25  enough poor arguments, maybe it all adds up to one good

1  argument.  It doesn't work that way, ladies and

2  gentlemen, and I would like to suggest to you when you

3  think about this evidence that when you hear somebody

4  give you a whole string of non-persuasive arguments,

5  usually it means they don't have one good argument.

6          What else did they bring?  Well, they brought

7  their name, and it is certainly a famous name, and they

8  told you about the free stuff they offer, as if that's a

9  defense to patent infringement.  Why talk about free

10  stuff and Google charities in a patent case?  Simple.

11  Because you don't want to talk about patent

12  infringement.  It reminds me of some politicians who

13  never seem to be able to answer the question that they

14  are actually asked.

15          The fourth thing I want you to think about when

16  you deliberate on the evidence, is think about the

17  motivation for why you heard certain evidence.  For

18  example, if Google clearly infringes a patent and it

19  doesn't want to pay money for that infringement, then

20  they are going to be motivated to say that that patent is

21  invalid.  Those arguments are standard practice, as you

22  heard.

23          A second example, Google elicited testimony

24  about mind pools.  Mind pools are not in this case.  It

25  is a concept that's disclosed in the patents and it does

1   appear in other claims, none of which have been asserted

2   in this case.  Why talk about a term that's not at

3   issue?  Again, it's a misdirection.

4           In sum, ladies and gentlemen, Google has

5   infringed these patents and it has been caught in the

6   act.  That's why they are so eager for you to take away

7   Ken's and Don's patents.  That's the motivation behind

8   the evidence on invalidity.

9           So with that background, I would like to talk a

10  minute about the inventor's story, and you heard some

11  evidence with respect to that.  You will remember Ken

12  Lang was a brilliant young mathematician coming out of

13  Duke who pursued a life-long passion with respect to

14  machine learning and intellectual intelligence.

15          He chose to enter Carnegie Mellon, which was

16  renown for its superior program on machine learning.

17  Carnegie Mellon is also where Lycos was born, well before

18  Google existed, and it's where Dr. Carbonell, one of the

19  preeminent machine learning scholars in the world,

20  teaches.  Some of his former students, he told you, now

21  work at Google.

22          As a result of his early work at Carnegie

23  Mellon, Ken formed a company called WiseWire, and that

24  began his collaboration with Don Kosak in October 1995.

25          Their work led to the first patent, the '799,

```
 1   which is a parent patent that's not asserted in this
 2   case.  And from the beginning Ken was focused on how his
 3   company was going to make money, how it was going to
 4   generate revenue.  He was focused on generating revenue
 5   because, as you have heard, he always pays his way.  And
 6   he learned that Lycos was using advertising and search
 7   engines to generate revenue.  He thought it would be a
 8   good idea to do that, too, with respect to his company.
 9           PX-218, which was a document admitted into
10   evidence, you will remember, was the investor summary
11   that Ken prepared in an effort to raise capital, and that
12   document talks about advertising.  In fact, it was Ken's
13   business model.  You will remember, I took him through
14   that diagram that is on about the fifth page.
15   Advertising was an important part of the plan.
16           Back then Ken was already thinking as well that
17   you would only charge advertisers who actually clicked on
18   the ad, and you will see that at PX-218 also.  It's
19   another example of Ken being ahead of his time.
20           Well, as you heard, the WiseWire technology was
21   so successful that Lycos decided it had to buy them, and
22   this gave Ken and Don the opportunity to develop patented
23   technology, which is what's at issue here, the '420 and
24   the '664 patents, to apply to search engines, something
25   that Ken, Don and Dr. Carbonell all told you had not been
```

1    done.

2          This technology included filtering for

3    advertisements, finding high quality advertisements for

4    users to click on.  Mr. Nelson asked you in opening to

5    open the binder and see if you could find advertisements

6    anywhere in the binders -- I mean, in the patents.  And

7    I'm going to show you in a minute that the evidence is

8    there that it is in both of the patents.

9          Ken and Don also told you how hard they worked,

10   how they had white boards filled with equations, working

11   late hours.  And the way Ken described it was it was like

12   peeling an onion, there was one challenge after another

13   that had to be resolved.  There wasn't a Eureka moment.

14   This was too complex a problem for there to be one Eureka

15   moment.

16         But when they got there, there was a problem,

17   and the problem was with Lycos.  Lycos didn't have the

18   machines to implement this invention and it wasn't

19   willing to spend the money to buy the machines.  Lycos

20   had large main frame computers which were ill-suited to

21   the invention, and it wasn't going to buy new ones.  The

22   investors at Lycos, in fact, wanted to sell the company,

23   they wanted to move on, and there was nothing that Ken

24   could do about that.  So he decided shortly afterwards to

25   leave.

1       Don stayed for almost ten years and he was able,

2  as you heard, to implement some of the technology in

3  parts of the Lycos system, but not in the main search

4  engine because they didn't have the machines and where it

5  would have had the biggest impact for Lycos.

6       In hindsight, maybe that was a mistake for

7  Lycos.  Don explained how he had tried to address that

8  situation.  Google may tell you that because Lycos didn't

9  implement this technology in its search engine, it

10  couldn't have been very important.  But remember, Lycos

11  was sold to a series of foreign investors, including a

12  Korean company named Daum.  And the testimony with

13  respect to that was Daum didn't know what it was doing.

14  It was a dark and difficult time for Lycos, and I don't

15  think that you can take anything out of Lycos's

16  difficulties in trying to assess the importance of the

17  inventions that are here.

18       Remember, I told you in the opening a patent is

19  a property right.  Whether you build a building on it or

20  not, it's still your property.

21       And you will recall that Ken has testified that

22  since the '420 issued it has been referred to or cited by

23  other inventors or the Patent Office 165 times.  I think

24  that is some evidence of importance, ladies and

25  gentlemen.

1    This is Ken's and Don's last chance to get
2  rewarded for their great work in this area.  The patents
3  will expire in four years and then they will be public
4  property, free for anyone to use for any purpose that
5  they want, including Google.  If there's no award in this
6  case, it means that Google has used the technology
7  without having to pay for it, and Ken and Don and IPE did
8  not get the benefit of a bargain that is established in
9  our Constitution.
10    And, by the way, I don't know whether you are
11  going to hear any arguments about IPE and Vringo, but
12  don't be misled by that.  Few companies or people could
13  be here today if they didn't have banks, investors,
14  sources of capital in order to pursue things they want to
15  pursue.  So don't hold it against them that they went to
16  a source of capital to be able to pursue enforcement of
17  these patent rights.
18    By the way, they are shareholders and they will
19  be rewarded for their work should you find for IPE in
20  this case.
21    Okay.  Let's turn to the key issue in this case,
22  whether Google infringes.  And I want to restate the
23  problem that I told you about in opening in the Google
24  context.  I want to explain to you how Google had the
25  problem that I described.

1    Let's remember, on a big picture level, Google

2 told you that it had 10 billion ads in its inventory.

3 That's too much information.  As my kids say, TMI.  So

4 the challenge for Google is to find the best ad out of

5 that 10 billion to put in the top spot for each set of

6 query results, and the reason for that is that that top

7 slot is the money ad, the top spot where 70 percent of

8 Google's advertising revenues come from.

9    Mr. Alferness testified for Google that Google

10 needed a system that would predict the right results,

11 something he testified that Google calls both Quality

12 Score and pCTR.  And remember, pCTR means predicted

13 click-through rate.

14    He also told you that Quality Score is an

15 overloaded term.  In other words, Google used it to mean

16 different things.  One of the things it uses the Quality

17 Score for is to communicate with its advertisers.  That's

18 ranking of 1 to 10 is not accused in this case, and

19 Mr. Alferness admitted that on cross-examination on the

20 witness stand.  What is accused is Quality Score 1 and

21 Quality Score 2, which is what Google uses to resolve its

22 10 billion ad problem.

23    And why did Google need this system?  Well,

24 Mr. Alferness told us the answer to that, too.  He said

25 if the users don't get useful ads, they might stop

1  coming, and that would be a real problem and it would be

2  a real problem since that's where almost all of Google's

3  revenues come from.  So it was hugely important for

4  Google to have this system that would predict quality

5  results, to go from 10 billion ultimately to that top ad

6  which I'm calling the money ad.  And that technology,

7  ladies and gentlemen, is in the '420 and the '664

8  patents.

9          You heard testimony about Fig. 6 in this case.

10 It is an illustration of how to practice the claims

11 here.  As you can see from the yellow highlighted boxes,

12 Fig. 6 takes structured and unstructured feature

13 information, which is content.  It has a learning

14 function, what Google calls training on the data, and it

15 learns what to do with that data.

16         And further down in the third yellow box you

17 will see it says collaborative input.  That's what other

18 users think.  And you see it learns or trains on that.

19         And then all of that is combined into what's

20 called complete rating predictor.

21         Notice the similarity between what Google does,

22 predicted click-through, and what's disclosed in Fig. 6,

23 a complete rating predictor, which is the combination of

24 both content and collaborative.

25         So, here's the process, if we can go to the next

1   slide.  It's described in the Google documents.  And you

2   can see here at the top there are ads quality levers

3   targeting, that's filtering for relevance to the query;

4   disabling, that's filtering; prediction, that's

5   filtering, pCTR, disabling again; promotion, another

6   filtering; and then finally, the only thing that's not

7   accused here is ranking and pricing.  But I would point

8   out to you that, as you saw in the testimony of

9   Dr. Ugone, you need to have pCTR to even rank or price.

10  This is exactly what Google needed for it 10 billion ad

11  problem.

12          And, by the way, Mr. Alferness has also told us

13  it was important that Google have results very, very

14  fast.  I think he said 200 milliseconds.  So the

15  computers have to do the work.  That's what's in the '420

16  and '664 patents, the computers do the work, not human

17  beings.

18          Now, we know where Don and Ken's patented system

19  came from.  It started with Ken's hard work at Carnegie

20  Mellon, progressing to WiseWire, and ultimately the work

21  they did at Lycos with respect to the search engines.

22  But where did Google's systems come from?  You didn't

23  hear anything about that.

24          Mr. Nelson told you in the opening he would

25  provide testimony and evidence of Google's development of

1  its own system to solve this problem, including patents

2  on the system.

3          Next slide.  He promised you that you would hear

4  about the efforts from Google witnesses to develop the

5  Google system.  Here are seven witnesses who testified in

6  this trial.  None of them described that story to you,

7  ladies and gentlemen.

8          Mr. Nelson also told you that you would hear

9  about a Google patent with respect to the development of

10  Smart Ads.  Remember, there was testimony about that,

11  too.  Mr. Furrow said he wasn't aware of any such patent,

12  and so did Mr. Holt.

13          Only one Google patent is going to be in the

14  binders that you have back in the jury room, and that's a

15  patent that IPE offered into evidence, and IPE offered

16  that patent into evidence to show that Google's patent

17  lawyers actually knew about the '420 patent.

18          That reminds me of something else.  Mr. Nelson

19  also complained that IPE never called Google about patent

20  infringement.  Well, what about Google?  Why didn't it

21  call Lycos?  Its patent lawyers knew about the '420

22  patent because the Patent Office cited it to them.

23  That's why we moved to admit PX-416 in your binders into

24  evidence to show that the Google patent owners knew about

25  the '420 patent.  That patent has nothing to do with the

1  Smart Ads development story, and you know that's true

2  because no Google witness testified about that patent.

3          Not only did Google know about the '420 patent,

4  but you also heard from Mr. Alferness that Google has

5  this vast database called Google patents.  It's free.

6  Anyone can use it, even Google.  And you can search for

7  any U.S. patent, and yet having this database, Google

8  never picked up the phone, called Lycos to discuss either

9  of these patents.

10         And remember the testimony of Dr. Ugone.  In

11  2004, February 2004, Google and Lycos were neck-and-neck

12  competitors in the Internet.  They had very close number

13  of visits from Internet users at that time.  So, no

14  development story from Google at all and no patent.

15         So what were some of Google's responses to these

16  arguments?  Well, as an example, Mr. Nelson encouraged

17  you to open the binder, as I said, and try to find where

18  there's any reference to advertising.  He said we were

19  trying to stretch the patents, that they don't apply to

20  advertising.  Well, as you see on this slide, his own

21  expert disagreed with him.  He agreed that when the

22  patent talked about informons, it included an

23  advertisement.

24         And what about claim 5 of the '664 patent?  This

25  invention expressly claims advertisement.  Could there be

1   any doubt that this patent encompasses claim for

2   advertising?  There's no stretching here, at least by

3   IPE, ladies and gentlemen.

4           Another response that I told you about in

5   opening was that Google has two-stories about what it

6   does, the story that it tells its customers and the story

7   they want to tell you here in court.

8           Remember, Mr. Fox testified that these technical

9   inaccuracies in these documents are confidential.  He

10  said that the English language documents that describe

11  how the system works and are supposedly inaccurate are

12  confidential.  Use your common sense.  Does that make

13  sense?  Year after year of the same public statements by

14  Google as to how the system works, which I'm going to go

15  through it for you in a few minutes.

16          Ladies and gentlemen, the technical inaccuracy

17  issue only came up after this lawsuit was filed.  This is

18  a gotcha argument, and this is how it goes:  For years

19  they tell the world, including their own internal

20  engineers, how their advertising system works, but during

21  all that time they say it was all wrong, not technically

22  accurate, to use their phrase.

23          According to this argument, the Google computers

24  actually do something different, which makes all those

25  Google documents wrong.  It's a very convenient argument

1  if you are defending a lawsuit and you don't want to take

2  responsibility and pay your fair share, pay your royalty,

3  but the documents are only wrong for the purposes of this

4  lawsuit, because Mr. Fox testified they have no plans to

5  correct them.  Why would that be?  Wouldn't a company

6  like Google want to do the responsible thing and correct

7  its documents?

8         There's a simple answer for this, ladies and

9  gentlemen.  The documents are correct, they are not

10  wrong, and that's why there is no plan to correct them.

11  They accurately describe the system, just as Dr. Frieder

12  told you after he reviewed the source code.

13         Another response Google made was source code.

14  Their position was when you go back into the jury room,

15  that's all you are going to have to rely upon.  That's

16  going to be the only evidence you can look at, evidence

17  that, I fear, you may not really be able to understand.

18  I can tell you that I don't understand it.  I'm not a

19  computer scientist.  I can't read source code.

20         When you are sitting back there with the source

21  code, I want you to think about this.  If their version

22  of the truth with respect to technical inaccuracy was

23  correct, don't you think that somewhere along the line in

24  the trial of this case you would have seen an e-mail, a

25  document, something that some Google engineer wrote that

1  said, hey, you know what, we can't describe this system

2  accurately, so let's just agree we are going to describe

3  it inaccurately?  Where was that document?  I never saw

4  it.

5          This technical inaccuracy argument is a lawyer's

6  argument.  Go back and look at those documents that you

7  are going to have in the jury room and see where you find

8  them.

9          In addition, it seems like not all the Google

10  witnesses got the litigation story.  You will remember

11  the testimony of Mr. Diorio.  It seems like he has pretty

12  good sense.  He said, why would you write something that

13  isn't true?  It doesn't make sense.  Exactly.  What they

14  wrote was true.  Dr. Frieder testified about it.  The

15  consistency of the documents tells you that that's true.

16          And what does it tell you when we use their

17  documents to prove infringement and they don't?  In his

18  testimony, Dr. Ungar, their expert, never relied on a

19  single Google document.  He played this legal gotcha game

20  of saying disregard all the documents and focus only on

21  source code, and he read from the slides when he was up

22  there on the witness stand that had been prepared for

23  him.

24          Okay.  So let's look at the documents, and we

25  are going to begin by going through a couple of them, and

1  then I'm going to very quickly go through the slides that

2  my partner, Frank Cimino, put up during his examination

3  of Dr. Frieder.

4          So, the first one you saw was PX-228, and this

5  one shows that the targeting or scanning a network to

6  find the relevant informon relevant to the query is met.

7  In other words, look for the best high quality ads.

8          If we can go the to next slide, PX-338.  One of

9  the things they do in that regard is look for content.

10         Next slide, please.  PX-338 again,

11  collaborative, feedback from the users.

12         And then they combine.  They calculate a Quality

13  Score based upon both the collaborative and the content

14  as a part of solving their 10 billion ad problem.

15         Now, IPE offered more than just Google

16  documents.  We showed you the testimony of Mr. Furrow.

17  I'm sorry, we played the testimony of Mr. Furrow, and he

18  said with respect to content that what the source code

19  was doing was getting at the textual similarity between

20  the query and the creative.  Creative, you may recall, is

21  the advertisement.

22         And for collaborative he said, the major input

23  is historical data.  And then he explained that they

24  combined and filter as well.

25         You, I'm sure, remember Mr. Furrow also came

1  here to testify, and he actually had another document

2  that he said he had prepared in ten minutes two nights

3  before his testimony to explain the system, but he had to

4  admit that he had forgotten something, he had left

5  something out, and that was the query, an extremely

6  important component of the Google system.

7           Apart from source code, this is all Google

8  offered you.   IPE, on the other hand, offered you a lot

9  of other documents with respect to the Google system.

10 So, for example, if we can look at PX-231 written in

11 2005, you see the same thing.

12          Next slide, please.   302, same thing.   The

13 Official Textbook from Google AdWords is the title of

14 this document.

15          PX-52, in 2007, same thing all over again.

16          PX-156, August 2008, content and collaborative.

17          PX-232, content and collaborative.

18          PX-357, content and collaborative.

19          PX-112.   These are all statements made before

20 the lawsuit was filed, ladies and gentlemen.   Updated

21 2011, content and collaborative.   Actually that one was

22 AdWords, forgive me.

23          But even afterwards, in November of 2011, PX-21,

24 same message, same accurate message.   There's no

25 technical inaccuracy here.

```
 1            PX-338 is the last one.

 2            Okay.  So we proved infringement by source code,

 3  by Google internal documents, by testimony of Google

 4  engineers like Mr. Furrow and Gary Holt who didn't come

 5  to trial, but he testified by videotape, and by a truly

 6  qualified expert, Dr. Frieder, who is an award-winning

 7  computer scientist, chair of a department in Georgetown,

 8  a full professor, has every credential you could imagine

 9  with respect to computer science in contrast to

10  Dr. Ungar, who has no degree in computer science and is

11  not even a full professor at his university.

12            One last point with respect to this.  As part of

13  Google's damages case, Google's expert, Dr. Ungar,

14  testified that Google would have chosen a different path

15  to avoid infringement.  He said, and I quote, it would be

16  easy to go in a different way.

17            That's not true.  Dr. Frieder testified that

18  that's not true and Dr. Carbonell agreed.  In fact,

19  Dr. Carbonell told you he tried to do that, and even he

20  couldn't do it.

21            This case has been pending for over a year.  If

22  it was so easy, why didn't Google do it?  The reason is

23  that this predictive tool that Ken and Don developed is

24  very, very special.  Very hard to create, and yet vital

25  to the money ad that generates most all of Google's
```

```
 1   revenue.  Nothing else produces the same quality as that
 2   machine process that's described in the patents.
 3          So in summary, the infringement evidence, you
 4   saw the check board, shows that all the elements of the
 5   claim are satisfied, and that means that there is
 6   infringement.  And there's not only infringement of claim
 7   10, but you are actually going to be asked in the verdict
 8   for to check a box with respect to every claim that's
 9   asserted in this case and that evidence applies to every
10   claim.  And so what I'm suggesting to you is that you
11   would check the box to show that every one of those
12   claims is infringed.
13          Okay.  Damages.  I need to start by explaining
14   to you that Judge Jackson has issued a ruling that is
15   limiting the recovery with respect to Google from the
16   period from September 15, 2011 to the present.  So what I
17   say to you about damages with respect to the amount
18   that's recoverable against Google is going to be
19   different than what I told you and what testimony you
20   heard about that during the course of the trial.  The
21   ruling only applies to Google, though.  It does not apply
22   to the other defendants.
23          You know, Google is a company that believes in
24   mathematics, but when it brought its damages model to you
25   in this court, they didn't use any math to calculate a
```

 1  royalty.

