# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | |
|---|---|
| I/P ENGINE, INC.    Plaintiff, | |
| v. | Civil Action No. 2:11-cv-512 |
| AOL, INC., *et al.*,    Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON INVALIDITY OR NEW TRIAL

Pursuant to Fed. R. Civ. P. 50(b) and 52(b), Defendants respectfully move for renewed judgment as a matter of law that the asserted claims are anticipated by the Culliss prior art reference and invalid for obviousness. Alternatively, pursuant to Fed. R. Civ. P. 59, Defendants respectfully move for new trial on these issues.

As to anticipation based on Culliss, Plaintiff only disputed whether Culliss contains two basic concepts from the asserted claims – content analysis and filtering for relevance to a query. Yet Culliss discloses these concepts on its very face. Thus, no reasonable fact-finder could conclude that Culliss fails to anticipate the asserted claims.

Further, the evidence presented to the jury established the patents as obvious under the applicable *Graham* factors. <u>All</u> the claim elements are found in the prior art, arranged in the same or nearly the same way that they are arranged in the patents-in-suit, and functioning the same way as in the patents-in-suit. Indeed, the best Plaintiff could muster to rebut this showing was to say that it was somehow inventive for the patents-in-suit to "throw the search query over the wall" between a search and filtering system (in other words, provide the query to the filtering system). While the prior art already disclosed "throwing the query over the wall," even if it had not, the slight variation of providing the search query to a filtering system is not the type of

innovation that warrants patent protection under applicable law. *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("If a person of ordinary skill in the art can implement a predictable variation, § 103 likely bars its patentability.")

The jury's findings and Court's conclusions as to obviousness were fundamentally flawed and contrary to law. For example, the Court based its obviousness opinion on the jury's findings that the asserted claims were non-obvious because Defendants' obviousness references "did not disclose a tightly integrated search system and could not filter information relevant to the query." Yet, in its infringement case, Plaintiff successfully argued that the "search system" and "search engine system" preambles of the asserted claim <u>are not even claim limitations</u>. Thus, it was improper as a matter of law to find that Defendants' obviousness references were distinguishable because they supposedly did not disclose a tightly integrated search system. The Court also improperly barred Defendants from introducing from the prosecution history a PTO double patenting rejection which found that the '420 Patent's method of tightly integrating a search system with a filtering system and filtering for relevance to a query <u>was</u> obvious.

Separately, the jury's "factual" findings related to obviousness were fundamentally flawed and provided no basis for the Court's legal conclusion of obviousness. For example, the jury interrogatory related to the scope of the prior art (the first *Graham* factor for obviousness) restricted the jury from viewing the prior art as a whole, as it should have under *Graham*. But even what the jury concluded in this interrogatory response was contrary to the plain disclosures in the prior art. And as to secondary considerations, the jury found that there had been copying of the '420 and '664 inventions, a finding that was unsupported by the evidence and was based on Plaintiff's arguments that should have been precluded by the Court's ruling on Defendants' motion *in limine* on copying. The jury also found that the '664 Patent – but <u>not</u> the '420 Patent –

had been independently invented by others (thus militating in favor of obviousness), despite there being no possible grounds to distinguish between the two patents on this basis.

For all these reasons, and for the reasons set forth in Defendants' Rule 50(a) Motion on Invalidity (D.N. 776), Defendants respectfully request that the Court grant judgment as a matter of law on the issues of anticipation and obviousness or, alternatively, a new trial.

## LEGAL STANDARD

Judgment as a matter of law under Rule 50(b) is required where a plaintiff fails to present substantial evidence for a reasonable jury to rule in its favor. *See* Fed. R. Civ. P. 50(b); *Konkel v. Bob Evans Farms*, 165 F.3d 275, 279 (4th Cir. 1999). A new trial should be granted, even if there is substantial evidence preventing a directed verdict, if the verdict is against the clear weight of the evidence, was based upon false evidence, or will result in a miscarriage of justice. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). When considering a motion for new trial, the court may weigh evidence and consider witness credibility. *Id.* In addition, it is well-established that a new trial should be granted based on errors in the admission or rejection of evidence if the errors were prejudicial. *See Bennett v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 539 (E.D. Va. 2010).

## ARGUMENT

### I. CULLISS ANTICIPATES EACH ASSERTED CLAIM OF THE '420 AND '664 PATENTS

As explained in Defendants' Rule 50(a) Motion on Invalidity (D.N. 776), Culliss meets every limitation of every asserted claim. At trial, Defendants' validity expert, Dr. Ungar, explained how Culliss meets every limitation. (S*ee* Trial Tr. 1346:10-1371:21.) For the majority of these limitations, Dr. Ungar's testimony was undisputed. Plaintiff's validity expert, Dr. Carbonell, argued that Culliss does not anticipate the asserted claims solely because Culliss

allegedly does not disclose content analysis or filtering. Thus, the only disputed limitations were elements [b] and [d] from '420 claims 10 and 25 and element [c] from '664 claims 1 and 26, as these limitations contain the disputed "content analysis" and "filtering" concepts. (*See* Trial Tr. 1871:1-1872:12, 1924:10-13; *see also* PDX 279; PDX 280; D.N. 776, 3-11.) No reasonable jury could have concluded that Culliss fails to anticipate based on any of the undisputed limitations, and the jury's findings indicate they made no such conclusions. For these undisputed limitations, Defendants renew the arguments in their Rule 50(a) Motion and incorporate such arguments into this Motion. (*See* D.N. 776 at 3-11.) As discussed below, no reasonable jury could have found that Culliss lacks the disputed "content analysis" and "filtering" limitations either.

### A.      Overview of Culliss

Culliss is directed to a search engine system that ranks and filters search results based on a combination of the content of the search results and feedback from prior users who had entered the same query and viewed these search results. In Culliss, Internet articles are associated with key terms they contain. (DX-058 at 3:60-64.) For example, two articles about museum-viewing vacations in Paris ("Article 1" and "Article 2") might be associated with the key terms "Paris," "museum," and "vacations" if they both contained those three words. (Trial Tr. 1344:8-11.) These articles are given a "key term score" for each of the key terms that they contain (DX-058 at 3:65-66), and the key term scores might be initially set to reflect how many times each of the key terms appeared in the article's content. (*See id.* at 14:34-36.)

