**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

_____
                                              )
I/P ENGINE, INC.,                             )
                                              )
              Plaintiff,                      )
       v.                                     )         Civ. Action No. 2:11-cv-512
                                              )
AOL, INC. et al.,                             )
                                              )
              Defendants.                     )
_____)


**MEMORANDUM IN SUPPORT OF PLAINTIFF I/P ENGINE, INC.'S**
**MOTION FOR AN AWARD OF POST-JUDGMENT ROYALTIES**

Plaintiff I/P Engine, Inc. ("I/P Engine") requests that Defendants be ordered to pay an

ongoing running royalty for their continuing infringement of I/P Engine's patents.  Defendants

should be required to pay such royalties from the date of entry of final judgment in this action

(November 20, 2012) until Defendants either cease their infringement, or until the expiration

date of the patents-in-suit (April 4, 2016).

I.      **BACKGROUND**

I/P Engine brought this action to seek redress for Defendants' infringement of U.S. Patent

Nos. 6,314,420 ("the '420 patent") and 6,775,664 ("the '664 patent").  On November 21, 2012,

the clerk entered this Court's final judgment based on a jury's verdict against Defendants on the

issue of infringement.  The Court's judgment found that Defendants' use of AdWords,

comprising Google's AdWords, AdSense for Search and AdSense for Mobile Search systems,

and AOL's infringing Search Marketplace system, infringed all of the asserted claims of the '420

and '664 patents, and that I/P Engine is entitled to a running royalty of 3.5%.  D.I. 801.  This

Court additionally entered judgment based on the jury's findings that the '420 and '664 patents

1

are valid, i.e., not anticipated or rendered obvious by prior art.  D.I. 799.  The judgment also included awards of past damages against each Defendant.  D.I. 801.

## II.    LEGAL STANDARD

The essential right granted to patentees is the "right to exclude others from making, using, or selling the invention throughout the United States."  *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 669 (1990) (quoting 35 U.S.C. § 154).  That right is rooted in the U.S. Constitution:

> Congress shall have the power to … promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

U.S. Const. Art. I, § 81, and codified in statute by Congress:

> Every patent shall contain … a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States….

35 U.S.C. § 154(a)(1).  Underlying the U.S. patent regime is a strong public interest in protecting inventors' rights and maintaining the integrity of the patent system as a whole.  *See, e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 2:03-cv-00597, 2010 U.S. Dist. LEXIS 144259, at *6 (D. Ariz. Sept. 8, 2010), *aff'd* 2012 WL 414373 (Fed. Cir. Feb. 10, 2012).  That public interest is disserved if an infringer can profit by continuing to deliberately infringe a valid patent.  *Bard*, 2010 U.S. Dist. LEXIS 144259 at *6.

In the absence of an injunction, a patentee is entitled to receive ongoing royalties that adequately compensate him for the loss of his lawful right to exclude others from profiting from his invention.  *See, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007); *Paice LLC v. Toyota Motor Corp.*, 600 F. Supp. 2d 620, 630 (E.D. Tex. 2009) (awarding running royalties on remand).  When confronted with ongoing infringement after judgment has

been entered, the question for this Court is: "what amount of money would reasonably compensate a patentee for giving up his right to exclude yet allow an ongoing willful infringer to make a reasonable profit?" *Paice LLC*, 609 F. Supp. 2d at 624 (citing factor 15 of *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).[1] Calculation of a royalty in these circumstances requires determination of two separate and distinct amounts: 1) the royalty base implicated by the infringement and 2) the royalty rate, or the percentage of that base "adequate to compensate" I/P Engine for the infringement. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1208 (Fed. Cir. 2010); *Cornell Univ. v. Hewlett–Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).

The proper apportioned royalty base is the revenue associated with the use of the patented technology, which segregates the revenue associated with the non-infringing portions of the technology. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (stating that "the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . .") (quotations omitted) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). With respect to the royalty rate, the Federal Circuit has set forth general principles that should guide a district court in setting a post-judgment ongoing-royalty rate. First, the determination of a post-verdict ongoing royalty rate is an equitable determination that is "committed to the sound discretion of the district court" and does not require a trial by jury. *Amado*, 517 F.3d at 1362, n.2; *Paice*, 504 F.3d at 1315-16. Second, district courts must take account of the fact that

---

[1] By statute, a reasonable royalty represents the bare minimum an infringer would have to pay for use of an invention. 35 U.S.C. § 284 ("the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty") (emphasis added); *Rite-Hite Corp. v Kelley Co.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc) (stating that the purpose of the statute is to set "a floor below which damage awards may not fall") (citation omitted).

