I/P ENGINE, INC.   Plaintiff,

        v.

AOL, INC., *et al.*,   Defendants.

Civil Action No. 2:11-cv-512

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON NON-INFRINGEMENT OR NEW TRIAL</u>

Plaintiff I/P Engine did not meet its burden at trial of introducing substantial evidence of infringement of any of the asserted claims of the '420 and the '664 patents. Judgment as a matter of law of non-infringement is appropriate for several reasons.

For example, I/P Engine failed to present evidence that the accused systems filter "combined information" as required by the '664 Patent. Instead, Plaintiff's expert Dr. Frieder admitted that what Plaintiff pointed to as the "combined information" in the accused system, predicted click-through rate (pCTR), is <u>not</u> filtered. Plaintiff's theory of infringement as to the patents' requirement of "combining" content and feedback data was also fundamentally flawed given that Dr. Frieder admitted that the supposed content and feedback data in AdWords was never merged at all. And I/P Engine failed to present evidence at all in the source code that AdSense for Search and AdSense for Mobile Search— the sole basis for Plaintiff's allegations as to the non-Google Defendants—meet the content limitations in the claims.

I/P Engine also improperly took inconsistent positions for infringement and invalidity. For example, I/P Engine asserted that using content to look-up feedback data is content-based analysis for purposes of proving infringement, but argued that this is <u>not</u> content-based analysis in order to rebut the Culliss prior art reference. I/P Engine also objected to Defendants arguing that the preambles of the asserted claims were limitations for purposes of

non-infringement, while simultaneously arguing that the accused products met the preambles and using them to attempt to distinguish the prior art. Defendants, therefore, respectfully request that the Court enter judgment as a matter of law of no infringement.

In the alternative, Defendants should be granted a new trial on infringement because the jury verdict was against the clear weight of the evidence, based on false evidence, and will result in a miscarriage of justice. For example, Plaintiff's reliance on marketing documents to prove infringement that Plaintiff's expert admitted and Plaintiff itself argued were irrelevant to the question of infringement improperly allowed the jury to rely on false evidence in reaching its verdict. Further, the jury was presented with jury instructions regarding indirect infringement and infringement under the doctrine of equivalents even though Plaintiff presented no evidence that Defendants infringe under either theory. Adding to the confusion, the jury was also presented with a verdict form that asked simply if Defendants infringe the asserted claims, rather than asking separate interrogatories for indirect infringement and infringement under the doctrine of equivalents. Defendants respectfully request a new trial.

## LEGAL STANDARD

Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) is required where a plaintiff fails to present substantial evidence for a reasonable jury to rule in its favor. Fed. R. Civ. P. 50(b); *Konkel v. Bob Evans Farms*, 165 F.3d 275, 279 (4th Cir. 1999). A new trial should be granted even though there is substantial evidence preventing the direction of a verdict if the verdict is against the clear weight of the evidence, was based upon false evidence, or will result in a miscarriage of justice. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). When considering a motion for new trial, the court may weigh evidence and consider the credibility of witnesses. *Cline*, 144 F.3d at 301. In addition, it is well-established that a new trial should be granted under Federal Rule of Civil Procedure 59 based on errors in the admission

2

or rejection of evidence if the errors were prejudicial. *Bennett v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 539 (E.D. Va. 2010).

**ARGUMENT**

**I.    PLAINTIFF FAILED TO PROVIDE SUBSTANTIAL EVIDENCE THAT THE COLLABORATIVE AND CONTENT LIMITATIONS WERE MET**

The '420 independent claims both require "a content-based filter system" (claim 10[b], claim 25[b]).  The '664 independent claims similarly require "a content-based filter system" (claim 1[c]) and "content-based filtering" (claim 26[d]).  As explained by the patents themselves, "content-based filtering is a process of filtering by extracting features from the informon, *e.g.*, the text of a document, to determine the informon's relevance."  ('420 Patent, 4:23-26.)  It is undisputed that both patents also require collaborative feedback.  (Trial Tr. 110:22-24, 124:11-13; PDX 131.)  And the asserted claims require combining content information and collaborative feedback data.  ('420 claim 10[d] ("the filter system <u>combining</u> pertaining feedback data from the feedback system with the content profile data…"); '664 claim 1[c] ("a content-based filter system for <u>combining</u> the information from the feedback system with the information from the scanning system…") (emphasis added).)

During trial, Dr. Frieder testified that the <u>content</u> limitations in the patents-in-suit are allegedly satisfied by a few of the dozens of feature templates used in the Smart Ad Selection System ("Smart Ads") in connection with ads served on Google.com.[1]  (Trial Tr. 530:23-531:19.)  According to him, these few feature templates require a "comparison" between the creative— i.e., the text of an ad— and the query.  (*Id.* at 529:17-20.)  He continued that the

features corresponding to the "comparisons" are used to look up odds multipliers, which he asserted met the <u>collaborative</u> limitations, which are used to calculate the predicted click through rate (pCTR) of an ad. (*Id.* at 529:21-530:11, 533:10-534:1.) Dr. Frieder further concluded that using the alleged content information to look up a corresponding odds multiplier (the alleged feedback information) somehow amounts to the <u>combination</u> of content and feedback required by all asserted claims.[2] (*Id.* at 533:1-16; 538:24-539:10.) Plaintiff's theories as to these critical elements were without merit for numerous reasons, and Plaintiff failed to provide substantial evidence that the accused products meet these elements.

A. <u>The Accused Systems Do Not "Filter the Combined Information," as Required by the '664 Patent.</u>

Both independent claims of the '664 patent require filtering the "combined information." (Claim 1 ("and a content-based filter system for combining the information from the feedback system with the information from the scanning system and for <u>filtering the combined information for relevance</u> to at least one of the query and the first user"); claim 26 ("combining the information found to be relevant to the query by other users with the searched information; and content-based <u>filtering the combined information for relevance</u> to at least one of the query and the first user") (emphasis added).)

1 ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

At trial, Dr. Frieder testified that the "combined information" in the accused systems is pCTR. (Trial Tr. 702:8-22.) Yet Dr. Frieder admitted that pCTR is <u>not</u> filtered and, in fact, that pCTR <u>cannot</u> be filtered in the accused systems. (*Id.* at 702:1-704:7.) Instead, Dr. Frieder asserted that the ads are filtered "based on" pCTR. (*Id.*) But the '664 claims require "filtering the combined information," not filtering <u>something else</u> "based on" the combined information. Because Plaintiff chose to ignore the plain language of this element, Plaintiff presented no evidence to show the accused systems meet this element.

