# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

I/P ENGINE, INC.

           Plaintiff,

    v.

AOL, INC., *et al.*,

           Defendants.

Civil Action No. 2:11-cv-512

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES OR A NEW TRIAL

The jury's damages award is not based on substantial evidence and was, instead, tainted by the introduction of unreliable and inadmissible expert testimony. Inadmissible evidence, as a matter of law, does not qualify as substantial evidence. Defendants therefore request that the Court enter judgment as a matter of law that I/P Engine failed to meet its burden of proof on damages. Alternatively, Defendants request a new trial on all issues.

The most glaring failure of proof is that there is no evidence of a royalty base. I/P Engine introduced evidence only of the Defendants' *total* accused revenues from September 2005 through September 2012. Despite being well aware of Defendants' laches defense and the potential impact on its case, I/P Engine never introduced evidence of what portion of the accused revenue was generated after the filing of the complaint. The Court found in favor of Defendants on laches, holding that I/P Engine could not recover damages for infringement prior to the filing of the complaint. As a result, the jury had no evidence of an applicable royalty base for any Defendant.

I/P Engine also failed to introduce admissible evidence apportioning the royalty base. Its expert, Dr. Becker, used what he found to be the entire incremental impact that the entire SmartAds system had on Google's revenue as his royalty base. Yet it is undisputed that SmartAds

is comprised of numerous non-infringing components. Further, in arriving at his apportionment figures, he included the incremental impact that such features as "disabling" and "promotion" had on Google's revenue according to a draft Google presentation without evidence that those features were attributable to the patents.

I/P Engine's damages case also suffers from a failure of proof because it rests entirely on expert testimony that was improperly admitted and, therefore, cannot defeat a motion for JMOL. *First*, Dr. Becker premised his entire opinion on an unsupported date for the hypothetical negotiation. I/P Engine's infringement theory turned on the use of certain "attribute templates." But there is no evidence that those templates were used before 2010, and therefore, no evidence to support an earlier hypothetical negotiation date. Dr. Becker assumed, however, a hypothetical negotiation date of 2004, when SmartAds was first launched.

*Second*, Dr. Becker's testimony that the hypothetical negotiation would have resulted in a running royalty was unsupported by substantial evidence and contrary to law. All the relevant and admissible evidence is in agreement that the hypothetical negotiation would have resulted in a lump-sum agreement. Further, where, as here, the record is devoid of substantial evidence to properly apportion a royalty base, the reasonable royalty must be in the form of a lump sum.

*Third*, Dr. Becker ignored all real-world transactions involving the patents and instead relied on non-comparable licenses that did not involve any of the parties. The patents have changed hands multiple times in real-world, arms-length transactions. Yet Dr. Becker instead relied on non-comparable licenses to artificially inflate the royalty rate.

Each of these deficiencies was brought to I/P Engine's attention repeatedly in expert reports and pretrial motions and Rule 50(a) motions. Yet I/P Engine never attempted to provide a legally cognizable damages theory, correct the errors in what it presented, or re-open its case to

introduce the admissible and substantial evidence that the record lacks. As the Supreme Court has held, where a plaintiff is on "notice of the exacting standards of reliability such [expert] evidence must meet," "was on notice every step of the way that [defendant] was challenging his experts, [and] made no attempt to add or substitute other evidence" to meet its burden of proof, JMOL is proper. *Weisgram v. Marley Co.*, 528 U.S. 440, 455-56 (2000). I/P Engine is not entitled to a new trial so that it can have a "do over" on damages.

If, however, the Court is inclined to give I/P Engine a second chance, a new trial should be ordered on *all* issues. Where the plaintiff introduces a large and improperly apportioned royalty base, it prejudices the entire case by inviting the jury to find for plaintiff on liability, not because of the evidence, but because the defendant is a large company that derived a large amount of revenue from the accused product and, therefore, can withstand an adverse judgment. *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 897-98 (D.C. Cir. 2010) (remanding for new trial in light of admission of prejudicial evidence of defendant's net worth); *Reilly v. NatWest Mkts. Group Inc.*, 181 F.3d 253, 266 (2d Cir. 1999) (evidence of defendant's wealth "can be taken as suggesting that the defendant should respond in damages because he is rich") (quoting *Koufakis v. Carvel*, 425 F.2d 892, 902 (2d Cir. 1970)). Thus, if JMOL is not granted, a new trial is warranted on *all* issues.

## BACKGROUND

**I.  DEFENDANTS MOTION TO EXCLUDE I/P ENGINE'S UNSUPPORTED DAMAGES THEORIES**

Defendants made I/P Engine well-aware of the deficiencies in its damages case prior to trial. Defendants' damages expert report describes those deficiencies in detail, and Defendants pled and moved for summary judgment on the equitable defense of laches, which precludes a patentee that unreasonably delays bringing suit from recovering pre-complaint damages. (D.N. 238.) Defendants contended that, because of I/P Engine's delay, I/P Engine must limit its damages

claim to only royalties allegedly owed after the date of the complaint. Defendants also moved to exclude the testimony of I/P Engine's damages expert, Dr. Becker because he relied on an unsupported date for the hypothetical negotiation, failed to properly apportion the royalty base, relied on non-comparable licenses, ignored all transactions involving the patents in suit, and opined without evidentiary support that the hypothetical negotiation would have resulted in a running royalty. (D.N. 320.) Defendants also moved in limine to exclude evidence of damages from the non-Google defendants because inclusion would constitute double counting of the same revenue. (D.N. 308.) The Court denied Defendants' motions. (D.N. 682 at 3-5; D.N. 705 at 8-9.)

## II. DR. BECKER'S RUNNING ROYALTY TESTIMONY

Fully aware of the challenges Defendants intended to make to its damages case, I/P Engine nevertheless presented an incomplete and superficial damages theory. I/P Engine contended, and Dr. Becker asserted, that damages should be in the form of a reasonable royalty that would result from a hypothetical negotiation for a license on the date of first infringement. Dr. Becker testified that this was based on the assumption that the date of first infringement, and therefore the date of the hypothetical negotiation, was in "early 2004." (Trial Tr. 786 & 790-91.) He claimed that this corresponded to the July 2004 date that Google first launched SmartAds. (*Id.* at 773, 780 & 786.) Dr. Becker did not testify what the result of the hypothetical negotiation would be on any date other than 2004. (*Id.* at 853.) I/P Engine, however, never introduced evidence of any infringement in 2004 and instead hinged its infringement theory on certain SmartAds templates that were not introduced until at least 2010. (*Id.* at 518-40.)

