**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| I/P ENGINE, INC.    Plaintiff, | |
| v. | Civil Action No. 2:11-cv-512 |
| AOL, INC., *et al.*,    Defendants. | **Public Version** |

<u>**OPPOSITION TO PLAINTIFF'S MOTION FOR POST-JUDGMENT ROYALTIES**</u>

I/P Engine's motion for a post-judgment royalty is contrary to law, fact, and the jury verdict. It has not even attempted to satisfy the standard for issuance of a mandatory injunction ordering the payment of ongoing royalties. It simply assumes that it is entitled to this equitable remedy. But both the Federal Circuit and the Supreme Court have rejected the proposition that there is any presumptive entitlement to equitable relief in a patent case, including an injunction ordering the payment of post-judgment royalties. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007). I/P Engine's request for post-judgment royalty should be rejected for this reason alone.

Moreover, I/P Engine ignores the fact that Google has already removed <u>all</u> of the functionality that I/P Engine alleged practiced the filtering elements of each asserted claim and had begun doing so even before the entry of judgment. Thus, I/P Engine has <u>no</u> evidence of any ongoing infringement. Although Google has offered I/P Engine discovery on its redesigned system, I/P Engine refused to take it, choosing instead to put its head in the sand. As a result, to the extent any royalty is appropriate, no royalty could be awarded for any time after May 11, 2013, when the launch of the redesigned system was completed.

Despite the design around, I/P Engine argues for a 7% royalty rate, which is twice as large as that found by the jury, and an apportionment rate over seven times larger than the largest apportionment the jury could have possibly found. To the extent any royalty would be appropriate at all, I/P Engine's method for reaching this result is, however, critically flawed. It argues that the appropriate inquiry is the result of a negotiation between <u>I/P Engine</u> and <u>Google</u> in <u>2012</u>, yet urges the Court to take as its starting point the jury's findings with respect to a <u>2004</u> negotiation between <u>Lycos</u> and <u>Google</u> and admits that its expert, Dr. Becker, has offered no new opinions despite an eight year change in the negotiation date. Further, it bases its 7% rate on

license agreements Dr. Becker testified would not be comparable to the 2012 hypothetical negotiation. (Motion at 7 n.3.) It then asks the Court to double the jury's royalty rate based on legally improper and duplicative "willfulness" and "changed circumstances" enhancements.

This entire approach is legally incorrect and inconsistent with the evidence. All of the comparable patent agreements from around 2012 are for lump-sum purchases of multiple patents in the $3.2 to $3.55 million range. (Ugone Dec. ¶¶ 41, 58.) The jury also rejected the 20.9% apportionment rate I/P Engine now seeks, a rate that—even were it somehow appropriate to use for a 2004 hypothetical negotiation—cannot be for one in 2012 because it purported to measure the benefit of functionality that Google has removed from the accused systems and no longer uses. Further, the design around means that Defendants would need a license for at most seven months to cover the period between the verdict and the finalization of its new system. Thus, to the extent that any royalty should be awarded at all, it should be a lump sum of $3.5 million, rather than a running royalty.

## Argument

## I.    I/P ENGINE HAS NOT MET THE EQUITABLE STANDARD FOR A POST-JUDGMENT ROYALTY

I/P Engine's motion should be denied because it does not even attempt to satisfy the standard for the award of an injunction requiring the payment of royalties. It simply assumes (incorrectly) that it is entitled to this equitable remedy. Patent damages address "past harm" resulting from past actions. *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 35 (Fed. Cir. 2012). By contrast, post-judgment royalties are an equitable remedy, not "damages." *Paice*, 504 F.3d at 1313 n.13, 1315-16. An award of post-judgment royalties is an affirmative injunction that requires a defendant to pay an amount of money in the future should it continue to infringe. If such awards were not injunctions, they would be damages, and the Seventh

Amendment jury-trial right would preclude judges from usurping the jury's prerogative to make such awards in ordinary proceedings at law. *See id.* at 1315-16.[1]

Post-judgment royalties are governed by 35 U.S.C. § 283, which allows for injunctions in patent cases. *Id.* at 1314-15. The statute provides that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (emphasis added). I/P Engine must, therefore, satisfy the traditional four-factor test for equitable relief, outlined in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006):

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*See Fisher v. Fisher*, No. WDQ-11-1038, 2012 WL 1392958, at *4 n.20 (D. Md. Apr. 19, 2012) (applying traditional four-factor test to request for mandatory injunction); *Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC*, 747 F. Supp. 2d 568, 581 (W.D.N.C. 2010) (similar).

Contrary to I/P Engine's assumption, a post-judgment royalty is <u>not</u> granted as a matter of course any time a permanent injunction is either not sought or denied, and I/P Engine therefore errs by failing to even attempt to show that it has satisfied the standard for an equitable remedy. *Whitserve* directed a district court to take "all relevant equitable considerations" into account when determining whether to award post-judgment royalties or other equitable relief. 694 F.3d at 36. *Paice* similarly instructed: "Under *some* circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate." 504 F.3d at 1314

---

[1] The jury answered a special interrogatory stating that its damages verdict was based on a 3.5% running royalty. (D.N. 789 at 11.) Those findings, however, concerned the result of the hypothetical negotiation with respect to past damages, and not the post-verdict hypothetical negotiation at issue in I/P Engine's motion.

(emphasis added). [2] But courts should not award "such relief as a matter of course whenever a permanent injunction is not imposed." *Id.* at 1315; *accord id.* at 1316 (Rader, J., concurring). The fact that I/P Engine prevailed at trial is a necessary, but not sufficient, condition for a post-judgment royalty.

I/P Engine nowhere addresses this standard, let alone shows its entitlement to an injunction compelling payment of post-judgment royalties. Nor can it. There is no irreparable harm because I/P Engine is not practicing the patents, does not compete with Defendants, and could be fully compensated by a remedy at law following a jury finding that the re-designed system infringes.[3] In situations like this, where "the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for infringement and an injunction may not serve the public interest." *eBay*, 547 U.S. at 396-97 (Kennedy, J., concurring). And an injunction ordering the payment of royalties on patents that are currently being reexamined by the Patent Office and subject to Office Actions rejecting the patentability of the asserted claims does not serve the public interest. (Kammerud Decl., Exs. 26, 30). I/P Engine's motion should be denied on this basis alone.

