UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| I/P ENGINE, INC.   Plaintiff,<br><br>         v.<br><br>AOL, INC., *et al.*,   Defendants. | Civil Action No. 2:11-cv-512 |

**DEFENDANTS' OPENING BRIEF ON ISSUES RAISED IN THE COURT'S
AUGUST 14 ORDER**

Plaintiff has not, and cannot, meet its burden to demonstrate that the new AdWords system in place since May 11, 2013 ("New AdWords"), is no more than a colorable variation of the old AdWords system found to infringe by the jury ("Old AdWords"). Google has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in Old AdWords that were Plaintiff's sole basis for alleging infringement of the "filtering" steps in each asserted claim. Plaintiff claimed these steps were critical to reducing the number of ads eligible for auctions for ad space due to the then-existing computational limitations of Google's systems. Google has resolved these computational restrictions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ignoring these significant differences, Plaintiff argues New AdWords is no more than colorably different than Old AdWords due to one step in New AdWords that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But the patents do not claim, and Plaintiff's infringement theory as to "filtering" did not center on, the mere use of an LTV score. Rather, Plaintiff focused on <u>pre</u>-auction steps in which <u>every</u> candidate ad was reviewed to determine whether it would be eligible to enter the auction. Yet, Plaintiff now points to a step ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Not only is the ▮▮▮▮▮▮▮▮▮ far more than colorably different than anything Plaintiff pointed to in its infringement theory, but using ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is not "filtering" at all. If Plaintiff wishes to pursue this novel theory, it must prove it to a jury. Google's constitutional right to a jury trial and due process precludes Plaintiff from shoehorning New AdWords into the prior verdict. Thus, any post-judgment royalty must therefore be limited to the period before the changes to New AdWords were completed on May 11, 2013.

Even for this limited period, Plaintiff requests an inflated royalty that is inconsistent with the jury's damages award. The Court has ordered that a 20.9% apportionment rate must be applied to determine any post-judgment royalty. If the jury applied a 20.9% apportionment rate to the financial figures Plaintiff presented at trial (through a demonstrative), the jury's ultimate damages award is consistent only with an effective 0.5% royalty rate, not the 5.0% rate Plaintiff now seeks. Indeed, Plaintiff's 5.0% rate would yield damages for the first <u>12</u> months after judgment more than <u>seven</u> times the jury award for the <u>14</u> months from filing to trial.

**Factual Background**

## I. THE "OLD ADWORDS" SYSTEM THE JURY FOUND TO INFRINGE

The Old AdWords auction used a Long-Term Value ("LTV") score to determine which ads to show and what position in each slot to show them in. (Trial Tr. 1042:6-19; 1460:23-1461:12; Ungar Report ¶ 18.)[1] As shown in the graphic below, Google has both a both a "top" slot with up to three available positions, and a Right Hand Side (or "RHS") with up to eight available positions. In Old AdWords, Google computed up to two LTV scores for each candidate ad for each query: a "top" LTV score that was used to place ads in the top slot, and a RHS LTV score that was used to place ads in the right hand side slot. (Trial Tr. 1098:1-17; 1101:7-18; 1104:25-1105:15; Frieder Report ¶ 5; Ungar Report ¶ 18.) Ads were ordered by their top and RHS LTV scores within the top and right-side slots, respectively. (Trial Tr. 1101:7-18; 1104:25-1105:15; Ungar Report ¶ 18.) Thus, the ad with the highest LTV score for a

---

[1] Defendants have filed a motion for leave to file evidence in support of their positions as the issues raised in the Court's August 14 Order. Defendants provide pin cites to this evidence in their brief, not only in the event the Court grants leave to file the evidence, but also as an offer of proof regarding evidence that Defendants would present were the Court to consider it, whether at an evidentiary hearing or along with briefing.

given slot was in the first position for that slot, followed by the ad with the next-highest LTV score, etc.  (Trial Tr. 1102:14-1103:4; Ungar Report ¶ 18.)



Plaintiff's infringement theory did not depend on or accuse the auction itself, or anything that occurred after the auction.  Instead, Plaintiff focused solely on what occurred before the auction, and for the filtering limitations specifically, only three pre-auction steps – QBB disabling, Mixer disabling, and Promotion thresholding.  (Trial Tr. 1015:23-1016:8; Ungar Report ¶ 24; Frieder Dep. 40:16- 41:20 ("[W]hat I accuse is the filtering that occurs that prevents items from entering in the auction . . . .").)  QBB disabling used a query-independent predicted click-through rate (pCTR), a coarse estimation of the clickability of the ad in general, to disqualify ads from participating in auctions.  (Ungar Report ¶ 34; Trial Tr. 1096:14-1097:11; 1252:2-20.)  Although imprecise, disabling ads based on this static pCTR reduced the computational server load and time for each auction, since those servers did not need to compute runtime pCTR for each ad.  (9.20.13 Furrow Dep. 65:2-25; Ungar Report ¶ 21.)