 2       Think about it, a math-driven company using no

 3  math.  Dr. Ugone, their damages expert, admits that he

 4  uses math to calculate a reasonable royalty in every case

 5  when he works for the patent owner, but he didn't do that

 6  here because he's not working for the patent owner.  He

 7  brought no math to the table.

 8       IPE did bring math to the table.  It was pretty

 9  straightforward, actually.  Look at the increase in

10  revenue associated with infringement -- not anything

11  else, just what's associated with infringement -- and

12  apply a royalty rate to it.

13       For that purpose he used a pretty simple

14  formula, which is right here on the next slide.  Take the

15  percentage of increase in revenue -- you heard testimony

16  from Dr. Becker about that -- apply the rate as he

17  determined to be customary in the industry, and you come

18  up with a number.

19       So let's talk about it.  And he did that for

20  each defendant.  Let's talk about the rate first.  How

21  did Dr. Becker do that?  Where did it come from?

22       Well, he looked for licenses that would

23  demonstrate a customary rate in the industry pursuant to

24  something known as Georgia-Pacific Factor 12, and he

25  found three such licenses.  Licenses to Marchex, eXact

1  and Interchange, and they had a range of rates from 3

2  percent at the low end to 5 percent at the high end.  He

3  chose a rate that's towards the lower end.

4           And, by the way, I believe the Court is going to

5  ask you -- I'm not quite sure about this, actually -- to

6  identify a rate in your verdict.  If he does, then I

7  suggest to you that 3.5 percent would be the appropriate

8  running royalty rate to enter, if that's on your verdict

9  form.

10          How did Dr. Becker get to the base, now?  Well,

11  he relied on Google documents and Google employees.

12  First of all, he used the only Google apportionment

13  document that was available to him, the revenue force

14  document from Google's own file, and that's PX-64.

15  That's in evidence.  That will be in the jury room with

16  you.  You can look at that, too.

17          There was a lot of criticism about that.

18  Dr. Becker did, but, by the way, remember, the testimony

19  was the (e) on the right stood for estimated from which

20  you can infer what didn't have an (e) was actual data,

21  not estimated data.

22          When there was no more data for Dr. Becker to

23  use, in other words, after 2007, he assumed the growth

24  was flat so he used the 20.9 percent.

25          And remember, for Google recovery is only

1  limited to the last four quarters, so back to the fourth

2  quarter of last year.  So those are the only rates from

3  here that are relevant to your determinations when you

4  retire to deliberate.

5       And you will recall that Dr. Becker confirmed

6  that there had actually been this much increase in

7  revenue from other sources.  For example, you heard the

8  Ben Love video, as we called it, in which Google

9  explained that turning on Smart Ads gave an immediate 20

10 percent gain in revenue in clicks, and that then

11 subsequently the difference is probably even higher than

12 that, maybe as high as 40 percent.  But Dr. Becker didn't

13 use any higher number than that.  That's PX-34.

14      There are other documents and presentations in

15 evidence as well.  PX-32, PX-337.  So that's how we got

16 to the base.  And then he applied 3.5 percent to identify

17 royalties.  And you will remember that he calculated

18 royalties on a quarterly basis.

19      Well, as a result of the ruling, the only

20 royalties that are at issue here are the ones that are

21 represented by the four bars on the far right.  And you

22 will need to rely on your memory and judgment to

23 determine based upon that what's a reasonable royalty for

24 Google to pay after September 15, 2011.

25      Now, with respect to the other defendants, you

1   may recall Dr. Becker offered specific numbers, and here
2   they are, for a total of $42,416,561.
3          Let me just summarize for you what his analysis
4   was for you quickly.  He established a trend line for
5   Google revenue unrelated to Smart Ads.  Everything that's
6   below that line in the green, that's a hundred percent
7   Google.  If you looked only at the 20 percent Smart Ads
8   increase in revenue that's above the red line, and he
9   calculated a royalty based upon that of 3.5 percent.
10         Now, Dr. Ugone in his testimony said, well,
11  Google contributed a whole bunch of things to this.
12  That's absolutely right.  That's absolutely right.  And
13  this slide down at the right was Dr. Ugone's explanation
14  to you on that.  That's the 96.5 percent, ladies and
15  gentlemen.  That's all to Google.  Nobody is asking for a
16  royalty on any of that, just on the impact that the
17  patented technology made with respect to Google's
18  revenues.
19         Now, Dr. Ugone and Google made several
20  arguments, including Dr. Becker shouldn't have relied
21  upon PX-64, and there they go again running away from
22  their own documents.  If they had something better, if
23  they had other numbers to provide, they should have
24  brought them to court.
25         There was no witness who came here from Google

1  and testified that those numbers were wrong.  There was

2  no witness from Google that gave you any better data, and

3  I suggest you can conclude, you can infer from that those

4  numbers are right and that all those confirmatory things

5  that are in evidence that you will have in the jury room

6  are correct.

7         Another argument was that Lycos and Google would

8  have agreed to a lump sum.  And underneath that is the

9  idea that a lump sum is a far, far smaller number than a

10  running royalty.  I asked Dr. Becker if that was correct,

11  and he said no.  And Dr. Ugone didn't agree with that,

12  that I heard from his testimony.  And it wouldn't make

13  sense, ladies and gentlemen.  Why would the price be so

14  different based upon the structure of the transaction?

15  And if it was true, why would any patent owner ever agree

16  to a lump sum?  It would just be giving money away.

17         In that hypothetical negotiation Lycos would

18  have known that Google was going to use its technology in

19  all of its advertising products.  And Don Kosak, one of

20  the inventors here, was on the executive team at Lycos.

21  He would have been at that table and he would never have

22  licensed out that technology so cheap to a close

23  competitor.

24         Google also relied on the Meyer purchase

25  agreement.  These are the patents that Dr. Ugone admitted

 1    he knows only they have been used to try to push down

 2    damages amounts payable in patent cases.  There's no

 3    evidence in the record that those Meyer patents have been

 4    used by Google for any other purpose.

 5           You know, the beauty of running royalty is that

 6    both sides get to share in the risk and you only pay for

 7    what you use.  And as you heard, that's how Google

 8    structures its agreements with its partners, including

 9    all the defendants in this case, a revenue sharing kind

10    of thing.

11           And Dr. Ugone gave you a bunch of explanations

12    about the administrative burdens of that.  Well, guess

13    what?  Google already has a system called Administrative

14    Console to take care of all that, including the sharing

15    of confidential information.

16           Dr. Ugone also relied upon the sale of Lycos

17    after the hypothetical negotiation, but he admitted he

18    knows nothing about that transaction other than the sale

19    price.  And he didn't even include it in his

20    Georgia-Pacific analysis, as he told you.

21           He also relies on the sale of the patents after

22    the hypothetical negotiation date.  But the evidence is

23    that Lycos had no idea whether Google was infringing.

24    Don Kosak testified that when he asked Google -- he asked

25    Google what they were doing.  Lycos had no information

2012

```
 1   about Google's use and profit from the use of this
 2   patented technology and, therefore, the sale of the
 3   patents is irrelevant, just like the Carl Meyer
 4   transaction.
 5            Ladies and gentlemen, Google's use and profits
 6   from this technology must be considered in calculating a
 7   royalty because it is this technology that drives those
 8   increases in revenue, as we have talked about.
 9            Let me talk to you for a few minutes about
10   validity.  First of all, remember that Google has the
11   burden.  Google is arguing, in effect, that four
12   examiners at different points in time made mistakes in
13   allowing these two patents.
14            Google showed you a slide in opening that seemed
15   to suggest that Ken didn't think he had invented the
16   combination of content and collaborative filtering.  In
17   fact, what Ken testified was he invented every way he
18   could think to do it.
19            When he was asked have you invented every
20   conceivable way to do it?  He said, I don't know how to
21   answer that question.  How could you know every
22   conceivable, every possible way of doing it?
23            And you remember, Google kept asking what's
24   innovative about the patent, not what's innovative about
25   the invention.  Ken's not a bad word.  You can talk about
```

1 his invention, but you can't talk about the patent

2 system.

3          You remember the video that you were shown at

4 the beginning of this case from the Federal Judicial

5 Center?  It explained when a person thinks he has an

6 invention, it goes to a patent lawyer.  That's what Ken

7 did.

8          There are four parts to this invention and, as

9 you heard Dr. Carbonell say, they are all tightly

10 integrated.  They are a very significant tightly

11 integrated, I don't know how better to say it,

12 invention.  And this next slide is the last element of

13 two claims, one from the '420, one from the '664, and you

14 can see all these things are working together like gears

15 in an engine and none of the prior art that you saw

16 discloses these elements, all of them working together

17 like gears in an engine.

18          So these claims say the search system must

19 filter, the filter must combine content and collaborative

20 data related to the query and filter it in.

21          THE COURT:  You have 14 minutes remaining.

22          MR. SHERWOOD:  I'm sorry, your Honor?

23          THE COURT:  14 minutes.

24          MR. SHERWOOD:  14.  Thank you very much, your

25 Honor.

1          So the defendants showed you the slew of prior

2    art references, but not a single one of them describes

3    that invention.

4          Let's look at the next slide.  Rose, Lashkari

5    and Fab, two separate systems, a profile system and

6    search system.  Dr. Carbonell explained that at length in

7    his over-the-wall slide that you are looking at here.

8          These profile systems, which are Fab, Lashkari

9    and Rose, they don't have a query.  They have a profile.

10   That's a persistent long-term information interest.

11   That's where Ken started at WiseWire, make no mistake

12   about it.  That's not where he ended up when he was at

13   Lycos.

14         There were two references that defendants

15   claimed were anticipatory, Bowman and Culliss.  And

16   Dr. Carbonell explained to you that those references are

17   missing, again, important parts of the gears to make the

18   system work.  They do not filter for relevance to the

19   query and they don't rank.  I mean, they do rank.  They

20   don't filter.

21         Dr. Carbonell went through this in detail

22   yesterday, so I'm not going to go through it again.  But

23   I do want to point out to you something that's in the

24   Bowman reference where he says, "By ordering and/or

25   subsetting the items in the query result in this way in

2015

1  accordance with collective and individual user

2  behavior--" that's the collaborative, "--rather than in

3  accordance with the attributes of the items."  Content.

4  So what he's saying is do collaborative, not content.

5           And finally, with respect to Culliss, I want to

6  point out to you that this is something that the patent

7  examiners did consider.  It's before them.  It's on the

8  front page of the patent.  And as you heard testimony,

9  the examiners actually initialed to show that they had

10 looked at this reference.  It has the same defects as

11 Dr. Carbonell described during his testimony.

12          So, ladies and gentlemen, under our Constitution

13 Lang and Kosak, or whoever owns these patents, are

14 entitled to enforce them during the limited time period

15 that they are in effect, and that's what brings us here

16 today, the enforcement of those rights.

17          And I will reserve the rest of my time, your

18 Honor.  How many minutes do I have left, Judge?

19          THE COURT:  Approximately ten.

20          MR. SHERWOOD:  Thank you.

21          THE COURT:  You can go forward.

22          MR. NELSON:  You want me to go, or I believe you

23 said you wanted to take a break after --

24          THE COURT:  Oh, yes.

25          Ladies and gentlemen, we are going to take a

```
 1   ten-minute break and then we will go forward with the
 2   next argument.
 3               (Jury out.)
 4               (A recess was taken at 11:48 a.m., after which
 5   court reconvened at 12:11 p.m.)
 6               THE COURT:  I believe you just brought a case
 7   that says laches applies to the codefendants of Google.
 8   I just checked the cases, and it is here in the cases in
 9   Virginia.  It's certainly reasonable and makes sense.
10               My concern is, Gentlemen, with all the lawyers
11   in this case, what is the problem that you cannot get to
12   the Court the proper law before the Court rules?  I mean,
13   you know, it's amazing.  We went over this in the charge
14   conference this morning and when Mr. Brothers raised the
15   proposition that laches was a personal defense --
16               MR. NELSON:  Can I address that?
17               THE COURT:  No, you wait.
18               MR. NELSON:  Okay.  Sorry.
19               THE COURT:  You did not say at that time, but,
20   Judge-- even if you had put it before me --the
21   codefendants are entitled to the benefit of laches also,
22   and give me this case so the Court could consider it
23   before it prepared the Instruction No. 32 on Date of
24   Commencement of Damages.  Mr. Sherwood has argued, and
25   now it's raised.
```

1          What do you have to say, Mr. Nelson?  Let's make
2  it quick.
3          MR. NELSON:  Your Honor, because of this,
4  pursuant to your Honor's instructions, we e-mailed them
5  at 5:00.  We said what are you going to do with damages?
6  What are you going to claim?  We followed up at 6:30, we
7  followed up at 8, we followed up at 10:00.  We didn't get
8  anything.  They walked into the charge conference this
9  morning and gave your Honor the cases.
10          THE COURT:  Now, why didn't someone give me this
11  case this morning at the charge conference?
12          MR. NELSON:  Because we didn't know they were
13  going to make this argument.  They have never raised
14  this.  Mr. Brothers came back in and tried five times to
15  get your Honor to change its ruling, which was tossing
16  out all the damages prior to September 15th, 2011.
17          Now they come into the charge conference and
18  dropped the case on you.  We didn't know this was even an
19  argument.  That's why we asked them, what are you going
20  to do?  What are you going to do respect to damages?  Not
21  only did they refuse to tell us, they didn't even
22  acknowledge the e-mail.
23          THE COURT:  Thank you.
24          All right.  Mr. Sherwood and Mr. Brothers, I
25  will hear from you briefly and then the Court is going to

```
 1  rule.  You have one more issue you gentlemen can take up
 2  with the Federal Circuit.  Come on.
 3          MR. BROTHERS:  We have not been provided with
 4  that case, your Honor.  I will note that we in our
 5  filings -- I don't know what case you are referring to
 6  because they didn't give me a copy.
 7          THE COURT:  You mean, you didn't give him a copy
 8  of the case?
 9          MR. NELSON:  I didn't have a copy of the case.
10  I had a citation.
11          Now I have a copy.
12          MR. BROTHERS:  Thank you.
13          THE COURT:  It's the case of Odetics versus
14  Storage Technology Corporation at 919 Fed.Supp. 911, and
15  the case does stand for the proposition that the
16  codefendants or the customers of one who benefits from
17  laches should be entitled to receive the benefit of
18  laches because if they cannot receive the benefit of
19  laches, the possibility is they could come back on
20  Google.  And then what it boils down to is if they can
21  recover from Google, then Google has been stripped of the
22  benefit of laches.
23          MR. BROTHERS:  I understand.  So the question is
24  whether there's any evidence from, and I'm listening to
25  your Honor in the description of it, of whether there was
```

```
 1  an indemnification here.  There's no evidence here.  No
 2  evidence has been provided that Google or the other
 3  defendants are seeking indemnification.  And to the point
 4  that is the distinction here, that assertion is simply
 5  not in evidence.
 6           I/P Engine has the right to sue each of these
 7  individual defendants and make its recovery independent
 8  of its claims of Google because they all are accused
 9  directly of infringement.  And so absent any evidence to
10  that extent, the general proposition, which we provided
11  to you, which was both Fourth Circuit and Federal Circuit
12  post-dating this case, is that laches is a personal
13  defense and to the extent there is an exception that is
14  being asserted here, there is no evidence that that
15  exception is provided.
16           I would also note that we provided to the
17  defendants when we filed at about 2:00 this morning our
18  proffer with regard to the laches defense exactly the
19  cases that we cited to your Honor this morning.
20           THE COURT:  Mr. Nelson, so back to the record
21  now.  We are back to the record.  This thing flips both
22  ways in terms of what's in the record.
23           This case does talk about some type of
24  indemnification.  Are there any type of indemnification
25  agreements between Google and all the rest of the
```

1  codefendants?  It's not before this Court.  I don't have

2  it.

3       MR. NELSON:  There are.  They are the very

4  service agreements that he just talked about that they

5  put into evidence and he just argued were a basis for the

6  running royalties.  So the service agreements they put

7  into evidence, those provided the indemnity.

8       I might add on this point, your Honor, on our

9  memorandum in support of our motion for judgment as a

10  matter of law to the matter of laches, we moved as to all

11 those things.  That was out there.  They were on notice.

12 So this whole thing that came up this morning and with

13 this proffer was again, as your Honor said yesterday,

14 backfilling by them after the fact.

15      THE COURT:  Okay.  In the case that it's in the

16 service agreements that have already been put into the

17 evidence, do you dispute that proposition that it's in

18 the service agreements?

19      MR. BROTHERS:  There are service agreements in

20 evidence.  I don't believe that they have the

21 indemnification language.  The first --

22      THE COURT:  All right.  Somebody give me one of

23 them.  Show it to me.

24      Mr. Taylor, we may have to change what we were

25 going to do here.  Have them eat in lunch before we go to

1   the charge.  The time is all off.  We will see what we

2   do.

3           MR. NELSON:  Your Honor, so for example,

4   Plaintiff's Exhibit 260, this is the agreement with

5   Target.

6           THE COURT:  Okay.

7           MR. NELSON:  It's TAR-IPE Bates No. 0208, the

8   last numbers.  Indemnification Rule:  "Google will

9   defend, indemnify and hold harmless Customer, its

10  affiliates (defined below in Section 11.3), and their

11  respective directors, officers and employees --" I should

12  slow down.

13          THE COURT:  The Court just read it.

14          MR. NELSON:  Okay.

15          THE COURT:  Here's where we are.  Have a seat.

16          The Court finds, in reading the case the Court

17  just cited in the record, that the codefendants should be

18  able to benefit from the Court's ruling on laches.  The

19  Court cited *Odetics versus Storage Technology Corporation*

20  at 919 Fed.Supp. 911, a 1996 case.