The articles are presented to the user in the order dictated by their combined key term scores. (DX-058 at 5:7-17.) Using the above example, if Article 1 had a key term score of 5 for "Paris," 3 for "museum," and 2 for "vacations," its aggregate score for the query "Paris museum vacations" would be 10 (5 + 3 +2). If Article 2 had a key term score of 4 for "Paris," 2 for "museum," and 3 for "vacations," its aggregate score for the query "Paris museum vacations"

would be 9 (4 + 2 +3).  (Trial Tr. 1344:17-22.)  Thus, Article 1 would be presented above Article 2 because it had a higher aggregate score.  (*Id.* at 1344:24-1345:1.)

When a user selects an article whose squib is presented to him, the key term scores for that article which correspond to the terms in the user's query are increased.  (DX-058 at 4:37-49.)  This is because the user, by selecting the article in response to his query, has implicitly indicated that these key terms from the query are appropriately matched to the article. (*See id.*)  For example, if a first user who queried "Paris museum vacations" selected Article 2, then Article 2's key term scores for "Paris," "museum," and "vacations" might each rise by +1.  (DX-058 at 4:43-45; Trial Tr. 1345:15-21.)  The next user who enters the same query would thus see a different rank of articles, based on the new key term scores that reflect the input of the prior user.  (*See* DX-058 at 4:66-5:1.)  Sticking with the same example, Article 2 would have a new aggregate score of 12 (instead of 9) after the first user selected it, because its key term scores for "Paris," "museum," and "vacations" each increased by +1 when the first user selected it.  Thus, a later user who queries "Paris museum vacations" would see Article 2 (which has a new score of 12) presented above Article 1 (which still has its old score of 10).  (Trial Tr. 1345:25-1346:4.)

In short, the article ranking in Culliss is based on a combination of the articles' content and feedback from previous users who entered the same query.  This is because both factors (article content and user feedback) are used to calculate the articles' key term scores.

## B.      The Jury's Findings on Culliss

The jury found that Culliss does not anticipate the asserted claims.  (D.N. 789, 7).  And in the obviousness section of the jury verdict firm, the jury explained <u>why</u> it believed that the asserted claims were patentably distinct from Culliss (as well as Defendants' other anticipation reference, Bowman).  Specifically, the jury found that "the Bowman and Culliss references identified by Defendants lack any content analysis and filtering for relevance to the query."  (*Id.*

at 8, 9.)  In reaching these conclusions, the jury implicitly adopted the views of Dr. Carbonell, who opined that content-based analysis and filtering are the two claimed concepts that are missing from Culliss.  (Trial Tr. 1924:10-13 ("Q: Now, on your direct examination I think you said that you thought Culliss didn't disclose filtering and didn't disclose content-based analysis; is that right?  A: That's right.").)

As explained below, however, no reasonable fact-finder could conclude that Culliss lacks content analysis or filtering for relevance to the query.  Accordingly, no reasonable fact-finder could conclude that Culliss fails to anticipate the asserted claims.

### C.     Culliss discloses content analysis

Culliss discloses content analysis because an article's key term score in Culliss can be initially set by counting how often terms from the user's query appear in the article.  (DX-058 at 14:34-36; *see also* Trial Tr. 1347:14-19.)  These initial content-based scores are then altered based on user feedback (DX-058 at 4:37-49), so that the final scores are a combination of the initial content-based analysis and the subsequent feedback-based adjustments.

Dr. Carbonell argued that Culliss does not disclose content analysis, but no reasonable fact-finder could credit this position.  Dr. Carbonell did not dispute that Culliss can calculate an article's key term scores in part by counting how often each key term from the query appears in the article's content.  (Trial Tr. 1858:12-1859:21.)  He merely argued that this content-based metric gets diluted over time as an article's key term score gets repeatedly altered by user feedback, so that, for all intents and purposes, Culliss's scores are based only on feedback.  (*See id.*)  Importantly, Dr. Carbonell did not opine that the content-based score ever <u>fully</u> disappears in Culliss.  Instead, he opined that the content score plays "virtually" no role (*id.* at 1859:4) – thus tacitly admitting that the content score does play <u>some</u> role.

However, the fact that the content analysis may play less and less of a role in Culliss's system as more and more user feedback is received does not mean that the content analysis is ever <u>absent</u>. No matter how much feedback is received to alter the initial content-based scores of Culliss's articles, the articles' final scores will always be <u>some</u> combination of content and feedback, and that is all that is required by the claims. Whether Culliss' scores contain "a lot" of content analysis or "a little" content analysis is irrelevant to anticipation. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir. 2005) (finding anticipation where prior art contained "at least trace amounts" of the claimed compound). Furthermore, the feedback received by Culliss can both raise an article's score when the article is clicked on and lower the score when the article is not clicked on. (DX-058 at 4:37-45; 15:12-19.) Thus, the positive and negative feedback adjustments can mostly cancel each other out, leaving a significant or even dominant role for the content score to play in setting an article's overall score.

**D.    Culliss discloses filtering for relevance to the query**

Culliss discloses "filtering" in the specific embodiment where articles' key terms include "rating" key terms like X-rated, G-rated, etc. (DX-058 at 11:8-12:41.) Like the other key term scores, the rating key term scores can be initially set by content analysis (*id.* at 14:23-25) and then altered by user feedback. (*Id.* at 11:47-51.) And these rating key term scores are used to filter the articles – for example, articles with an X-rated key term score above a certain threshold will be filtered out and not displayed to G-rated searchers. (*Id.* at 12:1-5.) As Dr. Ungar explained, excluding articles based on their rating scores is "filtering." (Trial Tr. 1347:20-1348:6.) Thus, not only does this Culliss embodiment "filter," but it also filters "for relevance to the query," since X-rated articles that are not relevant to G-rated queries will be filtered out.

Culliss also states that this rating embodiment can be integrated with the more traditional Culliss embodiments, so that Culliss's articles would receive a variety of key terms, one of

which is the rating key term used for filtering. (*See* DX-058 at 11:39-41 ("The invention, operating separately <u>or in addition to</u> the manner described above, would permit or require the user to enter a rating key term in the search query.") (emphasis added).)

Dr. Carbonell's only argument against this X-rated filtering embodiment was to say that this embodiment would not work well in practice. (Trial Tr. 1862:10-1864:14.) He specifically argued that this X-rated filtering embodiment would not work well for two reasons: (1) some G-rated searchers might have to view X-rated articles before the articles could be labeled as X-rated and filtered out of subsequent searches (*id.* at 1864:8-11); and (2) this embodiment may improperly deem articles to be X-rated just because adults like them. (*Id.* at 1863:12-1864:7).