"[t]here is a fundamental difference … between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." *Amado*, 517 F.3d at 1361.[2]  Failing to take into account the change in the post-verdict positions of the parties would be manifestly unjust. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158-59 (6th Cir. 1978) ("Determination of a reasonable royalty, after election [of risking an infringement finding] cannot, without injustice, be treated as though the infringer had elected [to negotiate a license] in the first place.").  This Court "must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property." *Paice*, 600 F. Supp. 2d at 630.

## III.   THIS COURT SHOULD ORDER DEFENDANTS TO PAY RUNNING ROYALTIES FOR THEIR ONGOING INFRINGEMENT

Determining the appropriate post-judgment running royalty involves three steps: (1) determining the appropriate royalty base, (2) determining the appropriate royalty rate, and (3) determining the frequency of the royalty payment.  Each is discussed below.

### A.    The Appropriate Royalty Base Is 20.9% of Defendants' U.S. AdWords Revenue

The evidence presented at trial established that, by 2007, Google's implementation of the infringing SmartAds technology generated a positive impact of at least 20.9% on Google's U.S. AdWords revenues.  Dr. Becker testified during trial that slides 37 and 38 of Google's "Revenue Force" document (PX-64) – titled "Cumulative Product Impact on RPM" – showed that, by the fourth quarter of 2007 and beyond, the infringing elements of the SmartAds technology added 20.9% to Google's AdWords revenue.  *See* PX-64 and Trial Tr. 802:24-803:8.  This was

---

[2]  This fundamental difference stems from the fact that, pre-verdict, liability "is uncertain and damages are determined in the context of that uncertainty."  *Id*. at 1362.

confirmed by Google's own documents and statements, as Dr. Becker testified.  For example, with respect to PX-34, Dr. Becker testified:

> It provided some qualitative support for the things that I was seeing in the quantitative data, namely that Smart Ads, as the gentleman said, is a big deal revenue-wise.  I think it had a large revenue impact on Google, and, in particular, in that last little bit of a clip we see the presenter stating that it had -- when SmartAss -- Smart Ads, excuse me, was turned on, it had a 20 percent impact on RPM and that now at the time of the presentation the impact was possibly greater than 40 percent.

Trial Tr. 809:25-810:9; *see also* PX-32.  Referring to PX-337, Dr. Becker used Google's own words that the infringing technology is a "mission critical component to the overall Google revenue stream" in testifying:

> So the sentence I have asked to be highlighted here says the pCTR, and that's as I understand it, predicted click-through rate that comes out of Smart Ads, 'The pCTR plays a central role in the ad ranking and pricing, and is a significant factor in the function of disabling an ad or promoting it to the top region of the search results page, making this SmartASS model a mission critical component to the overall Google revenue stream.'

Trial Tr. 817:13-21; PX-337; *see also* PX-228 at 19; Trial Tr. 818:24-819:3, 820:8-18, 821:6-15.

This evidence was unrebutted.  Defendants failed to provide any documents or testimony to dispute Dr. Becker's analysis.  This Court should rely upon and apply this evidence to establish the royalty base by apportioning 20.9% of Defendants' U.S. AdWords revenues.  The record evidence of the 20.9% ongoing revenue enhancement due to Defendants' infringement is the *only* evidence that provides a reliable and tangible basis to apportion the revenue associated with the infringing technology.  This apportionment appropriately excluded from the revenue base other elements of Google's revenues that are attributable to capabilities present in Google's system prior to Google's implementation of the infringing technology, as well as improvements to Google's system that have been implemented during or after the implementation of the infringing technology that are unrelated to the infringing technology.  Trial Tr. at 779:11-781:4.