Notably, unlike the '664 patent, claim 10[b] of the '420 patent does include the requirement of "filtering the informons <u>on the basis of</u> applicable content profile data for relevance to the query."[3] (emphasis added). Plainly, the applicants knew how to distinguish filtering combined information from filtering <u>something else</u> on the basis of combined information. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). At oral argument on this point, Plaintiff argued that "[w]ith regard to defendant's attempt to import into the '664 claims something that is not in the '420 claim, I believe that's improper. Each claim stands on its own. And for their attempt to [write][4] words in the '664

---

[2] As detailed in Defendants' Motion to Preclude Dr. Frieder from Testifying Regarding Untimely Opinions, which was denied, Dr. Frieder's actual theory of infringement based on Google AdWords's templates does not appear in his infringement reports. (D.N. 327, 328; D.N. 705.) Defendants further objected during trial to Dr. Frieder's infringement theories based on attribute templates, including templates that were not referenced even in his untimely supplemental expert reports. (Trial Tr. at 546:8-22, 550:23-551:11.) This testimony was not excluded, despite the Court's acknowledgement that Dr. Frieder should have provided a written opinion regarding these templates in his report. (*Id.* at 550:6-551:11.)

[3] Defendants assert that Plaintiff also did not prove that claim 10[b] of the '420 patent is met by the accused products. *See infra.*

[4] The word "write" was mis-transcribed as "aright."

claim with regard to the '420 is inconsistent with the Court's claim construction and fundamental patent law." (Trial Tr. 1014:7-13.) But it is Plaintiff that attempted to write in the language "on the basis of" from the '420 claim into the clear language from the '664 patent that requires "a content-based filter system . . . for <u>filtering the combined information</u> for relevance to at least one of the query and the first user."[5] (emphasis added). I/P Engine's strategic misreading of the claim language resulted in its failure to provide any evidence that this element is met.

**B.     The Accused Systems Do Not Combine "Content" and "Collaborative."**

Even if what Plaintiff pointed to as content and collaborative feedback data met those claim limitations (they do not as detailed below), Plaintiff failed to provide substantial evidence of their <u>combination</u> as required by all the claims. Dr. Frieder concluded using certain feature templates (the alleged content analysis) to look up a corresponding odds multiplier (the alleged feedback information) somehow amounts to the "combination" of content and feedback required by all asserted claims. (*Id.* at 533:1-16; 538:24-539:10.) But using one piece of data to look up another piece of data does not "combine" those two pieces. In fact, Dr. Frieder freely conceded that the alleged "content-based" information (the attribute) is never "merged" or used with the alleged "feedback" component (the odds multiplier):

Q:     Well, the attribute is not combined with the odds multiplier at all, is it?

A:     <u>I'm taking the particular value and using it as a lookup and to get the particular feedback data.</u> So I view it as combined, yes.

Q:     It's a lookup. It tells you where it is?

A:     It gives you the corresponding value.

---

[5]   Nor did Plaintiff at any point during claim construction argue that the term "filtering the combined information for relevance to at least one of the query and the first user" in the '664 patent should be construed identically to "filtering the informons <u>on the basis of</u> applicable content profile data for relevance to the query" in the '420 patent.

Q:     Right. So you don't take the attribute and merge it together with whatever the odds multiplier value is, right?

A:     I am combining it because I'm taking the two sources and combining them, but, <u>no, I'm not merging them together, no</u>. (Trial Tr. 694:9-19 (emphasis added).)

Dr. Frieder's unsupported conclusion that a combination somehow occurs even though nothing is merged is contrary to the plain meaning of "combine" and common sense, and unsupportable as a matter of law.[6] Indeed, Dr. Frieder himself used the words "merged" and "combined" interchangeably elsewhere in his own testimony. (*Id.* at 597:24-25: "Again, blue merged, combined with green to form the Quality Score in 2011.") In oral argument on Defendants' Rule 50(a) motion, Plaintiff fully adopted Dr. Frieder's nonsensical interpretation of combining: "I think that argument is specifically targeted to this idea of merger and, as we heard, there's no requirement in the patent there has to be a merger." (*Id.* at 1020:5-7.)

Dr. Frieder's testimony was also in stark contrast to the combining shown in Figure 6 of the specification, which Dr. Frieder attested was "the heart and soul, because what happens here is the entire invention." (*Id.* at 456:4-7.) As Dr. Frieder illustrated in his demonstrative, in Figure 6 the "collaborative data" score and the "content data" score are mathematically combined into one "certainty weighting function" score. (PDX-71; '420 patent at 14:56-64.) In Dr. Frieder's example, the "content data" score 7 is combined with the "collateral data" score 5, resulting in a merged score of "6." (PDX-71.) Dr. Frieder conceded such a combination did <u>not</u> occur in AdWords (*id.* at 694:9-19), and pointed to nothing in AdWords that comported with any reasonable meaning of the term combined. As Plaintiff presented no evidence that the

---

[6]   Agreeing with Defendants, the Court declined to construe the term "combining," finding that it should be given its plain meaning  (D.N. 171, 2 n.1.)  Alternatively, Defendants had proposed that the plain meaning of "combining" was "bringing together." (D.N. 122, 14.)

"combining" required by all asserted claims occurs in the accused products, JMOL is appropriate.

**C.    Plaintiff Failed to Provide Substantial Evidence of Content Filtering.**

    1.    Plaintiff's "Content-Based Filtering" Theory Contradicts Its Validity Case.

As outlined above, at trial, Dr. Frieder testified that the accused systems meet the content-based filtering limitations of the asserted claims through certain templates that, as Dr. Frieder admitted, are used to look up an odds multiplier for those specific attribute templates. (Trial Tr. 538:24-539:10; 674:11-14; 675:14-17; 692:9-13.) But no content-based filtering occurs based on these templates, or this look-up.

This was confirmed by Plaintiff's own validity expert, Dr. Carbonell. When attempting to distinguish the prior art, he testified that using content to perform a look-up for feedback data is <u>not</u> content-based filtering:

Q:    Right. So the key terms are associated with content in the article, correct?

A:    Yeah. We have been over this before. Yes. There are other ways of doing it as well. This is one of the ways.

. . . .

Q:    Okay. So you don't think, then, that doing an operation where I match the query terms to key terms and use that to access a feedback score meets the content-based filter limitation of this patent?

A:    That's right. (Trial Tr. 1929:13-17; 1930:13-17.)

And according to Dr. Carbonell, Culliss's increasing a score based on the number of times that users actually clicked on articles is not "content-based analysis" either. (*Id.* at 1929:20-1930:1.)