## III. DR. BECKER'S ROYALTY RATE TESTIMONY

Dr. Becker testified that the hypothetical negotiation would result in a 3.5% running royalty rate. To arrive at his inflated rate, Dr. Becker relied on three Overture Services licenses that do not involve the patents-in-suit and do not involve any of the parties in this case or their predecessors.

(Trial Tr. 853-54 & 870-71.) Even more troubling, Dr. Becker ignored the most relevant evidence—actual transactions involving the patents. In 2004, Daum Communications bought all of Lycos, including the patents, for $95 million. (*Id.* at 863-64.) And in 2011, Smart Search Labs purchased the patents, along with several others, for only $3.2 million. (DX-19 at 5.) Dr. Becker made no additional effort to identify comparable licenses. (Trial Tr. 887.)

## IV. DR. BECKER'S ROYALTY BASE TESTIMONY

Acknowledging that the law did not permit him to apply a running royalty against *all* of Defendants' advertising revenue, Dr. Becker testified that he had attempted to apportion to a proper royalty base using a draft Google document from 2006, shown below. (Trial Tr. 909.)



(PDX 72.) This draft document describes the impact of various systems on Google's "Revenue Per Thousand Queries," including the "SmartAds" system (listed as "SmartASS"), as well as "Spam," "Disabling," "Promotion," and several other features. (PDX 72.) Dr. Becker combined the impact for "SmartASS," "Disabling," and "Promotion" and used that as the measure of his royalty base. (Trial Tr. 802-05.) Dr. Becker therefore attributed between 7.8% and 22.4% of

Google's RPM to the patents-in-suit, depending on the time period in question, representing the entire market value of the Smart Ads, Disabling, and Promotion features. (*Id.* at 907-08.)

Dr. Becker then applied this apportionment methodology to the Defendants' revenue. In an effort to present the largest possible revenue number to the jury, I/P Engine introduced evidence of Defendants' "apportioned" revenue from 2005 through 2012 as aggregate totals. (*Id.* at 832.)



(PDX 77.) Although I/P Engine was aware of Defendants' laches defense that, if successful, would limit damages to only those incurred after the filing of the complaint, I/P Engine did not introduce any evidence breaking these revenues out by year, quarter, or month or introduce any evidence of what proportion was incurred post-complaint. (Trial Tr. 833.)

## V.   THE LACHES AND JUDGMENT AS A MATTER OF LAW RULINGS

During trial, Defendants made a proffer of evidence in support of their equitable laches defense and moved for JMOL. (D.N. 766 & 767.) The Court granted the motion from the bench, held in Defendants' favor, and ruled that "plaintiff's damages flow from the date of filing its complaint, which was September 15th, 2011." (Trial Tr. 1805-06; *see also* D.N. 800.)

Defendants also moved for JMOL on damages and argued that there was no evidence of a royalty base limited to the post-complaint period. (*Id.* at 1953-66; D.N. 752 & 773.) In response, I/P Engine did not move to reopen the record to submit additional evidence. Instead, it admitted to the Court that its damages expert, "Dr. Becker did not provide a number for the amount of damages from September 15, 2011 forward." (Trial Tr. 1962.) It argued, however, that it could prove damages by reference to a bar chart in a demonstrative exhibit—PDX 83:



(Tr. 1962.) This bar chart shows I/P Engine's alleged damages over time. It does not identify what portion is owed by which defendant. Nor is it clear how much revenue each bar represents or what time period it covers. I/P Engine also conceded that this demonstrative was not admitted:

> [T]his exhibit itself was not marked as an admitted exhibit. So I think with regard to where we are left – I think the premise that there is an absence of proof to support the plaintiff's case with regard to Dr. Becker's testimony, I believe the evidence is in the record, although I concede the specific number as of September 15, 2011 is not in there, and I believe we will require guidance from the Court on how we present that to the jury in our summations.

(Trial Tr. 1963.) Indeed, during trial, I/P Engine and the Court several times noted that demonstratives were for pedagogical use only and were not admitted into evidence. (*Id.* at 832-33, 1464-65, 1962-63 & 2119-21.) The Court nevertheless stated that it believed there likely was sufficient other evidence in the record for the jury to determine damages, though it was I/P Engine's duty to locate it. (*Id.* at 1964 & 1967-68.)

## VI.    CLOSING ARGUMENTS AND THE VERDICT

I/P Engine did not, however, locate any supporting damages or royalty base evidence. Instead, it told the jury to look to a slightly modified version of the demonstrative bar chart that was not admitted into evidence and calculate damages using "memory and judgment":

> Well, as a result of the [Court's laches] ruling, the only royalties that are at issue here are the ones that are represented by the four bars on the far right. And you will need to rely on your memory and judgment to determine based upon that what's a reasonable royalty *for Google to pay* after September 15, 2011.

(Trial Tr. 2008 (emphasis added); *see also id.* at 2069-70.)



(PDX 441.) Although I/P Engine told the jury that the demonstrative reflected damages owed only by Google, Dr. Becker had actually testified that the chart represented damages owed by all Defendants together. (Trial Tr. 848-49; *see also id.* at 767-68; PDX 82-83; D.N. 813 at 13-14.)

Further confusing the matter, based on an incorrect representation of the law by I/P Engine at the charge conference, the Court initially ruled that its laches ruling applied only to Google and not its codefendants. The Defendants objected to that portion of the Court's proposed jury instruction. (Trial Tr. 1977.) I/P Engine then argued to the jury that the laches ruling applied only to Google and not the other Defendants and that they were liable for the full pre-complaint damages period. (*Id.* at 2005.)

## Reasonable Royalty on Use of Patented Inventions By Non-Google Defendants

| AdWords/AdSense for Search/ Adsense for Mobile Search | | | AOL Search Marketplace | |
|---|---|---|---|---|
| AOL | $22,693,517 | | AOL | $510,746 |
| IAC | $18,917,570 | | | |
| Target | $282,380 | | | |
| Gannett | $12,348 | | | |



| | TOTAL | $42,416,561 |
|---|---|---|

Reasonable royalty for use
of patented technology

*PDX443*

(PDX 443.) Following I/P Engine's closing argument, the Court reconsidered, correctly held that laches applied equally to all Defendants, and instructed the jury that "damages commence on the date that the lawsuit was filed." (Trial Tr. 2016-22 & 2113.) In the rebuttal portion of its closing, I/P Engine acknowledged the Court's clarification, but did not address the figures it had earlier shown regarding the allocation of damages among the non-Google defendants.