## II.   I/P ENGINE FAILS TO MEET ITS BURDEN OF PROVING THAT DEFENDANTS' CURRENT SYSTEM IS NO MORE THAN COLORABLY DIFFERENT THAN THE ACCUSED PRODUCT

A patentee can only be entitled to post-judgment royalties if a changed product is "not colorably different" from the product that was found to infringe. *Mondis Tech. Ltd. v. Chimei Innolux Corp.*, No. 2:11-cv-378, 2012 WL 1554645, *1-2 (E.D. Tex. April 30, 2012). The

---

[2]   I/P Engine's contention (Motion at 2) that *Paice* stands for the proposition that "a patentee is entitled to receive ongoing royalties" is therefore false.

[3]   Indeed, I/P Engine has already obtained a judgment in this case of over $30 million (D.N. 789 at 11), which is approximately ten times what it paid to purchase the patents a year and a-half earlier. (Ugone Dec. ¶ 9.)

patentee bears the burden of proving that the new product continues to infringe and is not more than "colorably different" from the adjudicated product. *See TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011) (en banc) (patentee bears the burden of showing that adjudicated product and modified product are not more than colorably different).

As Google informed I/P Engine, Google has changed the accused system in ways that render it far more than just "colorably different" from the adjudicated system. Specifically, Google has removed all three alternative bases that I/P Engine presented at trial to meet the "filtering for relevance to the query" required in every asserted claims. (*See* '420 patent claims 10 and 25: "filtering... for relevance to the query"; '664 patent claims 1 and 26: "filtering ... for relevance to at least one of the query and the first user"). As a result, I/P Engine cannot receive any royalty for the period after the re-design was finalized on May 11, 2013.

**Pre-Auction QBB Disabling.** As detailed in the Declaration of Bartholomew Furrow, a Google software engineer on the Ads Quality Team who testified and was relied upon by both parties' technical experts at trial, as part of the Quality-Based Bidding (QBB) system, a Predicted Clickthrough Rate ("pCTR") (sometimes called a "QBB pCTR") is computed for each ad in advance of that ad being considered for display to the user. Previously, the QBB pCTR was used to determine a Minimum Cost-Per-Click (CPC) for each candidate advertisement. Ads whose bids did not at least meet the Minimum CPC were disqualified from the auction. (Furrow Dec. ¶ 8.). This functionality was termed "QBB disabling." (Furrow Dec. ¶ 8). QBB disabling was one of the three alternative theories I/P Engine presented as to the filtering for relevance to the query element in each asserted claim. (Trial Tr. 460, 1015-16 & 1128; PDX129; PDX 136; PDX142.) Google removed QBB disabling from AdWords on November 5, 2012, from AdSense for Search on February 14, 2013, and from AdSense for Mobile Search on January 28,

2013. (Furrow Dec. ¶ 9.) As a result, as of February 14, 2013, none of the accused systems used QBB disabling at all.[4] (Furrow Dec. ¶ 9.)

The jury was not asked to answer an interrogatory concerning which of I/P Engine's three alternative infringement theories the verdict was premised upon. Thus, it is entirely possible the verdict was based on I/P Engine's allegations on QBB disabling alone. Yet, I/P Engine does not even try to show how a system without QBB disabling infringes. Nor does it try to demonstrate how a system that removes QBB disabling is "not more than colorably different" from the adjudicated system even though it is I/P Engine's burden to so prove. *See TiVo*, 646 F.3d at 883. Accordingly, I/P Engine has not met its burden of showing an entitlement to royalties after QBB disabling was removed from each accused system.

**Pre-Auction LTV Disabling.** Even were the removal of QBB disabling not dispositive as to the issue of ongoing royalties, Google has redesigned the products to remove the other two functionalities I/P Engine alleged met the filtering-for-relevance-to-the-query elements. Specifically, I/P Engine argued that Defendants' systems also practiced the patents' "filtering" step by using pCTR computed in connection with the auction (sometimes called the "auction pCTR") to compute the Long Term Value (LTV) scores, which are in turn used to disqualify an advertisement from either the right-hand side auction ("disabling") or make it eligible for the top auction ("promotion"). (Trial Tr. 576-77, 698 & 803.) Google redesigned the accused systems to remove this functionality as well. (Furrow Dec. ¶¶ 11-12.) With the functionality accused of

---

[4]   I/P Engine represented in its Opposition to Defendants' Renewed Motion to Compel Deposition of Dr. Becker that Google has only stated that it "may, sometime in the future, try to design around I/P Engine's patents." (D.N. 934 at 6 n.4.) This is false. Google specifically told I/P Engine that QBB disabling had been removed: "[O]n our April 9 call we specifically told you what was changing. I mentioned that Plaintiff accused three functionalities of infringing its patents—QBB disabling, threshholding, and promotion. I told you that QBB disabling has already been removed from AdWords. I also told you the accused promotion and threshholding steps would be removed in the next few weeks." (Kammerud Decl., Ex.29.)

meeting the "filtering" elements gone, there can be no legitimate dispute that the changed system is more than colorably different and that an award of ongoing royalties is inappropriate. [5]

## III.   I/P ENGINE'S ROYALTY REQUEST IS VASTLY OVERSTATED

Even assuming I/P Engine has shown an ongoing royalty is somehow appropriate, I/P Engine's request is contrary to law and evidence.  As an initial matter, the finalization of Defendants' modifications to the accused AdWords system places a sunset date on any royalty because there is no evidence of infringement after that date.  And it also shows that I/P Engine's methodology for calculating the appropriate royalty from a hypothetical negotiation between I/P Engine and Google in 2012, is fundamentally flawed.  Despite its assertion that the negotiation should be in 2012, I/P Engine takes as its starting point the result of a hypothetical negotiation between Lycos and Google in 2004.  Not only does I/P Engine ignore Google's design around, which would have been known to the parties, but much of the evidence that I/P Engine contended was relevant to the 2004 negotiation its own expert conceded would not be relevant to a 2012 negotiation.  When the change in parties and passage of eight years is accounted for, the evidence shows that Google and I/P Engine would have agreed to, at most, a $3.5 million lump sum royalty.  I/P Engine's inflated running royalty opinion is unsupported and contrary to the jury verdict.  I/P Engine compounds this error by seeking legally erroneous and duplicative "willfulness" and "changed circumstances" enhancements.