3

The other alleged filtering steps, Mixer disabling and Promotion thresholding, further disqualified candidate ads from an auction. (Trial Tr. 495:20-496:8; 496:13-25; 1015:23-1016:8; Ungar Report ¶¶ 22-23.) These steps looked at the LTV scores described above for every candidate ad for each top and right hand side auction, and disqualified ads with LTV scores less than zero from each auction. (Trial Tr. 1102:13-1103:4; 1104:25-1105:10; Freider Report ¶ 5; Ungar Report ¶¶ 22-23.) As with QBB disabling, these steps reduced the number of ads in the auction and thus the computational load and time for those auctions. (Trial Tr. 1067:24-1069:14; 1102:13-1103:4; 1127:19-1131:7; 1994:1-22; Ungar Report ¶¶ 22-23; Freider Report ¶ 5.)

At trial, Plaintiff stressed the importance of using these accused filtering steps to reduce the number of ads that would participate in the auction. According to Plaintiff, they solved Google's "10 billion ads" problem, in that Google's databases had 10 billion ads but lacked the computational power to enter all these ads in the auction. (Trial Tr. 1994:1-3 ("Let's remember, on a big picture level, Google told you that it had 10 billion ads in its inventory. That's too much information."); *id.*, 1127:21-1128:11("Q. Google can't send all billion to the auction and return the ads in the time required for a user to get its search results, can't it? A. I don't think we've ever tried it."); *id.,*1067:24-1068:12 (similar cross-examination); Ungar Report ¶¶ 24-27.)

II.     GOOGLE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ FOR REASONS INDEPENDENT OF THIS LITIGATION

Google first began work on an overhaul to improve Old AdWords in April 2011, months before Plaintiff filed its complaint. (Ungar Report ¶¶ 29-30.) As part of these changes, it is undisputed that Google ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶¶ 38, 40; Freider Report ¶ 7.) This, by itself, demonstrates that there are more than colorable differences between Old AdWords and New AdWords.

4

New AdWords represents a fundamental change in how the accused product determines which ads to show. New AdWords calculates a separate LTV score for each candidate ad for each available position in each slot on the page. ▮▮▮

(9.20.13 Furrow Dep. at 38:8-39:8; Ungar Report ¶ 31.) Further, ▮▮▮ (9.20.13 Furrow Dep. at 39:22-40:2; 40:18-41:7; Ungar Report ¶ 31.) ▮▮▮ Thus, unlike Old AdWords, New AdWords ▮▮▮ (Ungar Report ¶¶ 38, 40; Frieder Report ¶ 7.)

These improvements took significant effort. For example, Google began working on ▮▮▮ (Ungar Report ¶ 35) and ▮▮▮ (Dkt. 940 ¶ 9.) ▮▮▮ (Ungar Report ¶ 35.)

## Argument

### I. PLAINTIFF DOES NOT, AND CANNOT, MEET ITS BURDEN TO SHOW THAT NEW ADWORDS IS JUST A COLORABLE VARIATION OF OLD ADWORDS

As this Court has found, Plaintiff bears the burden of showing that New AdWords is no more than colorably different from Old AdWords. (Dkt. 963, 7-8.) And it must meet this burden

5

through clear and convincing evidence. *nCube Corp. v. SeaChange Int'l, Inc.*, -- F.3d --, 2013 WL 5567555, at *3 (Fed. Cir. Oct. 10, 2013). In *nCube,* the Federal Circuit recently upheld a finding that the defendant's new product was more than colorably different where the defendant redesigned the product and the patentee subsequently claimed that an entirely different component that performed a different function than what Plaintiff pointed to at trial nevertheless infringed. *Id*. at *4-5. Similarly here, as detailed below, Google ███████████████ ███████████████, this modification is significant, and thus New AdWords is more than colorably different under established Federal Circuit precedent.