21          The Court has gone back and looked at the

22  service agreement with Target.  There's a service

23  agreement also in here for one of the other codefendants

24  at another exhibit, and they do provide for

25  indemnification against any lawsuits to the extent it's

1  brought into question the question of the patents or

2  trademarks, etc., that's being used.

3           Under those circumstances the Court would have

4  to find that the laches ruling also applies to the

5  codefendants.  That being the case, the damages will have

6  to be calculated in the same manner for the codefendants

7  as they are for Google, and the Court originally had an

8  instruction running those damage calculations to the date

9  of filing the lawsuit and so we are going right back to

10 that instruction, give them the copy I originally had in

11 there.  We are going back to that language and what the

12 parties can do.

13          Mr. Brothers, you-all can object to it for the

14 record.  You can object to it for the record.

15          MR. BROTHERS:  Thank you, your Honor.  We object

16 to the Instruction --

17          THE COURT:  32.

18          MR. BROTHERS:  -- 32 as revised by the Court.  I

19 would note that the indemnification referenced is not

20 specific to patent infringement, and there is case law

21 that unless there is specific indemnification to patent

22 infringement in general, that the indemnity reference

23 does not apply.  And I would also note that the customer

24 agreements are different with respect to each of the

25 defendants, and I do not believe that even the

1  indemnification language that was referenced for Target

2  is in, for example, the AOL or the IAC agreements.  I am

3  in the process of reviewing that right now.  So that is

4  an additional basis for the objection.

5       MR. NELSON:  Just for the record and to make it

6  clear, they do refer to those patents specifically, which

7  I think your Honor already read.

8       THE COURT:  Okay.  Gentlemen, that's where we

9  stand.

10      Mr. Sherwood, in view of the Court's ruling --

11  by the way, I have redistributed to you the new damages

12  instruction and the proposed verdict form.  You should

13  have it.

14      The Court will give you an additional five

15  minutes, if you need it.  You have got 15 minutes on

16  rebuttal since you need to deal with the issue of damages

17  in view of the Court's ruling.  That's all I will say.

18      MR. SHERWOOD:  Thank you, your Honor.  There is

19  one other thing I think your Honor might have been

20  alerted that there was an issue about one of the

21  exhibits.

22      THE COURT:  I thought we resolved all questions

23  of any exhibits, demonstrative exhibits, in the charge

24  conference.

25      MR. SHERWOOD:  Right.

```
 1          MR. NELSON:  Your Honor, you know what?  This
 2  had to do with damages because they hadn't told us the
 3  number.  We were going to replace it with a question
 4  mark.  We will just take that all out.  We don't even
 5  need to worry about it.
 6          THE COURT:  Thank you, sir.
 7          On second thought --
 8          MR. NELSON:  No, no.  This just has to do with
 9  your Honor's ruling about how we are going to deal with
10  they gave them numbers of $44 million for those previous
11  defendants, which, obviously, is not correct.
12          THE COURT:  Okay.  Well, I tell you what you can
13  do.  I am giving him a chance to go over on rebuttal to
14  try to address the issue of damages, and you have a
15  chance to argue it, that they are incorrect.
16          MR. NELSON:  Okay.
17          THE COURT:  Now, you have a chance to also
18  argue -- that's why you have the instructions.  And to
19  the extent that he had an instruction that to a certain
20  extent misdirected the parties' argument, that's why I'm
21  giving you the opportunity to go back because he has an
22  opportunity to go back, understanding the Court has ruled
23  that the damages are going to run for all the parties
24  from September 15 forward.
25          I think the Court, before you go back on
```

```
 1  rebuttal, Mr. Sherwood, in the interest of fairness, has
 2  to let the jury know that because of a Court ruling, you
 3  have been given an opportunity to re-address the argument
 4  you made regarding damages.  I will just have to do that.
 5           MR. SHERWOOD:  Thank you, your Honor.
 6           THE COURT:  Okay.
 7           Bring the jury back.
 8           (Jury in.)
 9           THE COURT:  You may be seated.
10            The record will reflect all yours are present
11  in the courtroom.  Does counsel agree?
12           MR. SHERWOOD:  Yes, your Honor.
13           MR. NELSON:  Agreed.
14           THE COURT:  All right.  We will now hear closing
15  argument from the defendants.
16           MR. NELSON:  May I proceed, your Honor?
17           THE COURT:  You may.
18           MR. NELSON:  I will move back a little bit-- the
19  monitor is here --so I can see what you are seeing.
20           All right.  Well, thank you.  I mean, before I
21  get started to talk to you about the evidence, I do want
22  to thank you.  I have done several of these, and the
23  attentiveness and the effort that you guys have put into
24  listening to the witnesses, looking at the evidence,
25  taking notes, is really appreciated because one of the
```

1  things that we are counting on in this case is that you

2  get the facts, right?  That's what we have been here for,

3  that's what we have been trying to give you, the facts.

4          Now, we just got accused in their opening

5  statements of trying to hide the facts from you, to try

6  to say, well, wait a minute, these documents, these

7  marketing documents are wrong.  That's not right.  You

8  listened to the facts in this case.  We brought in the

9  witnesses.  We brought Mr. Furrow in here to talk to you,

10  to tell you how the system worked.  We made all these

11  people available.  That's why they showed you-all the

12  depositions.

13          What did Dr. Frieder say?  Dr. Frieder said he

14  flew out to San Francisco, right, because he wanted to

15  sit in the deposition of Mr. Furrow because Mr. Furrow

16  was the one who knew how the system worked.  We made all

17  those people available.  We brought him in here.  He told

18  you how that system worked.  He told you how they had 27

19  models of the previous source code that they had worked

20  on and how that was written, and we made him available

21  for cross-examination.  They had every opportunity to ask

22  him any questions they wanted.  We don't have anything to

23  hide in this case.  We are not running away from

24  anything.

25          Now, let me talk about these documents, these

```
 1  marketing documents.  It was amazing to me.  Counsel says
 2  the most important thing is infringement, and then he
 3  breezed through it.  He didn't talk about the claims, he
 4  didn't talk about how the systems actually work, what the
 5  evidence is that you are going to be asked to consider
 6  here.  So let's think about who really is running away
 7  from these marketing documents.  They showed you all of
 8  these marketing documents during Dr. Frieder's testimony,
 9  and they had these colored documents, right, because they
10  wanted you to look at the colors.  This is content, this
11  is collaborative.  But they didn't explain anything.
12  They didn't say, wait a minute, how does this tie to how
13  the system works?  Because, remember, these documents are
14  for advertisers.  They are high-level descriptions so
15  that they can use the system better, but they don't get
16  in and tell you how the system actually works and that's
17  what you are after here today.
18          And let's think about what happened with some of
19  those documents.  You remember on Dr. Frieder's direct
20  examination he went through a number of these things, and
21  they had the colors on there and said, Look at this.
22  This is what I want you to look at.
23          But even here, PX-338, that's the first one.
24  Counsel went through and showed that to you and said,
25  This is one I want you to focus on.  Remember PX-338?
```

1    They had a little excerpt during Dr. Frieder's testimony,

2    that said, Here's what Quality Score is and we have our

3    colors on there, and you should look at that document.

4    But then when I actually showed him the document and

5    said, What does it say right above that?  It talks about

6    a Quality Score of 1 to 10.  And Dr. Frieder acknowledged

7    that on cross-examination.  He says this document is

8    talking about a Quality Score from 1 to 10.

9          And what did he say about that?  He said this is

10   not what I'm relying on.  That's not something that's

11   used in the product to serve ads.  So if he's not relying

12   on it and that's not what he's relying on for the

13   purposes of infringement because it's not how the product

14   works, why are they showing it?  What is the purpose of

15   that other than to distract and direct your attention

16   elsewhere besides how the product actually works.

17         Now, what else did they show you?  There was a

18   big aha a moment during their opening statement where

19   they showed you that video from Mr. Varian, you might

20   recall that, and that was also something they showed

21   during Dr. Frieder's direct examination.  But then on

22   cross-examination I played the rest of it, you know, the

23   next section that they didn't play?  And that was also

24   talking about a Quality Score from 1 to 10 they showed to

25   advertisers which Dr. Frieder acknowledged.  Again, not

1 something that he's relying on for the purposes of his

2 opinions.

3          So why are they spending the time on that if it

4 doesn't describe things that he's relying on for the

5 purposes of his opinions in this case?

6          Now, it doesn't stop there, though.  And we went

7 through more.  You will recall we went through more

8 documents and showed how they were referring to Quality

9 Score, showing to advertisers Quality Scores of 1 to 10,

10 things he was not relying on for the purposes of his

11 opinion.

12          But there was more, because even if we look

13 under the actual highlighting -- like here.  Here's

14 another document they showed.  This is actually PX-338

15 again, the same one counsel talked about during closing

16 arguments.  It says, Your keywords past click-through

17 rate, CTR.  That's what they have highlighted in

18 collaborative.  But I asked them, There is no keywords

19 click-through rate used in Smart Ads, correct?  That's

20 correct, right?  And, furthermore, asked him whether he

21 was relying on CTR for collaborative.  He says he's not

22 for the purposes of his opinion.  So why are they

23 highlighting those things in green and saying, Look at

24 this, when those things are in the product and those

25 things are not things that he's relying on for the

1   purposes of his opinion?

2           So it didn't stop with the green.  I mean, on

3   the blue you notice here, PX-338 again, and this is

4   something counsel highlighted during his closing

5   argument.  Here we have in blue the keyword, your

6   keywords.  And I asked him, You agree keywords is not

7   content, correct?  He says yes.  So, again, he's not

8   relying on that for the purposes of opinion.  He's not

9   saying that keywords are content.  Remember, the keywords

10  in this system are the ones that the advertisers

11  provide.  They are just words with the ads.  They are not

12  extracted from the content, so he wasn't relying on that

13  at all.  In fact, he was not relying on the keyword

14  matching for the purposes of the content filtering

15  elements at all in this particular case.

16          So, again, why are they showing you those

17  documents when he has said that's not what I'm relying on

18  for the purposes of my opinion?

19          Now, when I confronted -- maybe that's too

20  strong a word.  When I asked Dr. Frieder on

21  cross-examination why that was the case, you remember his

22  response?  His response was, I didn't read all the

23  documents that were presented during my direct

24  examination, I just skimmed them.  Well, you are here.

25  You have spent three weeks of your time.  You can see

1    that this is a case of a big magnitude.  Don't you think
2    that we are owed something more than just skimming the
3    documents that the expert is going to come in and tell
4    you show infringement in the case?

5           But further than that, there's no real dispute
6    about how these products actually work, right?
7    Mr. Furrow came in, Dr. Frieder on cross-examination,
8    which I'm going to show you in a minute and go through.
9    He agreed how the system worked, and Dr. Ungar as well.
10   There was no disagreement, no factual disagreement about
11   how the system worked.  And that's the important thing,
12   that's what you are supposed to be focused on.  Don't get
13   distracted by the colors without a description of how the
14   system actually works.

15          So let me go through.  I gave you four reasons
16   in opening statement why there's no infringement.  I'm
17   going to talk about those same four reasons.  I'm
18   actually going to put two of them together.  You will
19   remember in opening statement I had content, no content
20   filtering and no combining separate?  But during this
21   case we kind of talked about those things together, so I
22   think it's easier for presentation the way the evidence
23   came out if I talk to you about those two issues with
24   one.

25          And then there's one other thing that came up

1  based on some admissions during this case that I want to

2  highlight for you.  So let's talk about those.  The first

3  one.  The patents required combining feedback data with

4  content.  We all know that.  We have heard that a number

5  of times.

6         Well, here the fact of the matter is they do not

7  do that, and that is the undisputed evidence.  You recall

8  I asked Dr. Frieder very clearly on cross-examination

9  what it was in AdWords, the accused product here, that he

10 was contending to be the content data required by the

11 asserted claims, right?  If you go back, we can see that

12 that's one of the things in that first element is the

13 content profile data.

14         What did he say?  It's these templates, right?

15 He identified three of them during his examination, but

16 it's these templates.  Okay, fine.  That's what you are

17 saying.

18         Well, there was also no dispute that those

19 templates are used to generate attributes for the current

20 query Adware.  Everybody agrees on that, right?

21         Now, it's also the case that nobody disputes

22 those attributes then are used to look up an odds

23 multiplier, right?  And Dr. Frieder and everyone else --

24 Dr. Frieder said those odds multipliers, those are all

25 feedback data, right?  You recall that testimony.

1          But what does he say?  I asked him, I said,
2    Well, is that attribute merged with this feedback data
3    with the odds multiplier?  He said, No, they are not
4    merged.  They are not merged at all, right?  They don't
5    come together.  They don't combine and be one.  He said
6    that, but he says, Nonetheless, I say they are combined.
7          Well, that's not an explanation of things, that
8    is simply a conclusory statement.  He said, You should
9    trust me.  They are combined because I said they are
10   combined.  But they are not merged, and that's the
11   important thing here.
12         Now, let's talk about it in terms of Fig. 6.
13   You recall that Dr. Frieder said that Fig. 6 is the heart
14   and soul of this patent.  That's what he showed.  And
15   here, this is one of his figures, this is PDX-94.  This
16   is where he went and tried to explain to you how the
17   accused products do this.  But recall, I asked him, is
18   there any content score in the accused product?  And he
19   said, No, there is isn't.  And that's what he's showing
20   here.  You generate a content score, remember?  You
21   generate a collaborative score, and you do some kind of
22   mathematical averaging.  That's what he said, but when I
23   asked him on cross-examination he said that doesn't
24   happen, there his no content score in the accused
25   products.

1            Now, furthermore, if we look up here in the
2    corner, what do we see on this slide again?  This is what
3    he's trying to show you in the accused products.  This is
4    I am matching it up to a figure in the patent, which you
5    are supposed to match it to the claim, so let's let that
6    go for right now.  Your keyword's past click-through
7    rate.  Well, we just talked about that a minute ago.  I
8    showed you.  He said that doesn't exist in the accused
9    products.  There is no keyword's past click-through rate
10   in the accused product.  So how is it that this figure
11   shows infringement?

12            Furthermore, he's talking about keyword as
13   content again.  But, remember, I asked him that
14   question.  I just showed you that a minute ago.  Keywords
15   are not content.  He's not relying on that.

16            So he tried to show you Fig. 6 to support his
17   infringement opinion, but in fact in cross-examination it
18   became clear that it doesn't support his infringement
19   opinion at all.

20            Now, here it's a little bit different format
21   then I saw before, so I apologize for the delay, but this
22   is testimony yesterday from Dr. Carbonell and this is
23   important.  I want to spend a little time on this.  You
24   recall with respect to the Culliss reference he walked
25   through what the Culliss reference was and how those key

1  term tables were generated.  Remember, they were

2  generated based upon word in the article.  They had

3  extracted words from the article in order to generate

4  those key terms.  And you have a query come in and it's

5  matched to those key terms, which Dr. Carbonell said

6  that's a content analysis when you do that.

7          He said, though, there's no content filtering in

8  Culliss, that was his contention, because what that

9  content analysis, that matching is used to look up,

10  right, the key term score, the appropriate feedback.  So

11  I asked him, you don't think, then, doing an operation

12  where I match the query terms to key terms, content

13  analysis is what he said, and use that to access a

14  feedback score meets the content-based filter limitation

15  in this patent?

16          That's right.

17          So Dr. Carbonell agrees that taking that

18  attribute and doing a look-up of some feedback data is

19  not content-based filtering.

20          Now, with respect to collaborative filtering, I

21  want to talk about that for a moment.  Actually, I want

22  to mention one other thing.  You also heard on

23  Dr. Carbonell's cross-examination that he never -- he

24  didn't know anything about Dr. Frieder's infringement

25  opinions.  He didn't see the report.  He didn't read the

1   report.  He didn't look at it.  He wasn't here for his

2   testimony in open court.  So why was it that the

3   plaintiff, I/P Engine, wanted to keep those guys apart,

4   right?  Why was it that they wanted to allow them to

5   offer inconsistent opinions?  That's something that you

6   are going to have to decide when you go back there based

7   on the facts and the testimony that you saw.

8          Now, let's talk about collaborative filtering.

9   That's obviously another thing that we have heard a lot

10  about during this case.  So, the accused products don't

11  do collaborative filtering either.

12         Now, there's been some question and some

13  testimony about whether collaborative filtering is

14  required in the '664 patent.  Nobody has any doubt that

15  it was required in the '420 patent.  I/P Engine has

16  suggested perhaps that it's not required because the word

17  "collaborative" doesn't appear there in the claim.

18         But look at this testimony from Dr. Frieder.

19  This is in description of the slide PDX-141 that I have

20  at the top of the screen where he's talking about claim 6

21  of the '664 patent.  He says that it requires

22  collaborative, right?

23         And from Dr. Carbonell's testimony yesterday, he

24  puts up this slide here with the colors, the invention of

25  the '420 and the '664, both patents, saying it's

1  collaborative and content.  So the experts all agree that
2  that's the case.
3        Now let me talk about what the evidence has
4  shown.  In Smart Ads there's no question that there's no
5  grouping of users.  Nobody disputes that.  Everybody
6  admitted that.  The feedback data that's used, remember
7  we had that cube that we showed in opening statement and
8  how that's popular?  That comes from data from all users,
9  right?
10       So here counsel chastised us for looking at this
11 figure from the patent, but it's important to look at the
12 figures in the patent because you've got to get an
13 understanding of what the patent is based upon the
14 description.  Now, we never suggested that the patent is
15 limited to this implementation, but it in fact is the
16 only embodiment that describes how you do the
17 collaborative filtering in the patent.  You didn't hear
18 any evidence from I/P Engine to the contrary.  They never
19 came to you and said, Here's a different way to do it
20 then what the patent shows.
21       What it shows here and what's important is the
22 way the collaborative feedback is done is by breaking the
23 users down to communities, communities that have similar
24 interests or needs.  Then what you do, is when you are
25 using the collaborative feedback aspect of the filtering,

1   you take the feedback from only members of that

2   community.  Remember, that's the whole idea behind this.

3          Now, I/P Engine, of course, doesn't like this

4   figure because it doesn't support their theory.  What's

5   their theory in the case?  What did they say about

6   collaborative filtering?  Well, what they said about

7   collaborative filtering is you can determine users with

8   similar interests or needs based upon whether they've run

9   the same query in the past.

10          Well, first of all, they didn't point you to

11   anything in the patent suggesting that was the case,

12   right?  They never said that.  They never pointed to

13   anything.  There is no such description in the patent.

14          But, furthermore, it doesn't make any sense.

15   Remember Dr. Ungar explained this.  The idea behind the

16   patent was to give you additional information with this

17   collaborative filtering to provide better filtering.