Dr. Carbonell's argument is legally and factually incorrect. First, even if one fully credited Dr. Carbonell's position that Culliss' X-rated filtering would not work well for the reasons that he states, it is well-settled that "a prior art reference need not demonstrate utility in order to serve as an anticipating reference under section 102." *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1326 (Fed. Cir. 2005). For example, *Rasmusson* noted that a scientific article could be anticipatory even if the method disclosed was completely ineffective at achieving the desired results. *See id.* (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001)). As such, Culliss's X-rated filtering embodiment is anticipatory even if Dr. Carbonell is correct that this embodiment would not work well in practice.

Furthermore, there is no factual basis for Dr. Carbonell's position that Culliss's method would result in innocuous articles being erroneously labeled as X-rated just because adults like them. Rather, articles get high X-rated scores in Culliss' system through a combination of two factors: having X-rated terms in their content (DX-058 at 14:23-25) and being clicked on by

users who entered X-rated terms in their search queries. (*See id.* at 11:39-12:26). Nowhere does Culliss state that an article will be deemed X-rated just because adults like the article.

Because no reasonable fact-finder could conclude that Culliss lacks the disputed claim elements of content analysis and filtering for relevance to the query, Defendants respectfully request judgment as a matter of law that Culliss anticipates all asserted claims.

## II.     THE ASSERTED CLAIMS ARE INVALID FOR OBVIOUSNESS

Obviousness is a question of law, based on underlying facts. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). To determine obviousness, a court must consider: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966). Under these "*Graham* factors," all asserted claims are obvious as a matter of law. No reasonable jury could have found that the claim elements are not met by the prior art or that secondary factors existed to support non-obviousness, and the Court's ruling on non-obviousness (which was wholly grounded in these jury findings) was thus contrary to law.

Alternatively, the Court should grant a new trial on the obviousness question, as the Court improperly excluded critical evidence showing that the PTO itself considered the '420 Patent (and, by extension, the '664 Patent) to be obvious. Furthermore, the jury made findings about secondary considerations of obviousness that are mutually inconsistent, unsupported by the record evidence, and based on Plaintiff's arguments that violated the Court's orders *in limine*. For all these reasons, a new trial on obviousness is warranted.

## A.  Scope and Content of the Prior Art

Plaintiff repeatedly characterized the asserted independent claims as a combination of four color-coded elements for purposes of infringement: (1) yellow searching for information relevant to a query, (2) blue content-based analysis, (3) green collaborative analysis, and (4) purple combining the content and collaborative analysis to filter the information.  (*See* Trial Tr. 425:4-18; 521:16-24.)  The combination of these elements is found in Culliss and also found in the other prior art references raised at trial – the WebHound thesis (DX-049), the Rose patent (DX-034), and the Fab article (DX-050).  Furthermore, named inventor Donald Kosak admitted that content filtering, searching through content filtering, and collaborative filtering all existed in the prior art.  (Trial Tr. 336:3-17).  Thus, all independent claim elements existed in the art.

The Supreme Court has cautioned against granting patents, like the patents-in-suit, that are nothing more than a combination of known prior art elements.  *KSR*, 550 U.S. at 420 ("Common sense teaches [] that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." (emphasis added)).

### 1.  The claim elements are found in the WebHound thesis.

All of the elements cited in Plaintiff's infringement case are found in the WebHound thesis.  As shown in the Abstract of this reference, the WebHound thesis discloses a combination of content-based and collaborative filtering: "This thesis claims that content-based filtering and automated collaborative filtering are complementary techniques, and the combination of ACF with some easily extractable features of documents is a powerful information filtering technique."  (DX-049 at Abstract.)  Thus, the WebHound Abstract alone discloses three of the four elements that Plaintiff contended are required by the independent claims: content-based analysis, collaborative analysis, and combining content and collaborative analysis for filtering.

The WebHound thesis also discloses the fourth element cited in Plaintiff's infringement case – searching for information relevant to a query. Specifically, the thesis discloses that its content-based/collaborative filtering can be used to filter search results obtained by a search engine. (DX-049 at 78 ("[A] WEBHOUND like front-end to a popular search engine such as Lycos, could enable users to filter the results of their searches on the extensive databases complied by these search engines in a personalized fashion."); *see also* Trial Tr. 1293:11-22.) Thus, as Dr. Ungar testified at trial, the WebHound thesis renders obvious the asserted independent claims. (Trial Tr. 1294:19-1295:10.).

## 2. The claim elements found in the Rose patent

The elements from Plaintiff's infringement case are also found in the Rose patent (DX-034). As with the WebHound thesis, the Abstract of the Rose patent discloses content analysis, collaborative analysis, and combining the content and collaborative analysis. Specifically, the Rose Abstract explains that "the prediction of relevance [for information items] is carried out by combining data pertaining to the content of each item of information with other data regarding correlations of interests between users." (DX-034 at Abstract.) The Rose Abstract further explains that "[t]he user correlation data is obtained from feedback information provided by users when they retrieve items of information." (*Id.*) Thus, Rose combines content data with feedback data (from users with correlated interests)[1] to score items.

Rose further explains that "[t]he relevance predicting technique of the present invention . . . can be used to <u>filter</u> messages provided to a user in an electronic mail system <u>and search results</u> obtained through an on-line text retrieval service. (DX-034 at 2:51-55 (emphasis added).)

---

[1] Because the user feedback data in Rose comes from users with correlated interests, it is "<u>collaborative</u> feedback data" under the Court's construction. (*See* D.N. 212 at 4 (construing "collaborative feedback data" as "data from system users with similar interests or needs regarding what informons such users found to be relevant").)

11

In other words, Rose discloses that its content/collaborative scoring method can be used to "filter . . . search results." (*See also* Trial Tr. 1297:22-1298:7.) Thus, as Dr. Ungar testified at trial, the Rose patent renders obvious the asserted independent claims. (Trial Tr. 1298:8-1299:1.)

### 3. The claim elements are found in the Fab article

Finally, three of the independent claim elements from Plaintiff's infringement case – content-based filtering, collaborative filtering, and combining content-based and collaborative filtering – are found in the "Fab" reference (DX-050). (Trial Tr. 1287:16-1288:11.) The very <u>title</u> of the Fab reference is "Fab: Content-Based, Collaborative Recommendation." (DX-050 at 66.) The sub-title goes on to state: "By combining both collaborative and content-based filtering systems, Fab may eliminate many of the weaknesses found in each approach." (*Id.*)

### 4. The elements from the dependent claims are found in the prior art

Moving to the dependent claims, the dependent claim elements are also found in the prior art references discussed above. Neither the jury verdict form nor the Court's obviousness opinion suggests that any dependent claim elements are <u>missing</u> from Defendants' obviousness references, and Plaintiff never argued that any of the dependent elements are missing.