**B.      The Royalty Rate For Defendants' Ongoing Infringement Should be Greater Than 3.5%**

To establish the ongoing royalty rate, this Court should use as a starting point the jury's 3.5% finding; but this does not end the analysis.  The case law shows that there is an additional two-step approach to calculate the appropriate post-judgment royalty rate for continuing infringement.  First, the Court should establish a new ongoing royalty rate by using a modified *Georgia-Pacific* analysis.  Second, the Court should enhance that royalty rate based on the Defendants' established deliberateness and willfulness for their continuing post-verdict infringement.  *See, e.g.*, *Affinity Labs of Texas v. BMW North America*, 783 F. Supp. 2d 891, 898 (E.D. Tex 2011) (applying the two additional steps to determine the appropriate post-judgment royalty rate).  A "modified" *Georgia-Pacific* analysis considers the important aspects in which the dynamics of a post-judgment hypothetical negotiation would differ from those of a pre-judgment hypothetical negotiation, for example, (1) the parties' "changed legal status" and (2) the "different economic factors [that] are involved."  *Id.*

**1.      The jury's 3.5% royalty rate for past damages provides a starting point for determining the post-judgment royalty rate**

The jury-adopted rate of 3.5 is the minimum royalty rate that should apply to Defendants' ongoing infringing use.  "[T]he trial testimony and jury findings with respect to past damages can provide a basis for calculating a market royalty for any ongoing infringement." *Affinity Labs*, 783 F. Supp. 2d at 898.  After hearing extensive evidence from both parties, the jury applied the *Georgia-Pacific* factors – including, among other things, the comparable licenses to the patents-in-suit, Google's comparable licenses and the proportion of profit that is credited to the technology (*see* Trial Tr. 835:3-845:17) – and decided that a hypothetical negotiation occurring on the date of Defendants' first infringement (1st quarter of 2004) would have resulted in an agreement by Defendants to pay the patent owner a royalty of 3.5%.  D.I.

801.  The 3.5% rate was based upon the circumstances in the first quarter of 2004.  Becker Dec.,

¶3.

> ## 2.    This Court should modify the 3.5% rate upward based upon changed circumstances in the post-judgment hypothetical negotiation

The 3.5% royalty rate was based upon a hypothetical negotiation in the first quarter of

2004.  For the post-judgment royalty rate, however, courts apply a modified "Georgia-Pacific"

analysis to determine the post-judgment hypothetical negotiation between I/P Engine and

Defendants.  In this case, there are four factors that impact those dynamics.  First, the legal

relationship, i.e., the legal status, between I/P Engine and Defendants has been altered by the jury

verdict: Defendants were adjudged an infringer on each asserted claim of the '420 and '664

patents, and the '420 and '664 patents were found valid and enforceable.  Hence, the jury's

finding of liability strengthened I/P Engine's bargaining position during a post-verdict

negotiation.  *Boston Scientific Corp. v. Johnson & Johnson*, 2009 WL 975424, at *5 (N.D. Cal.

Apr. 9, 2009).[3]

Second, the patentee is different.  In contrast to Lycos being the negotiator at the 2004

hypothetical negotiation, the post-verdict negotiator is I/P Engine and its parent company

Vringo, Inc.  Unlike Lycos, I/P Engine, among other things, protects, enforces and licenses its

intellectual property rights and assets, whereas Lycos and its parent at the time of the 2004

hypothetical negotiation, Terra, were unaware or uninterested in protecting or monetizing Lycos'

patent portfolio.  Becker Dec., ¶7; Blais Depo. Tr. at 30:1-31:21.  Furthermore, I/P Engine is a

financially sound company.  During trial, Defendants argued that Lycos was low on cash and in

---

[3]  In any future negotiation, specifically one that would take place on or after November 21, 2012, the parties would also evaluate the alternatives to a compulsory license, namely that I/P Engine could sue again and Defendants would once again be liable for infringement – this time willful infringement and thus treble damages and attorneys' fees.

financial decline, and would not have had a bargaining position against Google (Trial Tr. at 1575:1-10).  Defendants' argument is without merit, at least as applied to Vringo.  I/P Engine's parent company Vringo has a current market capitalization in excess of $200 million and has adequate cash on hand.  Becker Dec., ¶7.

Third, the facts known as of the date of the hypothetical negotiation are different.  In 2004, the parties could differ on whether Defendants' use of the patented technology would substantially impact Google's revenue.  In 2012, there is no doubt that the patented technology directly and substantially increased revenue by at least 20.9%.  *See supra* III.A.  According to Google, the patented technology is "mission-critical" to AdWords' success.  PX-337; Becker Dec., ¶8.  Thus, in 2012, there is no longer any uncertainty as to the magnitude and importance of the patented technology.