By attempting to prove that the accused systems meet the content-based filtering limitations of the asserted claims for its infringement case, and simultaneously disputing that the same functionality that existed in the prior art was <u>not</u> content-based filtering for its validity case, Plaintiff violated a settled principle of law by asking its experts on infringement and validity to

offer directly contradictory opinions about what constitutes content-based filtering.
*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent

may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find

infringement."). No reasonable jury could have found infringement in light of Plaintiff's

experts' testimony, providing opposite opinions about the same claim limitation.

> 2. Plaintiff Failed to Provide Proof of Source Code for Content Filtering.
>
>> (a) I/P Engine failed to offer any proof of infringement regarding AdSense for Search or AdSense for Mobile Search

Again, Plaintiff contended that only a certain type of template, which involved a

"comparison" of content, met the content limitations. (Trial Tr. 694:24 to 695:2.) Yet, as its

supposed evidence that AdSense for Search and AdSense for Mobile Search, upon which I/P

Engine's allegations as to the non-Google Defendants are entirely based, met the content filtering

element of the asserted claims, Dr. Frieder provided no analysis or testimony as to which, if any,

of the feature templates in those models perform the content filtering, or how they perform it.

(Trial Tr. 552:5-13, 553:10-554:1.) Dr. Frieder merely pointed to source code files in exhibits

PX 332 and PX 333. At the Rule 50(a) oral argument on this issue, Plaintiff stated it just "didn't

need to" point to specific templates. (*Id.* at 1015:5-9.)

But an expert simply pointing to more than forty pages of source code is not sufficient

proof of infringement. As the Federal Circuit has held, parties must "clearly disclose, discuss,

and identify" how supporting evidence meets a claim limitation. *Fresenius USA, Inc. v. Baxter

Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381

F.3d 1142, 1151-52 (Fed. Cir. 2004). Accordingly, I/P Engine failed to provide evidence of

infringement for the asserted claims by AdSense for Search and AdSense for Mobile Search.

(b)     I/P Engine failed to offer any proof of infringement through the use of QBB

As part of the Quality-Based (QBB) system, a predicted clickthrough rate (pCTR) (for the QBB system) is computed for each ad in advance of an ad being considered for display to the user and in advance of the system receiving a query from the user. The pCTR is then used to determine a Minimum Cost-Per-Click (CPC) price, also known as a "reserve price," for each candidate advertisement. (D.N. 755-1 at 3, ¶ 7.) QBB disqualifies any advertisements whose bids fail to meet the reserve price. (*Id.* at 3-4, ¶ 8.)

Dr. Frieder pointed to the source code files in exhibit PX 331 as evidence that QBB disabling meets the content filtering element of the asserted claims. But Dr. Frieder's "analysis" stopped there. He did not show which, if any, of the attribute templates perform the alleged content filtering. Again, given that not all templates infringe even under I/P Engine's theory, simply identifying allegedly relevant source code files is insufficient to meet its burden of proof. (Trial Tr. 556:10-17; *id.* at 694:24 to 695:2.) *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

In any event, QBB cannot infringe any of the claim elements as it is undisputed that its functionality is query-independent and occurs before any query is received. *See infra.* Accordingly, it cannot filter informons or information for relevancy to the query as required by all asserted claims. *See infra.* Nor can any of the feature templates in the QBB model compare the creative to the query as required under Plaintiff's own infringement theory, as it is undisputed that QBB does not have access to query information. (D.N. 755-1 at 3-4, ¶¶ 7-8.)

(c)   I/P Engine failed to offer any proof of infringement by AdWords before 2010

While Dr. Frieder was allowed to provide some testimony regarding four feature

templates as evidence that the "content-based filtering" limitations were met (*id.* at 518:23-

519:18, 530:23-531:19, 534:12-536:9, 541:17-543:7), none of the templates on which Dr. Frieder

relied was shown to be in use prior to 2010. (*Id.* at 524:13-16 (pointing to two templates in

"google24" used in the version of SmartAds launched in May 2012); *id.* at 540:13-15 (discussing

a template from a 2010 model but offering no opinion that this model was in use prior to 2010);

*id.* at 548:3-15 (referencing another template not relied upon in his report).) Dr. Frieder merely

offered a conclusory statement that the AdWords system infringed since its launch in 2004 while

only pointing to templates that were in use after 2010. (*Id.* at 592:9-593:9.) This is insufficient

evidence of what the source code contained prior to 2010, or any theory based thereon. *Brooke*

*Group Ltd.*, 509 U.S. at 242. Accordingly, Defendants are entitled to judgment as a matter of

law of non-infringement prior to 2010.[7]

3.   I/P Engine failed to prove that the mere notion of "keyword relevance" is content-based filtering

Perhaps in light of the failure of proof in the source code, I/P Engine also attempted to

satisfy the "content-based filtering" limitation by arguing that Smart Ads tracks "keyword

relevance" or "ad text relevance." (Trial Tr. 596:11-14, 597:19-21.) In order to so argue, I/P

Engine ignored the critical distinction between actual evidence of infringement and mere

marketing materials. Indeed, I/P Engine failed to provide any explanation as to what generic

---

[7] As discussed in Defendants' Rule 50(b) Motion on Damages, as a result, I/P Engine's entire damages model is unsupported, as it is based on a hypothetical negotiation that takes place in 2004, six years before Plaintiff provided any actual evidence of infringement in the source code even under Plaintiff's improper theories.

terms like "keyword relevance" or "ad text relevance" actually mean in the context of how Google's systems function.

As detailed below, courts have routinely rejected this sleight of hand, recognizing that marketing materials shed little light on the inner workings of sophisticated technology, as is the case here. *Scantibodies Lab., Inc. v. Immutopics, Inc.*, 374 F. App'x 968, 971 (Fed. Cir. 2010) ("The use of language in marketing materials often means something quite different from the language used in a patent."); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351-52 (Fed. Cir 2007) (affirming judgment as a matter of law that overturned the jury's verdict of infringement, finding the advertising materials to be insufficient evidence where scientific proof was lacking); *Bauer Patent Corp. v. Westinghouse Elec. Corp.*, 193 F. Supp. 868, 873 (W.D. N.C. 1961) ("[I]n this action it seems without question that plaintiff has placed too much reliance upon this advertising data and too little upon actual comparison of the drawings of the patent as against the accused machines. Consequently plaintiff is not aided by its claim of infringement through advertising."). The Court should reach the same conclusion here.