The deliberations and verdict reflected the gaps in I/P Engine's damages case. Demonstrating confusion about the date of the hypothetical negotiation, the jury inquired, "Is there a date to use when considering the question of third-party infringement?" (*Id.* at 2141-42.) And illustrating confusion about the royalty base, the jury inquired "If a running royalty is determined, are we to apply the rate to a certain figure for each defendant?" (*Id.* at 2147) and "To what figure do we apply the rate?" (*Id.* at 2148). The jury's verdict allocated to the non-Google Defendants 48% of the total damages, despite the fact that I/P Engine had argued throughout the trial that they were liable for less than 10% of the total damages. (D.N. 789 at 11.)

## LEGAL STANDARD

**Judgment as a Matter of Law:** JMOL is appropriate where a party has been fully heard and "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50. When applying this standard, the Court must consider only evidence that was properly admitted at trial and exclude from consideration all inadmissible evidence. *Weisgram*, 528 U.S. at 454 ("Inadmissible evidence [for purposes of Rule 50] contributes nothing to a 'legally sufficient evidentiary basis.'"); *Fisher v. Am. Gen. Fin. Co.*, 52 F. App'x 601, 608 (4th Cir. 2002) (holding that district court erred in denying motion for JMOL "[i]n light of our conclusion that the Mynes deposition excerpts were inadmissible").

I/P Engine bears "the burden of proving the amount of reasonable royalty damages it is entitled to recover." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1376 (Fed. Cir. 2002). While a reasonable royalty calculation will involve "some approximation," a patentee must employ "sound economic and factual predicates" in proving a reasonable royalty. *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("[T]he patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'"); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860,

869 (Fed. Cir. 2010) ("[T]he trial court must carefully tie proof of damages to the claimed

invention's footprint in the market place . . . . Any evidence unrelated to the claimed invention

does not support compensation for infringement but punishes beyond the reach of the statute.").

Where, as here, the patentee, after being fully heard, fails to present to the jury a legally sufficient

basis upon which to calculate damages, JMOL is warranted.[1]

New Trial: A court should grant a motion for a new trial if (1) the jury instructions were

erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3)

the verdict is contrary to the great weight of the evidence. *See* Fed. R. Civ. P. 59. In ruling on

such a motion, the Court may "weigh the evidence and consider the credibility of witnesses."

*Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

## ARGUMENT

## I. I/P ENGINE HAS A COMPLETE FAILURE OF PROOF ON THE APPLICABLE ROYALTY BASE

I/P Engine has argued throughout this litigation that it is entitled to damages in the form of

a running royalty. The nature of such a remedy is that a royalty rate must be applied to a royalty

base. *Decca Ltd. v. United States*, 640 F.2d 1156, 1173 (Ct. Cl. 1980). I/P Engine, however,

blindly and recklessly ignored Defendants' laches defense and did not introduce any evidence of a

post-complaint royalty base. Nor did it seek to reopen the record to introduce such evidence either

after the Court ruled on the laches defense or during argument on Defendants' motion for JMOL

---

[1] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d. 1301, 1340 (Fed. Cir. 2009) (reversing denial of motion for judgment as a matter of law on damages); *Apple Inc. v. Motorola, Inc.*, No. 1:11-cv-8540, 2012 WL 2362630, at *1 (N.D. Ill. June 7, 2012) (Posner, J., sitting by designation) (where patentee failed to present substantial admissible evidence of damages, granting summary judgment on entitlement to past damages); *see also Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012) (Posner, J., sitting by designation) (dismissing claims with prejudice).

on damages. *Davis v. Rodriguez*, 364 F.3d 424, 432 (2d Cir. 2004) (non-movant may seek to reopen case to address failure of proof in response to Rule 50 motion).

As described above, the only evidence that I/P Engine attempted to rely on to establish damages or a royalty base after the Court held that only post-complaint damages were in play was a demonstrative bar chart. That demonstrative is not substantial evidence of anything, much less damages or a royalty base for several reasons. JMOL is therefore warranted.

*First*, as I/P Engine apparently agrees (Trial Tr. 1963), a demonstrative is not substantive evidence that can support a verdict. Demonstratives do "not have *independent* probative value for determining the substantive issues in the case."[2] Therefore, the only supposed "evidence" I/P Engine relied on cannot support the jury's verdict.

*Second*, the bar chart represents I/P Engine's claimed *damages* (PDX 441), not the royalty base that could be used to calculate those damages. Even crediting the chart, there remains a failure of proof on the Defendants' post-complaint royalty base.

*Third*, the bar chart lacks the clarity necessary to calculate damages for any defendant (much less a royalty base). The chart aggregates the claimed damages for all defendants together, and does not include dates or identify the specific damages or accused revenue for each quarter. Therefore, it does not provide data for any individual defendant. (*See* PDX 83; Trial Tr. 848.)

*Fourth*, the bar chart does not even describe damages owed by the non-Google defendants. I/P Engine argued that the bar chart represented damages owed by Google alone. (Trial Tr. 2008.) There is no post-complaint evidence that represented the damages or royalty base for any of the

---

[2]  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 535 F. Supp. 2d 580, 584 (E.D. Va. 2008); *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003) (holding that demonstratives are not evidence and Rule 611 is meant to allow pedagogical aides to clarify evidence that has already been admitted); *Pritt v. United States*, No. Civ.A. 601-1045, 2002 WL 32438757, at *4 (S.D. W. Va. July 30, 2002) ("Demonstrative exhibits do not constitute evidence.").

non-Google defendants. The only damages figures introduced for the non-Google defendants were aggregate totals that encompassed pre-complaint damages. (PDX 82; PDX 442-43; Trial Tr. 846-48.) The resulting jury confusion is illustrated by, for example, the fact that I/P Engine asked for twenty-times greater damages from Google than it did from AOL, but the jury awarded roughly twice as much.