---

[5]  Google has repeatedly offered I/P Engine discovery into the redesigned system.  (D.N. 925.)  But I/P Engine has declined this opportunity.  (D.N. 925.)  During the parties' post-trial meet and confer, I/P Engine contended that whether the redesigned system was colorably different from the adjudicated product or non-infringing is irrelevant.  (D.N. 925 at Ex. 2.)  That is not only contrary to accepted practice, *Mondis Tech.,* 2012 WL 1554645 at *1-2, it makes no sense where, as here, Google has already eliminated the accused "filtering" functionality entirely.

### A.    Any Royalty Must Be Limited to the Period Prior to May 11, 2013

As described above, by May 11, 2013, Defendants completely removed all functionality

that I/P Engine alleged practiced the "filtering" step of each asserted claim.  I/P Engine has

presented no evidence or argument that this new system infringes.  Thus, even if I/P Engine

could show entitlement to a post-judgment running royalty, such royalty should end on the date

that these changes were finalized, *i.e.*, May 11, 2013.  *Cf. ActiveVideo Networks, Inc. v. Verizon*

*Commc'ns, Inc.*, 827 F. Supp. 2d 641 (E.D. Va. 2011) (granting sunset royalty for period prior to

an injunction against the accused product took effect), *rev'd in part*, 694 F.3d 1312 (Fed. Cir.

2012).  There is no evidence of infringement after that date, much less evidence that the

redesigned system is not more than colorably different from the adjudicated system.  *See TiVo*,

646 F.3d at 883 (patentee bears burden of proving that altered product still infringes).

### B.    The Court Is Not Bound by the Jury's Findings Based on a 2004 Hypothetical Negotiation

I/P Engine contends that the Court must determine what the result of a hypothetical

negotiation between I/P Engine and Google would be <u>as of the date of the entry of judgment</u>.

(Motion at 7 n.3.)  Thus, if the Court determines that a post-judgment royalty is appropriate at

all, in doing so, the Court should take into account additional evidence to determine how

"changes in the market or other circumstances" would impact the amount of a post-judgment

royalty compared with the pre-judgment royalty.  *Paice*, 504 F.3d at 1316-17 (Rader, J.,

concurring) ("pre-suit and post-judgment acts of infringement are distinct, and may warrant

different royalty rates given the change in the parties' legal relationship and other factors").

But I/P Engine's position is at odds with its argument that the Court should rely on the

jury's finding of a 3.5% royalty rate in <u>2004</u> hypothetical negotiation as a "starting point" for its

analysis of a <u>2012</u> hypothetical negotiation.  In so arguing, it simply ignores the significant

changes that occurred during the intervening eight years.[6]  As Dr. Becker has conceded: "[t]he timing of the hypothetical negotiation is important, as it defines the market conditions and circumstances of the parties as well as the facts and circumstances that inform the bargaining positions of the two sides."  (D.N. 386 (Becker Report) at 50.)  Yet I/P Engine has claimed that Dr. Becker has neither offered "a 'new' damages theory or relied[d] on 'additional evidence'" and that his damages theories for a 2004 and 2012 negotiation are "identical."  (D.N. 934 at 1 & 3.)

The change in the date of the hypothetical negotiation is of exceptional importance in this case because, during that intervening period, Google developed and began launching its non-infringing replacement system.  By the date of the jury verdict, Google removed QBB disabling from Google.com and was in the process of, and now has, removed it from all accused services. Furthermore, Google has since ceased to use the alleged "filtering" in all its accused products. (Furrow Dec. ¶¶ 9, 11-12)  I/P Engine and Google would have entered the 2012 negotiation knowing that the asserted patents could readily be designed around.  Dr Becker testified that the opinion he offered at trial did not account for this.  (Trial Tr. 846-47 ("I'm not aware of any evidence that there are any alternatives.").)  And his subsequent opinion, submitted in support of I/P Engine's motion, also did not take into consideration Google's new, non-infringing system. Further, at the time of the 2004 hypothetical negotiation focused upon at trial, the patents-in-suit were owned by Lycos, not I/P Engine.  (Trial Tr. at 790-91; D.N. 824 at 3.)  The post-trial hypothetical negotiation is therefore not even with the same licensor, a fact critical to the bulk of

---

[6]   Although the Court denied the parties' post-trial motions related to damages, the fact that both parties called the jury's verdict into question confirms that it should not be the starting point of the Court's analysis.

the *Georgia-Pacific* factors. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970).

The change in negotiation date would also dramatically alter what agreements are most comparable to a 2012 hypothetical negotiation. At trial, Dr. Becker relied on three license agreements from 2005 and testified that other agreements in 2010 in 2011, were too "temporally removed" to be relevant. (PDX 80; Trial Tr. at 837, 842-45 & 853-54.) Obviously that would not be the case in a 2012 negotiation. Rather, it would be Dr. Becker's 2005 license agreements that would be too "temporally removed."

In sum, given the passage of time and change of events between the 2004 hypothetical negotiation date that was the basis for Dr. Becker's opinion at trial, the Court cannot simply rubber stamp any part of the jury's verdict as applying to ongoing royalties as I/P Engine urges. I/P Engine's admission that Dr. Becker has done no new analysis and not considered any additional evidence to arrive at his 2012 negotiation position—and in particular its failure to consider in any respect the new system put in place by Google—renders its position unreasonable and unreliable.

**C.    A Hypothetical Negotiation Would Result In a $3.5 Million Lump-Sum**

If the Court is inclined to grant a post-judgment royalty, application of the *Georgia-Pacific* factors shows that a hypothetical negotiation between Google and I/P Engine in 2012 would result in a $3.5 million lump-sum payment. (Ugone Dec. ¶ 45.) That result is consistent with both parties' licensing practices and the most comparable licenses.