A. **New AdWords Is Significantly Different from Old AdWords**

The Federal Circuit stated in *nCube* that "the determination of whether more than colorable differences are present requires the court to focus 'on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims.'" *nCube*, 2013 WL 5567555, at *5 (quoting *TiVo v. EchoStar, Corp.*, 646 F.3d 869, 882 Fed. Cir. 2011)). "[T]he colorable-differences standard focuses on how the patentee in fact proved infringement, not what the claims require." *Id*. Here, Plaintiff's trial theory was that the accused "filtering" steps were critical to the operation of Old AdWords because Google was unable to run an auction with all 10 billion ads. (Trial Tr. 1067:24-1068:12; 1127:21-1128:11; 1994:1-3; Ungar Report ¶¶ 24-28.) It is undisputed that all three of the pre-auction "filtering" steps that Plaintiff pointed to at trial are ███████████████

Far from being mere cosmetic changes to create the appearance that the accused functionality had been removed, the changes in New AdWords represented a significant shift in how Google auctions ad space with very real impacts on Google's systems. For example,

6

███████████████████████████, again the central aspect of Plaintiff's infringement theory. (Ungar Report ¶ 44.) ███████████████████████████████████ ██████████████████████ QBB disabling disqualified ads from all auctions based on their "static" or query-independent pCTR scores, but New AdWords ███████████████ ████████████████████████████. (Ungar Report ¶ 45.) Notably, Plaintiff's expert, Dr. Frieder, points to nothing in New AdWords analogous to QBB disabling, and presents no opinion <u>at all</u> how AdWords ████████████ can be only a colorable variation of AdWords ████████████.

Further, like QBB disabling, Mixer disabling and Promotion thresholding disqualified ads before they could enter the auction to save computational resources. (Ungar Report ¶¶ 21-23.) Again, however, █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████ (Ungar Report ¶ 42.) ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (Frieder Report ¶¶ 7, 10, 18.) Due to these fundamental changes, Plaintiff cannot meet is burden of showing that New AdWords is just a colorable variation of Old AdWords. Rather, these significant changes renders the two systems far more than colorably different. *See nCube*, 2013 WL 5567555 at *3; *TiVo*, 646 F.3d at 882.

**B. Plaintiff Fails to Meet Its Burden to Demonstrate the Auction-Stop Test Renders New AdWords Just Colorably Different from Old AdWords**

The crux of Plaintiff's "no more than colorably different" position is that ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Frieder Report ¶¶ 7-9, 11.) ██

7

███████████████████████████████████████████████ is not the same (or even equivalent to) using an LTV score from each ad to prevent that ad from even participating in the auction. Mixer disabling and Promotion thresholding in Old AdWords compared <u>every</u> candidate ad's LTV scores to zero <u>before</u> the auction was run to determine whether that ad could compete in the auction. (Ungar Report ¶ 56; Trial Tr. 1102:14-1103:4; 1104:25-1105:10.) It is undisputed, however, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ (Ungar Report ¶¶ 48-65; PX-336 at 36.) This is especially true in light of Plaintiff's allegations at trial which did not concern any aspect of the auction at all, but only pre-auction steps. *nCube*, 2013 WL 5567555, at *5.

Further, as Plaintiff asserted at trial, QBB disabling, Mixer disabling, and Promotion thresholding functioned to ensure that the auction would not be overloaded with too many ads. (Trial Tr. 1067:24-1068:12; 1127:21-1128:11; 1994:1-3; Ungar Report ¶¶ 24-28). In *nCube*, the divergence between the <u>function</u> of what was accused at trial and what was pointed to as the supposed colorable difference, was a critical point of the Federal Circuit's analysis. *nCube*, 2013 WL 5567555 at *5 (finding old and new elements more than colorably different where they "are actually used in [defendant's] systems to perform distinct functions"). As in *nCube*, the ██████ ██████ does not, and cannot, achieve the identical functions as the previously accused filtering steps. While an ad failing the "filtering" steps in Old AdWords was disqualified from entering ensuing auctions altogether, ████████████████████████████████

8

███████████████████████████████████████████████████████████

███████████████████ (Ungar Report ¶ 55.) These distinctions show that the █████

█ is far more than colorably different from Mixer disabling and Promotion. (*Id.* ¶ 63.)

By analogy, in the case of *Petter Invs. Inc., Inc. v. Hydro Eng'g, Inc.*, 1:07-CV-1033, 2011 WL 2935411 (W.D. Mich. July 18, 2011), the court found that the difference between the counterdefendant's infringing wash pads and redesigned wash pads "is more than merely one of appearance; rather, it affects how the wash pad functions." *Id.* at *5. Due to this functional, non-cosmetic difference, the court ruled that "the differences between Petter's re-designed wash pads and the accused products are significant, such that the redesigned products are more than colorably different from the adjudged infringing wash pads." *Id.* The same is true here.