18          Well, this goes back to something we saw in

19   opening and we saw during Dr. Ungar's testimony about

20   different users, people that have different interests,

21   right?  And here when they brought in the search Jaguar

22   in this example, they are going to get pages back for

23   cars or travel, and they are going to get pages back for

24   the football as well.

25          Well, if you only take feedback data from people

1  who run the same queries, as Dr. Ungar explained, it
2  doesn't solve this problem, because you just get the same
3  data back again.  It's going to be data from all of those
4  people so you are not going to be able to differentiate
5  one from the other.  So that theory doesn't make any
6  sense and it's not discussed in the patent.
7          Now, one other thing that's important here, and
8  let me go back to this slide, setting that issue aside
9  I/P Engine has provided no evidence that the accused
10 products do that.  They have provided no evidence that
11 the accused products segregate feedback by what query
12 users have run in the past.  They don't do that.  There's
13 no evidence.  Dr. Frieder never testified to that.  He
14 never told you here's how Smart Ads segregates feedback
15 data by users who have run the same query.  He simply
16 said, Well, you can tell if users have run the same query
17 in the past, that that's similar interests or needs.
18          In fact, Mr. Furrow when he was describing the
19 system, and again that's who Dr. Frieder said was the
20 expert on the system, he explained that feedback data
21 from users who ran one query like flowers, for example,
22 is going to affect all the attributes in the system,
23 including those regarding queries like hiatus, right?
24          So the feedback data affects everything, and
25 that's the undisputed testimony.  There's no segregation

1  of this.  There's nothing that they have shown that

2  indicates that the Smart Ad system takes information from

3  some community of users and uses that to train the odds

4  multiplier, which Dr. Frieder is claiming is the feedback

5  data.

6          So what's the next one?  Scanning.  This the

7  Court construed, scanning a network.  You remember we

8  talked about this at the beginning in opening

9  statements.  So let's just take that first construction,

10  scanning a network, looking for or examining items in a

11  network.

12          Now, Dr. Ungar explained, and there's no dispute

13  that the way that the accused products work is that the

14  ads are in the database, they are provided by the

15  advertisers along with keywords and some landing pages.

16  Nobody disputes that.

17          Then there is a database look-up, and

18  Dr. Frieder -- excuse me, not Dr. Frieder, Dr. Ungar

19  explained the fundamental difference.  You recall there

20  was about 45 minutes of cross-examination where he

21  explained this and the fundamental difference between a

22  database look-up and going out and scanning for unknown

23  information on a network.

24          Now, I/P Engine, and I think you heard here, oh,

25  that's frivolous.  That's a frivolous argument.  Well,

1   it's not a frivolous argument, and, furthermore, we know

2   from I/P Engine's own conduct in this case that they

3   don't believe it's a frivolous argument either.

4          Remember when they cross-examined Dr. Ungar,

5   what did they do?  They put up a slide where they

6   purported to insert the Court's construction here,

7   AdWords does a database look-up, it does not look... in a

8   network.  They edited out the Court's construction,

9   right?

10         If they thought the Court's construction

11  supported their argument, why would they edit it out?

12  Now, I think the excuse was made that, oh, there wasn't

13  enough room here.  Well, it's two or three more words.

14  There's plenty of room on that slide to put that up

15  there.

16         So now let's talk about one we haven't talked

17  about before, and this came up based upon the admissions

18  of Dr. Frieder regarding the '664 patent.  Now, that last

19  element of the '664 patent, and you will have this when

20  you go back there, it's the same in claim 1 as it is in

21  claim 26.  So here it says, "filtering the combined

22  information for relevance to at least one of the query

23  and the first user."

24         Well, Dr. Frieder on cross-examination very

25  clearly said that what he was contending was the combined

1    information was the predicted click-through rate, pCTR,

2    that we have talked about a number of times.  But when I

3    asked him whether pCTR was filtered, he said, no, it's

4    not filtered.  Instead adds a filter.  That was his

5    argument.  So right there, based upon those admissions,

6    we know, he says that pCTR is the combined information.

7    The claim requires filtering the combined information.

8    He says it's not filtering.  That's an admission.  The

9    claim element is not met.

10            And you know, and you will hear from the judge's

11   instructions, that if any element is not present, then

12   there's no infringement of that claim.

13            So what does he say?  He said, Well, it's

14   filtered based on pCTR.  The ads are filtered based on

15   pCTR.  That's not what the claim says.  It doesn't say

16   filtered based on.  They are changing the claim

17   language.

18            And the claim language is important because it's

19   the claim language that defines what counsel said is the

20   property right, right?  That tells you where the deed

21   is.  It doesn't -- you can't open it up and say, okay,

22   well I'm going to change the claim a little bit and now

23   I'm going to move on to my neighbor's yard.  That's not

24   the way it works.  That's what the purpose is of the

25   claim language.

1          So, you know, I spent time talking about these

2    things, and I have gone through these things and I

3    understand there's heaps of it, but those are the facts.

4    Nobody disputes how these things operate, and that's what

5    you are going to be asked to do when you go back in

6    there, look at the facts and compare those to the

7    claims.  Don't be distracted by colors that say, oh,

8    well, this is content, this is collaborative,

9    particularly when you have looked at the admissions where

10   he doesn't even -- he agrees that those things aren't in

11   the accused products.  He agrees that those things are

12   not what he's relying on for the purposes of his opinion.

13          So let me now switch gears and talk about

14   validity.

15          So I/P Engine started out this case by telling

16   you our invention, the solution to this problem was to

17   combine content data with collaborative analysis to

18   produce an overall score.  That's what they said, right?

19          Well, we showed you the testimony from the

20   inventors that they didn't invent all those things.  All

21   the things that are in the claim were in the prior art

22   before.  We have talked about these various things.

23          And, furthermore, we know from the inventors

24   they couldn't identify any technical barriers that they

25   encountered to put these elements together, right?  They

1  couldn't even identify when they conceived of the

2  invention or what led them to this particular invention.

3  So here what we see is plaintiff's color coding, right?

4  They went through and they color coded all the various

5  claims and the documents.

6         Now, interestingly, if you go back and you look

7  at some of those documents, you will see the color

8  coding.  Not only are they coding things that Dr. Frieder

9  has already said he's not relying on are not in the

10 product, but the words "collaborative," the words

11 "content," they don't appear there, right?  They don't

12 talk about those in these documents that they are relying

13 upon.

14        But they do appear in a prior art, right?  And

15 we showed you that.  The Fab article, for example, talks

16 specifically about combining content and

17 collaborative-based filtering in order to have an

18 improved approach.  That was out there.  That was in the

19 prior art.

20        Now, the WebHound reference, that's another one

21 which was not before the Patent Office, by the way.  We

22 talked about that.  The WebHound reference shows the

23 combination of content and collaborative filtering.  It

24 says that explicitly, and it also talks about taking that

25 and combining that with a search engine.  It says that

1   explicitly.

2          The Rose reference, the same.  We talked about
3   this.

4          Now, what's the response to that?  Well, what
5   Dr. Carbonell said yesterday is these prior art systems
6   don't show a tight integration.  Well, the words "tight
7   integration" don't ever appear in the claims and he
8   couldn't ever identify them in the patent; they are not
9   there.  So this is an after-the-fact explanation.

10          And what else did he say?  He said there's no
11  place in the prior art that discloses filtering for
12  relevance to the query.  That was his big thing on
13  direct, to say this is what these guys really invented
14  and this is what nobody had before.

15          Well, the patent says differently, right?  We
16  showed this on cross-examination.  The patent itself --
17  this is isn't the background section.  He acknowledged
18  this is in the prior art, describes, "Whereas
19  conventional search engines initiate a search in response
20  to an individual user's query and use content-based
21  filtering to compare the query to accessed network
22  informons."

23          So right there the patent is telling us that
24  filtering for relevance to the query was in the prior
25  art, in the prior art search engines.  Yet somehow we are

1 supposed to believe that where the prior art says combine

2 the content with collaborative filtering with the search

3 engine, that nobody is going to know that I should use

4 filtering with respect to relevance to the query that are

5 already in these search engine technologies.  That's what

6 we are being asked to believe .

7         Now, furthermore -- and before I go to that let

8 me talk about the inventors' story a little bit here.

9 So, we know that the inventors decided to combine their

10 previous content and collaborative-based filtering work

11 with search when they joined Lycos, which was a search

12 company, okay?  That happened, according to the

13 testimony, sometime in mid to fall 1998.

14         We also know that prior to joining Lycos there's

15 no evidence that either of the inventors had experience

16 in search technology, no prior experience.  Yet between

17 the few months when they joined Lycos and the time the

18 patents were filed, December 3rd, 1998, so it's about a

19 three or four-month period, they apparently figured out

20 all these hurdles Dr. Carbonell described and combined

21 these things together, with no prior experience in three

22 month's time, no ability to identify the technical

23 hurdles that they encountered to do this, and no ability

24 to identify when they conceived any of the inventions or

25 what led them to these inventions.

1          Now let's talk about the Culliss reference.  So
2  the Culliss reference, Dr. Ungar explained, meets the
3  asserted claims, but he was very up front.  It meets the
4  asserted claims based on how Dr. Frieder is stretching
5  these claims for the purposes of his infringement
6  opinions.
7          And recall, I mentioned this but it's worth
8  repeating, Dr. Carbonell didn't have Dr. Frieder's
9  infringement opinions.  He didn't look at them, did not
10  compare things for consistency, he didn't come into open
11  court to see what he was testifying about.
12          So let's just talk about his opinion on no
13  content-based.  Remember, there were two things he
14  identified in Culliss.  He said there's no content-based
15  filtering and there is no filtering separately.
16          So on the content-based we walked through, and I
17  talked about this a little bit earlier, the idea with the
18  key term tables.  The key terms are generated from words
19  in the article and when a query comes in, you match those
20  to words in the article.  That's what he said.  And he
21  said that that matching between the query and the key
22  terms was a content-based analysis.
23          But he had there, nonetheless, there is no
24  content-based filtering in the accused products because
25  he said that over time the content-based initialization

1    will get overwhelmed by the feedback.  So, in other

2    words, it will most that score that will mostly be

3    feedback and there won't be much content.

4           Well, a couple things about that.  First, that

5    is completely inconsistent with Dr. Frieder's

6    infringement opinion.  He says that you take the template

7    and compare the query to content in the ad you get an

8    attribute.  Now you take that attribute and look up an

9    odds multiplier, which he says is feedback data.  He says

10   that's the combination of content and collaborative to

11   give you the content-based filtering.

12          Dr. Carbonell says, No, that isn't.  It's

13   exactly the same functionality.

14          They can't have it both ways.  It's important.

15   That's why we put the prior art out there for you.  You

16   can't stretch your claims when you come in for an

17   infringement case after you have negotiated your patent

18   with the patent office and say, Here's what I want them

19   to mean now, but when we talk about the prior art let's

20   shrink them down.  It's got to be the same for both.

21          Now, the other thing he said was there's no

22   filtering in there.  Well, that's just not the case.  I

23   mean, we showed this ratings filtering, right?  And that

24   rating is initially based on someone's evaluation of the

25   content in the article and then there's feedback based

1   upon users putting in either a G-rated key term or an
2   adult-rated key term and, that feedback says when you
3   have a high score from the adult-rated content, when
4   somebody puts in a G-rated rating term in their search
5   query, we are not going to show that, right?  That's a
6   one by one, that's filtering.
7           His only real response to that was, well, I
8   don't think it would work in the context of the other
9   things.  It's disclosed.  It's there, and the fact that
10  it would or would not work, it was a United States
11  patent, right?  It was granted by the Patent Office.  A
12  patent examiner looked at it and decided it would work
13  because that's one of the requirements of getting a
14  patent.  So let's leave that for what it is.
15          Now let's talk about Bowman.  Now, Bowman,
16  again, there were two things about Bowman, what he said.
17  First he had it didn't do filtering and then he said
18  there was no content analysis.  So his opinion, and I
19  walked him through this yesterday during
20  cross-examination, so some of you might remember this.
21  His opinion was, Well, you always rank in Bowman, no
22  matter what.  So in order to do the subsetting, in order
23  to determine this threshold value, there's always
24  ranking, right?
25          But in order to get there, there's this sentence

1   that has an and or or in it, which means you can do the

2   previous thing and what comes next, or you can do the

3   other thing, right, you don't have to do both?

4          So I also walked him through an example of how

5   that would work and we went through Fig. 6, and you can

6   look this up when you go back there.  We added up the

7   score for one item.  It came up -- I did the math wrong.

8   It was supposed to be 327.  And he said, Yes, the way

9   Bowman works is if you set a threshold value at 300 and

10  it scores 327, it will be shown.  If you set the

11  threshold value at 350, it won't be shown.  But

12  nonetheless, he says that's not filtering, but that's

13  exactly what they are accusing of infringement.

14         I mean, remember, it's this LTV score that we

15  have talked about you have seen a few times where you

16  have the bid, you have the predicted click-through rate,

17  you have the creative quality and the landing page

18  quality, right?  And those things will generate a

19  long-term value for that particular ad.  If that

20  long-term value is above a certain threshold, it will

21  make it into the auction; if it's below the certain

22  threshold, it won't.  So, again, we have a complete

23  inconsistency between what they are accusing of

24  infringement and what they are saying about the prior

25  art.

1           Now, the only other thing that he says about
2   Bowman is that there is no content analysis.  Now, you
3   recall yesterday, and you can go back and look at this,
4   there's a description in the background section where it
5   talks about matching query terms to words in the book
6   title, right?  And he agreed that was a content-based
7   matching and he agreed where that talked about adjusting
8   the score based upon how many words in the item matched
9   the query terms, he agreed that that was a content-based
10  analysis.
11          Well, in that section we were reading in column
12  9 yesterday, that same language appears, but there he
13  says it means something different.  It's not a content
14  analysis now; it's something different.  You only adjust
15  it to determine or based upon which key terms, I think he
16  said, are in the ranking table that he had.
17          But think about that.  Remember we walked
18  through and we said here's how you generate the score.
19  You look at the first word in the query and you see
20  whether that matches an item in the ranking table, and
21  you give it a score, right?  And then you go through all
22  the query terms and you do that, and you give it a score.
23          Then right after that it said you can adjust
24  that score based upon how many terms match the item,
25  right, how many query terms matched the item?  He said,

1  Well, that's an adjustment based upon how many are in the

2  ranking table itself.  But that doesn't make any sense

3  because you already gave the score to it based upon how

4  many of those terms show up in the ranking table.  That's

5  how the score is generated in the first place.  So if

6  there's more terms, you are going to get a higher score.

7  If there are less terms, you are going to get a lower

8  score.  So that explanation doesn't make any sense.

9        And here, you know, you keep hearing, well,

10 Culliss was before the Patent Office, and we've never

11 disputed it was before the Patent Office.  But, remember,

12 they didn't have the infringement allegations in this

13 case when they looked at Culliss.  They didn't know how

14 these claims were going to be stretched.

15       And, in fact, the party that prosecuted this

16 patent, Lycos, they don't own it anymore.  It's now I/P

17 Engine.  It's somebody else.  It's not the party that

18 negotiated with the Patent Office.  It's somebody else

19 trying to stretch the claims of those patents.

20       But all those other references we showed, it

21 wasn't before the Patent Office.  The Patent Office never

22 had the opportunity to consider any of these things.

23       So let me step back a little bit and just talk

24 about some of the facts we have learned during this case

25 concerning these patents.  So I think counsel said during

1  his closing argument that Mr. Lang and Mr. Kosak, they

2  are here in this case because they need to be rewarded

3  for these inventions.  But you heard Mr. Lang's

4  testimony, they already sold these patents once.  When

5  they sold their company, the WiseWire company, to Lycos,

6  they received money for that, and part of what they sold,

7  as Mr. Lang testified to, were the rights to these

8  particular patents.  I think Mr. Lang said that they got

9  several million dollars for this.

10         Now, counsel may get back up here and say the

11  patents were actually filed after they went to Lycos.

12  That may be true, but it's a continuation.  They date

13  back to this '799 patent that was in there, and Mr. Lang

14  testified my agreement assigned anything that arose out

15  of that.  So these patents have already been sold one

16  time.

17         Now, Mr. Kosak testified that once he got to

18  Lycos he urged Lycos to implement, you know, commercial

19  embodiment.  Let's implement this in the system.  And I

20  think he said they actually tested something, right?

21  They put something together and tested it.  But Lycos

22  decided not to do it, right?

23         Mr. Kosak then said he continued to urge people

24  to do this, but he was there through 2009, think was the

25  testimony.  It might have been 2008, but right around

 1   that time period.  Never did Lycos implement a commercial

 2   embodiment of this.  They didn't think that it was worth

 3   their efforts to do that.  In other words, they are a

 4   company.  They are out there trying to make a profit like

 5   any other company, and they didn't think that this was

 6   going to do it for them.

 7           Now, you have heard from them, well, they were

 8   owned by a Korean company.  I mean, come on.  How many

 9   times did we hear that during the cross-examination of --

10   or excuse me, it wasn't cross-examination, the direct

11   examination of Mr. Kosak, the references, the repeated

12   references to this foreign company owned this, and this

13   foreign company owned that.  I mean, it's world economy

14   these days.  To come in to court and try to think that

15   you are going to make a decision if they keep saying this

16   is a foreign company over and over again?  It's just not

17   right.

18           Now, we also heard from Dr. Carbonell who has

19   been in this industry a long time, but he couldn't

20   identify any industry praise ever for these patents.

21   Nothing out there.  These patents have been out there 10,

22   11 years.  No industry praise ever.  Instead, that's

23   patents sat on the shelf for 10 years, right?

24           And the testimony was, so Lycos didn't do

25   anything.  They sat on the shelf until one of IP's

1  current lawyers-- this was Mr. Lang's testimony on

2  direct --the current lawyers in the case set up a meeting

3  between Mr. Lang and representatives from Hudson Bay to

4  discuss buying the patents from Lycos.  So they put this

5  deal together.

6        Shortly after that they had this meeting in June

7  of 2001.  They purchased the patents-in-suit.  I think

8  you heard it was a couple hundred dollars or a few

9  hundred dollars, I believe, from Mr. Lang, $12.50 from

10  Mr. Kosak, and $3.2 million from Hudson Bay.  So they

11  turn around.  They buy these patents.  Then --

12        Excuse me, your Honor?

13        Oh, I thought you were asking me something.

14        Then without contacting Google or any of the

15  other defendants, not even a phone call, they filed this

16  lawsuit.  That's the history of these patents.

17        And amazingly, this suit was filed without the

18  named inventor, Mr. Lang, and he was the CEO, remember,

19  of I/P Engine at the time, ever reading the patents.

20  Right?  He testified I haven't read these patents in over

21  ten years.  I haven't looked at them.  So apparently he

22  bought the patents.