#### (a) <u>'420 claims 14, 15, 27, and 28</u>

'420 claims 14, 15, 27, and 28 require that the feedback data be passive data reflecting a user's actual response to an informon. This element is disclosed by, *e.g.*, Culliss, which passively monitors whether users select articles and adjusts the articles' scores based on the user selections. (DX-058 at 4:37-45; Trial Tr. 1309:16-1310:15.) Furthermore, given that user feedback can comprise only two basic types – active or passive – it would be obvious to modify any "active feedback" reference to disclose passive feedback instead. *See KSR*, 550 U.S. at 421 (where "there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp").

**(b)    '664 claims 21 and 22**

'664 claims 21 and 22 require extracting features from information that indicate the information's relevance to the query or user.  This element is met by WebHound, which uses "extractable features of documents" and analyzes "the importance of [a given] feature relative to the other features for a particular user."  (DX-049 at Abstract, 38; Trial Tr. 1307:10-1308:4.)

**(c)    '664 claims 6 and 28**

'664 claims 6 and 28 require delivering the filtered information to the user.  This element is met by, *e.g.*, WebHound, which discloses <u>returning</u> the top-rated web pages to the user.  (DX-049 at 78 ("[T]he resulting matches could be filtered through WEBHOUND and only the top ranked ones (in terms of predicted rating) need be returned."); *see also* Trial Tr. 1308:5-1309:5.)

**(d)    '664 claim 5**

'664 claim 5 requires that the filtered information be an advertisement.  This element is disclosed by, *e.g.*, Culliss.  (*See* DX-058 at 9:61; Trial Tr. 1309:6-15.)  Furthermore, since advertisements are just one type of information that can be scored and filtered like any other, it would be obvious that the other prior art references disclosed herein could filter advertisements.

**(e)    '664 claim 38**

'664 claim 38 requires scanning a network in response to a demand search.  This element is met by, *e.g.*, Culliss, which discloses a search engine that scans the Internet for articles in response to a single search engine query.  (*See* DX-058 at 4:10-15; Trial Tr. 1346:25-1347:3.)

**5.  The jury's findings on scope of the prior art are flawed**

For the '420 patent, Plaintiff's interrogatory in the obviousness section of the verdict form asked the jury to identify the "scope and content of the prior art."  In response, the jury could choose among "All elements of the asserted claims are found in the prior art," "No prior art applies because (1) the Bowman and Culliss references identified by Defendants lack any

content analysis and filtering for relevance to the query and (2) other references identified by Defendants relate to profile system that do not disclose a tightly integrated search systems [sic] and could not filter information relevant to the query," and "Other, specify." (D.N. 789, 8.) The jury chose the second response, proposed by Plaintiff. The same question and answers appear for the '664 patent, and again, the jury chose the second option. (*Id.*, 9.)

Initially, the supposedly missing elements in Culliss, WebHound, Rose, and Fab <u>did</u> exist in these references, and no reasonable fact-finder could have found otherwise. Furthermore, Plaintiff's interrogatories—and the jury's answers—did not pose the proper question for the first *Graham* factor as a matter of law. The first *Graham* factor requires evaluating of the scope and content of the prior art <u>as a whole</u>. *Graham*, 383 U.S. at 17. Plaintiff's interrogatories do not seek the scope and content of the prior art as a whole, but instead suggest that all claim elements must be found in <u>each</u> prior art reference in order for that reference to "appl[y]" in the context of obviousness. This is just wrong: it is for anticipation, not for obviousness, that all claim elements must be found in a single reference. The first *Graham* factor looks to what existed across all references—*i.e.*, what "pieces of the puzzle" would be available to one skilled in the art to combine. *KSR*, 550 U.S. at 420 ("[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.")

In its order on non-obviousness, the Court pointed only to the jury's findings in the obviousness sections of the verdict form (D.N. 799, 1-2.) Reliance on these findings to make a ruling on obviousness is improper, however, because the options presented to the jury were divorced from the *Graham* factors and thus the jury's findings on obviousness were flawed. *See Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1325 (Fed. Cir. 2001) (holding that JMOL is appropriate where verdict was "premised on incorrect legal standards.")

### B.       Differences Between the Claims and the Prior Art

As detailed above, there are no differences between the claims and the prior art.  But even if there were any differences, including those that Plaintiff argued supposedly existed, such differences would have been easily overcome and obvious to overcome.

#### 1.   Any differences in the prior art would have been obvious

In concluding that the asserted claims are not obvious, the Court relied on the jury's findings that "Rose, Lashkari [*i.e.*, WebHound], and Fab, were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query."  (D.N. 799 at 2 (quoting D.N. 789 at 8, 9.))  In making its findings on this issue, the jury implicitly credited Dr. Carbonell's position that references such as WebHound and Rose may filter search results received from search systems, but do not tightly integrate search and filtering systems or use the search query when filtering in order to filter information relevant to the query.  (*See* Trial Tr. 1835:24-1836:10; 1875:10-23.)

Defendants respectfully submit that the jury's findings (and, thus, the Court's legal conclusions based on these findings) were erroneous.  First, despite Dr. Carbonell's repeated reference to "tight integration" as a key component of the claimed invention, the words "tight integration" or "tightly integrated" appear nowhere in the asserted claims or the Asserted Patents' shared specification.  Second, Plaintiff successfully argued at trial that the claim preambles – such as "a search system" from '664 claim 1 and "a search engine system" from '420 claim 10 – are not even limitations of the claims.  (Trial Tr. 1188:12-1194:24.)  Defendants were not even allowed to <u>mention</u> the "search" preambles in attempting to distinguish the accused products from the patents-in-suit.  (*See id.*)  If a search system is not a claim limitation for purposes of infringement, then it is improper as a matter of law to say that Defendants' obviousness references are lacking because they "do not disclose a tightly integrated search

system." (D.N. 799 at 2). To put it another way, it is legally improper to say that the claims require a "tightly integrated search system" for purposes of invalidity but do not require a search system of any kind for purposes of infringement. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

Third, even if "tight integration" of search and filtering were a required claim element, the obviousness of this element is shown by the fact that Mr. Lang and Mr. Kosak had <u>no</u> search experience before going to work for Lycos in the Spring of 1998 – yet, by December of that same year, they were able to file the '420 Patent application that supposedly achieves this "tight integration." (Trial Tr. 1897:19-1898:16.) Mr. Lang acknowledged that he could not identify any technical hurdles or barriers that he and his co-inventor had to overcome in order to come up with the claimed invention. (*Id.* at 273:3-10.)