Fourth, the range of comparable royalty rates is higher.  Although the comparable licenses that form the starting point for the hypothetical negotiation are the same as presented during trial (Marchex, eXact, and Interchange), the rate that reasonably would result from these licenses is different because of the timing of the hypothetical negotiation date.  Dr. Becker testified that the range of applicable rates presented at trial was 3-5%.  Trial Tr. at 842:2-843:23; Becker Dec., ¶¶10-11.  For example, under the Marchex license agreement, Marchex paid a favorable 3.75% rate because they were an early, *pre-litigation* licensee that had an existing business relationship with Overture.  *Id*. at ¶12.  In other words, Marchex received a rate at the low end of the range because it was outside the context of litigation, it was an early licensee, and it had a business relationship with Overture.  *Id*.  Here, none of those facts exist.  I/P Engine and Google have no business relationship, and their 2012 hypothetical negotiation is the direct result of a highly contested litigation.  Moreover, because the license would be a result of a post-trial

negotiation, Defendants are not an early licensee.  Furthermore, the other two license agreements that Dr. Becker, I/P Engine's damages expert, relied upon – eXact and Interchange – include a 5% royalty rate that was discounted to 4% because each company had a business relationship with Overture.  Here, as noted above, I/P Engine has no business relationship with Google or any other defendant.  Therefore, I/P Engine's post-verdict negotiations – based on all three licensing agreements relied upon at trial – would result in a rate at the high end of the range.  *Id.*

Consistent with his original analysis, Dr. Becker, I/P Engine's damages expert, has analyzed all of these factors and applied them to the present facts and has concluded that the resulting negotiated rate between Google and I/P Engine in 2012 should be 5%.  *See* Becker Dec. at ¶¶ 14-16.  He also concludes that there is no reason to depart downward from the 5% royalty rate because the patents are *known* to be valid and the patented technology is *acknowledged* to be "mission-critical" for Google.  PX-337; Becker Dec., ¶¶8, 13, 14.

For these reasons, consistent with the case law, this Court should conclude that an upward adjustment to a 5% ongoing royalty rate for Defendants' ongoing post-judgment infringement is justified.

### 3.     The 5% ongoing royalty rate should be enhanced in light of Defendants' ongoing willful infringement

Defendants' ongoing infringement is undisputedly willful.  Defendants are fully aware that their use of AdWords has been adjudged to infringe all of the asserted claims of the valid and enforceable patents-in-suit.  Judgment has been entered against them, and yet they continue to infringe.  The 5% ongoing royalty rate, however, does not yet reflect an enhancement under 35 U.S.C. § 284 for that willfulness.  *See Amado*, 517 F.3d at 1362 (noting that "willfulness, as such, is not the inquiry" when determining the initial post-judgment royalty rate).

The enhancement of the ongoing royalty rate, as well as the extent of the enhancement, is committed to the discretion of the trial court.  *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991) (holding that enhancement of damages is within the discretion of the district court and is informed by the totality of the circumstances).  The amount of enhancement is guided by application of the factors in *Read v. Portec*, 970 F.2d 816, 827 (Fed. Cir. 1992):  (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct.

Here, the first *Read* factor—whether Defendants copied the patents-in-suit—is informed by the evidence that Google was aware of the '420 patent prior to its infringement (Trial Tr. at 251:4-15; *see also* PX-0408-0421), and that Google offered no evidence whatsoever explaining how it developed the infringing AdWords system.

Factors two and five—whether Defendants had a good faith belief that the patents are invalid or not infringed and the closeness of the case—strongly favor enhancement.  Defendants are now adjudged infringers and the patents were deemed valid.  D.I. 799 and 801.  Accordingly, Defendants cannot assert a good faith belief of non-infringement or invalidity.  Nor, given the jury's findings, is there any indication that this case is a close one.

I/P Engine leaves factor three—the Defendants' litigation conduct—solely to the discretion of this Court.

Factor four, the size and financial condition of Defendants, also favors enhancement. Defendants – especially Google – are large, profitable companies.  Trial Tr. at 797:7-19.

Factor six, regarding the duration of misconduct, is unknown; there is no question that Defendants continue to infringe, and Defendants have shown no inclination that they will cease their infringement.[4]

Factor seven, regarding remedial action, favors enhancement because there is no evidence that Defendants have taken any steps to stop infringement, despite the testimony by Defendants' expert that non-infringing alternatives would be simple to implement.  Trial Tr. at 1470:9-14.