### D. The Accused Systems Do Not Use "Collaborative Feedback Data."

#### 1. The accused systems do not group users with similar interests or needs

Each asserted claim in the '420 patent requires the use of "collaborative feedback data." For example, independent claim 10 requires "a feedback system for receiving <u>collaborative feedback data</u> from system users relative to informons considered by such users" (emphasis added). Similarly, claim 25 requires "receiving <u>collaborative feedback data</u> from system users relative to informons considered by such users" (emphasis added). The Court construed "collaborative feedback data" to mean "data from system users with similar interests or needs regarding what informons such users found to be relevant." (D.N. 212, 4.)

The accused systems do not rely on "collaborative feedback data" because they do not

deliver ads based on feedback data from groups of users with similar interests or needs. Indeed, Dr. Frieder testified that the accused systems do not categorize ads <u>at all</u>, much less categorize them by the similar interests or needs of a particular subset of users. (Trial Tr. 427:3-8, 429:11-23 (discussing the collaborative limitation in terms of all users rather than users "with similar interests or needs"); *id.* at 680:22-682:19.) If the Court's construction of users "with similar interests or needs" could be read to cover a system that collects and tracks information from all users, <u>regardless</u> of the similarity of their interests or needs, then the "collaborative feedback" limitations would lose all meaning.

At trial, Dr. Frieder testified that the accused systems still meet this limitation because they receive information from users who ran the same or a similar query. (Trial Tr. at 488:9-489:7; *id.* at 680:22-681:1.) Yet, I/P Engine introduced <u>no evidence</u> that Smart Ads actually tracks how often users click on a particular ad in response to a particular query, or that Google uses such information in serving ads. In other words, there was simply no evidence whatsoever that the accused products group users by similar interests or needs in order to calculate the pCTR for a particular ad. Defendants pointed this out to the jury during Dr. Ungar's testimony, in closing, and argued this point in oral argument of their Rule 50(a) motion. (*Id.* at 1240:20-1241:2; 2039:7-23; 992:21-23.)

2. <u>The accused systems do not include a "[feedback system for] receiving information found to be relevant to the query by other users"</u>

Independent claims 1 and 26 of the '664 patent require a "[feedback system for] receiving information found to be relevant to the query by other users." In both the Court's June 15 and August 16 Orders, the Court declined to construe these terms in the '664 patent. (D.N. 171; D.N. 212.) But Dr. Frieder stated that this limitation in both claims 1 and 26 of the '664 patent should be interpreted to require collaborative feedback. (Trial Tr. 610:2-611:21: "[W]ell, basically in the claim it actually is requiring you to have the content-based information. <u>It's requiring the</u>

feedback system is a collaborative… It's just the way it's written, but it basically requires content, it requires collaborative, it requires combining it and basically it requires you to filter based on that combination." (emphasis added).) Dr. Frieder's trial demonstratives, such as PDX 131, confirmed this by highlighting the "feedback system" language in claim 1 of the '664 patent in green and annotating it as requiring "collaborative." (*See also* Trial Tr. 1222:12-13 (Plaintiff's counsel agreeing '664 patent requires collaborative feedback).) The Court construed what "collaborative" required in its construction of "collaborative feedback data," and so that governs the '664 patent as well. Accordingly, for the same reasons set forth as to the '420 patent as explained above, the accused systems do not use "collaborative feedback data" and thus do not have a "[feedback system for] receiving information found to be relevant to the query by other users," and cannot infringe the '664 patent.

     3.    Plaintiff's expert conceded historical clickthrough rate was not collaborative feedback

On direct, Dr. Frieder testified the collaborative requirements of the asserted claims are met by the use of a historical clickthrough rate (CTR). (Trial Tr. at 489:2-7; 490:3-5.) In doing so, Dr. Frieder again merely cited to snippets from marketing documents where Google simply mentions the term historical CTR. (*Id.* at 595:12-14.) As shown below, in §V,this is inappropriate as a matter of law. *PharmaStem*, 491 F.3d at 1351-52; *Whirlpool Corp. v. LG Elecs., Inc.*, 2006 WL 2035215, at *8 (W.D. Mich. July 18, 2006). Indeed, Dr. Frieder himself confirmed this at trial. (Trial Tr. 673:12-14: "Q. There is no keywords click-through rate used in SmartAds, correct? A. True. That is correct."; *id.* at 677:11-18: "I agree there is not -- there are not a template that represent the click-through rate of an individual ad in an individual query there, yes.") As such, Dr. Frieder further conceded he was not relying on CTR as the collaborative data required by the claims. (*Id.* at 680:9-12: "Q. But for purposes of AdWords,

you're not saying the CTR is collaborative data, correct? A. I am not saying that the CTR, I'm saying the clicks are. And this is a representation thereof of that." (emphasis added).)

At the very least a new trial should be granted because Plaintiff elicited testimony that it knew to be inconsistent with Dr. Frieder's actual opinions, which allowed the jury to rely on false evidence in reaching its verdict. *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008) (reversing, in part, denial of defendant's motion for new trial on the issue of invalidity of its patents because of plaintiff's expert's testimony that the plaintiff's patents disclosed real-time processing, which they did not); *Cline*, 144 F.3d at 301(explaining that a new trial is appropriate if, among other reasons, verdict was based on false evidence).

## II.  GOOGLE'S ADWORDS IS NOT A SEARCH ENGINE OR SEARCH SYSTEM

The preambles of asserted claims 10 and 25 of the '420 patent and claim 1 of the '664 patent unambiguously recite the terms "search engine system" and "search system," respectively. The preamble in claim 26 of the '664 patent recites "[a] method for obtaining information relevant to a first user." Although the preamble of this claim does not expressly use the words "search" or "search engine" as the other asserted claims do, based on the intrinsic evidence, its meaning and effect on the scope of claim 26 is the same.[8] Indeed, I/P Engine itself treated claim 26 as having the identical scope as claim 1 of the '664 patent. (*See, e.g.,* discussion of "feedback system" limitation, *infra.*)

---

[8] For example, the title of the '664 patent is "Information filter system and method for integrated content-based and collaborative/adaptive feedback queries." ('664 patent, Title (emphasis added).) Similarly, the Abstract of the '664 patent emphasizes that the asserted claims relate to a search engine: "[a] search engine system is provided for a portal site on the internet. The search engine system employs a regular search engine to make one-shot or demand searches for information entities which provide at least threshold matches to user queries. The search engine system also employs a collaborative/content-based filter to make continuing searches for information entities which match existing wire queries and are ranked and stored over time in user-accessible, system wires corresponding to the respective queries." ('664 patent, Abstract (emphasis added).)