*Fifth*, I/P Engine's theory introduced impermissible double counting of revenue and damages. It was undisputed that Google obtains revenue from SmartAds both by displaying advertisements on its own site and by contracting to display advertisements on the websites of the other defendants through programs called AdSense for Search and AdSense for Mobile Search. (*Id.* at 558, 629, 827 & 1046.) Google then pays the non-Google defendants a portion of the generated advertising revenue. (*See, e.g., id.* at 827; PX-242 (IAC Agreement); PX-260 & 261 (Target Agreements).) Therefore, all revenue obtained by the non-Google defendants as a result of alleged infringement was first revenue obtained by Google from advertisers. Yet I/P Engine introduced no evidence that it disaggregated these duplicate revenues that it attributed to AOL, IAC, Target, and Gannett from the revenue it attributed to Google.

I/P Engine encouraged duplicative recovery when it urged the jury to use the bar chart to determine "what's a reasonable royalty for Google to pay." (Trial Tr. 2008.) But Dr. Becker testified that the chart aggregated damages for *all* Defendants. (*Id.* at 848-49; *see also id.* at 767-68; PDX 82-83.) I/P Engine conceded this in its post-trial briefing. (D.N. 813 at 13-14 ("The damages figures presented to the jury in graphical form at PDX 83 and again at PDX 441 were the *total* damages for *all* defendants, not just the damages associated with Google's infringement.").) I/P Engine's closing argument therefore asked the jury to assess against *Google* the aggregate damages that Dr. Becker testified were owed by all Defendants combined. Thus, the amount that

I/P Engine asked the jury to award against Google already included, by I/P Engine's own admission, damages owed by all Defendants.

## II.    I/P ENGINE FAILED TO APPORTION THE ROYALTY BASE BETWEEN PATENTED AND UNPATENTED FEATURES

JMOL is appropriate because I/P Engine did not introduce evidence of a proper apportionment of the royalty base, and instead submitted expert testimony that was not supported by substantial evidence and was contrary to law. Such inadmissible evidence is not "substantial" and therefore cannot avoid JMOL, especially where, as here, I/P Engine has long been on notice of Defendants' challenges to this evidence, but nevertheless, "made no attempt to add or substitute other evidence." *See Weisgram*, 528 U.S. at 454-56.

### A.    Dr. Becker's Apportionment Is Contrary to Federal Circuit Law

Dr. Becker's testimony is contrary to Federal Circuit precedent on apportionment of royalty bases. Where a patent covers only a part of a multi-component system, the plaintiff cannot ordinarily include revenue attributable to the larger system in the royalty base. *See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Uniloc*, 632 F.3d at 1318-19; *Lucent Techs.*, 580 F.3d at 1336-39; *see also Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 285-87 (N.D.N.Y. 2009) (Federal Circuit Chief Judge Rader, sitting by designation). This rule is derived from the requirement that the patentee "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Uniloc*, 632 F.3d at 1318 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

Where the royalty base is either not apportioned, or the apportionment is not supported by substantial evidence, the Federal Circuit has found great risk of prejudice to the defendant. In

*Uniloc*, for example, the plaintiff introduced evidence that the gross revenue for the defendant's product was $19.28 billion. *Id.* at 1311. The district court held that this was improper because the royalty base must be apportioned, observed that once the jury heard this enormous revenue figure, the "'$19 billion cat was never put back into the bag'" and the jury may have "'used the $19 billion figure to 'check' its significant award of $388,000,000.'" *Id.* at 1312. On appeal, the Federal Circuit observed that the "disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Id.* at 1320.

The facts of this case are indistinguishable. Dr. Becker testified that SmartAds "is a big deal revenue-wise" and that "it had a large revenue impact." (Trial Tr. 810; *see also id.* at 818-19 ("high impact on Google's revenue").) I/P Engine argued that the sum of all Defendants' "apportioned" royalty bases was over ██████. (*Id.* at 832.) It used graphics like a magnifying glass to stress to the jury what a small portion of Defendants' revenue it sought.



(PDX 444; *see also* PDX 65.) Dr. Becker's "apportionment" of the Defendants' revenue was, however, not supported by substantial evidence. For example, Dr. Becker included incremental revenue for the Disabling and Promotion features in the royalty base without any evidence that this revenue is in any way related to Smart Ads or the accused functionality. (Trial Tr. 914-15.) If anything, the separate categories in the documents that Dr. Becker relies on suggest the opposite— *i.e.*, the Disabling and Promotion features are different from Smart Ads. And as Dr. Becker admitted, I/P Engine never asked any Google witness whether his understanding of the draft Cumulative Product Impact chart was correct. (*Id.* at 912.)

Further, I/P Engine introduced no evidence that the entire alleged 20% increase in revenue from the use of Smart Ads in 2006 was attributable to the impact of the patents in suit. Indeed, Dr. Becker testified that when SmartAds was first launched, it had only a 7.8% impact on revenue. (Trial Tr. 906-07.) SmartAds is a complex, multi-component system, of which the patents in suit are only alleged to be one part. For example, I/P Engine presented testimony that one aspect of the accused SmartAds system is the generation of a predicted clickthrough rate (pCTR) for an advertisement, one use of which was an essential part of its infringement theory. (*Id.* at 461-64, 467, 521, 577, 692-93, 702-03 & 1044.) I/P Engine's technical expert agreed, however, that the calculation of the predicted clickthrough rate was Google's invention and not taught by the patents. (*Id.* at 710.) Nor did the patents teach how to perform the auction that SmartAds uses to determine which ads to display or how to build the SmartAds templates or the filtering of advertisements based on bids. (*Id.* at 710-11.) Indeed, Dr. Becker agreed that SmartAds "includes a lot more than just the technology that's accused of infringement." (*Id.* at 918.)

Dr. Becker did not attempt to apportion out the value of these technologies or their contribution to Google's revenues:

16

Q. Okay. Well, you didn't parse out the incremental revenue for accused versus unaccused features, did you?

A. No. I don't have an individualized quantification that says this step of SmartAds is worth X and this other step of SmartAds is worth Y. The only thing I have done is to value SmartAds, the thing that I have to assume is infringing, recognize that there is many other things in it that Google contributed, and that's why we're talking about a 3 and a half percent royalty on it, not basically the whole green on the chart.

Q. Okay. And you didn't conduct any independent consumer research to measure demand for the accused versus the unaccused features of SmartAds, did you?