***Factor 1 – The Royalties Received for Licensing the Patents; Factor 2 – The Rates Paid for Similar Patents***: The starting point is two comparable agreements that were entered into near the 2012 date of the hypothetical negotiation. These agreements are the 2008 Carl Meyer lump sum patent purchase, valued at $3.55 million, and the 2011 sale of the patents by

Lycos to I/P Engine for a lump sum of $3.2 million. DX-090; *see Georgia-Pacific*, 318 F. Supp. at 1120; Ugone Dec. ¶¶ 9, 13.) Furthermore, if the Court is inclined to consider agreements, like the Overture agreements, that substantially predate the 2012 hypothetical negotiation, it should also consider Google's lump sum $5 million patent license with Disney from 2004 ██████ ██████. (Ugone Dec. ¶ 16.) Those patents in the Disney agreement, like the patents in suit, pertain to search functionality which is the subject of the patents in suit. (Ugone Dec. ¶ 61.)

The Carl Meyer agreement is indicative of the amount that Google would have paid for rights to similar patents. (Ugone Dec. ¶¶ 13-14, 60.) Through its 2008 agreement with Carl Meyer, Google acquired the rights to three U.S. patents and two U.S. patent applications for a lump sum of $3.55 million. (Trial Tr. at 1567, 1595-1596.) Dr. Unger testified that the technology in these patents was comparable to the patents-in-suit (*id.* at 1274-75), which I/P Engine has not disputed.

In 2011, I/P Engine bought the patents, as well as six other related patents, for $3.2 million. (*Id.* at 1582-1583.) The actual price paid for the patents, especially when near the date of the hypothetical negotiation, can be highly probative of a reasonable royalty.[7] This agreement was entered into only a little over a year before the hypothetical negotiation. (DX-019.)

---

[7]   *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds* 545 U.S. 193 (2005) (reversing denial of JMOL on damages where damages award was inconsistent with amount patentee paid to purchase patents); *Endress Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F. Supp. 1123, 1131-32 (S.D. Ind. 1995) ("Where, as here, the current patent owner purchased the patent, the value of the consideration given in exchange for the patent may be relevant to the determination of a reasonable royalty because it may bear on the amount that might have been accepted by a prudent patentee who was engaging in a hypothetical licensing negotiation."); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012) ("Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (error to admit expert testimony relying on non-comparable license agreements where there were licenses involving the patents-in-suit).

Additionally, when Lycos sold the patents, it did not simply take the first offer presented; it negotiated with multiple bidders, ultimately taking the highest amount for the two patents-in-suit and six additional related patents. (Ugone Dec. ¶ 61.)

These agreements also show that the hypothetical negotiation would result in a lump sum. The Carl Meyer and Disney Agreements are both for lump sum amounts. ██████████████ █████████████████████████████████████████████████████ (Disney ($5 million), ████████████████████████████████████████████ ████████████████████████████████████████████ ██████).)[8] Both damages experts agreed that Google has a preference for lump-sum licenses (Trial Tr. at 885 & 1576), I/P Engine also purchased the patents-in-suit for a lump sum, and I/P Engine ████████████████████████████. (Kammerud Decl., Ex. 5; DX-019; Ugone Dec. ¶¶ 8-9.)

*Factor 3 – The Nature and Scope of the License*: The nature and scope of these agreements shows that they are conservative indications of the outcome of the hypothetical negotiation in 2012. The purchase of the patents and the Meyer agreement involved the transfer of <u>all</u> rights to multiple patents and patent applications. (Trial Tr. at 1582-1583, 1595-96.) By contrast, the hypothetical negotiation between Google and I/P Engine would involve only a non-exclusive license to two patents. This shows that the amount agreed to at the hypothetical negotiation would be less than the amounts paid in the comparable agreements. (Ugone Dec. ¶ 10.)

---

[8]   The Court excluded these agreements from trial because of likely jury confusion. (D.N. 705 at 2-4.) Although Defendants dispute that ruling, because the determination of a post-judgment royalty does not involve a jury, the same concerns do not apply.

*Factor 7 – Duration of the Patent and Term of the License*: This factor shows that the value in these agreements is a conservative estimate. The patents will expire in 2016. Therefore, at the time of the 2012 hypothetical negotiation, they would have had less than four years left. By contrast, the patents had about five years left when I/P Engine bought them in 2011, and the Carl Meyer patents had nearly eleven years left when Google bought them. (*See* DX-091.)

In addition, as described above, the Defendants have fully removed the accused filtering technology from their product. (Furrow Dec. ¶¶ 9, 11-12.) Google had already begun implementing the redesigned system at the time of the hypothetical 2012 negotiation. (Furrow Dec.¶ 9.) Google would therefore negotiate with the understanding that it would only need to be licensed for approximately seven months. This would place serious downward pressure on any royalty. (Ugone Dec. ¶ 24.) I/P Engine would understand that the royalty base was limited to those amounts accrued before Google completed the design around, and it would be eager to accept a lump sum to avoid the risk of litigating the redesigned system, which removes the only functionality it accused of meeting the filtering limitations.

*Factors 8-11 – The Established Profitability of the Patented Product, Its Commercial Success and Current Popularity; The Utility and Advantages of the Patent Over Old Modes or Devices; The Extent of Use; The Benefits and Nature of the Invention*. Although SmartAds is successful, there is no evidence that this is attributable to the patents, as opposed to other technology that Google developed, or that the entire SmartAds system would have to be disabled if the patented technology were eliminated. Indeed, Google's design around with minimal impact on performance refutes that position. (Furrow Dec. ¶ 13.) This demonstrates the limited

benefits of the patented invention over alternative designs.[9]  Ugone Dec. ¶¶ 30-33; *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) (vacating award that did not account for non-infringing alternatives); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1572-73 (Fed. Cir. 1996) (availability of non-infringing alternative puts infringer in stronger bargaining position in hypothetical negotiation).

Moreover, any evidence that the patents were successful was known by the time I/P Engine purchased them in 2011 and would therefore likely be factored into the $3.2 million price that I/P Engine paid to purchase them.  Indeed, the Court found that I/P Engine and Lycos had constructive knowledge of alleged infringement since 2005, when the Court held in favor of Defendants on laches (D.N. 800 at 8-11), and that Lycos was a user of AdWords as early as 2003 (D.N. 800 at 14), giving it knowledge of the effectiveness of the system.

* * *

Based on the comparable license agreements, the additional factors discussed above,[10] the outcome of the hypothetical negotiation between Google and I/P Engine in 2012 would be a lump sum payment of no more than $3.5 million.  (Ugone Dec. ¶ 45.)