The importance of the difference between performing an item-by-item comparison of each ad to zero on the one hand, and ██████████████████████████████████ ███████████████████████████████████, is particularly shown by I/P Engine's own theories. As detailed further below, to distinguish the prior art Bowman patent, I/P Engine's validity expert Dr. Carbonell asserted that "filtering [] does not use a ranked list, but rather is an item-by-item process" (Dkt. 241-3, ¶ 90).

Plaintiff cannot circumvent Google's Seventh Amendment and due process right to a jury determination on whether New AdWords infringes by asking the Court to rule, in a post-judgment proceeding, that the never-adjudicated ████████ qualifies as "filtering." Rather, as the Federal Circuit has found, "[i]f the district court determines that there are more than colorable differences between the two devices, [Defendant] is entitled to a new infringement proceeding." *Tivo*, 646 F.3d at 884.

9

C.     The ███████████ Does Not Perform "Filtering"

To be entitled to an ongoing royalty, Plaintiff must also prove that New AdWords actually infringes the patents, including their "filtering" limitations. *Tivo*, 646 F.3d at 882-83. Plaintiff has not and cannot meet this burden. Filtering presupposes a plurality of items, with at least the possibility that some items will pass through the filter and others will be excluded. (Ungar Report ¶ 69.) This comports with the intrinsic evidence, which consistently show a plurality of informons being presented to the filter and some (not all) of these informons successfully passing through the filter. (*See, e.g.,* PX-001, 7:9-11; 26:40-43; Fig. 3 at Steps 110-115.) ████████████████████████████████████████

It is especially clear that the ███████████ is not "filtering" when one considers Plaintiff's validity theories, which bind it for purposes of infringement. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement."). In New AdWords, ████████████████████████████████████████ ████████ But when distinguishing the prior art, Plaintiff's validity expert, Dr. Carbonell, asserted that filtering <u>cannot</u> involve a comparative process. (Trial Tr. 1847:1-9 ("So filtering is done with a fixed criterion, a criterion that does not depend on the other items, and it does the processing one at a time <u>without comparing one item to another.</u>"); *see* Ungar Report ¶ 72.) Dr. Carbonell then concluded that the Bowman prior art reference does not engage in filtering, even though Bowman discards search results that fail to meet a threshold, because Bowman's thresholding process first requires ranking the search results relative to each other. (Trial Tr. 1852:11-20; Dkt. 241-3, ¶ 90 ("'Subsetting' as disclosed in Bowman is retaining a subset of a

10

ranked list either by thresholding on ranking values or retaining the top 'N' results. Bowman 9:58-64. <u>These techniques are relative and carried out with reference to the entire ranked list of search results. The use of these techniques is different than filtering, which does not use a ranked list</u>, but rather is an item-by-item process.") (emphasis added); *see* Ungar Report ¶ 72.) Since ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it cannot be considered "filtering" under Plaintiff's own validity theories.

Moreover, Dr. Carbonell testified that filtering is a "one by one" process in which each candidate item is compared to a standard to determine whether it should be kept or discarded. (Trial Tr. 1847:1-9; *see* Ungar Report ¶ 70.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as required for "filtering" under Plaintiff's validity theories. *See Amazon.com*, 239 F.3d at 1351; *cf. Petter*, 2011 WL 2935411, at *6 (finding re-designed wash pads more than colorably different from infringing pads where plaintiff's infringement claim against the re-designed pads would be in tension with plaintiff's validity theories). Therefore, New AdWords is not only colorably different, it does not infringe at all because its use of LTV scores is not "filtering."

## II. POST-JUDGMENT ROYALTIES SHOULD BE GRANTED UNTIL MAY 2013 AT THE LATEST, AT A ROYALTY RATE OF NO MORE THAN .5%

### A. The Court Should Apply the Jury's Effective .5% Royalty Rate.

The parties agree that the jury-awarded royalty should be the starting point for consideration of a post-judgment royalty rate. (Ugone Report ¶ 7, 16-18 & 48; Becker Report ¶ 7.) The Court ruled that the applicable royalty <u>base</u> is 20.9% of U.S. revenues, the same royalty base that Plaintiff presented to the jury. (Dkt. 963 at 6.) As a matter of mathematics, that means that the effective royalty <u>rate</u> that the jury applied was 0.5%. (Ugone Report ¶16.)