23        Came in for his deposition to testify.  He

24  testified that the lawyers told him not to read the

25  patent.  He testified he didn't read it before the case,

```
 1  before he came in to testify because, I believe, they
 2  were more important things to focus on.  Yet that's the
 3  testimony we have from him.
 4          Now, maybe that was an effort to turn his patent
 5  into something it wasn't.  Now, I have been yelled at
 6  here a couple of times because I said that this patent is
 7  about search engines.  It is about search engines,
 8  right?  That's the title of the patent.  That's what it
 9  talks about.  That's what the present invention is.
10  Contrary to what counsel said, I never said it mentioned
11  advertisement.  In fact, I was the one that brought out
12  the fact that it did mention advertisement.  That's what
13  I'm showing here in this slide.
14          It recites the word advertisement once, and it
15  does it with respect to this "preference cohort" and
16  "preselected consumer preference criteria" that
17  Dr. Frieder said on cross-examination don't have anything
18  to do with the asserted claims.
19          Now, counsel points to one dependent claim in
20  the '664 and said, See, it says advertisement.  These
21  patents are all about advertisement.
22          Well, the '420 was issued first.  You remember
23  that?  There were no claims in the '420 that mentioned
24  advertisements, right?  So if that's what these were
25  really about and it was so important, wouldn't you have
```

1   claims in your initial patent that deal with that?

2         Now, in here even again during his closing

3   argument, counsel references Exhibit 218, PX-218.  This

4   was that WiseWire document from 1995 that talked about

5   advertising, right?

6         Now, he wants to say this shows that that's what

7   these patents are about, that Mr. Lang was working on

8   these things.  But, remember, Mr. Lang testified that I

9   gave all the documents that I thought were relevant to

10  the invention of the '420 patent to my patent lawyer.

11  Counsel referenced that.

12        And I asked him, Did you give them this Exhibit

13  218?  He said, No.  So he didn't even give it to them.

14  He didn't think it was relevant to this patent.  He

15  didn't think it was relevant to the inventions in this

16  patent.

17        So make no mistake about it, this case is not

18  about a company trying to protect its inventions from a

19  competitor.  This case is about a few individuals trying

20  to use the court system for a windfall.

21        So let me talk about I/P Engine's damages claims

22  here.  The primary problem is Dr. Becker, that was I/P

23  Engine's damages expert, he just ignores all the

24  real-world facts.  Anything that's not convenient with

25  the number he wants to get to, he just ignores.

```
 1         So he says that this hypothetical negotiation
 2  would have taken place in 2004 between Lycos and Google,
 3  right?  Everybody agrees with that.
 4         Now, the first thing he says the parties would
 5  have come out of that with a running royalty agreement.
 6  But what's the evidence on that?  Well, the only evidence
 7  that we've heard is that around the time of the
 8  hypothetical negotiation Lycos had no preference.  They
 9  had no preference one way or the other.
10         Dr. Becker agreed that Google had a strong
11  preference for a lump sum.  In other words, you have an
12  amount where you pay one time and you are licensed.  Yet
13  he says the parties would have walked out of that
14  negotiation with a running royalty agreement.  That
15  doesn't make any sense in light of the facts.  There's no
16  evidence to support that.
17         Now, he also says, this is Dr. Becker, that
18  Lycos and Google would have used these three agreements
19  between Yahoo and three small companies to set the rate,
20  but the only evidence there is that Lycos never used
21  those agreements to value the patents, including when
22  they sold them in 2011.  So how is it that we get to the
23  point where Lycos would have used these as a value when
24  they said they didn't?
25         Now, he also showed -- with respect to those
```

1    agreements, you know, he used them, they are small
2    companies.  He likes the royalty rate.  He testified he
3    doesn't know how much was ever paid under those
4    agreements.  That's the important thing, how much is
5    going to be paid, and there wasn't anything paid under --
6    excuse me, I shouldn't say that.  He didn't know what was
7    paid under those agreements.
8           He also said that Lycos would have viewed Google
9    as being an attractive licensee.  He acknowledged that.
10   Yet somehow that doesn't have any bearing on this
11   hypothetical negotiation.
12          And then finally, you know, the Carl Meyer
13   agreement.  That shows Google what they purchased
14   comparable technology for and it shows that it was a lump
15   sum payment.  So that's Google's mindset.  That's
16   important to this hypothetical negotiation.
17          Now, instead counsel wants to keep directing you
18   to the use, the use by Google.  But Dr. Becker, he
19   acknowledged that there's all sorts of things that he is
20   claiming in Smart Ads that are Google inventions, Google
21   developments, that are not part of the patented
22   technology.  In fact, here I have a quote from
23   Dr. Frieder on his cross-examination where he
24   acknowledges that the predicted click-through rate, that
25   was developed by Google.  It's not talked about in the

1  patent.  It's not in there.  He had the same thing with
2  the attribute templates and everything else.
3          Furthermore, there's all this other technology
4  that Dr. Becker acknowledged here on cross-examination
5  that he's including in his revenue base.  Well, that's
6  just not right.  You are supposed to get to what it is
7  that the patent invention brings.  And he acknowledges he
8  has this 20 percent.  He acknowledges that that 20
9  percent includes all sorts of things that are beyond the
10 patented invention.  So this use is overstated.
11         Now, in addition, I/P Engine's counsel wants you
12 to refer to these services agreements, you know, the
13 Google services agreement with some of the customers in
14 the case and says, well, that shows that they would have
15 agreed to a reasonable royalty.
16         Well, first of all, Dr. Becker never relied on
17 those.  Never once did he rely on those agreements, so
18 it's not relevant to your analysis.  But, furthermore,
19 remember what those were for.  Those are for people using
20 the entire Google system, right?  Google brings the
21 systems for AdSense for Search and AdSense for Mobile
22 Search, and these customers use that.
23         They don't have to take a patent that has none
24 of the other parts, provide the infrastructure, provide
25 the know-how, provide all the things that make the system

1  work.  So those things are not at all comparable.

2          Now, rather than have an effort here to properly

3  assess damages, what you have here is the owner setting

4  an amount that they want and then backing into it.  And I

5  think, very telling of that, it happened on the

6  cross-examination of Dr. Ugone and it happened here again

7  today.  Counsel said that Mr. Kosak would have been at

8  the bargaining table in 2004 for Lycos.  Remember, he was

9  CTO of Lycos.  He said he would have been at the

10  bargaining table.  So obviously we know this hypothetical

11  negotiation is very important, right, in order to assess

12  the damages.

13          Now, Mr. Kosak, he's a consultant of I/P

14  Engine.  He testified for them.  He went out there on

15  direct examination.  Did they ask Mr. Kosak what he would

16  have done in a hypothetical negotiation with Google in

17  2004?  No.  They didn't ask him that question.

18          Did they ask him whether he would have used the

19  Yahoo agreements, these Overture agreements as a measure

20  of value in this negotiation?  No, they didn't ask him

21  that question.

22          Did they ask him if he would have demanded a

23  running royalty as opposed to some lump sum payment?  No,

24  they didn't ask him that question.

25          Did they ask him if he would have demanded 3.5

1   percent and no less?  No, they didn't ask him that

2   question either.

3         So counsel for I/P Engine has said, well, Google

4   could have come in and told you some things and brought

5   some witnesses.  Well, they had the witness here.  They

6   had him up on the stand and they didn't ask him any of

7   these questions.  You can infer from that that they would

8   not have liked the answers to those questions.

9         So, as I told you here on the first day, we

10  would focus your attention on the facts, which we have

11  tried to do, and prove that these patents aren't

12  infringed.  We have done that, and the facts are

13  important here.

14        Now, counsel for I/P Engine is going to get up

15  and he's going to have his attempt at rebuttal and he's

16  going to say things I don't get to stand up again, I

17  don't get to respond to those things.  He may raise new

18  things.  He's not supposed to, but he may raise new

19  things.  I don't get to respond to those either.  But

20  don't take that as a fact that I don't have a response.

21  I just don't have the opportunity.

22        So when you go back in that room to deliberate,

23  remember the facts, apply the facts, listen to the

24  judge's instructions, apply them.  That's all we can ask

25  from you and that's all we have asked from you from the

1    beginning of this case.

2          And on that, think about what you are being

3    asked to do with respect to this damages claim right

4    now.  I/P Engine has the burden of proof on that, and

5    they have no evidence.  They haven't told you what the

6    amount is.  They haven't told you how to calculate it.

7    Just use your memory, right?  Use your memory.

8          There was no testimony from Dr. Becker about

9    what that should be.  Remember that $493 million they

10   have been telling you about?  That's off the table,

11   right?  So what are you supposed to do with that?  Just

12   speculate?  Just make something up?  No, that's not what

13   the instructions are.  You need to apply the facts that

14   have been provided to you and the evidence when you go

15   back in that room.  And if you do that, I look forward to

16   your verdict.

17         Thank you.

18         THE COURT:  All right.  Ladies and gentlemen,

19   because of certain rulings of the Court, the Court has

20   given Mr. Sherwood probably an extra five minutes to

21   address some matters that the Court has ruled on

22   pertaining to the damages.

23         Mr. Sherwood.

24         MR. SHERWOOD:  Thank you, your Honor.  I'll try

25   not to use all of my time.

1          First of all, to comment on a couple of things
2   that you heard about from Mr. Nelson.  This slide that he
3   started by putting up, it only shows half of the
4   documents that I/P Engine put into evidence with respect
5   to how the system works.  The half that are not on this
6   slide are the Google internal technical documents that
7   they used to educate their personnel as to how the system
8   works.
9          You can look at those in addition to these.
10  When you look at these, though, look for the word
11  "eligibility" because eligibility means that it's
12  described the process by which an ad has been filtered is
13  now eligible to be in the auction.
14         All of these slides, or several of them anyway,
15  were misdirection about what is and what is not accused.
16         Remember there was testimony from Mr. Alferness
17  about Quality Score 1 through 10 and he said not
18  accused?  That's what these slides are about, ladies and
19  gentlemen, and it isn't accused.  I agree with that.  But
20  wherever eligibility is talked about, that's talking
21  about filtering and that is accused.
22         Dr. Carbonell's testimony with respect to
23  Culliss, he testified Culliss has no content.  It doesn't
24  get the article that's being filtered.  Therefore, he
25  gave the only answer to this question that he could

 1  give.  It's the only logical response.  This is the mind

 2  pool picture.  Go back and look at this in the jury

 3  room.  You will see the word "mind pool" is right here.

 4  It's not at issue in this case.  How are similar

 5  interests or needs determined?  Based on the query.

 6  Dr. Ungar admitted that.

 7          And, look, here's a real simple example.  If you

 8  type into Google Norfolk Airport rental cars, and then a

 9  couple hours later I came along and I typed the same

10  thing in, we would have the same interest or need, and

11  that's evidenced by the fact that we have asked Google to

12  give us information about the same thing.  That's similar

13  interests or needs.  That meets the claim construction.

14  That meets the requirements of the claim.

15          There is no grouping like mind pools because if

16  it was, this claim would be in the case, too.

17          Database retrieval is not a search engine.  This

18  argument says there's a difference between look for and

19  look up.  Come on, there's no difference there.  Google

20  has 10 billion ads.  The system has to go out and find

21  the ones to serve to the user.  Look up, look for, it's

22  the same thing.

23          There was argument that Dr. Becker didn't

24  allocate for all of Google's contributions.  The

25  magnifying glass slide shows you 96.5 percent stays with

1   Google.  Google definitely makes contributions to its

2   system.  Nobody is disputing that and nobody is asking

3   for a royalty on those contributions, just on the

4   contributions of these patents.

5           So I also heard him say that Dr. Frieder agrees,

6   in effect, that there's no infringement.  That's not the

7   testimony I heard.

8           And he had the '420 patent doesn't disclose

9   advertisements.  Informons, Mr. Lang testified, was a

10  catch-all phrase that the patent lawyer came up to

11  capture all of that stuff, all that stuff that's out

12  rattling around in the Internet that people are trying to

13  figure out, well, what is it I really want?  I want to

14  get rid of all the junk, all the spam, all the things

15  that I don't want to look at.  So he used this term

16  "informon," and Dr. Ungar agreed that included

17  advertisements.

18          There was a lot of argument, I would say, about,

19  well, the Google system is very complex.  You don't

20  understand it.  It's a lot more complex than the

21  plaintiff would have you think.

22          Remember my example in opening where I said

23  suppose you had a patent where you had a pencil and

24  somebody put an eraser on top of it, and I explained to

25  you, okay, what if you put a gripper on that pencil.

1  Would that somehow cure the problem of infringement?  No,

2  it doesn't, and you will see that in the jury

3  instructions the judge will give you.  Well, Mr. Nelson

4  has just given you a very elaborate pencil gripper

5  argument.

6          Mr. Nelson told you that the patents themselves

7  actually disclosed that they were invalid.  There were

8  four examiners who looked at this technology.  I don't

9  think they got it that wrong, ladies and gentlemen.  And

10  here's what the last two examiners with the '664 patent

11  had to say.  They said, and this is important, I'm going

12  to read it to you, "The prior arts--" which means

13  everything that was before them, including Culliss "--do

14  not fairly teach or suggest the teaching of information

15  filtering through a combination of data from a first user

16  and data from feedback by other users."

17          So there was argument about how there were no

18  technological hurdles.  Here's the testimony.  Let's see

19  if I can zoom in. Mr. Lang testified, "It was an onion of

20  problems.  You would learn, okay, this works well for

21  this number of user, but then you have to go on and solve

22  another problem.  And every time we would solve a

23  problem, another would pop up.  It was a struggle.  It

24  was a long time."

25          And then about the question with respect to what

1   did you invent?

2          "And you didn't invent every possible system

3   that combines content-based with collaborative-based?"

4   What are you going to say?

5          "No, I couldn't have imagined every conceivable

6   thing, everything that's possible under the sun."

7          He testified, in fact, "Do you believe that you

8   invented that combination in the search engine context"?

9   That is unrebutted testimony, ladies and gentlemen.  And

10  it's testimony that was supported by Dr. Carbonell, an

11  expert in his field, who, as I said earlier, tried

12  himself to do this and he couldn't do it.

13         And about the question of hypothetical

14  negotiation and who asked what questions, Google never

15  asked Mr. Kosak any of those questions.  They took his

16  deposition.  They knew where he was.  One of the first

17  things they asked him was, Where did you work and how

18  long did you work there?

19         So this little game of who asked what questions,

20  that doesn't get us anywhere.  That doesn't advance the

21  inquiry at all.

22         Okay.  So, lastly, I want to talk about damages

23  with you.  Google told you that a lump sum payment was

24  the right structure.  In effect, it's the cheap way out,

25  is the way I would characterize it.  And I ask you again,

```
 1  think about when in your experience the structure of how
 2  you pay for something changes the price as dramatically
 3  as they are trying to suggest here?
 4          The point about revenue sharing agreements,
 5  which applies equally to a licensing agreement, is that
 6  the revenue stream is shared; the risk is shared.  That's
 7  the point.
 8          And you are right, Dr. Becker didn't rely upon
 9  that.  He had his own independent reasons for what he
10  concluded.  But Dr. Ugone told you, oh, all the
11  administrative difficulties of having revenue sharing,
12  Google would never have agreed to that.  Well, in fact,
13  they have an administrative system online.  Log in and
14  you can get all of that information.  That's just not
15  plausible.
16          The Carl Meyer agreement, just to reiterate this
17  point because I think it's really an important point, it
18  is the only Google transaction that Dr. Ugone used to
19  rely on his opinion and it has never in this case been
20  used for any other purpose except to try the drive down
21  payment of damages of royalties in patent cases.
22          So when it comes to determining a royalty, as
23  you have heard the Court has made a ruling, an additional
24  ruling since I was up here before, with respect to what
25  the scope of recovery is.  And the scope of recovery is
```

1  going to be limited for all defendants to the period

2  September 15 forward to the present day.  September 15,

3  2011, excuse me.

4           So this is what you have to look at with

5  respect to how to calculate the damages in this case,

6  which is the last four quarters, and these amounts are

7  cumulative.  In other words, each bar on here reflects a

8  different amount of money, a per quarter cumulation of

9  revenue as a result of using the infringing system.

10          So, lastly, if I could have the Elmo, please, I

11  want to introduce up with more document to you, and that

12  is the verdict form, the ultimate statement that you will

13  make with respect to your decisions in this case.

14          And I'm not going to go through all the pages,

15  but I'm going to point out a couple of things here.

16  First of all, you are going to be asked a series of

17  questions, in effect, about whether Google infringed any

18  one of the claims in this patent.  And if you answer yes,

19  which I suggest to you the evidence will require you to

20  do, if you answer yes to any one of these, then you have

21  determined that Google infringes at least one claim in

22  one of these two patents.

23          I think you should answer all of these questions

24  yes.

25          Secondly, I want to point out to you page 7, and

1  I want to remind you that when you get to these questions

2  which relate to invalidity that your obligation is to be

3  satisfied by clear and convincing evidence that, in

4  effect, the Patent Office made a mistake when it granted

5  or allowed each claim, not just the patent, but each

6  claim that's been asserted in this case.

7         And, lastly, with respect to damages, you will

8  be asked -- I wasn't a hundred percent sure about this

9  when I got up before, but you will be asked to enter a

10 royalty rate if you believe that a running royalty is the

11 right structure.  I suggest to you that the number you

12 should enter in that box is 3.5 percent and you should

13 check running royalty, not lump sum royalty.

14        And then with respect to the amount of money,

15 that will be determined by your judgment with respect to

16 the four quarters of financial data that I have talked

17 about earlier.

18        So, ladies and gentlemen, I want to echo one

19 thing that Mr. Nelson said.  I've tried a lot of cases.

20 I think you have been the most attentive jury I have ever

21 seen and I really thank you for your attention and your

22 hard work, and we look forward to your verdict, too.

23 Thank you.

24        THE COURT:  All right.  Ladies and gentlemen,

25 the Court had anticipated that it would get an

1  opportunity to give you your final charge before lunch so

2  the Court had lunch ordered in.  Since we cannot do that,

3  reading you these final instructions will take

4  approximately an hour, what the Court's going to do is

5  have you to recess now to take advantage of the lunch

6  that has been provided for you in the jury room, and we

7  are going to come back in here at 2:45 and the Court

8  read to you your final charge and then give you this case

9  to deliberate.

10        So at this time you can retire to the jury

11 room.  You cannot discuss the case because you haven't

12 gotten the final instructions, but you simply take

13 advantage of the lunch that's been provided and come back

14 at 2:45 and then I will read the instructions.

15        The Court just doesn't believe we should stay

16 here for another hour before you get a chance to eat

17 lunch.

18        All rise.

19        (Jury out.)

20        THE COURT:  The Court has tendered to you the

21 revised verdict form and the revised instruction on --

22 the revised instruction should be given to you on

23 damages.

24        Recess until 2:45.

25        (A luncheon recess was taken at 1:32 p.m., after

1  which court reconvened at 2:55 p.m.)