As for Dr. Carbonell's position that references such as WebHound and Rose do not use the search query when filtering in order to filter information relevant to the query, it would be obvious as a matter of law to modify these references so that the search query <u>would</u> be used in the filtering process. As Dr. Ungar pointed out at trial, "[I]f you are filtering search results, it's obvious to keep around the query and use that also for filtering . . . just think about it. If you ask a query of a search engine, you get a result, you just have the query sitting there with the result, why not use that also for filtering." (Trial Tr. 1317:25-1318:7.)

Dr. Carbonell's contrary position that it would be <u>non</u>-obvious to use the search query when filtering is also belied by the Asserted Patents themselves. In their discussion of the prior art, the Asserted Patents' shared specification states that "conventional search engines initiate a search in response to an individual user's query and use content-based filtering to compare the

query to accessed network informons . . ."  (DX-001 at 2:15-18 (emphasis added).)  This disclosure underscores how using the search query when filtering is hardly inventive.

Dr. Carbonell's own trial metaphor illustrates this point.  According to Dr. Carbonell, prior art references such as WebHound and Rose ran a search and "tossed" the search results "over the wall" to a profile-based filtering system, but did not toss the search <u>query</u> over the wall so it could be used by the filtering system.  (*See* Trial Tr. 1834:9-1835:2; 1874:2-17; 1880:10-15.)  Thus, modifying WebHound and Rose to disclose the elements that the jury found lacking would simply require tossing the search <u>query</u> over the wall so that the filtering step could "filter information relevant to the query."  Given that WebHound and Rose already toss search <u>results</u> over the wall by Dr. Carbonell's own admission, it would be obvious as a matter of law to simply toss the search <u>query</u> over the wall as well.  This is particularly true given Dr. Carbonell's admission that using the search query when filtering would yield superior results (*id.* at 1875:19-1876:12), thus providing a suggestion or motivation for one of skill in the art to apply this technique to the prior art.  *See KSR*, 550 U.S. at 417.

Furthermore, Culliss uses the search query when scoring and filtering items, because Culliss's content scores compare words in the query to words in the items and Culliss's feedback scores utilize feedback from users who entered the same or a similar query.  (*See* DX-058 at 4:10-15, 4:37-45, 14:34-36.)  Thus, one of ordinary skill could draw upon these Culliss disclosures (if necessary) in order to modify WebHound or Rose to use the search query for filtering.  *See KSR*, 550 U.S. at 421 (holding that claims are obvious if they are an obvious combination of prior art elements).  By focusing solely on the claim elements that were allegedly missing from WebHound or Rose, without considering whether other references such as Culliss could supply these missing limitations, the Court's obviousness conclusion was legally

erroneous.  *See KSR*, 550 U.S. at 420 ("[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.")[2]

Finally, as explained in Defendants' Non-Infringement JMOL, filed concurrently herewith, Plaintiff essentially read the "to the query" sub-element out of the asserted claims for its infringement case by adducing no evidence that Google filtered for relevance to the query. Plaintiff cannot erase the "to the query" sub-element from its infringement case and yet distinguish Defendants' obviousness references on the ground that they do not use the query when filtering.  *See Amazon.com*, 239 F.3d at 1351.

### 2.    The jury's findings on differences between the claims and the prior art are flawed

Plaintiff's interrogatory on the verdict form asked the jury about the difference between the claimed invention and the prior art.  For the '420 Patent, the choices were: "no patentable differences," "The Bowman and Culliss references did not disclose either limitation (b) (a content-based filter and could filter information relevant to the query [sic] or (d) (combining feedback data with content profile data) of independent claims 10 and 25.  The other asserted references – Rose, Lashkari, and Fab, were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query," or "Other, specify."  (D.N. 789, 8.)  The choices were the same for the '664 Patent, except that the second choice was: "The Bowman and Culliss references do not disclose limitation (c) of the independent claims 1 and 26, because those references do not have a content-based filter that

---

[2]    As to differences between <u>Culliss</u> and the asserted claims, the jury's interrogatory response on obviousness stated that Culliss did not disclose the content analysis and filtering limitations of the asserted claims.  *See* Section II(B)(2), *infra* (quoting the jury's interrogatory responses).  As explained above, Culliss <u>does</u> unequivocally disclose these limitations, and thus the jury's interrogatory response was unsupportable.  For the same reason that Culliss anticipates all asserted claims, Culliss can certainly be used to help render the asserted claims obvious.

could not filter information relevant to a query, or combine information from a feedback system with content profile data.  The other asserted references – Rose, Lashkari, and Fab, were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query." (*Id.*, 9-10.)  The jury chose the second option for both questions. Because there are no patentable differences between the scope of the claimed invention and what is disclosed in at least Culliss, no reasonable fact-finder could have found as the jury did, as detailed above.  Yet the Court relied on the jury's fundamentally flawed answer to this interrogatory in its order on non-obviousness.  (D.N. 799, 1-2.)

C.    **The Level of Ordinary Skill in the Art**

As Dr. Ungar explained at trial, a person of ordinary skill in the art for the Asserted Patents would have a bachelor's degree in computer science (or an equivalent degree) plus 2-3 years experience in the field of information retrieval.  (Trial Tr. 1311:15-20.)  Dr. Carbonell had a very similar formulation for the person of ordinary skill in the art.  (*Id.* at 1284:8-18.)  Given the prior art disclosures recited above and the few (if any) differences between the asserted claims and the prior art, such a person would have found the asserted claims to be obvious.  (*Id.* at 1311:25-1312:4.)  This is particularly true given that asserted claims do not use content filtering, collaborative filtering, and search in any new or different way from the way that these elements were used in the prior art.  (*Id.* at 1312:5-22.)  Thus, there would have been no barriers to prevent a person of ordinary skill from combining these elements the way they are combined in the Asserted Patents.  (*Id.* at 1312:23-1313:4.)  *KSR*, 550 U.S. at 417 ("[A] court must ask whether the improvement [in a patent] is more than the predictable use of prior art elements according to their established functions.")