Finally, factors eight and nine, Defendants' motivation for harm and attempts at concealment, are neutral because there is no evidence that Defendants intended to harm I/P Engine or attempted to conceal their knowingly infringing activity.

The *Read* factors – especially factors 2, 4, 5 and 7 – suggest that this Court should enhance the 5% ongoing royalty rate upward to 7%.  Such an enhancement is consistent with the findings of other courts.  *See e.g.*, *Bard v. Gore*, 2012 WL 414373, at *18 (Fed. Cir. Feb. 10, 2012) (affirming award of post-verdict royalty rate ranging from 25% to 100% greater than the jury royalty reward); *Soverain Software v. J.C. Penney Corp*, 2012 WL 4903268, *10-*12 (E.D. Tex Aug. 9 2012) (setting post-verdict royalties 2.5 times higher than the jury's pre-verdict rate due to willfulness); *Affinity Labs*, 783 F. Supp. 2d at 905 (awarding post-verdict royalty rate 33% greater than the rate adopted by the jury); *Mondis Technology Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 647-53 (E.D. Tex 2011) (doubling the royalty rate  for willfulness).  Hence, I/P

---

[4]  Since the verdict, Google issued a statement saying that its system does not infringe the patents-in-suit and that they plan to challenge the merits of the verdict.  *See* Ex. A.

Engine respectfully requests, consistent with the case law, that this Court enhance the ongoing

royalty rate of 5% to 7% in light of Defendants' ongoing willful infringement.

### C.      Defendants Should Provide an Accounting and Pay Ongoing Royalties Quarterly

This Court also has discretion to determine the mechanics and timing of payment of any

post-judgment ongoing royalties.  *See Amado*, 517 F.3d at 1362, n. 2 (indicating that decisions

regarding post-verdict royalties are committed to the sound discretion of the district court).  I/P

Engine respectfully requests that this Court order that:  (1) Defendants pay ongoing royalties

quarterly to I/P Engine in certified funds or by wire transfer, accompanied by a statement

certifying under penalty of perjury the U.S. revenue attributable to Defendants' use of AdWords

in dollars and the calculation of the royalty amount, (2) Defendants make such payment and

provide the required statement to I/P Engine no later than 14 days after the end of each calendar

quarter, and (3) if the payment is not timely made, Defendants pay a penalty consisting of 5% of

the quarterly royalty owed, plus interest at the average prime interest rate, as reported by the

Federal Reserve (consistent with I/P Engine's pre-judgment interest request).  *See* D.I. 792-794

and 813.  This Court should further order that I/P Engine shall have the right to request audits of

such revenue figures, by Defendants providing its records to I/P Engine's designated auditor.

## IV.      CONCLUSION

For the reasons discussed above, I/P Engine respectfully requests that this Court enter an

Order requiring that, for the period from November 21, 2012 through April 4, 2016, Defendants

pay I/P Engine ongoing royalties computed on a base of 20.9% of Defendants' U.S. AdWords revenues, at a running royalty rate of 7% of that base for Defendants' continued willful infringement.

Dated:  December 18, 2012

By:  \_\_/s/ Jeffrey K. Sherwood_____
Donald C. Schultz (Virginia Bar No. 30531)
W. Ryan Snow (Virginia Bar No. 47423)
CRENSHAW, WARE & MARTIN PLC
150 West Main Street
Norfolk, VA 23510
Telephone:     (757) 623-3000
Facsimile:     (757) 623-5735

Jeffrey K. Sherwood (Virginia Bar No. 19222)
Frank C. Cimino, Jr.
Kenneth W. Brothers
Dawn Rudenko Albert
Charles J. Monterio, Jr.
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
Telephone:     (202) 420-2200
Facsimile:     (202) 420-2201

Counsel for Plaintiff I/P Engine, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of December, 2012, the foregoing

**MEMORANDUM IN SUPPORT OF PLAINTIFF I/P ENGINE, INC.'S MOTION FOR**

**AN AWARD OF POST-JUDGMENT ROYALTIES** was served via the Court's CM/ECF

system on the following:

Stephen Edward Noona
Kaufman & Canoles, P.C.
150 W Main St
Suite 2100
Norfolk, VA 23510
senoona@kaufcan.com

David Bilsker
David Perlson
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

Robert L. Burns
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
robert.burns@finnegan.com

Cortney S. Alexander
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
cortney.alexander@finnegan.com

/s/ Jeffrey K. Sherwood