**A.  Plaintiff Successfully Relied On The Preamble In Order To Prove Infringement And Rebut Defendants' Invalidity Arguments.**

Dr. Frieder emphasized that the preamble explains the environment in which the accused systems must operate and used a demonstrative at trial wherein, through Plaintiff's counsel, he placed a "check mark" next to each claim "element"—including the preamble—to graphically illustrate that the accused systems purportedly infringe each limitation in the asserted claims. (Trial Tr. 481:23-482:17; *id.* at 565:21-23: "Okay.  So that was the first box, which was the top box.  That was for the environment, the search engine environment.  That was the preamble.") Likewise, Plaintiff's validity expert, Dr. Carbonell, relied on the "search system" limitation in the preamble in distinguishing several of Defendants' validity references, arguing that they did not teach a "tight integration" of the filtering system with the <u>search system</u>.  (Trial Tr. 1835:24-1836:19.)  The jury apparently agreed and found that various prior art references did not invalidate the asserted claims due to the alleged lack of "tight integration." (D.N. 789, 8-10.)

**B.  The Court's Refusal to Allow Defendants to Introduce Evidence to Rebut Plaintiff's Infringement Argument Prejudiced Defendants.**

As outlined above, Plaintiff's expert Dr. Frieder was allowed to "check the box" to show that the accused systems met the "search engine" element in the preamble of the accused claims. Yet when Defendants sought to introduce their evidence that the accused systems do <u>not</u> have a "search engine" element, they were barred from doing so.  In other words, Defendants were <u>not</u> allowed to <u>un</u>check the box that Plaintiff checked.  It is <u>undisputed</u> that Google's search engine system is not accused of infringing the claims:

> And the way that the money is made is over here on the back of the technology at issue in this case, <u>not on the back of the search engine technology that you're all familiar</u> with . . . . Remember, it is two different worlds.  I got ahead of myself there.  Two different worlds; search information world and advertising world.

(Trial Tr. 117:2-5 (emphasis added); 133:3-5.)  Rather, Plaintiff accused Google's AdWords—an auction advertising system—of infringement.  Auctions are not search engines, if for no other

16

reason than that auctions choose "winners" based on expected revenue rather than relevance to a query.[9] The Court's rulings thus allowed Plaintiff to rely on the preamble in rebutting Defendants' invalidity case while avoiding Defendants' preamble rebuttal to its own infringement case. But "[a] patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Amazon.com*, 239 F.3d at 1351.

Even if the Court's ruling that the preambles did not constitute limitations were correct, which Defendants dispute, allowing Plaintiff to place a check mark next to the preambles as met in their infringement case and then use the search engine/search system limitations for their invalidity theory, but precluding Defendants from unchecking the box to show a lack of infringement, was confusing and misleading to the jury and prejudicial to Defendants. Because of the Court's ruling, the jury could only conclude that Defendants had no evidence to rebut the check marks next to the preambles and Dr. Frieder's corresponding testimony about the check marks. Further, assuming the Court's ruling were correct, there was no reason to allow Plaintiff to place the check marks next to the preambles and allow Dr. Frieder to testify that the accused products infringe the asserted claims based on the preambles. Accordingly, Defendants are at least entitled to a new trial with evenhanded treatment of each side's infringement case. *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1377 (Fed. Cir. 2012) (granting a new trial where district court's evidentiary rulings resulted in a "one-sided trial" about issue of invalidity); *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 54 (4th Cir. 1993) (ordering a new trial after district court erred in admitting evidence); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 305 (4th Cir. 1984) (holding that error not harmless and ordering a new trial when court could not be certain that refusal to admit evidence did not prejudice outcome).

---

[9] Given that all claims require filtering for relevance to the query, the fact that auctions rank based on expected revenue rather than relevance to a query is highly material.

## C.    The Preambles Of The Asserted Claims Are Limiting.

The preamble of a claim limits the scope of the invention in three different circumstances: (i) when it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim; (ii) when it provides a necessary antecedent basis for the body of the claim; or (iii) when it was clearly relied upon during prosecution to distinguish the claimed invention from the prior art. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002).

Here, the preambles of the asserted claims meet at least one of these conditions and, therefore, limit the scope of I/P Engine's invention. For each claim, the preamble gives life, meaning, and vitality to the claim in that the preamble makes clear that the claimed systems and methods must actually search for resources in order to locate information, instead of merely retrieving information from a known location. (Trial Tr. 479:8-480:3 (the Court discussing the importance of the preamble and explaining that "[t]his is one of those situations where you can't get away from the preamble in order to interpret the claims").); *Mems Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 154 (Fed. Cir. 2011) (finding that the preamble language "microelectromechanical system package" for claims directed to a microphone was necessary to give meaning to the claim).

The PTO itself relied on the '420 patent's preambles in allowing the claims generally over the prior art: "[t]he present invention is directed to a <u>search engine</u> operated with collaborative and content-based filtering." (DX-004, IPE 0002121 (emphasis added).) It also stated "it would have been obvious to one of ordinary skill in the art at the time of the invention to have implemented the information filtering system of Lang et al. (U.S. Patent no. 5,867,799) wherein the computer network provided thereon (Lang et al. Figure 1) <u>would have incorporated a search engine</u>." (DX-004, IPE 0002093 (emphasis added).); *Koepnick Med. & Educ. Research*

*Found., L.L.C. v. Alcon Labs., Inc.*, 162 F. App'x 967, 971-72 (Fed. Cir. 2005) (holding that the statements made by the PTO examiner in allowing claims can inform the construction of claim terms). Accordingly, the preambles in the asserted claims serve as limitations in both patents. *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) (applying limitations used to distinguish prior art in the parent application to the child when applicant failed to adequately inform the PTO of the desired expanded scope of the claims); *iLOR LLC v. Google Inc.*, 550 F.3d 1067, 1074-75 (Fed. Cir. 2008). Likewise, the Court relied on the preambles during claim construction when, for example, it construed the term "demand search" to mean "a single <u>search engine</u> query performed upon a user request." (D.N. 171, 19 (emphasis added).); *Catalina Mktg.*, 289 F.3d at 808 ("[W]hen the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope."). In any event, given that Plaintiff argued that the preamble was a limitation which was met by the accused products, and was <u>not</u> met by the prior art to supposedly distinguish it, Plaintiff cannot now argue that the preamble is not a limitation. *Amazon.com*, 239 F.3d at 1351. Judgment as a matter of law is appropriate because the preambles are limitations of the asserted claims and it is undisputed that the accused systems do not meet the preambles' "search engine" or "search system" limitations.