A. Not -- no, I didn't do any independent research beyond the testing that obviously Google has done on this.

Q. And instead you just used the total incremental revenue for the SmartAds system as the royalty base in your analysis, right?

A. Yes, as the base.

(*Id.* at 919.) As is well-established, this is error. *LaserDynamics*, 694 F.3d at 67; *Uniloc*, 632 F.3d at 1318-19; *Lucent Techs.*, 580 F.3d at 1336-39; *Cornell Univ.*, 609 F. Supp. 2d at 285-87.

**B.      Reliance on an Unsupported Date for the Hypothetical Negotiation Rendered Dr. Becker's Apportionment Opinion Unreliable and Inadmissible**

As described above, *see* Part II D, Dr. Becker's apportionment testimony is based on his analysis of a chart measuring the impact of the implementation of SmartAds from 2004 to 2006. PDX 72. I/P Engine argued to the jury and Dr. Becker testified based on this chart that Google's revenue increased by 20% in 2006 from SmartAds, and that the appropriate royalty base was therefore approximately 20% of Google's revenues. (Trial Tr. 133-36, 773, 777-81 & 810.) But, as described below in Part III, I/P Engine introduced no evidence of infringement before 2010 or the impact the introduction of the templates that it relied on to prove infringement had on Google's revenue in 2010. And even Dr. Becker agreed that, when launched, SmartAds had only a 7.8% impact on Google's revenue. (*Id.* at 906-07.) There is no evidence that the alleged 20% increase in Google's revenue is attributable to the patents, and admission of Dr. Becker's apportionment opinion was prejudicial error.

### C.   Neither I/P Engine Nor Dr. Becker Justified the Use of an Inflated Royalty Base

I/P Engine and Dr. Becker's efforts to account for this inflated royalty base are contrary to law. Dr. Becker testified that he attempted to account for his improper apportionment by adjusting the royalty rate down (Trial Tr. 919), and I/P Engine offered similar justifications at oral argument during trial (*id.* at 952-53) and to the jury during closings:

> Now, Dr. Ugone in his testimony said, well, Google contributed a whole bunch of things to this. That's absolutely right. That's absolutely right. And this slide down at the right was Dr. Ugone's explanation to you on that. That's the 96.5 percent, ladies and gentlemen. That's all to Google. Nobody is asking for a royalty on any of that, just on the impact that the patented technology made with respect to Google's revenue.

(*Id.* at 2009.)

The Federal Circuit rejected this reasoning in *LaserDynamics*, 694 F.3d at 69, and *Uniloc*, 632 F.3d at 1319-20. In *LaserDynamics*, the plaintiff's damages expert testified that he accounted for a royalty base that included revenue attributable to unpatented aspects of the accused product by adjusting the royalty rate down by one-third. 694 F.3d at 69. The Federal Circuit deemed this adjustment arbitrary and ruled that admission warranted a new trial. Similarly, in *Uniloc*, the plaintiff argued that the royalty base need not be properly apportioned "if the royalty rate is low enough." *Uniloc*, 632 F.3d at 1319. *Uniloc* rejected this argument, stating that a patentee cannot account for an inflated royalty base "simply by asserting a low enough royalty rate." *Id.* at 1320. Indeed, the argument defeats the purpose of the apportionment rule, which is to prevent prejudice caused by parading an inflated revenue figure in front of the jury. *See id.*

It is also not sufficient that Dr. Becker made *some* effort to apportion a reasonable royalty base from Google's total revenue through use of his arbitrary 20% figure. Federal Circuit Chief Judge Rader rejected this precise argument in *Cornell University v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009) (Rader, C.J., sitting by designation). In that case, the plaintiff

asserted that its patent was infringed by a processor, which was incorporated into a CPU brick, which was itself part of a cell board, which was in turn incorporated into a server. *Id.* at 283. Judge Rader first held that the plaintiff could not use revenue from the sale of the entire server as the royalty base. *Id.* at 284. The plaintiff then introduced an alternative theory that used revenue based on the value of the CPU brick. *Id.* Judge Rader, after trial, granted the defendant's motion for JMOL, reasoning that the plaintiff "simply stepped one rung down the Hewlett-Packard revenue ladder" without substantial evidence that even this narrower royalty base included only value attributable to the patented technology. *Id.* at 285. It is therefore no answer for I/P Engine to argue that Dr. Becker performed *some* apportionment because, as described above, the apportionment he performed was not supported by substantial evidence.

Nor is it an answer, even assuming it were true, that there was insufficient evidence to more fully and accurately apportion the royalty base. As the Federal Circuit observed in *LaserDynamics*, such an argument ignores the fact that a "running royalty is not the only form of a reasonable royalty that the parties might have agreed to in a hypothetical negotiation." 694 F.3d at 70. A lump-sum royalty eliminates the need to determine or apportion a royalty base, which *LaserDynamics* notes "belies the argument" that a running royalty and calculation of a royalty base "is 'necessary.'" *Id.* As described more fully below, the record is devoid of substantial evidence that the hypothetical negotiation would have even resulted in a running royalty, which I/P Engine's failure to properly apportion the royalty base only confirms.

## III.  I/P ENGINE RELIED ON THE WRONG DATE FOR THE HYPOTHETICAL NEGOTIATION

Defendants are entitled to JMOL because I/P Engine introduced no evidence of the result of a hypothetical negotiation on a date supported by substantial evidence. In the alternative, Defendants are entitled to JMOL that the date of the hypothetical negotiation would be in 2010.

19

I/P Engine introduced no evidence other than the conclusory and unsupported *ipse dixit* of Dr. Becker that a 2004 date was appropriate. Further, Dr. Becker's unsupported assumption of a 2004 date rendered his testimony unreliable and inadmissible. *See, e.g., Global Traffic Techs., LLC v. Tomar Elecs., Inc.*, No. 05-756, 2008 WL 6397825, at *5 (D. Minn. Oct. 1, 2008) (excluding expert testimony based on an unsupported date for negotiation). Without Dr. Becker's testimony, there is no evidence of damages, requiring JMOL. *See Weisgram*, 528 U.S. at 454.