### D.   I/P Engine's Post-Judgment Running Royalty Request Is Unsupported

I/P Engine's motion unreasonably asks the Court to double the royalty rate applied by the jury and increase the highest possible apportionment rate applied by the jury by more than 600%. Further, its royalty rate position ignores Google's non-infringing redesign and relies on license

---

[9]   Dr. Becker testified at trial that his opinion assumed that there were no non-infringing substitutes for I/P Engine's patents.  (Trial Tr. 846-48.)  And Dr. Becker's current declaration again does not address available substitutes for the patents.

[10]   The other *Georgia-Pacific* factors are neutral.  I/P Engine does not have a policy of not licensing its patents (Factor 4), I/P Engine is not Defendants' competitor (Factor 5), and AdWords does not drive the sale of other products (Factor 6).  Factor 12—the portion of the profit or selling price of the invention that may be customary to allow for use of the invention— is reflected by the actual price paid by I/P Engine for the patents.

agreements that by its own expert's testimony are not comparable.  Compounding these errors, I/P Engine asks the Court to enhance the royalty rate based on "willfulness," contrary to both the Patent Act and Federal Circuit precedent.  The Court should decline these invitations to error.

### 1. Dr. Becker Ignores Non-Infringing Alternatives

Dr. Becker testified at trial that his royalty rate opinion was based in part on his belief that there were no non-infringing substitutes for the patented technology.  (Trial Tr. 846-48.)  That assumption has now been thoroughly refuted by Google's removal of the alleged "filtering" features from the accused systems.  The removal of those features has had at most a negligible impact on revenue generated by the system.  (Furrow Dec. ¶13.)  Because Dr. Becker does not account for these changes in his declaration regarding the 2012 negotiation it should be ignored entirely.  *Riles*, 298 F.3d at 1312 (vacating damages award that failed to account for noninfringing alternatives in the hypothetical negotiation).

### 2. I/P Engine Fails To Support a 3.5% Running Royalty

I/P Engine bears the burden of proving that the Overture licenses upon which Dr. Becker bases his royalty rate are comparable to the license that would result from a hypothetical negotiation in 2012.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 & 1332 (Fed. Cir. 2009.)  I/P Engine has not met this burden.

The facts here are similar to those in *LaserDynamics.*, 694 F.3d at 78-81.  In that case, the plaintiff's expert disregarded every license for the patent-in-suit, all of which were for lump sums, based, in part, on a wrong date for the hypothetical negotiation.  *Id.* at 75-76, 81.  The Federal Circuit reversed, ordered a new trial, and instructed the trial court to exclude expert testimony that damages should be measured using a running royalty.  *Id.* at 64-65 & 80.  The only evidence I/P Engine claims justifies a running royalty are the Overture licenses from 2005, a difference of <u>seven years</u> from the date at issue.  (Trial Tr. at 845.)

While Dr. Becker pays lip service to a 2012 hypothetical negotiation date, I/P Engine has conceded that he has neither offered "a 'new' damages theory or relied[d] on 'additional evidence'" and that his damages theories for a 2004 and 2012 negotiation are "identical." (D.N. 934 at 1 & 3.) This is nowhere better illustrated by the fact that he does not even try to show how the Overture agreements, which were executed in 2005, are comparable to a hypothetical negotiation in 2012. Nor could he, as Dr. Becker himself testified that a passage of only four years was sufficient to render an agreement "temporally removed" from the hypothetical negotiation. (Trial Tr. at 837.) And he refused to consider the $3.2 million lump-sum sale price of the patents-in-suit in part because the sale occurred in 2011, which he said was too long after the 2004 date of the hypothetical negotiation at issue at trial. (D.N. 386 (Becker Report) ¶76.) And as Defendants have explained, I/P Engine's failure to show that the technology licensed by Overture is comparable to the technology claimed in its patents or that the Overture licensees were all in comparable negotiating positions than Google would have been in a negotiation with Lycos in 2004 shows the Overture agreements are not comparable. (D.N. 320, 752 & 773.)

### 3. I/P Engine's 20.9% Apportionment Rate Is Unsupported

I/P Engine argues that the royalty rate should be applied to the apportioned percentage of revenue that it argued for at trial: *i.e.* 20.9% of U.S. revenues from the accused products. But the jury did <u>not</u> apply that apportionment rate. Rather, as detailed in Defendants' Opposition to Plaintiff's Motion For An Award Of Prejudgment Interest, Post-Judgment Interest, And Supplemental Damages, the jury rejected that argument and instead applied, at most, a 2.8% apportionment rate. (D.N. 805; D.N. 806 at 3-5.)[11] Nor did I/P Engine have support for its 20.9% apportionment rate for all reasons articulated in Defendants' JMOL Motion. (D.N. 834.)

---

[11]   During its closing argument, I/P Engine argued that the damages award should be based on its 20.9% apportionment and 3.5% royalty rates. It argued to the jury that the application of

But even were the reliance on the 20.9% apportionment somehow appropriate for the 2004 hypothetical negotiation, the changes in Google's system demonstrate it cannot be relied on now.  Dr. Becker arrived at his 20.9% rate examining a bar chart in a draft Google document called "Cumulative Product Impact on RPM."  (Trial Tr. at 815-16.)  Dr. Becker combined the "impact" for "Disabling," SmartASS," and "Promotion" bars and used that as the measure of his royalty base.[12]  (Trial Tr. at 802-05; 907-08; PDX076.)  But again, as of the date of the verdict, Google had completely removed QBB Disabling from AdWords.  (Furrow Dec. ¶ 9.)  Dr. Becker's 20.9% apportionment therefore includes revenue that he claims is attributable to features that AdWords <u>did not even have</u> at the time of the 2012 hypothetical negotiation.  And with the removal of QBB disabling for the other accused systems and removal of LTV based disabling for promotion and right side auctions, the bar chart has no relevance at all to accused functionality.  (Furrow Dec. ¶¶ 11-12.)  Thus, even if reliance on the bar chart was somehow appropriate at trial, there can be no legitimate basis to rely on it now.  (Ugone Dec. ¶¶ 31-33, 36.)