11

The demonstrative that Plaintiff used for its damages claim as to Google showed post-Complaint damages of roughly $118 million, based on a 20.9% apportionment factor for the royalty base and a 3.5% royalty rate. (PDX-441, Ugone Report ¶ 17; Trial Tr. 2008:19-2009:2.) Yet the jury awarded running royalty damages against Google of $15.8 million, only one-seventh of Plaintiff's $118 million demand. Because the Court has ordered the parties to use a 20.9% apportionment, the only way to square the jury's $15.8 million award against Google with the approximately $118 million number in Plaintiff's demonstrative is that the jury applied an effective royalty rate of 0.5%.[2] (Ugone Report ¶¶ 17-18.)

Contrary to Plaintiff's argument, the post-judgment royalty rate should be (if anything) lower than the pre-judgment rate that the jury found, not higher. (*See* Ugone Report ¶¶ 7-48.)[3] By the time of the post-judgment hypothetical negotiation, Google had contributed far more of its own improvements to the accused systems. (Ugone Report ¶¶ 37, 42.1.) These changes would have included, for example, the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ a significant part of Plaintiff's infringement theory, entirely from AdWords. Yet the contributions of the Patents would have remained static. While it is true that the parties would be negotiating in the shadow of a jury finding of infringement and validity, the parties to the 2004 hypothetical negotiation were also to assume infringement and validity. (Ugone Report ¶ 8 n. 15-16.)

---

[2] If one considers the aggregate $30.5 million that the jury awarded against all Defendants, rather than the $15.8 million that the Court awarded against Google, then the effective royalty rate that the jury awarded was 0.9% instead of 0.5%. (*See* Ugone Report ¶¶ 16-18.) However, the damages awarded against Google and the non-Google defendants were based on double counting of revenue because the demonstrative that Plaintiff told the jury to use in calculating damages against Google alone already included revenues attributable to the other Defendants. (Ugone Report ¶ 17; Dkt. 805 at 13.) Therefore, the appropriate award to consider as to all Defendants is the award against Google alone.

[3] Ugone performs the modified *Georgia-Pacific* approach ordered by the Court (Dkt. 963, 5), as detailed in his Declaration. Given the detail required, it is not practicable to address all the applicable *Georgia-Pacific* factors in this 15 page brief.

B.  **The 0.5% Effective Royalty Rate Should Be Applied with Recognition of Google's Non-infringing Alternative.**

It is undisputed that Google completed implementing the New AdWords system on May 11, 2013. As shown above, Plaintiff cannot meet its burden to show New AdWords is merely colorably different from Old AdWords and infringes after May 11, 2013. (Ugone Report ¶ 50.) The Court should therefore terminate any post-judgment royalty as of that date, at the latest.

The parties to the November 2012 hypothetical negotiation would also recognize that Google was in the process of implementing its planned transition to New AdWords by May 2013 and that any ongoing royalty would therefore be of a limited duration. The parties would also have realized, however, that Google could accelerate implementation of New AdWords and end any royalty obligations even sooner. (*See* Dkt. 963, 8 (noting relevance of ease and availability of non-infringing alternatives).) As detailed in the Ugone Report Google could have accelerated the implementation of New AdWords ██████████████████████████████

██████████████████████████████ which would have forced Google to incur roughly ██████████ in extra operating and engineering costs. (Ugone Report ¶¶ 51-52.) Under either of these scenarios the parties to the November 2012 hypothetical negotiation would negotiate a 0.5% running royalty rate (with the Court-ordered 20.9% apportionment rate) lasting until those changes could be implemented, together with a one-time payment of the costs of implementing the changes as the royalty for the remainder of the period through May 2013. (Ugone Report ¶¶ 49-53.)

In the event the Court finds that New AdWords is infringing and no more than colorably different from Old AdWords, the appropriate post-judgment ongoing royalty rate is 0.5%. As explained more fully above, assuming a 20.9% apportionment rate, the jury's damages award corresponds to a 0.5% royalty rate. This rate is consistent with the *Georgia-Pacific* factors,

13

including the absence of convoyed sales, the fact that Plaintiff and Google are not competitors, Plaintiff's willingness to license, Plaintiff's many licenses to the patents, and Google's overwhelming contributions to AdWords above and beyond what Plaintiff offered from a license. (Ugone Report ¶¶ 10-47.)