2                        **AFTERNOON SESSION**

3           MR. NOONA:  One very minor thing this afternoon,

4  your Honor.  Steve Noona on behalf of the defendants.

5  Plaintiff's Exhibit 228, which has been admitted into

6  evidence, contains at least one page of source code.

7  Each side have agreed we can place it in an envelope, and

8  we spoke with your clerk and wanted to clear it with you

9  before doing so.

10          THE COURT:  That would be fine.

11          MR. NOONA:  Thank you, your Honor.

12          THE COURT:  That's the easiest stop I've had all

13 trial, Mr. Noona.

14          Okay.  Bring them in.

15          (Jury in.)

16          THE COURT:  You may be seated.

17          The record will reflect that all jurors are

18 present in the courtroom.  Does counsel agree?

19          MR. SHERWOOD:  Yes, your Honor.

20          MR. NELSON:  Agreed, your Honor.

21          THE COURT:  All right.  Ladies and gentlemen, I

22 will be reading to you the final instructions in this

23 case, but I will give you the index stack of everything

24 that I have read to you.  So if you want to go back and

25 find a definition that the Court has read or something,

1   you will be able to read it and review it at your pace.

2           Now that you have heard all of the evidence, it

3   is my duty to give you the instructions of the Court

4   concerning the law applicable to this case.

5           It is your duty as jurors to follow the law as

6   the Court shall state it to you and to apply the law to

7   the facts as you find them from evidence in the case.

8           Now, counsel may quite properly have referred to

9   some of the governing rules of law in their arguments.

10  If, however, any difference appears to you between the

11  law as stated by counsel and the law as stated by the

12  Court in these instructions, you, of course, are to be

13  governed by the instructions as given to you by the

14  Court.

15          You are not to single out one instruction alone

16  as completely stating the law but consider the

17  instructions as a whole.  Neither are you to be concerned

18  with the wisdom of any rules of law stated by the Court.

19  Regardless of any opinion you may have as to what the law

20  is or ought to be, it would be a violation of your sworn

21  duty to base a verdict upon any view of the law other

22  than that given in the instructions of the Court, just as

23  it would also be a violation of your sworn duty as judges

24  of the facts to base a verdict upon anything else other

25  than the evidence in this case.

1          Now, in deciding the facts of this case you must

2    not be swayed by sympathy for any party nor bias or

3    prejudice or favor as to any party, because our system of

4    law does not permit jurors to be governed by prejudice or

5    sympathy, bias, guesswork or speculation.

6          Justice through trial by jury must always depend

7    upon the willingness of each individual juror to seek the

8    truth as to the facts from the same evidence presented to

9    all the jurors and to arrive at a verdict by applying the

10   same rules of law as given in the instructions of the

11   Court.

12         You must consider and decide this case as an

13   action between parties of equal standing in the

14   community, of equal worth and holding the same or similar

15   stations in life.  A corporation is entitled to the same

16   fair trial at your hands as a private individual.  All

17   persons, including corporations, stand equal before the

18   law and are to be dealt with as equals in a court of

19   justice.

20         The evidence in the case, as I told you when we

21   began, consists of the sworn testimony of the witnesses,

22   regardless of who may have called them; all exhibits

23   received in evidence, regardless of who may have produced

24   them; and all facts which have been admitted or

25   stipulated.

1          Statements and argument of counsel are not

2     evidence in the case unless made as an admission or

3     stipulation of fact.  When the attorneys on both sides

4     stipulate or agree as to the existence of a fact,

5     however, you must, unless otherwise instructed, accept

6     the stipulation as evidence and regard that fact as

7     proved.

8          Any evidence as to which an objection was

9     sustained by the Court and any evidence ordered stricken

10    by the Court must be entirely disregarded.  You will

11    recall that the Court struck the testimony of Dr. Becker

12    regarding the Google Disney agreement.  The Court took

13    this action for legal reasons having nothing to do with

14    any improper conduct of Dr. Becker.  In other words,

15    there was no improper conduct by him for the reason the

16    Court struck the evidence.

17         You will also recall the Court struck some

18    testimony regarding the Google Overture agreement.  What

19    it means, ladies and gentlemen, when the Court strikes

20    the testimony, is you must entirely disregard that

21    testimony in arriving at a verdict in this case.

22         Anything you may have seen or heard outside of

23    this courtroom is not evidence and must be entirely

24    disregarded.  You are to consider only the evidence in

25    the case.  In your consideration of the evidence,

1 | however, you are not limited to the bald statements of
2 | the witnesses.  In other words, you are not limited
3 | solely to what you see and hear as a witness testifies.
4 | You are permitted to draw, from facts which you find have
5 | been proved, such reasonable inferences as you feel are
6 | justified in the light of experience.
7 |   Before the trial of this case the Court held a
8 | conference with the attorneys for all parties.  At that
9 | conference the parties entered into certain stipulations
10 | or agreements in which they agreed that facts could be
11 | taken as true without any further proof.  By this
12 | procedure it is often possible to save time.  Certain
13 | facts have been stipulated to in this case.  I'm simply
14 | going to go on and read them.  They are not that long.
15 |   Now, the United States patent -- I'm going to
16 | give you the abbreviated form -- '420, titled
17 | "Collaborative/Adaptive Search Engine" and issued on
18 | November 6th, 2001.  The application issued as the '420
19 | patent was filed on December 3rd, 1998.
20 |   Claims 10, 14, 15, 25, 27 and 28 of the '420
21 | patent are asserted.
22 |   Claims 1, 5, 6, 21, 22, 26, 28 and 38 of the
23 | '664 patent are asserted.
24 |   And the '664 patent, which is entitled
25 | "Information Filter System and Method for Integrated

1  Content-Based and Collaborative/Adaptive Feedback

2  Queries," was issued on August 10th, 2004.

3        The application that issued there in the '664

4  patent is a continuation of the '420 patent and was filed

5  on October 22nd, 2001.

6        Andrew K. Lang and Donald Kosak are the named

7  inventors of the '420 patent.

8        Andrew Lang and Donald Kosak are also the named

9  inventors of the '664 patent.

10        United States Patent No. 6,202,058, called the

11  Rose patent or '058 patent, is entitled "System for

12  Ranking the Relevance of Information Objects Accessed by

13  Computer Users."  systems by Internet users.

14        The Rose patent was issued by the United States

15  Patent & Trademark Office on March 13th, 2001.

16        The application that issued as the Rose '058

17  patent was filed on April 25th, 1994.

18        United States Patent No. 6,006,222, the Culliss

19  '222 patent, is entitled "Method for Organizing

20  Information."

21        The Culliss patent was issued by the United

22  States Patent & Trademark Office on December 21st, 1999.

23        The application that issued as the Culliss or

24  '222 patent was filed on August 1st, 1997 and is a

25  continuation of Application No. 08,840,922, filed April

1  25th, 1997.

2      The United States Patent No. 185,558, the Bowman

3  or '558 patent, is entitled "Identifying the Items Most

4  Relevant to a Current Query Based on Items Selected in

5  Connection with Similar Queries."

6      Now, this Bowman patent, the '558 patent, was

7  issued by the United States Patent & Trademark Office on

8  February 6th, 2001, and the application for the Bowman

9  patent was filed on March 10th, 1998 and is a

10 continuation of Application No. 09,033,824, filed on

11 March 3rd, 1998.

12     The statements I read are listed right here in

13 the instructions.

14     So to continue with what you may consider, while

15 you should consider only the evidence in the case, you

16 are permitted to draw such reasonable inferences from the

17 testimony and exhibits that you feel are justified in

18 light of your common experience.  In other words, you may

19 reach deductions and conclusions which reason and common

20 sense lead you to draw from the facts which have been

21 established by the testimony and evidence in this case.

22     You may also consider either direct or

23 circumstantial evidence.  Direct evidence, ladies and

24 gentlemen, is the testimony by one who asserts actual

25 knowledge of a fact, such as an eyewitness.  And

1  circumstantial evidence is proof of a chain of facts and

2  circumstances.  The law makes no distinction between the

3  weight to be given either direct or circumstantial

4  evidence.  It requires only that you weigh all of the

5  evidence and be convinced of the defendant's infringement

6  before you can find for the plaintiff.

7          Now, the burden is on the plaintiff in a civil

8  case, a civil action such as this, to prove every

9  essential element of his or her claim -- or its claim

10 since we are talking about a corporation -- by a

11 preponderance of the evidence.  If the proof should fail

12 to establish any essential element of plaintiff's claim

13 by a preponderance of the evidence in this case, the jury

14 should find for the defendant as to that claim.

15         To establish by a preponderance of the evidence,

16 ladies and gentlemen, means to prove that something is

17 more likely so than not so.  In other words, a

18 preponderance of the evidence in the case means such

19 evidence as, when considered and compared with evidence

20 opposed to it, has more convincing force and produces in

21 your minds a belief that what is sought to be proved is

22 more likely true than not true.  This rule does not, of

23 course, require proof to an absolute certainty since

24 proof to an absolute certainty requires -- I mean, is

25 seldom possible in any case.

1          In determining whether any fact in issue has

2     been proven by a preponderance of the evidence you may,

3     unless otherwise instructed, consider the testimony of

4     all witnesses, regardless of who may have called them;

5     all exhibits received in evidence, regardless of who

6     produced them.  It does not make any difference whether

7     the exhibits are marked for the defendants or for the

8     plaintiff.

9          The test is not which side brings the greater

10    number of witnesses or presents the greater quantity of

11    evidence, but which witnesses and which evidence appears

12    to your mind as being most accurate and otherwise

13    trustworthy.

14         Now, you have heard some reference to the

15    defendants having to prove invalidity by clear and

16    convincing evidence.  Clear and convincing evidence is

17    evidence that produces in your mind a firm belief or

18    conviction as to the matter at issue.  Clear and

19    convincing evidence involves a greater degree of

20    persuasion that is necessary to meet the preponderance of

21    the evidence standard.  This standard does not require

22    proof to an absolute certainty, again, since proof to an

23    absolute certainty is seldom possible in any case.

24         Now, here's another instruction on credibility

25    of the witnesses:

1          You, as judges, jurors, are the sole judges of

2    the credibility of the witnesses and the weight their

3    testimony deserves.  I told you this in the beginning.

4    You may be guided by the appearance and conduct of the

5    witnesses or by the manner in which the witness has

6    testified or by the character of the testimony given or

7    by the evidence to the contrary of the testimony given.

8          You should carefully scrutinize all the

9    testimony given, the circumstances under which each

10   witness has testified, and every matter in evidence which

11   tends to show whether the witness is worthy of belief.

12   Consider each witness's intelligence, motive and state of

13   mind and demeanor or manner while on the stand.  Consider

14   the witness's ability to observe the matters as to which

15   he or she has testified and whether he or she impresses

16   you as having an accurate recollection of these matters.

17   Consider also any relation each witness may bear to

18   either side of the case, the manner in which each witness

19   might be affected by the verdict and the extent to which,

20   if at all, each witness is either supported or

21   contradicted by other evidence in the case.

22         Now, inconsistencies or discrepancies in the

23   testimony of a witness or between the testimony of

24   different witnesses may or may not cause you, as a juror,

25   to discredit such testimony.  Two or more persons

1  witnessing an incident or transaction may see or hear it

2  differently.  An innocent misrecollection, like a failure

3  of recollection, is not an uncommon experience.

4           In weighing the effect of a discrepancy always

5  consider whether it pertains to a matter of importance or

6  an unimportant detail, whether the discrepancy results

7  from innocent error or deliberate, intentional falsehood.

8           After making your own judgment, you are to give

9  the testimony of each witness such weight, if any, as you

10  think it deserves.  You may, in short, accept or reject

11  the testimony of any witness in whole or in part.

12           Also, the weight of the evidence is not

13  necessarily determined, again, by the number of witnesses

14  testifying to the existence or the nonexistence of any

15  fact.  You may find that the testimony of a small number

16  of witnesses as to any fact is more credible than the

17  testimony of a larger number of witnesses to the

18  contrary.

19           Now, we have had multiple experts in this case.

20  The rules of evidence may limit the ability of witnesses

21  to testify as to opinions or conclusions, but greater

22  latitude, ladies and gentlemen, is given to those we call

23  "expert witnesses."  Witnesses who by education or

24  experience have become an expert in some art, science,

25  profession or calling may give an opinion as to relevant

1  and material matter as to which they possess experience

2  and may also state their reasons for the opinion.

3        Now, opinion testimony by a qualified expert

4  witness is competent evidence.  You should consider each

5  expert opinion received as evidence in this case and give

6  it give each such opinion the weight you find it

7  deserves.  If you should decide the opinion of an expert

8  witness or his or her qualification is not supported by

9  sufficient education or experience, or if you should

10 conclude the reasons given in support of the opinion are

11 not sound or that the opinion is outweighed by other

12 evidence, you may disregard the opinion entirely.

13       Now, during the trial of this case certain

14 testimony has been presented to you by way of

15 depositions, video depositions or other depositions

16 consisting of sworn, recorded answers asked of the

17 witness in advance of the trial by one or more of the

18 attorneys for the parties to this case.  The testimony of

19 a witness who for some reason cannot be present to

20 testify from the witness stand may be presented in

21 writing under oath, as you had happen here.  Now, such

22 testimony is entitled to the same consideration and is to

23 be judged as to credibility and weighed and otherwise

24 considered by the jury, insofar as possible, in the same

25 way as if the witness had been present and had testified

1   from the witness stand.

2           You have also heard certain answers given in

3   response to written questions submitted by the other

4   side.   The written questions are called interrogatories.

5   The written answers were given in writing and under oath

6   before trial, and you must consider these answers to

7   interrogatories in the same manner as if the answers were

8   made from the witness stand.

9           Now, ladies and gentlemen, I'm going to talk

10  about impeachment.   A witness may be discredited or

11  impeached by contradictory evidence or by evidence that

12  at some other time the witness has said or done something

13  or has failed to say or do something which is

14  inconsistent with the witness's present testimony; that

15  is, the witness's testimony here in court.

16          If you believe any witness has been impeached

17  and thus discredited, it is your exclusive province to

18  give the testimony of that witness the weight you think

19  that witness's testimony deserves.

20          If a witness is shown knowingly to have

21  testified falsely concerning any material matter, you

22  have a right to distrust such witness's testimony in

23  other particulars, and you may reject all the testimony

24  of that witness or give it such credibility as you think

25  it deserves.

1          An act or omission is knowingly done, if

2    voluntarily and intentionally and not because of mistake

3    or accident or some other innocent reason.

4          Now, evidence that at some other time a witness,

5    not a party to this action, has said or done something

6    which is inconsistent with the witness's testimony at

7    trial may be considered for the sole purpose of judging

8    the credibility of the witness but may never be

9    considered as evidence of the proof of the truth of any

10   such statement.

11         Where, however, the witness is a party to this

12   case and by such statement or other conduct admits some

13   fact or facts against his or her interest or its

14   interest, then such statement or other conduct, if

15   knowingly made or done, may be considered as evidence of

16   the truth of the facts or the facts so admitted by such a

17   party as well as for the purpose of judging the

18   credibility of the party as a witness.

19         Once again, an act or omission is knowingly done

20   if done voluntarily and intentionally and not because of

21   mistake or accident or some other innocent reason.

22         Sometimes in a jury case you are concerned with

23   the intent of a witness or a party, and this next

24   instruction deals with intent.

25         Intent ordinarily may not be proved directly

1  because there is no way of fathoming or scrutinizing the

2  human mind, but you may infer a person's intent from

3  surrounding circumstances.  You may consider any

4  statement made or act done or omitted by a party whose

5  intent is in issue and all other facts and circumstances

6  to indicate his state of mind.

7          You may consider it reasonable to draw an

8  inference to find a person intends the natural and

9  probable consequences of acts knowingly done or knowingly

10 omitted.  It is for you to decide, ladies and gentlemen,

11 what facts have been established by the evidence.

12         Now let's turn to the issues at hand in this

13 case.

14         As I did at the start of this case, I will first

15 give you a summary of each side's contentions in this

16 case.  I will then provide you with detailed instructions

17 on what each side must prove to win on each of its

18 contentions.

19         As I previously told you, plaintiff, I/P Engine,

20 Inc., contends that the defendants Google, Inc., AOL,

21 Inc., IAC Search and Media, Inc., Gannett Company, Inc.,

22 and Target Corporation infringed claims 10, 14, 15, 25,

23 27 and 28 of the '420 patent, which has been referred to

24 as "the '420 patent," and claims 1, 5, 6, 21, 22, 26, 28

25 and 38 of the '664 patent.  Specifically, I/P Engine

1  contends that Google's AdWords directly infringes the
2  asserted claims and that AOL, Inc., IAC, Gannett and
3  Target infringed through their use of Google's AdWords
4  system.  I/P Engine has the burden of proving the
5  defendants infringed any of these claims by a
6  preponderance of the evidence.  That means that I/P
7  Engine must show that it is more likely than not that
8  Google's AdWords infringes the claims.
9        Now, the defendants deny that they infringed any
10  claims of the '420 or the '664 patent.  Defendants also
11  contend that the asserted claims of the '424 patent and
12  the '664 patent are invalid.  Invalidity is a defense to
13  patent infringement.  Even though the United States
14  Patent & Trademark Office has allowed the claims of the
15  '420 and '664 patent, you, the jury, are responsible for
16  deciding whether the claims of the patent are valid.
17        Your job is to decide whether or not the
18  asserted claims of the '420 patent or the '664 patent
19  have been infringed and whether or not those claims are
20  invalid.  If you decide that any claim of the '420 patent
21  or the '664 patent has been infringed and also that an
22  infringed claim is not invalid, then you will then need
23  to decide money damages to be awarded to I/P Engine.  I/P
24  Engine has the burden of proving that it is entitled to
25  the damages it seeks by a preponderance of the evidence.

1          I will now give you instructions and definitions
2    to help you in answering the questions that follow:
3          Before you can decide many of the issues in this
4    case, you will need to understand the role of patent
5    claims.  And I know you were given a little introduction
6    three weeks ago to a patent case, so we are going to go
7    through it again.
8          The patent claims are the numbered sentences at
9    the end of each patent.  You will have those patents in
10   the jury room.  The claims are important because the
11   words of the claim define what a patent covers.
12         The figures and texts in the rest of the patent
13   provide a description and/or examples of the invention
14   and provide a context for the claims, but it is the
15   claims that define the breadth of the patent's coverage.
16   Each claim is effectively treated as if it were a
17   separate patent, and each claim covers more or less than
18   another claim.  Therefore, what a patent covers depends,
19   in turn, on what each of its claims cover.
20         You will first need to understand what each
21   claim covers in order to decide whether or not there is
22   infringement of a claim.  The law says that it is my role
23   to define the terms of the claims and it is your role to
24   apply my definitions to the issues that you are asked to
25   decide in this case.  Therefore, as I explained to you at

2090

1  the start of the case, I have determined the meaning of

2  certain of the terms in the claims and have already

3  provided to you my definitions of certain claim terms in

4  the notebooks that you have there.  You must accept my

5  definitions of these words and the claims as being

6  correct.  It is your job to take these definitions and

7  apply them to the issues that you are deciding, including

8  the issue of infringement.