**D.     No Secondary Considerations Can Rebut the Obviousness Showing**

A patentee may rebut an obviousness showing by pointing to "secondary considerations" of non-obviousness, such as commercial success of the patented invention, failure of others to create the patented invention, or showing that the patented invention filled a long-felt and unsolved need. *KSR*, 550 U.S. at 406 (citing *Graham*, 383 U.S. at 17-18). In this case, however, there were no secondary considerations that a reasonable jury could have found which might rebut the obviousness of the '420 and '664 Patents. The jury's findings to the contrary are unsupported and inconsistent, and the Court's reliance on them was contrary to law.

**1.  There was no evidence of copying, and Plaintiff's argument as to copying should have been excluded pursuant to the Court's order**

Prior to the trial, Defendants filed a motion *in limine* to preclude Plaintiff from offering evidence or argument of Defendants' pre-suit knowledge or copying of the patents-in-suit. (D.N. 299.) The Court granted this motion. (D.N. 705.) Notwithstanding the Court's ruling, and notwithstanding the absence of any evidence on this point (which was why Defendants' motion *in limine* on copying was properly granted in the first place), Plaintiff made reference to copying and pre-suit knowledge in its opening statement and closing argument. In its opening statement, for example, Plaintiff implied that Google copied the '420 and '664 Patents:

> You'll have to draw your own conclusions about where the Google AdWord system came from, but I don't believe you'll see any Google documents that explain how the system that's accused was developed. I don't know how Google came up with this technology, but I do know how Ken Lang and Don Kosak came up with the technology. And, in fact, the evidence will also show that before Google launched its Smart system, it had actually cited '420 patent in a patent application of its own on another subject.

(Trial Tr. 122:4-13.) Defense counsel objected to this portion of the opening statement, but it was not stricken. (*Id.* at 122:14-19).

During its closing argument, Plaintiff argued that because Google did not present evidence about the development of Smart Ads, "there was no Google development story" (Trial Tr. 1986:24-25), and again suggested that this meant Google had copied Plaintiff's patents. (*Id.* at 1996:18-23.) Additionally, Plaintiff presented evidence that a Google patent cited the '420 Patent, in order to argue (in contravention of the Court's ruling on the motion *in limine*) that Google had knowledge of the '420 Patent. When Plaintiff attempted to introduce this evidence during the direct examination of Ken Lang (and, as noted above, during opening statement), Defendants objected. (Trial Tr. 251:18-19.) When the Court asked why Plaintiff was moving the Google patent into evidence, Plaintiff responded that "it has to do with the patents that were cited here in the '420 patent being cited in 2003," and Plaintiff was allowed to proceed. (*Id.* at 251:20-252:5.) Plaintiff did not explain why it would be relevant that certain patents were co-cited in the '420 Patent and a Google patent, and Plaintiff's true motive – to argue, in contravention of the Court's ruling, that Google had knowledge of the '420 Patent – was evidenced in its closing argument:

> Why didn't [Google] call Lycos? Its patent lawyers knew about the '420 patent because the Patent Office cited it to them. **That's why we moved to admit PX-416 in your binders into evidence to show that the Google patent owners knew about the '420 patent.**

(*Id.* at 1997:20-25 (emphasis added).) In other words, Plaintiff admitted during its closing argument that it had offered evidence in violation of the Court's order precluding evidence about willfulness, copying, or pre-lawsuit knowledge of the patents. Plaintiff's arguments misled the jury, which found that "[c]opying of the claimed invention by others" had been established. (D.N. 789 at 9, 10.) In light of the Court's ruling on the motion *in limine*, this factor should not even have been included on the verdict form in the first instance, and Plaintiff should have been precluded from making the arguments it did.

Even leaving aside the procedural impropriety of Plaintiff's copying arguments, Plaintiff did not present any <u>evidence</u> that could lead a reasonable jury to find that Defendants had copied the '420 and '664 Patents. Plaintiff's innuendo that "there was no Google development story" could not lead a reasonable fact-finder to conclude that Google had copied the '420 and '664 Patents. Nor could the mere fact that one Google patent cited the '420 Patent. Thus, there was no basis for a reasonable jury to find that Google had copied the '420 and '664 Patents.

### 2. There was evidence of independent invention

The prior art introduced during trial provided evidence of independent invention before or at about the same time as the named inventors thought of the claimed invention. Apparently the jury agreed at least in part, because the jury found that the '664 Patent had been independently invented by others before or at about the same time as the named inventors thought of it. (D.N. 789, 9-10.) This finding supports the obviousness of the '664 Patent. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Intern. LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010) ("Independently made, simultaneous inventions, made 'within a comparatively short space of time,' are persuasive evidence that the claimed apparatus 'was the product only of ordinary mechanical or engineering skill.'"). Although the Court's ruling on non-obviousness relied entirely on the jury's findings, the Court did not address this finding that strongly supports the obviousness of the '664 Patent. (D.N. 799.)

Having found that there was evidence of independent invention for the '664 Patent, the jury should also have found that there was such evidence for the '420 Patent, as the evidence introduced did not support any distinction between the two patents on this basis. Rather, Plaintiff's obviousness arguments were identical for the '420 and '664 Patents: for example, Plaintiff referred to the two patents collectively as "the Lang and Kosak invention." (Trial Tr. 1875:10-23.) The jury's internally-inconsistent findings further show how the jury's findings

relating to obviousness were flawed.  No reasonable jury, having found that the '664 Patent <u>was</u> independently invented, could have found that the '420 Patent was <u>not</u> independently invented.

### 3.  There was no evidence of acceptance by others

Plaintiff did not present evidence of "[a]cceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention," contrary to the jury's findings on this issue.  (D.N. 789 at 9-10.)  Plaintiff's own witness Dr. Carbonell testified that he was not aware of praise for the claimed inventions.  (Trial Tr. 1933:20-23.)

Nor did Plaintiff present evidence of licensing of the claimed inventions.  The only evidence in the record that the patents were ever licensed was the license-back provision in the sales contract between Lycos and Plaintiff for the patents-in-suit.  Plaintiff did not argue that this license-back provision was evidence of non-obviousness, nor could it: Lycos's 30(b)(6) deponent Mark Blais said that Lycos placed no monetary value on the license-back provision, and that it was just "cross our T's, dot our I's and be protected going forward so nobody could sue us on patents we sold, or I'd look like an idiot."  (D.N. 818-2 at 139:7-14.)  But in order for secondary indicia of non-obviousness to be accorded substantial weight, "the proponent must establish a nexus between the evidence and the merits of the claimed invention."  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).  Plaintiff cannot establish any such nexus, as the Lycos license was simply pro forma and unrelated to the merits of the patents.  Thus, no reasonable fact-finder could have reached the jury's conclusion of acceptance by others.