## III. THE ACCUSED SYSTEMS DO NOT INFRINGE THE ASSERTED CLAIMS BECAUSE THEY DO NOT *SCAN* OR *SEARCH* FOR ADS

Claims 10 and 25 of the '420 patent recite the limitation "<u>scanning a network</u> to make a <u>demand search</u> for informons relevant to a query from an individual user . . ." (emphasis added). The Court construed two terms in this limitation. First, it construed "scanning a network" to mean "looking for or examining items in a network." (D.N. 171, 15.) Second, it construed "demand search" to mean "a single <u>search engine</u> query performed upon a user request." Similarly, claim 1 of the '664 patent includes the same scanning concept, wherein it recites "a search system comprising: <u>[a] scanning system</u> for searching for information relevant to a query

associated with a first user in a plurality of users . . ." (emphasis added). The Court construed the term "a scanning system" to mean "a system used to search for information." (D.N. 171, 17.) Claim 26 of the '664 patent similarly requires "searching for information . . ." I/P Engine failed to introduce evidence from which a reasonable jury could find the accused systems contain either the scanning/searching element or the demand search element of the asserted claims.

*Scanning/searching element:* As an initial matter, Dr. Frieder testified that AdWords supposedly looks for or examines items in a network when it attempts to find advertisements relevant to a user's query. (Trial Tr. 483:20-485:12.) But advertisers submit ads to Google for inclusion in a database in which Google organizes and stores these submitted ads based on associated keywords. (D.N. 755-1 at 13, ¶ 6.) As such, AdWords does not have to go out and look for ads in response to a user's query.[10] It already has them, and it knows exactly where those ads reside in the database. (*Id.* at 43-44, ¶¶ 77-81.) Under this database model, AdWords does not "look[] for or examin[e] items in a network" or "search[] for information relevant to a query" as required by this limitation.

Dr. Frieder attempted to cure I/P Engine's failure of proof when he testified that the scanning element was met when Google "targets" ads. (Trial Tr. 484:17-485:18.) But the notion of "targeting" is not specific functionality in AdWords and is not evidence of infringement. Again, Dr. Frieder's reliance on buzzwords that appear in Google's marketing materials to show that technical systems operate in an infringing manner is insufficient as a matter of law. *PharmaStem*, 491 F.3d at 1351-52.

Dr. Frieder's misdirection in citing the processing of landing pages should similarly be dismissed. (Trial Tr. 485:19-486:5.) All asserted claims require that the "informons" or

---

[10] Contrast with search engines, which typically scan or search websites for relevant information.

"information" be later filtered. Dr. Frieder did not make any allegation that landing pages are filtered, as required by these later limitations. Nor did Dr. Frieder testify that Google must go out and find the landing pages, as opposed to have them given to Google by advertisers. Indeed, Dr. Frieder's inclusion of the irrelevant "scanning" of landing pages tacitly conceded that his arguments as to the alleged "scanning" of advertisements are without merit.

Notably, in cross-examining Defendants' expert Dr. Ungar about whether the accused systems "look[] for or examin[e] items in a network," Plaintiff attempted to edit the Court's claim construction to say "look . . . in a network" in order to fit its unsupportable interpretation that the accused systems meet the scanning limitation merely by looking in a network. (Trial Tr. 1438:1-1439:7; PDX 252.) Plaintiff's attempt to again mislead the jury shows the lack of merit in its actual argument.

*Demand Search:* Claim 10 of the '420 patent claims a system that performs a "demand search" via a search engine query in order to locate information relevant to a user's search query. Claim 25 of the '420 patent has a similar limitation. The Court construed "demand search" to be "a single search engine query performed upon a user request." (D.N. 171, 19.) Yet, at no point during trial did I/P Engine even attempt to introduce evidence that the accused products perform a "demand search." Dr. Frieder never once mentioned the Court's construction or opined regarding how this element of the claims is in AdWords. I/P Engine simply failed to address it, even though it is black letter law that literal infringement requires that each and every claim limitation be present in the accused product. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). Judgment as a matter of law of non-infringement as to the '420 claims is appropriate for this reason too.

*Network element:* Not only did I/P Engine fail to provide substantial evidence concerning the scanning element of the asserted claims, it also failed to do so concerning the

"network" component of the claims. As noted above, the Court has construed "scanning a network" as "looking for or examining items in a <u>network</u>." But there is a broad disconnect between looking for or examining items in a network as compared to the distributed database look up in AdWords. (D.N. 755-1, at 43-44, ¶¶ 77-81.) Indeed, at trial, Dr. Frieder made no attempt to explain how these two very different modes of operation could conceivably be the same. Again, Plaintiff's failure to meet its burden of proof entitles Defendants to judgment as a matter of law of non-infringement as to the '420 claims.

## IV. THE ACCUSED SYSTEMS DO NOT FILTER FOR RELEVANCE TO THE QUERY

Dr. Frieder offered no opinion that the accused products filter for relevance to the query as required by all asserted claims (claims 10 and 25 of the '420 patent: "filtering . . . for relevance to the query"; claims 1 and 26 of the '664 patent: "filtering . . . <u>for relevance to at least one of the query</u> and the first user").[11] Indeed, his testimony focused on filtering generally, <u>not</u> on filtering for relevance <u>to the</u> query. Further, Dr. Frieder testified that AdWords performs filtering based on the pCTR of an advertisement, and that filtering in the patents must be performed based on "exactly" the pCTR to meet the claim. (Trial Tr. 493:23-25: "Q. So no check yet. What do we have to do to get a check in this box, then? A. You must filter based on <u>exactly</u> what you just combined.") But, Dr. Frieder admitted that the accused disabling steps "filter" based on factors <u>other</u> than pCTR.

For two of the accused functionalities, Dr. Frieder agreed that the products disable ads based on the Long Term Value (LTV) score, not the pCTR. (Trial Tr. 697:23-698:7.) The use of the LTV score creates a "reserve price" such that advertisers must bid high enough so that their

---

[11] I/P Engine did not assert that any of the accused products filter "for relevance to [] the first user," but instead relied solely on its (faulty) argument regarding filtering for relevance to the query.

LTV score is greater than zero, with the Min CPC set to that amount. Advertisers whose bids are high enough to meet the reserve price are eligible for the auction; advertisers whose bids are not high enough are disqualified from the auction. (*Id.*) This is true for both the right hand side disabling (Disabling 2 or Ad Mixer disabling) and above the search results promotion (Promotion). (*Id.* at 729:24 to 730:20.) Thus, the alleged filtering is based on whether the bid is sufficiently high to overcome the reserve price, not based on the value of the pCTR. Even if pCTR were a measure of relevance to the query, and it is not, the fact that ads with low pCTRs might qualify for the auction and ads with high pCTRs might be disqualified from the auction is proof positive that AdWords does not filter based on pCTR.