The first step in any reasonable royalty calculation "is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred." *Integra LifeSciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2005), judgment vacated on other grounds 545 U.S. 193 (2005). "The correct determination of this date is essential for properly assessing damages." *Id. Integra Lifesciences* noted that a "license negotiated in 1994 could be drastically different from one undertaken in 1995" under the facts of that case. *Id.* The court therefore reversed the denial of a motion for JMOL where the evidence only supported a date of first infringement that was a year before the date used by the patentee's expert for the hypothetical negotiation. *Id.* at 871. Similarly, in *LaserDynamics*, 694 F.3d at 75-77, the Federal Circuit reversed where the district court erred by three years in its determination as a matter of law on the date of the hypothetical negotiation. *See also Boston Sci. Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 792 (D. Del. 2011) (determining date of hypothetical negotiation as a matter of law); *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1179-80 (N.D. Cal. 2010) (granting summary judgment on the date of the hypothetical negotiation).

There is no evidence that the 2004 version of Smart Ads infringed any patents. All of the claims require "content-based filtering." I/P Engine's technical expert, Dr. Frieder, testified that this limitation was satisfied by the use of four specific templates. (Trial Tr. 518-19, 530-31, 534-

36 & 541-43.) There is, however, no evidence that any of these templates was in use prior to 2010. For two of these templates, the only evidence Dr. Frieder pointed to that AdWords ever uses them is a version of Smart Ads that was introduced in May 2012. (*See id.* at 524, 531 & 534-36.) Dr. Frieder also referenced a third template, but neither he nor I/P Engine provided any evidence as to when this template was first used. Dr. Frieder also pointed to a fourth template from an earlier model, dated 2010. (*Id.* at 540.) But he did not testify that this template was used in any pre-2010 model.

In an effort to fill this gap, Dr. Frieder testified that it was his opinion that SmartAds infringed since it launched in 2004. (*Id.* at 592-93.) When asked the basis for that opinion, however, he did not provide any analysis of the 2004 version of SmartAds and did not identify any template or other component in the 2004 version that satisfied the "content-based filtering" limitation. Instead, he simply provided a vague list of evidence he considered in forming that conclusory opinion. (*Id.* at 592-93.) Conclusory expert testimony is not substantial evidence.[3]

Dr. Becker's unsupported assumption that the date of first infringement was in 2004 dramatically affected the reliability of his testimony, rendering it inadmissible and insubstantial. *See Weisgram*, 528 U.S. at 454. Fundamentally, the royalty that would be arrived at in a hypothetical negotiation in 2004 differs dramatically from what would be arrived at in 2010. For example, during the intervening time Lycos, along with the patents, was sold to Daum Communications at the end of 2004. (Trial. Tr. at 144, 328-29 & 863-64.) Daum, I/P Engine argued to the jury, "didn't know what it was doing," (*id.* at 1992), and presumably would not be a particularly strong negotiator. Further, by 2010, Lycos was no longer seriously competing with

---

[3]   *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008).

Google in the internet search market. (*See id.* at 1659-60 (I/P Engine cross examination regarding relative market share of Lycos and Google in 2004).) And I/P Engine introduced irrelevant evidence of Lycos' finances in 2003 to support its claimed damages. (*Id.* at 1697.)

Dr. Becker also testified that the date of the hypothetical negotiation influenced his determination of what licenses were probative of the royalty rate that would result from the hypothetical negotiation. He testified that he disregarded Google's lump-sum patent-purchase agreement with Carl Meyer in part because it was signed in 2008, which he testified was "temporally removed from 2004." (*Id.* at 837.) Instead, he relied on patent license agreements between Overture and three non-parties, all entered into in 2005. (PDX 80; Trial Tr. 842-45 & 853-54; *see also* D.N. 460 at 14 (I/P Engine arguing that agreements Dr. Becker relied on were comparable because their "timing . . . makes them highly relevant").)[4]

Dr. Becker also testified that his assessment of the profitably of SmartAds supported a higher rate. (Trial Tr. 797 & 818-19.) The evidence that he relied on, however, was all derived from the pre-2010 period, before there is any evidence of infringement. (*Id.* at 799-807 & 909.) The profitability of a non-infringing system is not relevant to the appropriate royalty rate for a patent that the system does not practice.

Finally, Dr. Becker's assumption that infringement began in 2004 rendered completely unreliable and inadmissible his testimony regarding apportionment of the royalty base, as described above in Part II.B. That testimony was based on changes in Google's revenue that occurred between 2004 and 2006, before there was any evidence of infringement.

---

[4] Dr. Becker relied on these licenses not only for the royalty rate, but also to support his opinion that the hypothetical negotiation would result in a running, as opposed to lump-sum, royalty. *See infra* Part IV.

IV.  **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON WHETHER THE DAMAGES ARE MEASURED AS A RUNNING ROYALTY**

Dr. Becker testified and I/P Engine argued to the jury that the result of the hypothetical negotiation would be a running royalty whereby Google agreed to pay to Lycos a percentage of its revenue. (Trial Tr. 135-36, 771, 834, 845, & 866.) That testimony was, however, speculative, not based on substantial evidence, and inadmissible. Defendants are consequently entitled to JMOL on damages, *see Weisgram*, 528 U.S. at 454-57, or, in the alternative, JMOL that damages would be in the form of a lump sum and a new trial on all other issues.

A running royalty award based on the defendant's revenue or use must be supported by substantial evidence. *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561 (Fed. Cir. 1983). Where the undisputed evidence establishes that the hypothetical negotiation would have resulted in a lump-sum royalty not based on revenue or use instead, JMOL that damages should be awarded in that form is appropriate. *See id.* In *Stickle*, for example, the district court awarded damages of $1.485 million based on a running royalty rate of 4.2%. *Id.* at 1553. The undisputed evidence was, however, that the industry in question did not "utilize use royalties in connection with machines" related to the patent. *Id.* at 1561. The record contained "only a few questionable incidents of use royalties in the entire industry, and none in connection with [the plaintiff's products]," and in actual negotiations, the plaintiff had never offered anything but a paid-up license. *Id.* The Federal Circuit therefore held that "the trial court was clearly in error in basing a royalty on [defendant's] production rather than on a lump-sum for each machine." *Id.* at 1563. The court therefore remanded for determination of a lump-sum royalty. *Id.*

Similarly, in *LaserDynamics*, 694 F.3d at 78-81, the Federal Circuit reversed and ordered a new trial and instructed the trial court on remand to exclude expert testimony that damages should be measured using a running royalty. Every license for the patent in suit was in the form of a lump

sum. *Id.* at 64-65 & 80. The plaintiff's damages expert had disregarded these agreements in part by his adoption of an unsupported date of first infringement and the hypothetical negotiation. *Id.* at 75-76 & 81. The Federal Circuit therefore instructed on remand that the patentee could not present its running royalty theory to the jury. *Id.* at 81.