### 4. There Is No Basis To Double the Royalty Rate Based On "Changed Circumstances" or "Willfulness"

I/P Engine's overreaching is further shown by its request that the Court adjust the 3.5% royalty rate it argues for upward to 5% based on changed circumstances (effectively a 40%

---

these rates to the accused revenue resulted in damages illustrated in four bars on a demonstrative bar chart. (PDX 441;Trial Tr. 2005-08, 2069-70.) Although I/P Engine provided no total damages figure to the jury, when the numbers that appear to be shown by these four bars are added together, they result in approximately $118 million in damages. (D.N. 806 at 5 & Ex. 2.) The jury, however, awarded only $15.8 million against Google, which was approximately 13.4% of I/P Engine's demand. (D.N. 806 at 5 & Ex. 2.) The apportionment rate is, therefore, at most 2.8% (13.4% of the apportionment rate that I/P Engine used in its calculations). (D.N. 806 at 5-6.)

[12]  It is undisputed that the "Promotion" and "Disabling" measurements in this chart do not refer to changes made in the disabling and promotion functions themselves, not to the SmartAds pCTR used in those functions. (D.N. 321.)

increase), and <u>then</u> enhance that rate <u>again</u> to 7% based on alleged willfulness (another 40%

increase).  These duplicative enhancements are unjustified.

### (a)    "Changed Circumstances" Do Not Warrant An Enhancement

Initially, as detailed above, I/P Engine ignores the most significant changed circumstance

of all:  Google's removal of all accused "filtering" functionality.  *Riles*, 298 F.3d at 1312.  This

alone makes I/P Engine's request for "enhancement" meritless.

Nor do any of the supposed "changed circumstances" upon which I/P Engine relies

justify a 40% increase in the royalty rate.  I/P Engine argues that "the legal status" of the parties

to the hypothetical negotiation has been altered by the verdict that the patents were infringed and

not invalid.  But the 2004 hypothetical negotiation was premised on the assumption that the

patents were valid and infringed and understood to be so by the parties to the negotiation.  (Trial

Tr. 785-87, 790-91, 925 & 932-33.)  This is therefore not a changed circumstance.[13]

---

[13]   *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, No. 08cv1307, 2012 WL 1436569, at
*11-12 (W.D. Pa. Apr. 25, 2012) ("The jury was instructed to assume, for purposes of the
damages portion of the trial, that the '554 patent was valid and was being infringed . . . .  Thus,
because the jury found, in the third portion of the trial, that the claims of the '554 patent at issue
in the damages portion of the trial are, in fact, valid, there is no change in the circumstances from
the jury's award of a reasonable royalty."); *Mondis Tech. Ltd. v. Chimei Innolux Corp.*, 822 F.
Supp. 2d 639, 648 (E.D. Tex. 2011) ("Furthermore, when the jury determined damages based on
a hypothetical negotiation in 2005, it also assumed that validity and infringement for those
claims it found to be valid and infringed.  Therefore, InnoLux's status as an adjudicated infringer
(aside from potentially willfulness) has not changed the parties' bargaining position with respect
to the 2005 hypothetical negotiation as compared to the post-judgment negotiation."); *Presidio
Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-cv-335, 2010 WL 3070370, at *4 (S.D.
Cal. Aug. 5, 2010), *vacated in part on other grounds*, 702 F.3d 1351; *Cummins–Allison Corp. v.
SBM Co.*, 584 F. Supp. 2d 916, 918 (E.D. Tex. 2008) ("[A] jury finding of infringement and no
invalidity does not change any logically consistent analysis; rather, it merely confirms the
original assumption of those facts."); *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 918
(E.D. Tex. 2008) ("[I]t is logically inconsistent to argue that a calculation based upon
assumptions of infringement and validity would change when those assumptions are replaced by
jury findings of the same facts.").

While I/P Engine asserts that the verdict gives it greater negotiating power, it fails to explain how. The "difference" in the negotiating positions identified in many cases granting an enhanced post-judgment royalty "is largely due to the threat of an injunction, which 'serves as a big stick, essentially framing negotiation in terms of how much an adjudged infringer would pay for a license to continue its infringing conduct.'" *Presidio Components*, 2010 WL 3070370, at *4 ("Where, as here, an injunction is no longer proper, the Court is hard pressed to find in what material respect the situation is different now than it was during trial."). But I/P Engine is not seeking an injunction against practicing the patents. Further, because the Defendants no longer even arguably practice the patents, the threat of an injunction would carry little weight.

I/P Engine's remaining "changed circumstances" are equally unconvincing. I/P Engine is wrong when it claims that, unlike Lycos, it "protects, enforces and licenses its intellectual property rights and assets." (Motion at 7.) Lycos did protect its intellectual property rights by bringing lawsuits for infringement of patents in the same family against companies such as Netflix. (Ugone Dec. ¶ 8.) And I/P Engine's argument that, in 2012, "there is no doubt that the patented technology directly and substantially increased revenue by at least 20.9%" (Motion at 8), is based on the same faulty assumptions by Dr. Becker discussed above.

### (b)     There Is No Basis For Imposing a Willfulness Enhancement

I/P Engine argues that the royalty should be further enhanced because, it claims, any post-judgment infringement is willful. (Mot. at 9-12.) That is contrary to law and equity.

### (i)     Post-Judgment Royalties May Not Be Enhanced Under 35 U.S.C. § 284

I/P Engine contends 35 U.S.C. § 284 allows for enhancing a post-judgment royalty for willfulness. (Motion at 9.) Willfulness, however, has no place in a post-judgment royalty analysis. Section 284, entitled "Damages," only authorizes courts to increase "damages," not

equitable relief.  35 U.S.C. § 284.  As explained above, prospective royalties are equitable relief, not damages, and are therefore governed by Section 283, not Section 284.  *See Paice*, 504 F.3d at 1316.  The statute I/P Engine relies on simply does not apply.

Further, an injunction, including an injunction requiring payment of future royalties, must be crafted to prevent irreparable harm, not punish.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 449 F. App'x 923, 932 (Fed. Cir. 2011) (unpublished) ("The purpose of a permanent injunction is to prevent future infringement rather than … punish an infringer for past infringement."); *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1367 (Fed. Cir. 1998) (district court abused discretion in issuing permanent injunction that "amount[ed] to punishment of [defendant] for its infringement"); *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1549 (Fed. Cir. 1987) ("Punishment is not the purpose of an injunction.").  "Enhanced damages, however, are punitive, not compensatory."  *Whitserve*, 694 F.3d at 37; *see also Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) (similar).  Therefore it is not appropriate to add a punitive willfulness enhancement to an injunction to pay post-judgment royalties.