### C. Plaintiff Vastly Overstates the Appropriate Ongoing Royalty.

Plaintiff asserts the post-judgment royalty rate should be <u>5%</u> of revenues (applied to the court ordered 20.9%), which, as detailed above, would result in a <u>seven-fold</u> increase in post-judgment royalties against Google, compared to the pre-judgment damages that the jury awarded. Yet, Dr. Becker does not even attempt to justify diverging so greatly from what the jury did. He (like Plaintiff) just puts his head in the sand on the issue.

Dr. Becker's royalty analysis is riddled with further additional flaws. For example, as was the case at trial, the lodestar for Dr. Becker's post-judgment royalty analysis is three 2005-era agreements between Overture and other third-parties for licenses to Overture's '361 Patent (Ugone Report ¶ 44.) Although Dr. Becker testified at trial that he believed that a 2008 license was not probative of a 2004 hypothetical negotiation because it was too "temporally removed," he fails to explain how the Overture agreements, which are seven years "temporally removed" from the 2012 negotiation are nevertheless probative. (Trial Tr. 837:2-8; Ugone Report ¶ 44.) Dr. Becker also ignored real-world indicators of value that <u>are</u> temporally close to the 2012 hypothetical negotiation, such as Lycos' sale of the Asserted Patents to Plaintiff in 2011 for just $3.2 million. (Trial Tr. 192:23-193:4; Ugone Report ¶¶ 10, 12-14, & 67.) *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005) (reversing denial of motion for JMOL where the $15 million damages award did "not appear to take into account numerous factors" including the fact that the patentee purchased prior company owning the patents "for $20,000,000").

14

If the Court <u>did</u> find that the 2005 agreements licensing Overture's '361 Patent provide a valid proxy for the 2012 post-judgment hypothetical negotiation, as Dr. Becker asserts, the appropriate benchmark would be found in Google's actual license of the same Overture '361 Patent in 2004. Google's 2004 SEC filings gave a $28.5 million value to the stock that Google exchanged for that license. (Ugone Report ¶¶ 46-47.) It follows that, if a license to Overture's '361 patent is the appropriate proxy for the hypothetical negotiation, then Google would have been willing to pay no more than $28.5 million for a license to the Asserted Patents – *i.e.*, Google would have placed a $28.5 million cap on its royalty payments. Plaintiff recently accepted such a "capped" royalty when licensing the Asserted Patents to Microsoft in the post-judgment period. (Ugone Report ¶¶ 10, 15, 47.) Specifically, Plaintiff accepted a royalty payment from Microsoft of $1 million, plus 5% of Plaintiff's recovery against Google, but subject to a cap that would be triggered if "the amounts received from Google substantially exceed the judgment [$30.5 million] previously awarded." (Ugone Report ¶ 10.) It stands to reason that this unspecified Microsoft cap is less than $28.5 million, since it is a mere 5% of some number that "substantially exceeds" the current $30.5 million judgment against Google. Thus, if as Dr. Becker argues, a license to the Overture patents provides the best proxy for the November 2012 hypothetical negotiations, the parties would agree to a $28.5 million cap in the hypothetical negotiation in November 2012.

DATED: October 30, 2013      /s/ Stephen E. Noona
                             Stephen E. Noona
                             Virginia State Bar No. 25367
                             KAUFMAN & CANOLES, P.C.
                             150 West Main Street, Suite 2100
                             Norfolk, VA 23510
                             Telephone: (757) 624-3000
                             Facsimile: (757) 624-3169

15

senoona@kaufcan.com

David Bilsker
David A. Perlson
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700
davidbilsker@quinnemanuel.com
davidperlson@quinnemanuel.com

*Counsel for Google Inc., Target Corporation,
IAC Search & Media, Inc., and Gannett Co., Inc.*


 /s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile:  (757) 624-3169
senoona@kaufcan.com

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW,  GARRETT &
DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile:  (202) 408-4400

Cortney S. Alexander
FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 94111
Telephone: (404) 653-6400
Facsimile:  (415) 653-6444

*Counsel for Defendant AOL Inc*.

16

## **CERTIFICATE OF SERVICE**

I hereby certify that, on October 30, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jeffrey K. Sherwood
Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC   20006
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
sherwoodj@dicksteinshapiro.com
brothersk@dicksteinshapiro.com

Donald C. Schultz
W. Ryan Snow
Steven Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, VA  23510
Telephone:  (757) 623-3000
Facsimile:  (757) 623-5735
dschultz@cwm-law.cm
wrsnow@cwm-law.com
sstancliff@cwm-law.com

*Counsel for Plaintiff, I/P Engine, Inc.*

 /s/ *Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone:  (757) 624-3000
Facsimile:  (757) 624-3169
senoona@kaufcan.com