9         Now, this next instruction is entitled "How a

10  Claim Defines What It Covers."  I will now explain how a

11  claim defines what it covers.

12         A claim sets forth in words a set of

13  requirements.  Each claim sets forth its requirements in

14  a single sentence.  If a device or a method satisfies

15  each of these requirements, then it is covered by the

16  claim.

17         There can be several claims in a patent, and I

18  just listed several claims in these various patents.

19  Each claim may be narrower or broader than another claim

20  by setting forth more or fewer requirements.  The

21  coverage of a patent is assessed claim by claim.  In

22  patent law the requirements of a claim are often referred

23  to as "claim elements" or "claim limitations."  When a

24  thing such as a product or process meets all of the

25  requirements of a claim, the claim is said to cover that

1   thing, and that thing is said to fall within the scope of

2   that claim.   In other words, a claim covers a product or

3   process where each of the claim requirements is present

4   in that product or that process.

5        Sometimes the words in a patent claim are

6   difficult to understand and, therefore, it is difficult

7   to understand what requirements these words impose.   It

8   is my job to explain to you the meaning of the words in

9   the claims and the requirements these words impose.

10        As I just instructed you, there are certain

11   specific terms that I have defined, and you are to apply

12   these definitions that I provide to you.

13        By understanding the meaning of the words in a

14   claim and by understanding the words in a claim set forth

15   the requirements that a product or a process must meet in

16   order to be covered by that claim, you will be able to

17   understand the scope of coverage for each claim.   Once

18   you understand what each claim covers, then you are

19   prepared to decide the issues that you will be asked to

20   decide, such as infringement.

21        This case involves two types of patent claims,

22   ladies and gentlemen:   Independent claims and dependent

23   claims.

24        An independent claim sets forth all of the

25   requirements that must be met to be covered by that

1  claim.  Thus, it is not necessary to look at any other

2  claim to determine what an independent claim covers.  In

3  this case claims 10 and 25 of the '420 patent are each

4  independent claims, and claim 1 and 26 of the '664 patent

5  are each independent claims.  The remainder of the

6  asserted claims are dependent claims.

7          A dependent claim does not itself recite all of

8  the requirements of the claim but refers to another claim

9  or claims for some of its requirements.  In this way the

10 claim depends on another claim or claims.  In this case

11 claims 14, 15, 27 and 28 of the '420 patent are each

12 dependent claims.  Claims 5, 6, 21, 22, 28 and 38 of the

13 '664 patent are each dependent claims.

14         A dependent claim incorporates all of the

15 requirements of the claims to which it refers.  The

16 dependent claim then adds its own additional requirements

17 to determine what a dependent claim covers.  It is

18 necessary to look at both the dependent claim and any

19 other claim to which it refers.  A product or process

20 that meets all of the requirements of both the dependent

21 claim and the claims to which it refers is covered by

22 that dependent claim.

23         I will now explain to you the meaning of some of

24 the words of the claims in this case.  In doing so, I

25 will explain some of the requirements of the claims.  As

1  I have previously instructed you, you must accept the

2  Court's definition of these words in the claims as

3  correct.  You should not take my definitions of the

4  language of the claims as an indication that I have a

5  view regarding how you should decide the issues that you

6  are being asked to decide, such as infringement.  These

7  issues are yours to decide.

8          I will now instruct you how those words are to

9  be construed and understood when deciding the issues of

10 infringement and validity.  You have been provided with

11 written copies of the '420 patent and the '664 patent,

12 and you may use them during your deliberations.

13         Now, ladies and gentlemen and counsel, you have

14 been provided pretrial all of the terms the Court is

15 about to read.  The Court doesn't see any need to read

16 these terms because the Court has provided these terms to

17 you.  Do each of you have your notebooks?

18         Unless there's an objection, I'm not going to

19 read every definition that has previously been provided.

20         MR. SHERWOOD:  No objection, your Honor.

21         MR. NELSON:  No objection, your Honor.

22         THE COURT:  All right.  So you will look in your

23 notebook and you will find the Court's definition of the

24 terms of "collaborative feedback data," "scanning a

25 network," "demand search," "informon," "user," for both

1 patents, "relevance to the query," "query," and "order of

2 the steps," "order of steps."  That's in the notebook,

3 and you can go to those definitions and use them in

4 reaching your verdict.

5          Let's talk about infringement generally.  What

6 are we talking about here?

7          I will now instruct you on how to decide whether

8 or not the defendants have infringed the '420 patent or

9 the '664 patent.

10          Infringement is assessed on a claim-by-claim

11 basis.  Therefore, there may be infringement as to one

12 claim but no infringement as to another.  In this case

13 I/P Engine has alleged that the defendant directly

14 infringed, again, claims 10, 14, 15, 25, 27 or 28 of the

15 '420 patent and claims 1, 5, 6, 21, 22, 26, 28 or 38 of

16 the '664 patent.  In addition, I/P Engine has alleged

17 that the third parties directly infringed -- that is,

18 other defendants, directly infringed -- the '420 patent

19 and the '664 patent and the defendants are liable for

20 actively inducing or contributing to that direct

21 infringement by those third parties.  When I say "those

22 third parties," I'm really talking about the other

23 defendants.

24          Infringement is assessed on a claim-by-claim

25 basis.  Therefore, there may be infringement as to one

1  claim but no infringement as to another.  I said that
2  twice.
3         In this case there are two possible ways that a
4  claim may be infringed.  The two types of infringement
5  are called direct infringement and active inducement.
6  Active inducement is referred to as indirect
7  infringement.
8         There cannot be indirect infringement without
9  someone else engaging in direct infringement.  To prove
10 the indirect infringement the patent holder must also
11 prove that the accused infringer's indirect infringement
12 caused direct infringement.
13        In this case I/P Engine has alleged that Google,
14 Inc. directly infringes the '420 and the '664 patent.  In
15 addition, I/P Engine has alleged that the other
16 defendants directly infringed the '420 patent and '664
17 patent and they are liable for actively inducing or
18 contributing to that direct infringement by those third
19 parties -- I say by the other defendants.
20        In order to prove infringement the patent
21 holder, that is I/P Engine, must prove that the
22 requirement for one or more of these types of
23 infringement are met by a preponderance of the evidence;
24 that is, that it's more likely than not that all of the
25 requirements of one or more of each of these types of

1   infringement have been proved.

2          I will now explain each of these types of

3   infringement in more detail.

4          To prove direct infringement, the patent holder,

5   I/P Engine, must prove by a preponderance of the evidence

6   that it is more likely than not that the alleged

7   infringer, that is Google, made, used, sold or offered

8   for sale within the United States a product or used a

9   process that meets all of the requirements of a claim and

10  did so without the permission of I/P Engine during the

11  time the patent was in force.

12         You must compare each and every one of the

13  requirements of the claim with the product or process to

14  determine whether all of the requirements of that claim

15  are met.  You must determine separately for each asserted

16  claim whether or not there is infringement.

17         There is one exception to this rule.  If you

18  find that a claim on which other claims depend is not

19  infringed -- that is, one of those independent claims --

20  there cannot be infringement of any dependent claim that

21  refers directly or indirectly to that independent claim.

22  On the other hand, if you find that an independent claim

23  has been infringed, you must still decide separately

24  whether the product or the process meets additional

25  requirements of any claims that depend from the

1   independent claim; thus, whether those claims have also

2   been infringed.  A dependent claim includes all of the

3   requirements of any of the claims to which it refers plus

4   additional requirements of its own.

5        The next instruction is entitled "Direct

6   Infringement Doctrine of Equivalents."

7        If a company makes, uses, sells or offers to

8   sell or imports from the United States a product or uses

9   a process that does not meet all the requirements of the

10  claim and, thus, does not literally infringe that claim,

11  there can still be direct infringement if that product

12  satisfies that claim under the Doctrine of Equivalents.

13       Under the Doctrine of Equivalents, ladies and

14  gentlemen, a product or process infringes a claim if the

15  accused product or process contains the elements or

16  performs the steps corresponding to each and every

17  requirement of the claim that it is equivalent to, even

18  though not literally met by the accused product or

19  process.

20       You may find that an element or a step is

21  equivalent to a requirement of a claim that is not met

22  literally if a person having ordinary skill in the field

23  of technology of the patent would have considered the

24  differences between them to be insubstantial or would

25  have found that the structure or action performed

1 substantially the same function, works in substantially

2 the same way, to achieve substantially the same result as

3 the requirement of the claim.

4　　　　In order for the structure or action to be

5 considered interchangeable, the structure or action must

6 have been known at the time of the alleged infringement

7 to a person having ordinary skill in the field of

8 technology of that patent.

9　　　　Interchangeability at the present time is not

10 sufficient.  In order to prove infringement by

11 equivalents I/P Engine must prove the equivalency of the

12 structure or action to a claim element by a preponderance

13 of the evidence.

14　　　　On the other hand, if you find that the accused

15 product or process has no corresponding structure or set

16 of structures or action or set of actions to any of the

17 steps or structures or action that I defined as

18 performing that function, then you must find that there

19 is no infringement under the Doctrine of Equivalents.

20　　　　Indirect infringement or active inducement.  I/P

21 Engine alleges that Google is liable for infringement by

22 actively inducing the other four defendants to directly

23 infringe the '420 patent and the '664 patent.  As with

24 direct infringement, you must determine whether there has

25 been active inducement on a claim-by-claim basis.

```
 1          The defendants are liable for active inducement
 2  of a claim only if I/P Engine proves by a preponderance
 3  of the evidence that the acts are actually carried out by
 4  the third parties and directly infringe that claim;
 5  defendants took action during the time the '420 patent
 6  and the '664 patent were in force, intending to cause the
 7  infringement acts of third parties, again, I'm saying the
 8  other defendants; defendants were aware of the '420
 9  patent and the '664 patent and knew the actions taken
10  would constitute infringement of that patent.
11          In order to establish active inducement of
12  infringement it is not sufficient that the other
13  defendants themselves directly infringed the claim, nor
14  is it sufficient that Google was aware of the acts of the
15  other defendants that allegedly constitute the direct
16  infringement.  Rather, you must find that Google
17  specifically intended the other defendants to infringe
18  the '420 patent and the '664 patent.
19          Now let's talk about invalidity generally.
20  Patent invalidity, as I told you, is a defense to patent
21  infringement.  I will now instruct you on the rules you
22  must follow in deciding whether or not the defendants
23  have proved that these claims 10, 14, 15, 25, 27 or 28 of
24  the '420 patent and claims 1, 5, 6, 21, 22, 26 or 38 of
25  the '664 patent are invalid.  To prove that any claim of
```

1  a patent is invalid the defendants must persuade you by

2  clear and convincing evidence.

3        Now, invalidity based on prior art.

4        Prior art may include items that were publicly

5  known or that have been used or offered for sale,

6  publications or patents that disclose the claimed

7  invention or elements of the claimed invention.  To be

8  prior art the item or reference must have been made,

9  known, used, published or patented either before the

10 invention was made or more than one year before the

11 filing date of the patent application.  However, prior

12 art does not include a publication that describes the

13 inventor's own work and was published less than one year

14 before the date of the invention.

15        For the claim to be invalid because it is not

16 new the defendants must show that all other requirements

17 of that claim were present in a single previous device or

18 method that was known or used -- known of, used or

19 described in a single previous printed publication or

20 patent.  We call these things anticipating prior art.

21        To anticipate the invention, the prior art does

22 not have to use the same words as the claim, but all of

23 the requirements of the claim must have been disclosed,

24 either stated expressly or implied to a person having

25 ordinary skill in the art in the technology of the

1  invention, so that looking at that one reference that
2  person could make and use the claimed invention.
3        In order for someone to be entitled to a patent
4  the invention must actually be new and the inventor must
5  not have lost his or her rights by delaying the filing of
6  an application claimed to the invention.  In general,
7  inventions are new when the identical product or process
8  has not been made, used or disclosed before.
9  Anticipation must be determined on a claim-by-claim
10 basis.  Defendants contend that the asserted claims of
11 the patents-in-suit, that is the '664 patent and the '420
12 patent, are invalid because the claimed inventions are
13 anticipated.  Defendants must convince you of this by
14 clear and convincing evidence; that is, that the evidence
15 highly probably demonstrates the claims are invalid.
16       Here are the ways defendants showed the patent
17 claim was not new or the patentee lost the right to
18 patent the claims.
19       Anybody want to stand up and take a stretch?
20 Nobody?  All right.  We will keep pushing.  I have at
21 least another 15 minutes, at a minimum.  You are okay?
22       All right.  An invention is not new if it was
23 known to or used by others in the United States before
24 the inventor's invention.  An invention is known when the
25 information about it was reasonably accessible to the

1  public on that date.

2        An invention is not new if it was already

3  patented or described in a printed publication anywhere

4  in the world before the inventor's invention.

5        I/P Engine has lost its rights if the claimed

6  invention was already printed or described in a printed

7  publication anywhere in the world by the inventors or

8  anyone else more than a year before December 3rd, 1998,

9  which is the effective filing date of the application for

10  the '420 patent and the '664 patent.

11        An invention was patented by another if the

12  other patent describes the same invention claimed by I/P

13  Engine to a person having ordinary skill in the

14  technology.

15        I/P Engine has lost its rights if the claimed

16  invention was publicly used or sold or offered for sale

17  in the United States more than one year before December

18  3rd, 1998, again, which is the effective filing date of

19  the application for the '420 patent.

20        An invention was publicly used when it was

21  either accessible to the public or commercially

22  exploited.  An invention was sold or offered for sale

23  when it was offered commercially and what was offered was

24  ready to be patented; that is, a description to one

25  having ordinary skill in the field of the technology

1  could have made and used the claimed invention, even if

2  it was not yet reduced to practice.

3       Again, an invention is not new if it was

4  described in a published patent application filed by

5  another in the United States before the effective filing

6  date of the patent, in this case December 3rd, 1998.

7       An invention is not new if the claimed invention

8  was described in a patent granted on an application for a

9  patent by another filed in the United States and the

10 application was filed before the effective filing date of

11 the patent, in this case December 3rd, 1998.

12      Now we have reached invalidity on another

13 ground.  You heard testimony about obviousness.

14      Now, I want you to pay careful attention to this

15 instruction because on this instruction as a juror you

16 will have to make certain special findings on the issue

17 of obviousness.  There will be questions on the verdict

18 form that you will have to answer on this issue.

19      Even though an invention may not have been

20 identically disclosed or described before it was made by

21 an inventor, in order to be patentable the invention must

22 also not have been obvious to a person of ordinary skill

23 in the field of technology of the patent at the time the

24 invention was made.

25      The defendants contend that claims 10, 14, 15,

1  25, 27 or 28 of the '420 patent and claims 1, 5, 6, 21,

2  22, 26, 28 or 38 of the '664 patent are invalid because

3  the invention was obvious.  Defendants may establish that

4  a patent claim is invalid by showing that the claimed

5  invention would have been obvious to persons having

6  ordinary skill in the art at the time the invention was

7  made in the field of the invention.

8         In determining whether a claimed invention is

9  obvious you must consider the level of ordinary skill in

10  the field of the invention that someone would have had at

11  the time the claimed invention was made, the scope and

12  content of the prior art, and any differences between the

13  prior art and the claimed invention.  Those are the

14  things you will have to answer.

15         Keep in mind that the existence of each and

16  every element of the claimed invention in the prior art

17  does not necessarily prove obviousness.  Most, if not

18  all, inventions rely on building blocks of prior art.  In

19  considering whether a claimed invention is obvious, you

20  may, but are not required, to find obviousness if you

21  find at the time of the claimed invention there was a

22  reason that would have prompted the person having

23  ordinary skill in the field of the invention to combine

24  the known elements in the way the claimed invention does,

25  taking into account such factors as whether the claimed

1  invention was merely the predictable result of using
2  prior art elements according to their known function;
3  whether a claimed invention provides an obvious solution
4  to a known problem in the relevant field; whether the
5  prior art teaches or suggests the desirability of
6  combining elements claimed in the claimed invention;
7  whether the prior art teaches away from combining
8  elements in the claimed invention; whether it would have
9  been obvious to try the combination of elements, such as
10 when there is a design need or market pressure to solve a
11 problem and there are a finite number of identified,
12 predictable solutions; and whether the change resulted
13 more from design incentives or other market forces to
14 find it rendered the invention obvious, you must find
15 that the prior art provided a reasonable expectation of
16 success.  Obvious to try is not sufficient in
17 unpredictable technologies -- obvious to try is not
18 sufficient in unpredictable technologies.
19         In determining whether the claimed invention was
20 obvious, consider each claim separately.  Do not use
21 hindsight, that is, consider only what was known at the
22 time of the invention.  In making these assessments you
23 should take into consideration the things sometimes
24 called secondary considerations that were made at the
25 time of the invention and afterwards that may shed light

1   on the obviousness or not of the claimed invention, such

2   as -- and here's another list:

3           Whether the invention was commercially

4   successful as a result of the merits of the claimed

5   invention rather than a result of design needs or market

6   pressure; whether the invention satisfied a long-felt

7   need; whether others had tried and failed to make the

8   invention; whether others invented the invention at

9   roughly the same time; whether others copied the

10  invention; whether there were changes or related

11  technologies or market needs contemporaneous with the

12  invention; whether the invention achieved unexpected

13  results; whether others in the field praised the

14  invention; whether persons having ordinary skill in the

15  art of the invention expressed surprise or disbelief

16  regarding the invention; whether others sought or

17  obtained rights to the patent from the patent holder;

18  whether the inventor proceeded contrary to accepted

19  wisdom in the field.

20          Those are some of the considerations you need to

21  look at in trying to determine whether these inventions

22  were obvious.

23          Now we turn to the question of damages.  There's

24  a lot of discussion about damages in this case, ladies

25  and gentlemen, and damages will probably be one of the

1  last things you get to, depending upon what your findings

2  are as you go through the verdict form.

3       If you find that the defendants infringed any

4  valid claim of the '420 patent or the '664 patent, you

5  must then consider what amount of damages to award to I/P

6  Engine.  I will now instruct you about the measure of

7  damages.  By instructing you on damages, I'm not

8  suggesting which party should win this case, on any

9  issue.  These instructions are provided to guide you on

10  the calculation of damages in the event you find

11  infringement of a valid patent claim and thus must

12  address the damages issue.

13       The damages you award must be adequate to

14  compensate the patent holder, that is I/P Engine, for the

15  infringement.  They are not meant to punish an

16  infringer.  Your damages award, if you reach this issue,

17  should put I/P Engine in approximately the same financial

18  position that it would have been in had the infringement

19  not occurred.