### 4.  There was no evidence of other secondary considerations supporting a finding of non-obviousness

The jury also found that the secondary considerations of commercial success, long-felt need, and unexpected and superior results from the claimed invention were present.  (D.N. 789, 8-10.)  Yet these secondary considerations are also unsupported by the record evidence.

For example, there was no commercial success for these patents – in fact, the patents were never commercially used at all by anyone who ever owned them. (Trial Tr. 332:7-12, 339:18-341:5, 1315:4-16.) Furthermore, "[t]he commercial success of a product is relevant to the non-obviousness of a claim only insofar as the success of the product is due to the claimed invention." *Geo. M. Martin*, 618 F. 3d at 1304. Although Dr. Carbonell testified that the commercial success of search engines like Google is evidence of commercial success, no search engine was even accused in this case. (Trial Tr. 1886:25-1887:5.) Even assuming that the accused products in this case infringed the patents, Plaintiff never presented evidence that the success of these products was due to the claimed inventions, and the testimony on the record indicates that it was not. For instance, Google had an established base of users, a strong brand name, and extensive infrastructure prior to its alleged implementation of the patented features. (Trial Tr. 1588:2-1590:1.) Even Plaintiff's own technical expert admitted that calculation of predicted clickthrough rate was Google's own invention and not taught by the patents, and its damages expert acknowledged that the accused product "includes a lot more than just the technology that's accused of infringement." (*Id.* at 918:8-12.)

Nor did these patents fill any long-felt need. To the contrary, numerous prior art references had <u>already</u> solved the problem of combining content-based and collaborative filtering, in order to resolve the weaknesses of each individual method on its own. (*See* Section II(A), *supra*; *see also* Trial Tr. 1316:10-15.) For the same reason, the patents did not produce superior or unexpected results as compared to the prior art.

Finally, the jury found that for the '420 invention, but not for the '664 invention, there had been unsuccessful attempts by others to find the solution that is provided by the invention. (D.N. 789 at 8, 10.) Dr. Carbonell stated generally that both he and the prior art had tried

unsuccessfully to come up with the patented invention. (Trial Tr. 1888:2-14). Yet he provided no details to support this conclusory statement, and thus there was no concrete evidence to support the jury's finding of unsuccessful attempts. Furthermore, even if the jury fully credited Dr. Carbonell's conclusory statement on unsuccessful attempts, Dr. Carbonell's statement provided no basis for the jury to draw a distinction <u>between</u> the '420 invention and the '664 invention on this ground, as the jury did. The mutual inconsistency of these findings further shows how the jury's findings on obviousness were fundamentally flawed and no reasonable fact-finder could have made these findings. The Court should not have relied – let alone solely relied – on the jury's fundamentally flawed findings in its obviousness ruling.

In sum, under a proper application of the *Graham* factors, no reasonable fact-finder could have found that the asserted claims are non-obvious. Accordingly, Defendants respectfully request judgment as a matter of law that all asserted claims are invalid for obviousness.

## III. DEFENDANTS ARE ENTITLED TO A NEW TRIAL ON INVALIDITY

### A. The Court improperly excluded critical evidence about how it would be obvious to tightly integrate a search and filtering system in order to filter information relevant to a query

Even if the asserted claims are not deemed obvious as a matter of law, Defendants are at least entitled to a new trial on obviousness because the Court improperly excluded a critical piece of evidence about how it would be obvious to tightly integrate search and filtering systems in order to filter information relevant to a query. As discussed above, tightly integrating search and filtering in order to filter information relevant to the query were the concepts that the jury found missing from Defendants' obviousness references. Because the Court improperly excluded critical evidence on this point, Defendants were prejudiced.

Defendants sought to show the jury, and elicit testimony about, demonstrative exhibits DDX 3.35 and 3.36 during Dr. Ungar's direct testimony on obviousness. DDX 3.35 and 3.36 are

excerpted and highlighted portions of the '420 prosecution history, which was previously admitted into evidence in its entirety as DX-004. DDX 3.35 highlights the double-patenting rejection of the '420 Patent that occurred during the prosecution history. Specifically, the PTO rejected the '420 Patent as obvious over its predecessor, the '799 Patent. The PTO acknowledged that the '420 Patent added search elements that were not present in the '799 Patent, given that the '799 Patent merely taught a content/collaborative filtering system with no search elements whatsoever. Nonetheless, the PTO found that the '420 Patent was not patentably distinct from the '799 Patent because "it would have been obvious to one of ordinary skill in the art at the time of the invention to have implemented the information filtering system of Lang et al. (U.S. Patent no. 5,867,799) wherein the computer network provided thereof . . . would have incorporated a search engine." (*See* DX-004, IPE 0002092-93.) DDX 3.36 was the terminal disclaimer in response to this office action, where the '420 applicants essentially acceded to the obviousness rejection by filing the terminal disclaimer that restricted the '420 Patent's term to the '799 Patent's term. (*Id.* at IPE 0002109 ("A terminal disclaimer is enclosed herewith. The terminal disclaimer should overcome the double-patenting rejection.").)

After Plaintiff objected to the introduction of these demonstratives and testimony about the portions of prosecution history disclosed therein, the Court overruled the objection to DDX 3.36 but sustained the objection to DDX 3.35. In doing so, the Court did not explain its rationale, but instead simply stated, "This may make no sense to you, but the first one I sustain the objection to the 3.35, and I overrule the objection to 3.36." (Trial Tr. 1268: 15-17.)

The Court's ruling allowing the publication of DDX 3.36 showing the terminal disclaimer, but excluding publication of the double-patenting rejection and related testimony, was akin to sustaining the objection as to both. The terminal disclaimer slide means nothing on

its own; it simply reveals that a terminal disclaimer was filed. The terminal disclaimer only becomes meaningful when viewed alongside the double-patenting rejection that it was submitted to overcome — a double-patenting rejection in which the PTO found that the '420 Patent was an obvious improvement over a content/collaborative filtering system.