Further, as Google engineer Bartholomew Furrow explained in deposition testimony played during I/P Engine's case, the third accused functionality, Disabling 1, or QBB disabling, is performed without the query and before the user inputs a query. (D.N. 755-1, at 27-28, ¶¶ 19-23.) Accordingly, QBB disabling cannot be related to the relevance to the query. It happens before the query.

## V.   PLAINTIFF'S INFRINGEMENT CASE WAS IMPROPERLY BASED ON IRRELEVANT MARKETING DOCUMENTS

### A.   Plaintiff Improperly Relied On Marketing Documents To Prove Infringement.

Plaintiff's expert, Dr. Frieder, acknowledged that source code was "as detailed as you get" in terms of understanding the system. (Trial Tr. 593:2-3.) Yet, throughout the case Plaintiff ran away from this detailed evidence, instead urging the jury to ignore the source code. (Trial Tr. 119:5-16: "Google's evidence about how the system works primarily is source code. I can't understand source code. I can't read that . . . . You don't need to be an expert in source code, ladies and gentlemen, to decide this case."; *id.* at 2000:13-19: "Another response Google made was the source code . . ., evidence, I fear, you may not really be able to understand. I can tell

you that I don't understand it. I'm not a computer scientist. I can't read source code.")

Plaintiff instead based its infringement case primarily on marketing documents. For example, in summarizing his opinions for the jury, Dr. Frieder relied primarily upon two pieces of evidence: (1) PX 338, a Google marketing document prepared for Google's advertisers and (2) a video prepared by Hal Varian, an economist, also for Google's advertising customers. (Trial Tr. 434:15-436:5; *id.* at 436:10-20.) And, in his claim-by-claim analysis, Dr. Frieder again placed primary reliance on PX 338 to support his infringement contentions. (*Id.* at 486:17-488:6 (relying on PX 338 to show content-based filtering); *id.* at 489:2-490:18 (relying on PX 338 to show the combination of content and collaborative and filtering based on that content and collaborative; PDX 57-59, 91-93, 98, 119, 126-128, 133-35, 139-41.)

Plaintiff's reliance on marketing documents is insufficient to show infringement as a matter of law. *PharmaStem*, 491 F.3d at 1351-52. For example, in *PharmaStem*, the Federal Circuit affirmed the lower court's judgment as a matter of law that overturned the jury's verdict of infringement, finding the advertising materials to be insufficient evidence where scientific proof was lacking. 491 F.3d at 1351-52; *Scantibodies Lab.*, 374 F. App'x at 971 ("The use of language in marketing materials often means something quite different from the language used in a patent."); *Whirlpool Corp. v. LG Elecs., Inc.*, 2006 WL 2035215, at *8 (W.D. Mich. July 18, 2006) (granting summary judgment because "[i]t is the [product], not the marketing materials, that are the subject of the infringement accusation. The marketing materials cannot override the actual operation of the [product]."). Dr. Frieder's conclusory statements that the source code confirms infringement do not cure the failure of Plaintiff's primary reliance on marketing documents. *PharmaStem*, 491 F.3d at 1355.

## B. Plaintiff Admitted that the Marketing Documents It Relied On to Prove Infringement Were Irrelevant.

Quality Score is a broad term used by Google in different ways depending on the subject or context. (Trial Tr. 1079:8-14.) There is no dispute, however, the Quality Score between 1 and 10 shown to AdWords advertisers is not accused in this case. (*Id.* at 2064:1-19.) Indeed, on cross-examination, Dr. Frieder admitted that the type of Quality Score for advertisers that indicates a number between 1 and 10 was not accused and that he did not intend to rely on it for his infringement contentions. (*Id.* at 636:20-637:17.)

Yet, Dr. Frieder admitted that many of the documents he presented to the jury to show infringement, including PX-338, the one document he primarily relied upon for his testimony, pertained to the non-accused Quality Score 1 through 10. (*Id.* at 645:15-19: "Q. Okay. So we know that the Quality Score that's being discussed in PX-338 is shown to advertisers and we know that the document says it's on a scale of 1 to 10, correct? A. That one is, yes."; *id.* at 647:3-5 (PX 51); 647:15-649:1 (PX 357); 650:1-651:9 (PX 112); 667:6-17 (Hal Varian video).) Despite Dr. Frieder's admissions, Plaintiff's counsel still elicited testimony from Dr. Frieder on redirect that the documents were somehow really about the accused Quality Score rather than just the unaccused Quality Score as Dr. Frieder admitted. (*Id.* at 728:12-729:6, 729:7-732:21.) This elicited testimony was plainly false. Indeed, Plaintiff's counsel later argued that such documents were irrelevant to its case. (*Id.* at 2064:1-19: "Remember there was testimony from Mr. Alferness about Quality Score 1 through 10 and he said not accused? That's what these slides are about, ladies and gentlemen, and it isn't accused. I agree with that.")

By relying on irrelevant evidence and asking the jury to ignore the most detailed evidence of how the systems work, Plaintiff demonstrated that even it believed the actual evidence of infringement Plaintiff presented was insubstantial. Judgment as a matter of law is appropriate.

## C.    Defendants Are At Minimum Entitled to a New Trial.

If the Court finds that judgment as a matter of law is not warranted, Defendants are at

least entitled to a new trial because the verdict was against the clear weight of the evidence, was

based upon false evidence, and will result in a miscarriage of justice for all of the reasons

outlined herein.  In particular, because most of the marketing documents were irrelevant to the

question of infringement, and the remainder were not sufficient to prove infringement, the

verdict was against the clear weight of the evidence.  Defendants were also prejudiced because

Plaintiff confused and misled the jury by introducing marketing documents it knew to be — and

even itself argued — were irrelevant, while urging the jury to nevertheless rely on them rather

than the actual technology at issue in the case.  *Sparks*, 992 F.2d at 54 (ordering a new trial after

district court erred in admitting evidence); *Ellis*, 745 F.2d at 305 (holding that error not harmless

and ordering a new trial when court could not be certain that refusal to admit evidence did not

prejudice outcome).

## VI.    PLAINTIFF FAILED TO PROVE EITHER INDIRECT INFRINGEMENT OR INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

Plaintiff never once argued inducement or contributory infringement, or infringement

under the doctrine of equivalents.  Plaintiff did not seek to establish any of these theories'

elements at trial.  Thus, no reasonable jury could have found that Defendants indirectly infringe

the asserted claims or infringe under the doctrine of equivalents.  Instead, based on the verdict, it

appears I/P Engine merely confused the jury on these issues.  Although the jury instructions

included instructions on indirect infringement and infringement under the doctrine of

equivalents, there was not a single question in the jury verdict asking the jury to find that

Defendants had indirectly infringed the patents-in-suit or infringed under the doctrine of

equivalents.  Instead, the jury verdict simply asked if each Defendant infringed the asserted

claims.  To the extent the jury answered in the affirmative on the basis of indirect infringement

or doctrine of equivalents, no reasonable jury should have done so as outlined below, and Defendants' motion for judgment as a matter of law should be granted. To the extent the jury didn't understand the verdict form, given its inconsistency with the jury instructions, Defendants should be granted a new trial with corrected instructions that are consistent with the evidence submitted in the case.