In this case, none of the evidence relied on by I/P Engine or Dr. Becker to justify a running royalty was admissible or reliable. The only evidence that Dr. Becker cited to support his opinion was the fact that the Overture licenses were in the form of a running royalty. (Trial Tr. 845 ("in light of the evidence from factor 12 with these running royalties").) Reliance on those agreements, however, is unreasonable and not supported by substantial evidence because it was based on the assumption that the hypothetical negotiation would have taken place in 2004, and the Overture agreements were entered into in 2005. (*Id.* at 837 (distinguishing Google-Meyer license as "temporally removed").) As described above, however, the evidence in the record supports a date for the hypothetical negotiation no earlier than 2010. *Supra* at Part III. Further, as described below in Part V, the Overture agreements are not comparable .

The only other basis that I/P Engine or Dr. Becker provided to support a running royalty was generalized, non-specific testimony regarding theoretical advantages that a running royalty may offer. (Trial Tr. 845; *see also id.* at 772.) This type of generalized, theoretical testimony, divorced from any evidence specific to this case cannot support a running royalty. *See LaserDynamics*, 694 F.3d at 79 (rejecting reliance on "loose or vague" comparisons between different technologies for purposes of calculating a reasonable royalty); *Uniloc*, 632 F.3d at 1318 (damages evidence "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and

circumstances at the relevant time"). The same theoretical arguments would apply to any case, including, for example, the Federal Circuit's decisions in *Stickle* and *LaserDynamics*.

By contrast, Defendants introduced evidence that the hypothetical negotiation would have resulted in a lump-sum. Every transaction involving the patents was a transfer in exchange for a lump-sum (DX-19 at 5; Trial Tr. 863-64), and every admitted Google license agreement was for a lump-sum amount. (DX-90.) Dr. Becker also testified that Google had a preference for lump sum agreements (Trial Tr. 885), and that Lycos "would have been willing to license the patents-in-suit to Google on attractive terms" and "viewed Google as a very attractive licensee." (*Id.* at 893.)

Finally, a running royalty is foreclosed by I/P Engine's failure to provide evidence of a properly apportioned royalty base. As described above in Part III, I/P Engine did not introduce substantial evidence apportioning the royalty base. In *LaserDynamics*, the Federal Circuit held that, where the record did not contain sufficient evidence to properly apportion a royalty base for a running royalty, a new trial was warranted where the patentee's expert nevertheless testified that a running royalty was appropriate. 694 F.3d at 70. The Federal Circuit reasoned that any argument to the contrary "overlooks" the fact that there was substantial evidence in support of a lump-sum royalty, which did not require deriving an apportioned royalty base. *Id.*

## V. I/P ENGINE GROSSLY OVERINFLATED THE ROYALTY RATE

JMOL is appropriate because I/P Engine's entire damages theory and its expert testimony ignored all real-world transactions involving the patents-in-suit and were instead based on non-comparable license agreements. Exclusion of that improper testimony leaves I/P Engine devoid of evidence in support of damages. *See Weisgram*, 528 U.S. at 454

The Federal Circuit "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet*, 594 F.3d at 869 (emphasis in original). "When relying on licenses to

prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. A patentee relying on existing license agreements to bears "the burden to prove that the licenses were sufficiently comparable" to the agreement that would result from a hypothetical negotiation. *Lucent*, 580 F.3d at 1329.

As *ResQNet* explains, a damages expert may not use "licenses with no relationship to the claimed invention to drive the royalty rate up." 594 F.3d at 870. Instead, the licenses must be "commensurate with what the defendant has appropriated." *Id.* at 872. "If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id.* This is especially so where the record contains real-world transactions involving the exchange of rights in the actual patents being litigated. *See id.* at 870 (error to admit expert testimony based on licenses "with no relationship to the claimed invention" where the record contained licenses to the actual patents in suit). It is "particularly troubling" when the district court admits testimony from a damages expert who disregards actual licenses to the patents-in-suit and instead relies on "extremely high rates" in unrelated licenses. *ResQNet*, 594 F.3d at 870.

One example of this is when the patentee's damages expert ignores transactions involving the sale of the patents in suit. In *Integra Lifesciences* , 331 F.3d at 871, *vacated on other grounds*, 545 U.S. 193 (2005), the court reversed the denial of a motion for JMOL, reasoning:

> The $15,000,000 royalty also does not appear to take into account numerous factors that would considerably reduce the value of the hypothetical license. For example, Integra purchased Telios (together with all of its products, patents and know-how) for $20,000,000 in 1996. A $15,000,000 award figure to compensate for infringement of only some of Telios' patents before Integra's acquisition seems unbalanced in view of the overall acquisition price.

*Id.* These rules could not be clearer. I/P Engine may not pick and choose what it perceives to be favorable, albeit less relevant, licenses, while simultaneously ignoring more relevant transactions that involve the actual parties and actual patents-in-suit.

### A. Dr. Becker Selectively Ignored Comparable Real-World Transactions Involving the Patents In Suit

The record contains at least two agreements that objectively show that I/P Engine's damages demand and the jury's verdict overstate what would have resulted from a hypothetical negotiation. These historic, real-world transactions are compelling evidence of the outcome of a hypothetical negotiation. *See Georgia-Pacific.*, 318 F. Supp. at 1120.

First, Dr. Becker ignored Lycos' sale of the patents-in-suit, along with six other patents, to I/P Engine in 2011 for a lump-sum payment of just $3.2 million. (Trial Tr. 136, 193, 854-55, 862, 868 & 933.) This 2011 transaction involving the actual patents-in-suit was far closer to the 2010 date of the hypothetical negotiation established by the evidence (*see supra* Part III), than were the 2005 Overture licenses that Dr. Becker relied on. At the time of this sale in 2011, Lycos was presumably well aware of Google's Smart Ads system, which was a matter of public knowledge, and any potential patent infringement claims it would have had based on the patents-in-suit. Thus, the jury's award of nearly $30.5 million in reasonable royalty damages for a license that covered only *use* from September 2011 through trial was nearly ten times what I/P Engine actually paid to purchase them in their entirety, along with several others, in 2010.