Finally, the issue of whether any infringement is subjectively willful is for a jury to decide, not a court.  *See Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989) ("Willfulness of behavior is a classical jury question of intent.").  There has been no jury determination that any infringement—whether pre- or post-trial—is, was, or will be willful.

(ii)    Plaintiff Fails to Meet Its Burden to Show Defendants Are Willful

Even if willfulness were relevant to an injunction to pay a post-judgment royalty, I/P Engine has not shown by clear and convincing evidence of post-trial infringement, let alone willful infringement under *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc), which requires which requires a showing that defendants' conduct was objectively

reckless. That standard is not met because there remain reasonable arguments about validity and infringement. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F. App'x 284, 291 (Fed. Cir. Jan. 7, 2008) ("Under this objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.").

Defendants continue to have good-faith, reasonable, non-infringement and invalidity defenses. Defendants have not exhausted their appeals, and the patents are being re-examined by the Patent Office, which raises a serious question as to their validity. In the pending re-examination of the '420 patent, the PTO has issued a ***Final*** Office Action rejecting all asserted claims as anticipated or obvious in light of five prior-art references. (Kammerud Decl., Ex. 25). And in the pending re-examination of the '664 patent, the PTO has found that five separate references each raise a substantial new question of patentability for all asserted claims. Kammerud Dec. Exs. 26 & 30; *see Plumley v. Mockett,* 836 F. Supp. 2d 1053, 1075 (C.D. Cal.2010) ( "While a substantial question of patentability raised by a reexamination request is not dispositive in a willfulness inquiry, it is certainly relevant."); *Lucent Techs., Inc. v. Gateway, Inc.,* No. 07–2000, 2007 WL 6955272, at *7 (S.D.Cal. Oct.30, 2007) (reexamination is "one factor" to consider in willfulness analysis). Further, as stated above, Google began removing the accused functionality even before the jury even reached a verdict. (Furrow Dec. ¶ 9.) Any alleged infringement between the time of the jury's verdict and the completion of Google's re-design was therefore not willful and was subject to reasonable validity and infringement challenges that had not been fully resolved.

> (iii)   Any Willfulness Enhancement Is Not Equitable

As discussed above, I/P Engine's request for an enhancement from a running royalty of 3.5% to 5% already took into consideration any alleged enhancement warranted by the changed

circumstances of the jury's findings and judgment against the Defendants.  Yet, I/P Engine asks

the Court to enhance the royalty rate again to 7%.  This is despite the fact that I/P Engine did not

even contend that Defendants' alleged pre-judgment infringement was willful.  Even assuming

that Defendants' alleged post-judgment infringement could be deemed willful, I/P Engine fails to

justify such a significant increase in the royalty rate.

To the extent the Court finds that willfulness is an issue at all, the factors relevant to

whether to enhance, set forth in *Read Corp. v. Portec*, 970 F.2d 816 (Fed. Cir. 1992), are:  (1)

whether the infringer deliberately copied the patentee's design or ideas; (2) whether the infringer,

after learning about the other's patent protection, investigated the scope of the patent and formed

a good-faith belief that it was invalid or not infringed; (3) the infringer's behavior as a party to

the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the

duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the

infringer's motivation for harm; and (9) whether the infringer attempted to conceal its

misconduct.  *Id.* at 827.  Because the *Read* factors were meant to evaluate pre-verdict

willfulness, however, many of the factors are irrelevant in the post-judgment royalty context.

*Mondis Tech.*, 822 F. Supp. 2d at 652-53.

Indeed, even if one assumes that post-judgment infringement is willful (which, as

discussed above, is not true) that would not mandate an enhancement of the royalty rate.  *See*

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1461 (Fed. Cir. 1998) (en banc) (affirming

denial of enhanced damages despite finding of willfulness).  Where the *Read* factors so indicate,

the Court may deny an enhancement of the royalty rate.  *See id.*; *see also Funai Elec. Co., Ltd. v.*

*Daewoo Elecs. Corp.*, 616 F.3d 1357, 1376-77 (Fed. Cir. 2010) (affirming denial of enhanced

damages in view of totality of circumstances despite finding of willfulness); *Juicy Whip, Inc. v.*

*Orange Bang, Inc.*, 382 F.3d 1367, 1373 (Fed. Cir. 2004) (same). I/P Engine acknowledges that enhancement is "committed to the discretion of the trial court." (Motion at 10.) The *Read* factors establish that no enhancement is warranted.

   ***Factor 1—Copying:*** Factor one—copying—weighs against enhancement. I/P Engine notes that Google cited the '420 patent during prosecution of one of its own patent applications and that Google did not introduce testimony explaining how the accused system was developed. (Motion at 10.) But even I/P Engine does not contend that this supports a finding of copying. Nor could it. *IpVenture, Inc. v. Cellco P'ship*, No. 10-4755, 2011 WL 207978 (N.D. Cal. Jan. 21, 2011) (dismissing claim of willful infringement where patentee merely alleged that its "patent application was cited in Defendants' patents"). Indeed, the Court excluded all arguments or alleged evidence on copying from trial in connection with willfulness. (D.N. at 705 at 7.) Accordingly, factor one weighs against enhancement.

   ***Factors 2 & 5—Good Faith Non-Infringement and Invalidity Belief and Closeness of the Case:*** Nor do factors two or five—a good-faith belief that the patents were invalid or not infringed and the closeness of the case—support enhancement. I/P Engine argues that the jury's verdict forecloses any good-faith belief that the patents are invalid or not infringed or that the case is close. (Motion at 10.) That is false. This Court had not yet ruled on renewed motions for judgment as a matter of law at the time of the 2012 hypothetical negotiation, Defendants have not exhausted their appeals, and as described above, the patents are being reexamined by the Patent Office. *See ActiveVideo*, 827 F. Supp. 2d at 656-57 (in context of a sunset royalty, noting that the defendant "will raise a substantial amount of complex issues to the Federal Circuit"

which "place [defendant] in a better bargaining position").[14] And Defendants have removed all accused "filtering" functionality, rendering the redesigned system non-infringing.