20       The patent holder-- every time I say patent

21  holder, I'm talking about I/P Engine here, --has the

22  burden to establish the amount of its damages by a

23  preponderance of the evidence.  In other words, you

24  should award only those damages that the patent holder

25  establishes that its more likely than not suffered.

1          There are different types of damages that the
2   patent holder may be entitled to recover.  In this case
3   I/P Engine seeks a reasonable royalty.  A reasonable
4   royalty is defined as the money amount the patent holder
5   and the infringer would have agreed upon as a fee for use
6   of the invention at the time prior to when infringement
7   began.

8          I will give you more detailed instructions
9   regarding damages shortly.  Note, however, that I/P
10  Engine is entitled to recover no less than a reasonable
11  royalty for each infringing act.

12         If you find that I/P Engine has established
13  infringement, I/P Engine is entitled to at least a
14  reasonable royalty to compensate it for the infringement.

15         Now, what is a reasonable royalty and what does
16  that mean?  A royalty is a payment, ladies and gentlemen,
17  made to a patent holder in exchange for the right to
18  make, use, or sell the claimed invention.  A reasonable
19  royalty is the amount of royalty payment that a patent
20  holder and the infringer would have agreed to in a
21  hypothetical negotiation taking place at a time prior to
22  when the infringement first began.  In considering this
23  hypothetical negotiation, you should focus on what the
24  expectations of the patent holder and the infringer would
25  have been had they entered into an agreement at that

1  time, and had they acted reasonably in their

2  negotiations.

3         In determining this, you must assume that both

4  parties believed the patent was valid and infringed and

5  the patent holder and infringer were willing to enter

6  into an agreement.  The reasonable royalty you determine

7  must be a royalty that would have resulted from the

8  hypothetical negotiation, and not simply a royalty either

9  party would have preferred.  Evidence of things that

10 happened after the infringement first began can be

11 considered in evaluating the reasonable royalty only to

12 the extent that the evidence aids in assessing what

13 royalty would have resulted from a hypothetical

14 negotiation.  Although evidence of the profits -- let me

15 back up.  Although evidence of the actual profits an

16 alleged infringer made may be used to determine the

17 anticipated profits at the time of the hypothetical

18 negotiation, the royalty may not be limited or increased

19 based on the actual profits the alleged infringer made.

20        Now, here are some of the things you look at in

21 trying to determine what a reasonable royalty is.  It's

22 called reasonable royalty relevant factors.  Here are

23 some reference to the Georgia-Pacific factors in here

24 used.  A lot of these factors are the Georgia-Pacific

25 factors.

1          In determining the reasonable royalty, you

2    should consider all the facts known and available to the

3    parties at the time infringement began.  Some of the

4    kinds of factors that you may consider in making your

5    determination are:

6          The royalties received by the patentee for the

7    licensing of the patents-in-suit, that is the '664 and

8    the '420 patents, proving or intending to prove an

9    established royalty.

10          The rates paid by the licensee for the use of

11    other patents comparable to a patent-in-suit.

12          The nature and scope of the license, as

13    exclusive or nonexclusive, or as restricted or

14    nonrestricted in terms of territory or with respect to

15    whom the manufactured product may be sold.

16          The licensor's established policy and marketing

17    program to maintain his or her patent monopoly by not

18    licensing others to use the invention or by granting

19    licenses under special conditions designed to preserve

20    that monopoly.

21          The commercial relationship between the licensor

22    and a licensee.  When I say licensor or licensee, as an

23    example, the commercial relationship between the parties

24    here, Google and Lycos or I/P Engine, such as whether

25    they are competitors in the same territory in the same

line of business, or whether they are inventor and
promoter.

No. 8. The established profitability of the
product made under the patents, its commercial success,
and its current popularity.

No. 9. The utility and advantages of the
patented property over the old modes or devices, if any,
that had been used for working out similar results.

No. 10.  The nature of the patented invention,
the character of the commercial embodiment of it as owned
and produced by the licensor, and the benefits to those
who have used the invention.

No. 11.  The extent to which the infringer has
made use of the invention and any evidence probative of
the value of that use.

The portion of the profit or of the selling
price that may be customary in the particular business or
in comparable business to allow for the use of the

line of business, or whether they are inventor and
promoter.

The effect of selling the patented specialty in
promoting sales of other products of the licensee, the
existing value of the invention to the licensor as a
generator of sales of his nonpatented items, and the
extent of such derivative or convoyed sales.

The duration of the patent and the terms of the
license.

No. 8. The established profitability of the
product made under the patents, its commercial success,
and its current popularity.

No. 9. The utility and advantages of the
patented property over the old modes or devices, if any,
that had been used for working out similar results.

No. 10.  The nature of the patented invention,
the character of the commercial embodiment of it as owned
and produced by the licensor, and the benefits to those
who have used the invention.

No. 11.  The extent to which the infringer has
made use of the invention and any evidence probative of
the value of that use.

The portion of the profit or of the selling
price that may be customary in the particular business or
in comparable business to allow for the use of the

1   invention or analogous inventions.

2          No. 13.   The portion of the realizable profits

3   that should be credited to the invention as distinguished

4   from unpatented elements, the manufacturing process,

5   business risks, or significant features or improvements

6   added by the infringer.

7          No. 14.   The opinion and testimony of qualified

8   experts.

9          15.   The amount that a licensor (such as the

10  patentee) and a licensee (such as the infringer) would

11  have agreed upon (at the time the infringement began) if

12  both had been reasonably and voluntarily trying to reach

13  an agreement; that is, the amount which a prudent

14  licensee who desired, as a business proposition, to

15  obtain a license to manufacture and sell a particular

16  article embodying in the patented invention, would have

17  been willing to pay as a royalty and yet be able to make

18  a reasonable profit and which amount would have been

19  acceptable by a prudent patentee who was willing to grant

20  a license.

21         That's the hypothetical negotiation we are

22  talking about.

23         No one factor is dispositive, ladies and

24  gentlemen, and you can and should consider the evidence

25  that has been presented to you in this case on each of

1  these factors.  You may also consider any other factors

2  which in your mind would have increased or decreased the

3  royalty of the infringer -- would have increased or

4  decreased the royalty Google would have been willing to

5  pay and I/P Engine would have been willing to accept,

6  acting as normally prudent business people or entities.

7  The final factor establishes the framework which you

8  should use in determining a reasonable royalty, that is,

9  the payment that would have resulted from a negotiation

10  between the patent holder, that is I/P Engine, and Google

11  taking place at a time prior to when the infringement

12  began.

13        Now, in determining the amount of damages, you

14  must have a starting point for your determination, in

15  other words, what date should these damages run.  Because

16  of a ruling of the Court that the Court has made for all

17  the defendants, if you reach the question of damages,

18  damages commence on the date that the lawsuit was filed,

19  September 15th, 2011.

20        Now, I have permitted you to take notes during

21  the course of this trial, ladies and gentlemen, and the

22  Court will say you have been unusually attentive and the

23  Court looks at a jury all the time.

24        The Court has permitted you to take notes during

25  the trial.  Your notes should be used only as memory

1  aids.  You should not give your notes precedence over

2  your independent recollection of the evidence.  If you

3  did not take notes, you should rely on your own

4  independent recollection of the proceedings and you

5  should not be influenced by notes of your fellow jurors.

6  I emphasize that notes are not entitled to any great

7  weight than the recollection or impression of each juror

8  as to what the testimony may have been.

9        Now, your verdict must represent the considered

10  judgment of each juror.  In other words, your verdict

11  must be unanimous.  All nine of you must agree to the

12  verdict.

13        Each of you must decide this case for yourself,

14  but only after an impartial consideration of all the

15  evidence in the case with your fellow jurors.

16        It is your duty as jurors to consult with one

17  another and to deliberate with a view to reaching an

18  agreement if you can do so without violence to individual

19  judgment.  In the course of your deliberations, do not

20  hesitate to re-examine your own views and change your

21  opinion, if you are convinced it is erroneous.  But do

22  not surrender your independent, honest convictions as to

23  the weight or effect of the evidence solely because of

24  the opinion of your fellow jurors or for the mere purpose

25  of returning a verdict.

1    Remember one thing.  You are not partisans.

2    You are judges of the facts.

3    Your sole interest so to seek the truth from the

4  evidence in the case.

5    Now, upon retiring to the jury room you must

6  select one of your members to serve as your foreperson

7  who will preside over your deliberations and will be your

8  spokesperson here in court.  A form of verdict has been

9  prepared for your convenience.

10    You will take the exhibits and the form of

11  verdict to the jury room and when you have reached a

12  unanimous verdict, you will have the foreperson be sure

13  it's filled out, date and sign it, and you will notify

14  the court security officer that you have a verdict.

15    Now, if during your deliberations, you should

16  desire to communicate with the Court, your message or

17  question must be in writing and signed by the

18  foreperson.  I want you to fold it up.  And you will then

19  give the note to the court security officer who will

20  bring it to my attention.

21    Now, the Court will respond promptly, either in

22  writing, if there's any space left on the bottom of the

23  page, or either bring you back to the courtroom to give

24  you an oral response.  If you do transmit a message, the

25  Court does not want to know what your numerical division

1   is, or who is for what or who's against what, so do not

2   specify any numerical division.

3          Finally, do not interpret anything the Court has

4   said or done during the course of this trial as

5   indicating what the verdict should be.

6          That's your responsibility.  It's exclusively

7   within your domain.

8          Now, let me say a word about this verdict sheet.

9          This is the verdict form.  I don't want to scare

10  you to death, but the verdict form is 11 pages long.

11  That's so you can indicate what your decisions are.

12         You take this verdict form and you will go

13  through it to deliberate.  You can start on page 1 and as

14  you go through deliberating, you record your

15  determinations on that sheet.

16         And then you move to page 2 and 3, and you work

17  your way through the sheet, okay?

18         The Court clearly understands that depending

19  upon what you find on the first five pages, you may not

20  get to -- first 6 pages, you may not get to the balance

21  of the form.  But you will have to determine your verdict

22  based upon going through this sheet, as the Court has

23  indicated, taking it page by page and recording your

24  decisions after you have engaged in some deliberations.

25         Now, ladies and gentlemen, I'm going to have

1  counsel to examine the charge and the exhibits and the
2  verdict form, and then we will send those items in to you
3  so you can begin your deliberations.
4          Now, the Court recognizes you have been here all
5  day and this has been a three-week trial, so the Court is
6  going to follow suit as it's usually done.  You go in and
7  you can get started, select your foreperson and get
8  yourself organized, but the Court is going to terminate
9  today at 5:00 and bring you back in here tomorrow morning
10  and let you commence your deliberations fresh at 10:00.
11  Okay?
12          So you may retire to the jury room.
13          (Jury out.)
14          THE COURT:  You need to wait until we send in
15  everything before you do anything.
16          You may have a seat.  Perhaps I should have done
17  this before they were released, but if I have to bring
18  them back, I will.  Are there any questions or objections
19  to the charge as read?
20          MR. BROTHERS:  Your Honor, I/P Engine renews its
21  objections to Instruction 32 for the reasons previously
22  stated.
23          THE COURT:  Oh, no, that's not what I'm talking
24  about.  That's noted for the record.
25          MR. BROTHERS:  Oh, okay.

```
 1              THE COURT:  The Court wants to know if there's
 2   any objections to the charge as read by the Court?
 3              MR. BROTHERS:  No objections by the plaintiff,
 4   your Honor.
 5              MR. NELSON:  No, sir.
 6              THE COURT:  All right.  I want you to step
 7   forward and look at the jury charge, the verdict form,
 8   all exhibits.  I don't know whether you have done it or
 9   not already.
10              THE DEPUTY CLERK:  No.
11              THE COURT:  Okay.  You need to step forward,
12   Mr. Brothers, Mr. Nelson, those who are going to
13   represent the various parties.  I only need a couple of
14   you-all.
15              (Counsel conferred with the deputy clerk over
16   the charge, verdict form and the admitted exhibits.)
17              MR. BROTHERS:  Will the jury have a video player
18   in there?
19              THE COURT:  They will have a cleared laptop in
20   there.
21              All right.  Is there any objection to the
22   exhibits, charge or verdict form?  I mean other than
23   what's been lodged regarding the substance or the form?
24              MR. BROTHERS:  None by plaintiffs, your Honor.
25              MR. NELSON:  No, your Honor.
```

```
 1            THE COURT:  All right.  Mr. Taylor, if you would
 2   take these items into the jury room.
 3            Yes, sir.
 4            MR. PERLSON:  Your Honor, we just have some
 5   demonstratives we wanted to lodge objections to just for
 6   the record.
 7            THE COURT:  Some demonstratives you wanted to
 8   lodge --
 9            MR. PERLSON:  Yes, demonstratives that were
10   either objected to or sustained that we wanted to put in
11   and weren't allowed, just for the record.
12            THE COURT:  The proper thing probably to have
13   been done is to do that as we were going along so the
14   Court could see exactly what you were offering, putting
15   into the record.  Now they come in totally out of
16   context.  Just how many are you getting ready to do that
17   on?
18            MR. PERLSON:  I don't know the exact number,
19   but -- well, there's a fair amount of them because most
20   of them are related to the marketing documents that we
21   had that long list.  I mean, we went through it on the
22   record and stated for the record the long list of
23   objections.
24            THE COURT:  So you want to offer into the record
25   demonstrative exhibits?
```

```
1              MR. PERLSON:  Just for the purposes of appeal to
2   get the record --
3              THE COURT:  No.  Demonstrative exhibits, if you
4   check your rules of evidence, are ordinarily not
5   admissible in the first place, so why are we putting
6   demonstrative exhibits into the record?
7              MR. PERLSON:  Well, if they were demonstratives
8   that shown to the jury that we have an objection to and
9   they were allowed and still shown, then we want to be
10  able to preserve our objection.
11             THE COURT:  All right.  Put them on into the
12  record.  Give them to me by number.
13             Is that a stack, or is that a single one?
14             THE DEPUTY CLERK:  It's a stack.
15             MR. PERLSON:  There's a cover pleading and a
16  stack.
17             THE COURT:  Well, I want you to look at them,
18  Counsel, to be sure they were ever even shown in the
19  first place.  I don't want something coming in here that
20  never even came into the courtroom in the first place.
21             The Court really has no independent recollection
22  of every demonstrative exhibit that you stood up here
23  with, and that's the problem with giving me a stack at
24  the end of the case.
25             MR. BROTHERS:  Your Honor, I would ask that we
```

1  be given a chance to go back and compare these because,

2  you know, this is a stack of what looks like over 50

3  demonstratives that, you know, just flipping through I

4  can't tell you whether they were all in there.

5          THE COURT:  We will deal with that before the

6  case is over.  But I can tell you, I want you to do this:

7  I want you to go back and read your rules of evidence and

8  go through those demonstrative exhibits, and surely there

9  are not 50 demonstrative exhibits that probably should

10 have come into the record that the Court held out.

11         MR. PERLSON:  No, no, that's not what we are

12 saying.  There are some of them that they showed to the

13 jury and we objected to it.

14         THE COURT:  That you have objected to?

15         MR. PERLSON:  Yes.

16         THE COURT:  Well, I'm saying I doubt that there

17 are 50 of them that you objected to that were admissible

18 anyway, so go back and take a look at them and you will

19 know exactly what I'm saying.

20         MR. BROTHERS:  Your Honor, the first one I saw

21 is the Constitution of the United States.

22         THE COURT:  Really?  You can't be serious.

23         MR. PERLSON:  Well, that was one of the

24 objections that was made that was overruled.

25         THE COURT:  That's right, I overruled that

1    objection.

2           MR. PERLSON:  Okay.

3           THE COURT:  All right, fine.  I still say what I

4    say.  You go back and look at them tonight and you think

5    about it, and we will come back and see if that list gets

6    whittled down substantially from the 50 demonstrative

7    exhibits.  I'm just telling you that you are wasting

8    paper.

9           Court will be in recess until 5:00.

10          MR. SHERWOOD:  Your Honor, should we stay in the

11   courthouse, or what's the Court's advice with respect to

12   that?

13          THE COURT:  Here's the situation.  They may have

14   a question, so you need to be close by so it won't take

15   long to get everyone here.  If they have a question, we

16   are not going to spend ten minutes looking for counsel,

17   so you need to be close by if they come back with a

18   question so we can address it.

19          MR. SHERWOOD:  Thank you, your Honor.

20          THE COURT:  I know these are not the greatest

21   facilities in the world, but you can find someplace to

22   camp out so that we can get to you quickly to answer any

23   questions they may have.  They may not have any in the

24   next hour, but who knows?  Stay close by, please.

25          MR. SHERWOOD:  Thank you.  Yes, your Honor, of

 1  course.

 2          THE COURT:  Recess court.

 3          (A recess was taken at 4:09 p.m., after which

 4  court reconvened at 5:02 p.m.)

 5          (Jury in.)

 6          THE COURT:  You may be seated.

 7          The record will reflect that all jurors are

 8  present.  Does counsel agree?

 9          MR. SHERWOOD:  Yes, your Honor.

10          MR. NELSON:  Agreed, your Honor.

11          THE COURT:  All right.  Ladies and gentlemen, I

12  think that's it for the day.  We are simply going to have

13  you go out and come back tomorrow.  Although you,

14  perhaps, have chosen your foreperson and you have started

15  to deliberate, do not discuss the case outside the

16  presence of the jury when you come in tomorrow morning

17  and get started.

18          The Court can have you in here as early as you

19  want to get in here and get started tomorrow morning.

20  What the Court will do is the Court will simply have you

21  come in tomorrow morning at 9:30 and start your

22  deliberations.  I think that will give you enough time to

23  do what you need to do.  9:30.

24          All right.  See you in the morning.

25          (Jury out.)

1          THE COURT:  You can have a seat up with second
2   after they leave, please.
3          Who is your technology representative, your
4   computer specialist?
5          MR. PERLSON:  Yusef.
6          THE COURT:  I don't know who I am referring to,
7   but one of your folks had the computer back there on the
8   computers.  The computers were permitted to come into the
9   courtroom merely for the purposes of aiding you in
10  putting on exhibits, not for them to be on the computer
11  and communicating or doing anything, other than using
12  those computers for the purposes of putting on your
13  evidence.  And I don't want that happening again.  So
14  whoever it is, you find them and you tell them that's it,
15  don't come in here and get on a computer for any other
16  purpose than for presenting your evidence.
17         MR. PERLSON:  We will make that clear, your
18  Honor.
19         THE COURT:  All right.  Court will be in recess
20  until tomorrow morning at 9:30.
21         (Court adjourned for the evening recess at
22  5:05 p.m.)
23
24                              *    *    *
25

1                    CERTIFICATION

2          I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5
                        X_____/s/ Sharon B. Borden_____X
6
                         Sharon B. Borden, RMR, FCRR
7
                         X November 1, 2012 X
8
                                   Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25