The Court's ruling excluding DDX 3.35 (the double-patenting rejection) and Dr. Ungar's testimony about the double-patenting rejection was also contrary to law. The Federal Circuit has consistently held that it is appropriate to consider the prosecution history of a patent when analyzing obviousness. *See, e.g.*, *Schiele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1261 (Fed. Cir. 2012) ("The presumption [of validity] applies to all issued claims. That does not mean, however, that we should not consider the prosecution history. We can take it all into account . . . in our obviousness analysis."); *Andersen Corp. v. Pella Corp.*, 300 F. App'x 893, 899 (Fed. Cir. 2008) (discussing prosecution history in analyzing obviousness). There is no exception where, as here, an obviousness-type double patenting rejection is cured by a terminal disclaimer. Accordingly, there was no basis to exclude DDX 3.35 or Dr. Ungar's testimony about DDX 3.35.

This is particularly true given that Plaintiff was allowed to introduce and elicit testimony about portions of the prosecution history that it deemed helpful to its own case. For example, Plaintiff elicited testimony about the Notice of Allowance from the '664 prosecution history in an effort to show that the PTO considered this invention to be novel. (Trial Tr. 1487:11-1490:10). Because Plaintiff used the prosecution history to argue that the PTO deemed the patents to be novel, simple fairness required that Defendants be allowed to "complete the story" by using the prosecution history to show how the PTO considered the patents to be <u>non</u>-novel in important respects. Instead, not only were Defendants barred from presenting the relevant prosecution history to the jury on obviousness, but Plaintiff was allowed to present the

prosecution history in a misleading way to which the Court's rulings prevented Defendants from meaningfully responding. *See U.S. v. Williams*, 106 F.3d 1173, 1177 (4th Cir. 1997) (where one party "opened the door" to a particular issue, other party is allowed to elicit additional testimony about this issue to prevent "mislead[ing] the jury" through one-sided testimony).

Furthermore, Defendants were severely prejudiced by the Court's error in excluding DDX 3.35 and related testimony. The significance of this double-patenting rejection to the obviousness question can hardly be overstated. There has never been any dispute that Defendants' obviousness references, such as WebHound and Rose, teach hybrid content/collaborative filtering. The jury found that these references do not render the asserted patents obvious solely because these references "did not disclose a tightly integrated <u>search</u> system and could not filter information <u>relevant to the query</u>." (D.N. 789 at 8, 9) (emphasis added). Thus, the jury implicitly found that the patents-in-suit require these search-related elements, that Defendants' obviousness references did not teach these elements, <u>and that it would not be obvious to modify Defendants' references to meet these elements</u>.

Yet the PTO's double-patenting rejection found that it <u>would</u> be obvious to modify a content/collaborative filtering system – namely, the '799 Patent – in order to meet the search elements taught by the '420 Patent. Thus, the PTO reached the opposite conclusion that the jury reached about whether the '420 Patent is an obvious improvement over a content/collaborative filtering system. While the jury is of course not <u>obligated</u> to follow the PTO's conclusions on questions of obviousness, the PTO's conclusion that the '420 Patent is obvious over a content/collaborative filtering system is a highly relevant data point that the jury should have been allowed to consider. Furthermore, given that Plaintiff's obviousness arguments were

identical for the '420 and '664 Patents,[3] the exclusion of this evidence infected the jury's findings on the obviousness of the '664 Patent as much as it did for the '420 Patent.

Given the importance of the excluded evidence, it would be highly speculative for the Court to conclude that this evidence could not have affected the outcome of this case. As such, Defendants were prejudiced by the Court's ruling. *See Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 54 (4th Cir. 1993) ("We cannot determine that the evidence did not adversely affect the outcome of the case . . . . Accordingly, we conclude that a new trial is necessary in this case."); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 305 (4th Cir. 1984) (same). Accordingly, Defendants are entitled to a new trial on obviousness.

**B.      The Jury's Findings Related to Obviousness Are Fundamentally Flawed**

The jury's findings related to obviousness are fundamentally flawed. As described above, the jury's findings on secondary considerations were mutually inconsistent and devoid of evidentiary support. For example, the only basis for the jury's findings on copying was Plaintiff's remarks in opening statement and closing arguments, which were not supported by the evidence and which violated the Court's order *in limine*. Furthermore, as described above, the questions presented to the jury relating to the scope of the prior art and the differences between the prior art and the claimed inventions rely on the incorrect standard and so should not have informed the Court's ruling on non-obviousness. But in its order on non-obviousness, the Court pointed only to the jury's findings. (D.N. 799, 1-2.) Accordingly, the pervasive flaws in the jury's obviousness findings warrant the granting of a new trial on obviousness.

---

[3] For example, in contrasting the '420 and '664 Patents with Defendants' obviousness references, Plaintiff referred to the '420 and '664 Patents collectively as "the Lang and Kosak invention" without differentiating the two Patents from each other. (*See* Trial Tr. 1875:10-23.)

In sum, Defendants are at least entitled to a new trial on anticipation and obviousness. The jury's finding that Culliss does not anticipate the asserted claims went against the clear weight of the evidence. And the court's obviousness ruling was based on jury findings that were mutually inconsistent and poisoned by Plaintiff's copying arguments that violated the Court's order *in limine*. The obviousness analysis was further hindered by the unjustifiable exclusion of evidence showing that the PTO itself considered the patents to be obvious improvements over a content/collaborative filtering system. For all these reasons, a new trial on anticipation and obviousness should be granted. Moreover, as explained in Defendants' Motion on Damages, should the Court deny Defendants' JMOL on damages, a new trial on all issues would be appropriate given that Plaintiff's conduct in relation to damages poisoned the entire trial.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request judgment as a matter of law that each asserted claim of the '420 and '664 Patents is anticipated by Culliss and invalid for obviousness. In the alternative, Defendants request a new trial.

DATED: December 18, 2012

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com

davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation, IAC Search & Media, Inc., and Gannett Co., Inc.*

  */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile:  (757) 624-3169
senoona@kaufcan.com

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW,  GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile:  (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile:  (415) 653-6444

*Counsel for Defendant AOL Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC  20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA  23510
Telephone:  (757) 623-3000
Facsimile:  (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

　　　　　　　　　　　　　　*/s/ Stephen E. Noona*
　　　　　　　　　　　　　　Stephen E. Noona
　　　　　　　　　　　　　　Virginia State Bar No. 25367
　　　　　　　　　　　　　　KAUFMAN & CANOLES, P.C.
　　　　　　　　　　　　　　150 West Main Street, Suite 2100
　　　　　　　　　　　　　　Norfolk, VA 23510
　　　　　　　　　　　　　　Telephone:  (757) 624-3000
　　　　　　　　　　　　　　Facsimile:  (757) 624-3169
　　　　　　　　　　　　　　senoona@kaufcan.com