### A.    No Reasonable Jury Could Have Found that Google Indirectly Infringes the Asserted Claims.

I/P Engine introduced no evidence of indirect infringement. Rather, as Defendants pointed out in oral argument on their Rule 50(a) motion, I/P Engine's purpose in asserting indirect infringement was to sneak in theories regarding Google's alleged "copying" of the patents that the Court explicitly rejected in granting Defendants' *motion in limine* on willfulness. (Trial Tr. 1003:21-1004:19; Dkt. No. 705 at 7.) I/P Engine's failure to present evidence of indirect infringement, and end-run around the Court's ruling on indirect infringement, has caused irreparable harm to Defendants and, at the least, is grounds for a new trial.

*Active Inducement:* I/P Engine's argument fails at the threshold: where there is no direct infringement, as explained above in §I, there can be no indirect infringement. *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360 (Fed. Cir. 2012) ("Inducement of infringement requires that there be a showing of an underlying act of direct infringement.").

But even if there were direct infringement, I/P Engine failed to provide any evidence that Google actively induced others to infringe the patents-in-suit. To establish active inducement, I/P Engine needed to show that Google purposefully caused others to directly infringe the asserted claims in the patents-in-suit. Specifically, it needed to prove that Google (i) had <u>actual</u> knowledge of the patents-in-suit and (ii) <u>specifically intended</u> for others to perform acts that directly infringe one or more of the asserted claims. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Here, I/P Engine introduced no evidence at trial that Google

had actual knowledge of either patent-in-suit. The citation to the '420 patent during prosecution of Google's own patent application is insufficient as a matter of law to show actual knowledge of the patents-in-suit by Google. *Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141, 1285 (W.D. Wash. 2008) ("[H]aving 'knowledge' of a single patent only because it was cited during prosecution of two patents among thousands (and then only through imputing that knowledge from [the defendant's] attorneys) does not give [the defendant] sufficient 'knowledge' to formulate 'intent' required for inducement."). I/P Engine also presented no evidence that Google specifically intended for others—i.e., users or the other Defendants in this case— to directly infringe one or more of the asserted claims.

*Contributory Infringement:* Likewise, even if there were direct infringement, I/P Engine failed to provide any evidence that Google contributed to others' infringement of the patents-in-suit. To establish contributory infringement, I/P Engine needed to show "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). This test is conjunctive. I/P Engine needed to provide substantial evidence for each element. The accused systems do not directly infringe the asserted claims. But more than that, I/P Engine made no attempt whatsoever to introduce any evidence concerning the last three elements of this test for contributory infringement, and did not even argue the point to the jury. Accordingly, I/P Engine did not meet its burden of proof as to indirect infringement of the patents-in-suit.

Because I/P Engine presented no evidence of indirect infringement, the Court erred by including a jury instruction related to indirect infringement. *United States v. Taylor*, 179 F. App'x 881, 884 (4th Cir. 2006) ("To be entitled to a requested jury instruction, the party urging the instruction must establish a sufficient evidentiary foundation to support the instruction.").

Including this legal theory that was not supported by the evidence, and yet not including a

separate interrogatory related to this theory, confused and misled the jury and rendered the jury

verdict ambiguous as to how the jury found infringement. Thus, a new trial is required to resolve

this ambiguity.[12] *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8

(1997) ("[I]n cases that reach the jury, a special verdict and/or interrogatories on each claim

element could be very useful in facilitating review, uniformity, and possibly postverdict

judgments as a matter of law."). Because no reasonable jury could have found indirect

infringement, and because a new trial is necessary to resolve the ambiguity in the verdict as

compared to the jury instructions, Defendants' motion for judgment as a matter of law or in the

alternative a new trial as to indirect infringement should be granted.

**B.** **No Reasonable Jury Could Have Found that Defendants Infringe the Asserted Claims Under The Doctrine Of Equivalents.**

Similarly, despite alleging that Google is liable for infringement under the doctrine of

equivalents, I/P Engine presented no evidence or argument in support of this allegation. Under

the doctrine of equivalents, "a product or process that does not literally infringe . . . the express

terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between

the elements of the accused product or process and the claimed elements of the patented

invention." *Warner–Jenkinson Co.*, 520 U.S. at 21. Plaintiff, however, presented no evidence or

argument about infringement under the doctrine of equivalents, so including a jury instruction on

the doctrine of equivalents was error. *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422,

1426 (Fed. Cir. 1989) ("[S]ince there was neither argument nor evidence explicitly setting forth

---

[12]  It is clear that the jury was confused by the Court's instruction, as it asked a question about "third-party infringement," language used in connection with indirect infringement, that made no sense whatsoever. (Trial Tr. 2141:1-2 (announcing the jury's question of "Is there a date to use when considering the question of third-party infringement?").)

equivalence of result, function, and means, the trial court should not have instructed the jury on the doctrine."). Additionally, the verdict form was inconsistent with the jury instructions, in that it simply asked if each Defendant infringed the asserted claims. It is impossible to know whether the jury by answering yes found infringement under the doctrine of equivalents. As discussed above, because no evidence or argument was presented about the doctrine of equivalents, Defendants are entitled to judgment as a matter of law that they did not infringe under the doctrine of equivalents. Because the jury was allowed to consider that doctrine in determining infringement but the Court did not submit a special interrogatory about it, the Court should grant a new trial to ensure the jury did not find infringement based on a wholly unsupportable theory. *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Judgment as a Matter of Law on Non-Infringement, or New Trial.

DATED: December 18, 2012        */s/ Stephen E. Noona*
                                     Stephen E. Noona
                                     Virginia State Bar No. 25367
                                     KAUFMAN & CANOLES, P.C.
                                     150 West Main Street, Suite 2100
                                     Norfolk, VA 23510
                                     Telephone: (757) 624.3000
                                     Facsimile: (757) 624.3169
                                     senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation,*
*IAC Search & Media, Inc., and*
*Gannet Co., Inc.*

By: */s/ Stephen E. Noona*        
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile: (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile: (415) 653-6444

*Counsel for Defendant AOL, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

    */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624.3000
Facsimile: (757) 624.3169
senoona@kaufcan.com