Second, Dr. Becker also ignored the fact that in October 2004, Daum Communications bought the entire Lycos company, which owned the patents at the time, for $95 million. (Trial Tr. 863-64.) This transaction occurred only about seven months after the date of the hypothetical negotiation that Dr. Becker used in his analysis. (*Id.*) Dr. Becker's opinion was that Google would have agreed to pay Lycos a running royalty amounting to over $493 million just seven

months before the entire company was sold for $95 million. (*Id.* at 866-67.) Further, the jury's award of nearly $30.5 million in damages for a non-exclusive license lasting just over a year is widely disproportionate to the $95 million sale price of all of Lycos.

**B.      The Overture Licenses Relied on by Dr. Becker Are Not Comparable**

Dr. Becker's error was compounded by his reliance on the non-comparable Overture licenses, which did not involve the patents-in-suit or any party related to this case, were not from the appropriate time period, and did not involve comparable technology. Dr. Becker, in fact, admitted that he did not even look for other third-party agreements that might be comparable to the hypothetical negotiation in this case, but instead just opted to use license agreements that he had relied on in a previous case. (Trial Tr. 887.)

Dr. Becker testified that he relied on the Overture agreements in part instead of transactions involving the patents-in-suit or Google's license agreements because he believed that their 2005 effective date rendered them temporally more comparable to the alleged 2004 hypothetical negotiation than other agreements in the record. (*Id.* at 837 (rejecting the 2008 Mayer license as "temporally removed").) As explained above, however, the assumption of a 2004 date is not supported by evidence. The earliest date for the hypothetical negotiation supported by substantial evidence is 2010. Under Dr. Becker's own reasoning the Overture agreements are not comparable.

I/P Engine and Dr. Becker also failed to provide any justification for their assertion that the value of the technology claimed in the Overture patents is comparable to the technology claimed in the asserted patents. Even patents directed to similar technologies may enjoy vastly different licensing rates depending on numerous factors, including the breadth of the claims and the ease with which the patent can be designed around. *See ResQNet*, 594 F.3d at 869 ("This court has long required district courts performing reasonable royalty calculations to exercise

vigilance when considering past licenses to technologies *other* than the patent in suit.")
(emphasis in original). Dr. Becker concedes that the Overture patents were well-known in the
industry. (Trial Tr. 887.) And I/P Engine's technical expert, Dr. Frieder, testified that the
technology of the Overture patents were comparable only "in the general sense." (*Id.* at 630.)
As Dr. Frieder testified, the Overture patent portfolio "doesn't talk about relevance, it doesn't
talk about relevance. It can't filter based on relevance, correct." (*Id.* at 717.) I/P Engine
introduced no evidence at all about the breadth of the Overture patents or whether an internet
advertising business could design around them and continue to operate at a comparable profit.

Finally, Dr. Becker conceded that the Overture licensees were all in radically different
negotiating positions against Overture than Google would have been in a negotiation with Lycos.
(*Id.* at 888-93.) Overture was, for example, practicing the Overture patents (*Id.* at 888-89), while
Dr. Becker was unaware of whether Lycos practiced the patents-in-suit. (*id.* at 891). The
Overture licensees were also not "household names" or "global technology leader[s]," (*id.* at
889-90), unlike Google in 2010, or even 2004. Yet Dr. Becker did not account for these
differences when he relied on the Overture agreements. Nor was Dr. Becker aware of the actual
amounts that any of the Overture licensees ultimately paid under their agreements. (*Id.* at 886.)

## VI. NO REASONABLE JURY COULD HAVE AWARDED ADDITIONAL DAMAGES AGAINST THE NON-GOOGLE DEFENDANTS

The non-Google defendants are entitled to a new trial on all issues on at least two
additional grounds. First, during closing arguments, I/P Engine argued that the laches ruling
applied only to Google and that the non-Google defendants were therefore liable for the full
period of pre-complaint alleged infringement. (Trial Tr. 2008-09.) Following I/P Engine's
argument, the Court ruled that the laches defense also barred pre-complaint damages for

Google's co-defendants. (*Id.* at 2022.)[5] The confusion that this engendered is reflected by the fact that Dr. Becker's demonstrative (which was based on an impermissibly broad time period), attributed approximately 8.5% of the total damages to the non-Google defendants, but the jury's verdict found them liable for 48% of the total damages. (D.N. 789 at 11.)

Second, as these numbers reflect, the jury's damage award as to the non-Google Defendants is completely out of proportion relative to I/P Engine's damages demands. While I/P Engine presented no evidence at all as to what its asserted royalty base was for the non-Google Defendants in the appropriate time period, it was clear all along that the damages sought from the non-Google Defendants were much smaller than those sought from Google. No reasonable jury would award an amount of damages against the non-Google defendants on a proportion far greater than what I/P Engine's own expert testified about at trial.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter JMOL against I/P Engine on the issue of past damages or, in the alternative, a new trial on all issues.

DATED: December 18, 2012  
                              */s/ Stephen E. Noona*  
                              Stephen E. Noona  
                              Virginia State Bar No. 25367  
                              KAUFMAN & CANOLES, P.C.  
                              150 West Main Street, Suite 2100  
                              Norfolk, VA 23510  
                              Telephone: (757) 624.3000  
                              Facsimile: (757) 624.3169  
                              senoona@kaufcan.com

---

[5] If there was any doubt whether Plaintiff's damages case was confusing, misleading, and unsupported by any evidence, the jury's four separate questions about damages during deliberations resolved this doubt. (Trial Tr. 2141, 2146, 2148 & 2154-55.)

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation,*
*IAC Search & Media, Inc., and*
*Gannett Co., Inc.*

By: */s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile: (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile: (415) 653-6444

*Counsel for Defendant AOL, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

                                         */s/ Stephen E. Noona*
                                         Stephen E. Noona
                                         Virginia State Bar No. 25367
                                         KAUFMAN & CANOLES, P.C.
                                         150 West Main Street, Suite 2100
                                         Norfolk, VA 23510
                                         Telephone: (757) 624.3000
                                         Facsimile: (757) 624.3169
                                         senoona@kaufcan.com