Even if Defendants had exhausted their appeals, had not designed around the patents, and the patents were not being reexamined, this factor would not weigh in favor of higher royalty. The decisions I/P Engine itself relies upon, such as *Affinity Labs*, state that these factors simply carry "little to no weight" or "less weight" in the context of a post-judgment royalty. 783 F. Supp. 2d at 902-03.

*Factor 4—Defendants' Size and Financial Condition:* I/P Engine argues that factor four—the size and financial condition of Defendants—favors enhancement, but it cites only evidence that Google is a profitable company. While Google is profitable, I/P Engine is owned by Vringo, a publicly traded corporation with a market capitalization of over a quarter billion dollars. (Ugone Dec. ¶ 61 & n.70.) Because all parties are large, publicly traded companies, this factor is neutral. *See Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) ("Defendant's size and financial condition should be viewed both relative to the Plaintiff and also individually to ensure that enhanced damages would 'not unduly prejudice the [defendant's] non-infringing business.'") (quoting *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 561 F. Supp. 512, 533 (E.D. La. 1981)).

*Factor 7—Defendants' Remedial Action:* Factor seven—remedial action by the Defendants—weighs against enhancement. As described above, Defendants removed the accused functionality.[15] This factor therefore weighs against enhancement.

---

[14]   The patents have less than three years before they expire. Therefore, even assuming the validity and patentability of I/P Engine's patents is eventually established, the appeal in this case and/or the reexamination proceedings are likely to last for a large majority, if not the entirety, of their remaining lifespan.

*Factors 3, 8, 9—Defendants' Litigation Conduct, Motivation For Harm, and Attempts*

*At Concealment:* The parties agree the remaining factors do not support enhancement. (*See* Motion at 10-11.)

\* \* \*

In sum, none of the *Read* factors support an enhancement. Even assuming I/P Engine had shown that a few of the *Read* factors support enhancement, a 40% enhancement is not justified.[16] Recently, for example, in *University of Pittsburgh v. Varian Medical Systems, Inc.*, 2012 WL 1436569, at \*11-13, the court awarded a post-judgment royalty at the same rate that the jury awarded for pre-trial damages where the patentee did not directly compete with the infringer and enjoining the infringer would actually harm the patentee because it would not receive ongoing royalties. The same reasoning applies here.[17]

---

[15] This factor at least does not weigh in I/P Engine's favor, as even the case that it relies on, *Mondis Technology*, states that this factor is entitled to little weight in the post-judgment context. 822 F. Supp. 2d at 653.

[16] *See Funai Elec.*, 616 F.3d at 1376 (affirming denial of enhancement where three *Read* factors favored patentee); *Energy Transp. Group, Inc. v. Sonic Innovations*, No. 05-422, 2011 WL 2222066, at \*16 (D. Del. June 7, 2011) (denying enhancement where defendant's size and financial condition favored enhancement); *Lee v. Accessories by Peak*, 705 F. Supp. 2d 249, 260 (W.D.N.Y. 2010) (denying enhancement where three *Read* factors favored patentee).

[17] The cases that I/P Engine cites are distinguishable. *Bard v. Gore*, 670 F.3d 1171, 1192-93 (Fed. Cir. 2012) (defendant was in direct competition with patentee); *Soverain Software v. J.C. Penney Corp.*, No. 6:09-cv-274, 2012 WL 4903268 (E.D. Tex. Aug. 9, 2012) (awarding an ongoing royalty rate of only between 0.875% and 1.05%); *Mondis Tech.*, 822 F. Supp. 2d at 653 (enhancement based on statement of the defendant's CEO that "[t]he issue of patent infringement is being taken too seriously," which showed a "lack of respect for this Court and the jury's verdict"). *Affinity Laboratories*, 783 F. Supp. 2d at 905, also relied on by I/P Engine, is limited to cases in which the plaintiff also sought a permanent injunction. *Univ. of Pittsburgh*, 2012 WL 1436569, at \*12 (distinguishing *Affinity Labs*).

## IV. I/P ENGINE'S ACCOUNTING REQUESTS ARE IMPROPER

If the Court grants a post-judgment running royalty, Defendants would agree to quarterly payments by wire transfer or in certified funds.[18] However, Defendants object to I/P Engine's other requests as inappropriate.[19] Specifically, the requirement that payment be made fourteen days after the end of each calendar quarter is not feasible. (Kuethe Dec. ¶6.) Google does not finalize its quarterly earnings figures until approximately two to three weeks after the end of each quarter, and Google's finance department typically requires up to thirty days to process a payment. (Kuethe Dec. ¶¶3-5.) Google would be able to complete such accounting and organize payment in sixty or more days after the end of the quarter. (Kuethe Dec. ¶7.) Further, there is no justification for imposing a 5% penalty for the failure to make a timely payment no matter the extenuating circumstances, or why the payment of interest alone would not be sufficient.

Nor should the Court impose a post-judgment royalty against the non-Google defendants. The parties' April 16, 2013 Stipulation provides "Because Google is indemnifying the other Defendants for the Judgment, Google will satisfy in full any Judgment amounts that remain after appeal against all Defendants." (Kammerud Decl., Ex. 28.) Google provides the accused instrumentalities and has records of the other parties' revenue from the accused products. (*See* Kammerud Decl., Ex. 29.) There is therefore no reason for the Court to impose a separate post-judgment royalty or reporting requirement against the non-Google defendants.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny I/P Engine's request for a post-judgment royalty.

---

[18] Defendants reserve the right to seek a stay of any royalty payment pending appeal.

[19] Although the Court has discretion to set the means of payment, the single case I/P Engine cites addresses a court's discretion in determining the amount of a post-judgment royalty award. *See Amado*, 517 F.3d at 1362, n.2.

DATED: May 13, 2013

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation,
IAC Search & Media, Inc., and Gannett Co., Inc.*

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile: (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &

DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile:  (415) 653-6444

*Counsel for Defendant AOL Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC  20006
Telephone:  (202) 420-2200
Facsimile: (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA  23510
Telephone:  (757) 623-3000
Facsimile:  (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

　　　　　　　　　　　　　　　　　　*/s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone:  (757) 624-3000
Facsimile:  (757) 624-3169
senoona@kaufcan.com